UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN DOE,<br>*Plaintiff*<br><br>v.<br><br>THE PENNSYLVANIA STATE UNIVERSITY<br><br>*Defendant* | : | Civil Action No. |

**COMPLAINT**

John Doe[1], a 2nd-year Penn State University (hereinafter "PSU" or the "University") Schreyer Honor College student, files this civil rights complaint seeking to redress the Pennsylvania State University's violation of his constitutional right to due process and his Title IX statutory right to equal treatment in the context of an ongoing sexual assault disciplinary prosecution. Mr. Doe's lawsuit seeks an immediate Court order enjoining PSU from re-instituting a University disciplinary prosecution against him following a prior University Title IX Hearing Panel's ("Panel") determination that his conduct, which largely consisted of "flattering" his accuser by, for example, texting her that he thought she was "beautiful", amounted

---

[1] A Motion for Leave to Proceed Under Pseudonym has been filed contemporaneously with this Complaint. Additionally, all the exhibits referenced in this Complaint are being filed under seal due to their contents. Exhibit Z is not referenced in this Complaint, but will be used as a reference in the Motion for Emergency Temporary Restraining Order and or Preliminary Injunction which will be contemporaneously filed with this Complaint.

to "pressuring" and "cajoling" which "coerced" her into agreeing to have sex. The prior Panel found Mr. Doe liable for sexually assaulting his accuser and imposed a one-year suspension and other requirements.

Weeks later, a PSU appeals officer set the Panel's determination aside finding that that they misinterpreted PSU's "consent" definition and ordered the Office of Student Conduct ("OSC") to convene a newly-constituted Panel to preside over a second attempt to discipline him. On July 16, 2019, just six days before the July 23, 2019 hearing is set to occur, PSU's Title IX Coordinator provided Mr. Doe a copy of a new "coercion" definition that explicitly includes "cajoling" as conduct that negates consent. Moreover, the University retrofitted its existing definition, still in place for other students, in an attempt to capture the conduct alleged in Mr. Doe's case.[2]

In this pleading, Mr. Doe alleges that PSU violated, and continues to violate, his constitutional and statutory rights to a fair, reliable and non-discriminatory disciplinary process. Specifically, the University's policies and practices, generally, and as applied to him specifically, violate his right to due process of law by prohibiting him from calling witnesses on his own behalf and confronting and cross

[2] On July 16, 2019, Chris Harris notified Plaintiff via email of Penn State's updated definition of "coercion," which redefined "coercion" to mean an "unreasonable amount of pressure to engage in sexual activity" including "duress, cajoling, compulsion or abuse". See Exhibit W. However, PSU's public and student-facing website, as of July 16, 2019, publishes the prior definition of coercion that does not mention "cajoling" or "pressuring". See Exhibit X.

examining his accuser and adverse witnesses. The University also failed to provide Doe with: a fair, unbiased and unconflicted tribunal comprised of individuals who are separate and apart from, and not under, the auspices of the University's Office of Student Conduct "prosecutor"; the presumption of innocence; the active and meaningful participation of his attorney "advisor", including their right to cross examine adverse witnesses; the equal opportunity to review and respond to evidence; an objective evaluation of all relevant evidence including exculpatory evidence, and; and the opportunity to respond to evidence before a determination is made. The University due process violation includes their *ad hoc* creation of a retrofitted "consent" definition which denies Doe of his right to advance notice of its sexual misconduct policy. The University also failed to follow its own policies including, but not limited to: its prohibition against presenting "new evidence" at a hearing by allowing the complainant to testify at length regarding facts and circumstances that were "new" and by simultaneously prohibiting Doe from making timely objections; OSC's case managers refusal to apply to the policy's definition related to her "gate keeping" function, and; its explicit appeal timing and disposition requirements. The University also violated Mr. Doe's statutory Title IX rights because the original Panel's erroneous finding resulted in an erroneous outcome resulting from impermissible gender discrimination.

John Doe filed this lawsuit because PSU's due process and Title IX violations deprives him of his right to an education, his Penn State degree, sullies his reputation, jeopardizes his future livelihood, and has caused him significant emotional distress. Doe is requesting an injunction so that the Court can provide relief to the irreparable harm the University has and is causing him as a result of an unfair process and delay.

## PARTIES

1. Plaintiff John Doe is a 19 year-old Penn State Schreyer Honor College sophomore majoring in Mechanical Engineering at the University Park campus of the Penn State University.

2. Defendant, The Pennsylvania State University ("Penn State"), is an educational institution established and operated by the Commonwealth of Pennsylvania with a principal place of business at 201 Old Main, University Park, Pennsylvania. Penn State operated under color of state law at all times relevant to this complaint.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over Plaintiff's claims arising under the United States Constitution and Title IX, pursuant to 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 1331 and 1343.

4. This Court has authority to issue the declaratory and injunctive relief sought in this matter pursuant to 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983, and Federal Rules of Civil Procedure 57 and 65.

5. This Court has venue for this claim pursuant to 28 U.S.C. § 1391. The Defendants are residents of the State in which this district is located and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTS

### A. Penn State Adopts and Pilots an "Investigative Model"

6. On April 4, 2011, the Office for Civil Rights ("OCR") of the U.S. Department of Education ("ED") sent a "Dear Colleague Letter" to colleges and universities (hereinafter referred to as the "Dear Colleague Letter"), including PSU. The Dear Colleague Letter provides a necessary set of background facts to this current action.[3]

7. The Dear Colleague Letter advised that, in order to comply with Title IX, colleges and universities must: institute prompt procedures to investigate and resolve sexual misconduct complaints and adopt a low "preponderance of the evidence" burden of proof to resolve sexual misconduct disciplinary complaints. The Dear Colleague Letter encouraged universities to focus more on victim advocacy. For example, the Letter ordered the schools to "minimize the burden on

[3] See Exhibit A.

the complainant," transferring alleged perpetrators, if necessary, away from shared courses or housing.

8. On September 22, 2017 the U.S. Department of Education issued new interim guidance on campus sexual misconduct and withdrew the "widely criticized" 2011 Dear Colleague Letter opining that the "withdrawn documents ignored notice and comment requirements, created a system that lacked basic elements of due process and failed to ensure fundamental fairness."[4]

9. On July 2, 2014, less than two months after taking office and in the wake of the Penn State/Sandusky sexual assault scandal, Penn State University President Eric Barron announced the formation of a Task Force on Sexual Assault and Sexual Harassment and charged it with making recommendations that would allow the University to "become the benchmark by which other universities are judged when it comes to sexual misconduct prevention and response."[5]

10. In its January 23, 2015, final report, the Task Force acknowledged that the context for its recommendation included:

> A growing national debate about higher education's response to the problem of sexual and relationship violence. The White House and Congressional leaders, spurred by student activists on college and university campuses, convened various groups to discuss the issue.

[4] See Department of Education Issues New Interim Guidance on Campus Sexual Misconduct, September 22, 2017 (available at https://www.ed.gov/news/press-releases/department-education-issues-new-interim-guidance-campus-sexual-misconduct).

[5] Exhibit B, Task Force on Sexual Assault and Sexual Harassment Report, January 23, 2015, p.1; http://www.psu.edu/ur/2014/Task_Force_final_report.pdf, hereafter, the "Report."

> Multiple federal guidelines were published. National higher education organizations sponsored related conversations across the country. The nation's news media increasingly focused their attention to the conflicts inherent in the problem. And the Department of Education continued to add new schools to its list of those colleges and universities under investigation for Title IX concerns—a sum that numbered eighty-six by early November, many of them among the most notable higher education institutions in the country, including Penn State.

11. Less than a month later, President Barron adopted each of the Task Force's 18 recommendations, including its recommendation that "the student conduct process at each campus move away from the traditional hearing process and embrace instead an investigative model for resolving sexual misconduct cases."

12. This "Investigative Model" would rely upon a professional investigator, rather than a hearing board, to conduct the required fact finding in sexual misconduct cases.

13. According to the Task Force, the Investigative Model would strike a balance between obtaining fair, accurate outcomes while avoiding the "undue stress and other harm too often caused by the current hearing model."

14. At the request of Defendant Barron, Danny Shaha, then Penn State's Senior Director of the Office of Student Conduct and Deputy Title IX Coordinator, revised Penn State's student discipline procedures to comply with the Report's recommendations.

15. Prior to the inception of the Investigative Model, disciplinary proceedings addressing sexual misconduct accusations provided the accused with, among other protections, the right to: a hearing where the parties and witnesses testified in person before a fact-finder and were subjected to cross-examination and a "clear and convincing" burden of proof.

16. Prior to the inception of the Investigative Model, Penn State's sexual misconduct disciplinary process afforded the accused the same type of protections that students accused of other disciplinary infractions, almost all of which are far less serious, were provided and still enjoy. Rather than maintain the traditional policies which afforded a fairer and more reliable investigative and hearing process, the University implemented its Investigative Model which was designed to favor student accusers over the accused.

17. On November 3, 2016, the U.S. Department of Education announced that it would levy a historic $2.4 million Cleary Act fine following their review of the university's handling of sexual misconduct incidents.

18. Although the initial Investigative Model provided for paperless "hearings" only, the University revised and reissued their Title IX procedures twice in 2016 and again in 2018. On information and belief, John Doe was prosecuted under the August 31, 2018, revision of the Code of Conduct ("the Code"[6]). On

[6] Exhibit C.

information and belief, the Office of Sexual Misconduct Prevention & Response's Student Title IX Report Procedures in place at the time John Doe was investigated is similar to the procedures currently in place.

**B. Penn State's Code's "Special Protocols for Title IX Allegations"**

19. Penn State's Office of Student Conduct ("OSC") is responsible for administering the University's discipline system and promulgated the Code of Conduct to outline the "standard procedures and practices of the University discipline process." The Code created special protocols (Section VI, D) for cases involving Title IX violations.[7]

**20.** The current Code of Conduct incorporates Penn State's current Sexual And/or Gender-Based Harassment and Misconduct Administrative Directive's "consent" definition[8]:

> Consent must be informed, freely given and mutual. If coercion, intimidation, threats or physical force are used there is no consent. If a person is mentally or physically incapacitated or impaired so that such person cannot understand the fact, nature or extent of the sexual situation, there is no consent. This includes impairment or incapacitation due to alcohol or drug consumption, or being asleep or unconscious, where the respondent knew or reasonably should have known that the person was incapacitated. Inducement of incapacitation of another with the intent to affect the ability of an individual to consent or refuse to consent to sexual contact almost always, if not always,

[7] *Id*. at pg. 18.

[8] AD85 Sexual And/or Gender-Based Harassment and Misconduct (Including Sexual Harassment, Sexual Assault, Dating Violence, Domestic Violence, Stalking, and Related Inappropriate Conduct) (Formerly Discrimination, Harassment.) https://policy.psu.edu/policies/ad85.

negates consent. Silence does not necessarily constitute consent. Whether a person has taken advantage of a position of influence over an alleged victim may be a factor in determining consent.

21. OSC refers all sexual misconduct accusations to the University's Office of Sexual Misconduct Prevention and Response ("OSMPR") which is responsible for "investigating allegations of Title IX violations." The OSMPR will "typically investigate such allegations" using an investigator designated by the Title IX Coordinator who will attempt to gather "reasonably available" information regarding the alleged incident.[9] This may include interviewing the Complainant, Respondent, and/or any other witnesses who are identified during the course of the investigation, as well as gathering available documentary, electronic, or physical evidence.[10]

22. The University permits the parties to have an "advisor," defined as any "person selected by the respondent or complainant to assist and accompany them through the University conduct process (including Disciplinary Conferences, Administrative/University Conduct Board Hearings, Sanction Reviews, and formal Appeals)."[11] The University prohibits the advisor from "perform[ing] any function in the process other than advising the party and may not make a presentation or

[9] The 8/31/18 version of the OSC policy states the "OSMPR will typically investigate such allegations utilizing the process articulated at http://titleix.psu.edu." See Exhibit C, 8/31/18 OSC policy, pg. 18.
[10] Exhibit C, 8/31/18 OSC policy, pg. 18-20; Penn State Student Title IX Report procedures at http://titleix.psu.edu/psu-title-ix-procedures/.
[11] Exhibit C, 8/31/18 OSC policy, pg. 18, 4.

represent the party."[12] The advisor "may not speak on behalf of the advisee" and the Code requires the "parties…to ask and respond to questions on their own behalf, without representation by their advisor."[13]

23. The investigator prepares a "draft Investigative Packet" at the "conclusion of the investigation" using the "material information gathered during the investigation," which does not "contain any findings of responsibility/non-responsibility."[14]

24. The Code requires that the parties be provided with the "opportunity to meet with the assigned investigator in order to review the draft Investigative Packet, submit additional information or comments, identify additional witnesses or evidence for the investigator to pursue, (and to) submit any additional questions that they believe should be asked of any other party or witness."[15] The investigator incorporates "any revisions or new information in to a final Investigative Packet within five (5) business days, if possible. The parties will be provided with an opportunity to review any new information that is added to the Investigative Packet before it is finalized."[16]

---

[12] *Id.* at pg. 4.
[13] *Id.* at pg. 4-5.
[14] Penn State Student Title IX Report Procedures at http://titleix.psu.edu/psu-title-ix-procedures/.
[15] *Id.*
[16] *Id.*

The University gives the investigator the ability to determine the scope of the investigation, who to interview, what questions to ask, and what information to include in the packet. The investigator is free to exclude information if s/he determines that the evidence is not "relevant" or "appropriate". The investigator does not report to the parties or the panel the information that s/he excluded from the packet or the investigation's purview – let alone why. The investigator decides what to include or exclude from the Packet; who to interview; how much or how little to follow-up on leads, and; how to characterize the information he had received. The investigator is not given the authority to compel a party or witness to engage in the process or to turn over evidence (such as text messages or medical records) even if potentially exculpatory. The policy does not give a party the right to challenge the investigator's "appropriateness" or "relevance" filters. The evidence is "filtered" through an investigator with little to no visibility into the guidelines or parameters guiding his decisions or "cabining his discretion."[17] In this manner, the University accords the investigator an unchecked and unreported evidence "funneling" role.

25. The investigator forwards the final packet to an OSC "Case Manager" whose job it is "to recommend charge(s) and sanction(s), to serve as University

[17] *Doe v. Pennsylvania State University*, 336 F.Supp. 3d 441, 449-450 (M.D.Pa. 2018).

presenters in [Title IX] hearing(s), and to monitor and mandate the completion of assigned sanctions."[18]

26. Pursuant to University policy, the case manager recommends charges and sanctions if s/he determines that the investigative packet "reasonably supports a code of conduct violation."[19] Although the Code contains an extensive "definition" section, it does not define "reasonably supports."

27. The "plausibility" standard in effect credits only the accusations of the accuser, who, on information and belief, are overwhelming women, by accepting her version as true and by discounting or ignoring issues relating to her credibility or information and evidence favorable to the accused.

28. If the respondent contests the charges, the case manager refers the case and the packet to a Title IX Decision Panel ("Panel") for a hearing that could result in sanctions "ranging from Suspension to Expulsion." The Panel consists of three University "staff" or "faculty" authorized by, and under the control of, the OSC's Senior Director to adjudicate a respondent's responsibility and sanction.[20] The University provides students facing misconduct charges in far less serious matters with a five-person panel that includes two students.

---

[18] Exhibit C, 8/31/18 OSC policy, pg. 5.

[19] *Id.* at pg. 18. Penn State Student Title IX Report Procedures at http://titleix.psu.edu/psu-title-ix-procedures/.

[20] Exhibit C, 8/31/18 OSC policy, pg. 6, 19.

29. The Code delegates prosecutorial, adjudicative, and sanctioning roles to the OSC; the OSC provides the "prosecutor" presenter to a Panel it selects and that operates under its authority, along with its "pre-hearing" finding that the investigative report "reasonably supports" a finding that the respondent violated the Code of Conduct.

30. The Code prohibits the parties from calling witnesses during the hearing, limiting participation to the parties alone and limiting the scope of any presentation to "highlight[ing] the information that they believe is most relevant to the hearing authority's deliberation" and "respond[ing] to questions that may be posed by the hearing authority and the Investigator, if any."[21]

31. Although the complainant and respondent may submit questions to be posed by the Panel chair to the other party, the Panel will only consider them as a suggestion.[22] The Panel alone determines what proposed questions it will ask and will refuse to pose any proposed question that they do not believe to be both "relevant" and "appropriate." The Code does not define "relevance" or "appropriateness."[23]

---

[21] *Id.* at pg. 20.
[22] *Id.*
[23] *Id.*

32. The parties or their advisors may not question, cross examine or confront the other party. The parties are not permitted to pose follow up questions to address question responses.

33. Once the hearing convenes, "no new information may be provided to the hearing authority, unless the person offering the information can show that the evidence was (1) "not available during the investigation;" and, (2) "relevant to establishing whether or not the Respondent is responsible for misconduct."[24]

34. If one party is allowed to introduce new information to the hearing authority, the policy provides that the "the other party [with the] opportunity to respond."[25]

35. Penn State's policies and procedures for adjudicating "Title IX allegations" limit an accused student's right to be heard in disciplinary proceedings to the right to be heard only on matters deemed "relevant" and "appropriate" by a "Title IX Compliance Specialist" and included in the "Investigative Packet," the exclusive vehicle for factual submissions to the "Title IX Decision Panel." Indeed, during the "hearing", the parties are permitted only to "highlight" portions of the packet.

---

[24] *Id*. at pg. 19-20.
[25] *Id*.

36. The Panel must use a "preponderance of the evidence" standard in determining whether the respondent is responsible for the charged misconduct.[26]

37. The Panel determines a sanction if it finds the Respondent responsible for violating the Code of Conduct. The parties are informed in writing of the hearing authority's decision and their rights to appeal the decision.[27] The parties are given five days to file an appeal.

38. A responsible student is permitted to appeal on three grounds: (1) the respondent has been "deprived of their rights and/or stated procedures were not followed that affected the outcome;" (2) "new evidence is presented, that was not available during the time of the original outcome, relevant to establishing whether it is more likely than not that the respondent is responsible for misconduct;" (3) the sanctions imposed "were outside the University's sanction range for such violations and/or not justified by the nature of the offense."[28]

39. The Student Conduct Appeals Officer "will review the case records and any additional information that is submitted as may be requested by the Student Conduct Appeals Officer. The original decision(s) regarding responsibility and sanction(s) may be sustained, modified, or reversed."[29] The Code does not allow for

[26] *Id.* at pg. 20.
[27] *Id.*
[28] *Id.*
[29] *Id.*

any decision to be overturned or modified without "consultation with the Vice President for Student Affairs, Senior Director, or Chancellor."[30]

40. The Code provides that the Appeals Officer "will typically" issue a decision within five (5) business days of receiving the appeal request and the respondent will be notified in writing if applicable.[31]

41. There is no further avenue for review following disposition of the appeal.

**C. The Alleged Incident, Roe's Complaint, and the Investigation**

42. In the Fall of 2017, John Doe enrolled as an 18-year-old freshman in the Schreyer's Honors College. The College awarded him with an Academic Excellence Scholarship as part of his acceptance to this prestigious program.[32]

43. During the Spring of 2017, Doe and Jane Roe, who also accepted into the Schreyer's Honors College, became acquaintances seeing each other in group settings at official events such as new student orientation before the official start of their college experience at Penn State.

44. On January 26, 2018, Doe saw Roe in a University computer lab and they started talking, which quickly turned into mutual flirting. As Roe was leaving

[30] *Id.*
[31] *Id.* at 27.
[32] Exhibit D, Acceptance to Schreyer College

the lab, she put her number in Doe's phone so that they could continue their flirtation and texted herself "I LOVE YOU".[33]

45. Jane Roe and John Doe continued to send each other flirtatious texts throughout the day. Later that afternoon, Jane Roe texted Doe asking him if she could come to his room wearing her "jammies" to "nap" after informing him that her room had flooded.[34]

46. Doe agreed, and Roe went to his room and lounged on his bed. Doe's roommate was initially present. Roe remained in his room with Doe's roommate after Doe left for class. Roe stayed in Doe's room alone after Doe's roommate left for class.[35]

47. Roe remained in Doe's dorm room until he returned from class. Doe and Roe sat on Doe's bed, cuddled, and continued to flirt. They discussed having sexual intercourse together. Roe asked Doe if he had ever been tested for sexually transmitted diseases (STDs). Roe informed Doe that she wanted him to be tested. Doe and Roe discussed their prior sexual experiences and history. Roe disclosed to Doe that she had sex with five other male partners in the past month following a break-up. Roe also told Doe that she had recently been accepted into another University for the Fall of 2018 and, at the time, was likely to transfer.

---

[33] Exhibit E, Text Messages between Roe and Doe on January 27-28, 2017
[34] *Id.*
[35] *Id.*

48. In order to extend their time together, Roe texted her friends to tell them that she would not be going to dinner with them as planned. Roe and Doe continued flirting and cuddling in his room. Doe and Roe separated when Doe left to attend a fraternity function.

49. Roe and Doe recommenced their flirtatious texting following the function. During a text exchange about being "friends with benefits", Roe texted Doe that she was not going "fuck [him]" because they could not have sex and remain friends. Shortly thereafter, she texted it had only been two days since she last had intercourse and was already "tempted" by him and "I mean c'mon, I can't fuck 5 guys in one month. That's probably really bad."[36]

50. Roe confirmed with Doe that her roommate was not in her room and texted Doe her dorm room number. Doe arrived at approximately 1 a.m. on January 27, 2018. Roe and Doe sat on Roe's bed, talked for a little while, and eventually began to make-out and undress. Roe and Doe engaged in consensual kissing and fondling.

51. In his statement to the Panel, Doe stated that:

a. Roe asked him to "finger" her vagina and he complied;

b. He immediately stopped when she asked him "how many fingers" he was using and told him that it "hurt";

---

[36] See Exhibit E.

c. He asked Roe whether he should stay or leave when she went to the bathroom. She told him she wanted him to stay;

d. After returning from the bathroom, Roe got him a condom and told him to use it;

52. In July 2018, Roe initiated the Penn State Office of Sexual Misconduct Prevention and Response formal complaint process.[37]

53. On August 2, 2018, the University notified Doe for the first time that a complaint, alleging that he "engaged in sexual intercourse and digitally penetrated [Roe] without consent," had been filed against him.[38]

54. Then Investigator Spencer Peters—now the Director of the Office of Sexual Misconduct Prevention & Response—was tasked with conducting the University's investigation.

55. After the filing of the complaint and during the investigation, Roe told the Investigator Peters that Doe performed oral sex on her for a few seconds and that it would stop when she moved away. Doe agreed that he briefly performed oral sex on Roe but that it ceased when Roe requested that Doe "finger" her vagina instead. Roe stated that she asked Doe how many fingers he was using and that he stopped fingering her when she told him that it hurt.

[37] Exhibit F, August 2, 2018 Notice of Investigation from Investigator Spencer Peters.
[38] *Id.*

56. According to Roe, Doe asked her whether he should stay or leave when she was leaving her dorm room to use the bathroom. She told him to stay, provided Doe with a condom, and told him to put it on after she returned to her room.

57. Roe told the investigator that she positioned herself in front of Doe on her hands and knees so that they could attempt to have sex in that position.[39] Roe and Doe attempted to have intercourse in that position, but Doe stopped when Roe indicated that the position was not "working" and it "hurt." Roe repositioned herself so that she was straddling Doe as he laid in a supine position. Doe and Roe agreed that Doe stopped trying to have intercourse with her when he realized that his penis was not fitting inside her.

58. Later that afternoon, Roe texted Doe "[h]ow was the doctor?" which, on information and belief, referenced their prior communications about STD testing and specifically, whether he had been tested so they could continue their sexual relationship.[40] Roe continued to send Doe flirtatious texts and told her friends that she wanted to have sex with Doe again under her "terms." Doe did not immediately receive or respond to Roe's texts because his phone was broken. [41]

---

[39] Roe later altered her account to the OSC Investigator and claimed she tried to get away from Doe after the initial intercourse attempt. She further claimed that Doe picked her up while Doe was lying on his back and forced her on top of him placing her in a straddling position. Doe denied these claims; at no time did Roe indicate that she did not consent and at no time did Doe use physical force to prevent Roe from extracting herself from the situation.

[40] References to these texts are contained in the Investigative Packet. The university does not provide the parties with a copy of the investigative file.

[41] Exhibit E, Text messages between Roe and Doe post-alleged incident on January 29, 2018.

**D. The Hearing**

59. The OSC selected the members of a three-person Title IX Decision Panel to preside over Doe's April 12, 2018, hearing. Prior to the hearing, OSC case manager and Interim OSC Senior Director, Karen Feldbaum, provided the investigative packet to the Panel and advised them that she had concluded that the investigation packet "reasonably supported" a finding that Doe had violated the code of conduct by engaging in nonconsensual sexual intercourse and nonconsensual digital penetration of Roe.

60. On information and belief, Ms. Feldbaum performed her gate-keeping function using a significantly weaker "plausibility" rather than "reasonably supports" standard.

61. On April 10, 2019, Mr. Doe emailed Ms. Feldbaum a letter outlining various concerns relating to the University's Title IX disciplinary process.[42] With respect to his "objections", Mr. Doe wrote:

- I am prevented from calling witnesses on my own behalf to provide live testimony before the fact finders. This is especially critical given the "he said/she said" nature of the allegations;
- I am prevented from confronting and cross-examining my accuser and any adverse witnesses. Again, this is critical given the credibility issues involved in a "he said/she said" allegation;
- I am prevented from having an adjudicative tribunal comprised of individuals who are separate and apart from, and not under the auspices of, the University's Office of Student Conduct;

[42] Exhibit T, April 10, 2019 Letter Regarding Objections to April 12, 2019 Hearing.

- The process divests me of a presumption of innocence given your determination that the evidence "reasonably supports" a conclusion that I committed a sexual assault and your decision to provide this conclusion to the panel members prior to the hearing;
- The process prevents me from having an advisor that can actively and meaningfully participate in this process including, but not limited to, conducting cross-examination of the accuser and adverse witnesses;

I also believe that Penn State's policy permitting the investigator to act as a funnel in regard to what evidence it presents to you and the panel violates Due Process. As you know, Penn State's policies gives the investigator unilateral decision-making power to determine what information regarding the incident is "relevant" and "appropriate". I was unable to find any definition of "appropriate" in the policies. Moreover, I have no idea what information was given to the investigator and excluded from the packet. I also object to the fact that the policy prevents me from having an opportunity to ask follow-up questions to my accuser after she responds to any questions that panel agrees to provide to her.

The University never responded to or addressed Mr. Doe's objections.

62. During the hearing, the Panel Chair cautioned Roe and Doe that no "new information" could be provided during the hearing and they were only permitted to "highlight" information contained in the investigative packet.

63. Notwithstanding this instruction, the Panel permitted Roe to present extensive "new" information -- all of which was available during the course of the investigation. This information included her providing an *ad hoc* explanation of the meaning of her texts and prior statements to the investigator in an effort to explain

unfavorable and contradictory information in the packet. The new evidence also included testimony that witnesses, who she had not disclosed during the investigation, would corroborate the new information she was providing.

64. By permitting Roe to present "new" evidence during the hearing, the Panel prevented both Doe and the Investigator from following up on her statements and corroborating witnesses claim. Moreover, by permitting Roe to present "new" evidence, the Panel gave her the opportunity to provide additional information not contained in the packet, which allowed her—uncontrolled and unconstrained—to explain away weaknesses and inconsistencies in her narrative.

65. The Panel chair cut Doe off when he attempted to object to the new evidence and told him to wait until she was finished with her testimony. The Panel chair then dismissed Doe's objection and offered the nonresponsive explanation as to why he permitted the new evidence: Roe was "sharing her testimony".

66. Following Roe's testimony, Doe provided the Panel with approximately 40 questions that he wanted the Panel to ask of Roe. The Panel agreed to ask approximately seven. One of the lines of inquiry that the Panel refused to question Roe about related to statements she made to her medical providers that directly contradicted evidence in the Packet and which she was permitted to reconcile by providing new evidence during her testimony.

67. In the late afternoon of Friday, April 12, 2019, Interim OSC Director Karen Feldbaum informed Mr. Doe that the Decision Panel found Mr. Doe responsible for violating 2.03 Nonconsensual Intercourse and 2.05 Nonconsensual Penetration, Digital, or with an Inanimate Object. The sanctions included a conduct suspension through the end of the Fall 2019 semester, psychological assessments, and participating in any recommended educational programming related to the alleged violation.[43]

**E. The Panel's Decision, the Title IX Coordinator's Inquiry into the Decision Panel's Rationale, the Intervention by the Assistant Vice President of Student Affair's Admission, and the Appeal**

68. On April 22, 2019, Ms. Feldbaum provided Mr. Doe with a copy of the Title IX Decision Panel Report.[44] The Panel wrote that the "evidence supported 'coercion' on the part of the respondent" because Doe "pressu[ed] and cajol[ed] the complainant" into having sex with him.[45] The Panel found that the sex was nonconsensual despite Roe's explicit verbal consent – here is a condom, use it – because it was the product of Doe's flattery which, it reasoned, amounted to "cajoling" and "pressure" which it viewed as impermissible "coercion". Ultimately, the Panel determined that Roe "could not provide consent" because "there was

---

[43] Exhibit H, April 12, 2019 Correspondence from Karen Feldbaum indicating DP found Doe responsible.
[44] Exhibit I, Title IX Panel Decision Report
[45] *Id.* at pg. 2.

coercion."[46] Having so concluded, the Panel never opined on whether it felt that Doe knew, or should have known, that the sexual contact was nonconsensual.

69. On April 26, 2019, Ms. Feldbaum informed Doe that after reviewing the Panel's decision, Title IX Coordinator Chris Harris wanted an "opportunity for conversation with the Panel to clarify some of their findings, prior to taking any additional steps in our process."[47] The Code of Conduct makes no provision for such a review.

70. On April 26, 2019, Mr. Harris requested that the Panel chair provide him with clarification regarding the "coercion" finding and an explanation as to why they concluded that Doe's "behavior was consistent with that definition."[48] Mr. Harris asked the chair for clarification regarding whether and why the Panel credited "the complainant's contention".[49] Additionally, Mr. Harris asked the Panel to elaborate on why they determined that the complainant was "credible" and the "respondent determined to be non-credible."[50]

71. The Chair responded by referencing the "texts back-and-forth and the Respondent's persistence to go to her room" as evidence that the "the respondent was being coercive."

---

[46] *Id*. at 3.
[47] Exhibit J, 4/26/19 email from KF RE_Panel Decision Delay email
[48] Exhibit K, April 26, 2019 Correspondence From Chris Harris to Dr. Jamey Perry at pg. 1.
[49] *Id.*
[50] *Id*.

72. On April 26, 2019, Ms. Feldbaum informed Doe that the University had "placed the time frame for receipt of any request for appeal on hold." [51] Mr. Doe nonetheless submitted his appeal on April 29, 2019, because PSU's Code of Conduct contains no provision permitting the University to place an appeal on hold.

73. On May 14, 2019, Mr. Harris informed Doe that he had received responses to the questions he posed to the Panel and his questions "were not designed to change the panel's decision, and their original decision remains unchanged, pending appeal by one or both parties."[52]

74. On May 15, 2019, Mr. Harris provided Mr. Doe with a copy of his memo to the Title IX Decision Panel Chair and the Panel's response to the two questions.[53] The Chair responded:

> The panel felt that the respondent's continual flattery (some examples: "Haha nah you beautiful" followed by two wink emojis, then followed by "I wanna be both" and "You're beautiful" and I'm not that emotional, I could be both" after she clearly stated "Still not gonna fuck u, friend" followed by two squinting face with tongue emojis and her statement that [hooking up] "ruins friendships, constitutes cajoling. The text message thread on pp. 69-73 shows that the respondent continued to pressure the complainant, even after the lack of desire to hook up had been clearly stated in these text messages.
>
> Likewise, the complainant's description of the respondent's continual attempts to remove her clothing, his continual pressuring

[51] Exhibit J, April 26, 2019 Email from Karen Feldbaum to Doe.
[52] Exhibit L, May 14, 2019 Email from Chris Harris to Doe.
[53] Exhibit M, May 15, 2019 Email from Chris Harris to Doe; Exhibit N, Decision Panel Response to Chris Harris' Memo.

> of her (stopping, then starting up again even after she continued to express her lack of desire to engage in the behavior) constitutes coercion in that it appears the respondent used pressure and cajoling to compel the complainant to choose to allow him to have sex with her. Likewise, the complainant stated that "She no longer had the guts to keep telling Mr. [Doe] to stop since he just kept going further each time and would not listen to her requests."
>
> The panel found the complainant more credible, as the complainant was able to offer specific details as to the interaction which were consistent not only throughout the investigation, but also with the text message thread provided. Conversely, the respondent was unable to provide nearly any details regarding the incident until such time as he reviewed the packet, even though the respondent claimed to have not been intoxicated during the encounter. This lack of information provided led the panel to believe that the respondent may have been more intoxicated than he had indicated, thus harming his credibility.[54]

The Chair explained that the Panel could not find valid consent where "the actions of pressuring and cajoling were present . . . ."

75. Mr. Harris also provided Doe with a draft Decision Panel report which suggested that the Panel provided Ms. Feldbaum with the draft and was prepared to incorporate her suggested "adjustments" or "clarifications".[55] The Code contains no provision permitting an OSC case manager, the University's prosecutor, to edit, modify or provide rationale for, a Panel's decision.

76. On May 23, 2019, Danny Shaha, the Assistant Vice President of Student Affairs, acting as Ms. Feldbaum's "designee", intervened in Doe's appeals

---

[54] Exhibit M pgs. 7-8 (internal citations omitted).
[55] Exhibit N at pgs. 4-5.

process and requested a review of the decision made by the University Conduct Board. Specifically, Shaha informed Associate Vice President and Associate Dean for Undergraduate Education, Dr. Alan Rieck, the OSC-designated appeals officer, that based upon the "entire investigative packet, the recording of the hearing, the board report and additional information shared by the board chairperson (provided in response to questions posed by the University's Title IX Coordinator), it appears that, in this case, the board may have misinterpreted the University's definition and application of 'coercion."[56]

77. Instead of reversing the Decision Panel's determination which was based upon a factual record that did not meet the University's "consent" definition, Mr. Shaha "formally request[ed] that [Dr. Rieck] refer the case to a new hearing board" and reassured Dr. Rieck that the OSC and Title IX Coordinator " will be sure to clarify the definition of coercion and related concepts to the new hearing board members."[57]

78. Although Mr. Shaha's letter was dated May 23, 2019, the University did not provide Mr. Doe with a copy until May 29, 2019. Mr. Doe informed Ms. Feldbaum on May 30, 2019 that the University's ongoing delay in adjudicating his

[56] Exhibit P, May 23, 2019 Letter from Shaha to Dr. Rieck
[57] *Id*.

appeal was "critical and prejudicial" to him since he had several transfer applications to other universities pending with looming deadlines.[58]

79. On May 28, 2019, Mr. Doe submitted a second appeal.[59]

80. On or about June 4, 2019, Mr. Doe submitted a response to Mr. Shaha's letter to Dr. Rieck requesting that he reverse the Panel's finding of responsibility given that their factual findings were insufficient to meet the University's burden of proving that Doe sexually assaulted the Complainant notwithstanding consent.[60] Dr. Rieck did not respond to Mr. Doe's letter.

81. Instead, on June 13, 2019, Dr. Rieck ordered that Roe be given the opportunity to present her allegations to a new Title IX Decision Board. According to Dr. Rieck, "[t]he sole grounds for making this judgment is the failure to follow university procedures, such that the outcome may have been different when a misinterpretation of the university's definition of the word 'coercion' was used and applied by the Title IX Decision Board."[61]

82. According to the Code of Conduct, an Appeal officer may only "sustain[], modif[y] or revers[e]" the "original decision(s) regarding responsibility and sanction(s)".

---

58 Exhibit O, May 29, 2019 Email from Doe to Karen Feldbaum.
59 Exhibit Q, Doe's Appeal of the Panel Decision Submitted on May 28, 2019.
60 Exhibit R, Doe's Letter to Dr. Rieck in Response to Shaha's May 23, 2019 request.
61 Exhibit S, June 13, 2019 Appeal Ruling by Dr. Rieck.

83. By July 5, 2019, email, Ms. Feldbaum informed Mr. Doe that a new hearing will be scheduled on July 26, 2019. On July 11, 2019, six days later, Ms. Feldbaum informed Doe that the hearing will be moved up by three days to July 23, 2019.[62]

84. On July 16, 2019, six days before the second hearing is set to occur, the Title IX Coordinator provided Mr. Doe with a copy of a new "coercion" definition that explicitly includes "cajoling" as conduct that negates consent. The new "coercion" definition states:

> "Coercion" is an *unreasonable amount of pressure* to engage in sexual activity. Coercion is more than an effort to gain consent, or persuade, entice, or attract another person to engage in sexual activity. Coercion includes elements of pressure, (e.g., duress, cajoling, compulsion or abuse).
>
> When determining if an individual's behavior constitutes coercion, context is everything. For example, seduction is reasonable, and coercion as unreasonable. Seduction is welcomed sexual advances that may initially be rebuffed but where the object of the pressure ultimately wants to be convinced to engage in sexual activity or welcomes the activity, or a reasonable person would perceive it so.
>
> Coercion, however, is the point where the pressure is or becomes objectively unwelcomed and unreasonable, or the point when a person concedes to sexual activity due to the use of words or behavior that causes or threatens to cause severe emotional distress and/or psychological harm.
>
> It's important to realize that people negotiate sex all of the time. Some amount of pressure may be okay, but too much pressure crosses the line and becomes unreasonable.

[62] Exhibit U, July 5 and 11 Emails Scheduling New Hearing.

> In determining what is an unreasonable amount of pressure, case managers, hearing officers, and panels should consider four factors: (1) duration (over what period of time is the pressure occurring?), (2) frequency (how many times is the pressure occurring?), (3) isolation (does the respondent isolate the complainant while pressuring, and does that change the dynamic?), and (4) intensity (does the respondent move beyond trying to convince the complainant of the respondent's sexual prowess or how badly the respondent wants sex and turn the tables on the complainant, attacking the complainant's values, morals, religion?).
>
> After considering all of the factors noted above, if it is determined that the amount of pressure was *unreasonable*, then coercion was present and there was no consent. If, on the other hand, after considering the factors noted above, it is determined that the presented pressure does not rise to the level of unreasonable, then coercion was not present.[63]

85. Although the University is ordering the Panel to use this new definition, it continues to publish the original definition on its web site. [64] On information and belief, the University retrofitted its "consent" definition in an attempt to ensure that a second panel would find Mr. Doe liable.

86. The University's delay in prosecuting Mr. Doe has severely and irreparable prejudiced his ability to transfer to other colleges and universities. Mr. Doe has extremely strong academic credentials including: (1) high school valedictorian; (2) high school GPA of 4.0; and (3) Penn State GPA for first year of 3.8. By any academic measure, he would be a strong transfer candidate.

---

[63] See Exhibit W.
[64] See Exhibit X.

87. The University's delay has prevented the Plaintiff from transferring to another college or university given the timing and ongoing nature of OSC's disciplinary process. For example, on July 3, 2019, the University of Miami rescinded their offer of acceptance.[65] Defendant's delays through this process has precluded the Plaintiff accepting an offer in good faith because the disciplinary action remains open. Mr. Doe's only open acceptance is to Arizona State University. Any additional delay at this critical juncture will result in the passing of looming deadlines and Mr. Doe's preclusion from transferring.

88. The University's ongoing disciplinary prosecution has resulted in a gap or lapse in Doe's education and damages to his reputation.

89. Plaintiff was entitled and continues to be entitled to a process commensurate with the seriousness of the allegation and the potential discipline, sanctions, and repercussions facing him. The allegations in this case and the ongoing pendency of this disciplinary process will have lifelong ramifications for the Plaintiff including time lost in a prestigious program, delays in education or entering the workforce, and inability to transfer to another university given the ongoing nature of this disciplinary inquiry.

## CLAIMS FOR RELIEF

### COUNT I
***Violations of the Fourteenth Amendment and 42 U.S.C. §1983***

---

[65] See Exhibit V.

90. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

91. The Fourteenth Amendment to the United States Constitution provides that no State shall "deprive any person of life, liberty, or property without due process of law."

92. Plaintiff has a property interest protected by the Fourteenth Amendment in continuing and finishing his education at Penn State University.

93. Plaintiff has a liberty interest protected by the Fourteenth Amendment in continuing and finishing his education at Penn State University.

94. The University violated Doe’s right to due process by:

a. Preventing him from calling witnesses on his own behalf and from confronting and cross examining his accuser and adverse witnesses.

b. Failing to provide him with a fair, unbiased and unconflicted tribunal comprised of individuals who are separate and apart from, and not under, the auspices of the University’s Office of Student Conduct “prosecutor”;

c. Failing to accord him the presumption of innocence;

d. Denying him the ability to have an advisor that can meaningful participate in the proceedings including in the conduct of cross examination, and;

e. Denying him a fair and objective evaluation of all relevant evidence including exculpatory evidence, and;

95. The University violated Mr. Doe's due process rights by failing or refusing to follow its existing disciplinary policies and procedures.

96. The University violated Doe's right to due process by material changing and retrofitting its consent definition days prior to the second hearing. As a result, the University failed to provide Doe advance notice that his alleged behavior constituted a violation of its sexual misconduct policy.

97. By amending its definition of consent days prior to the second hearing, and by refusing to reopen the investigation, the University denied Doe the right to an investigation informed by this new definition.

98. The process due to Doe in the April 12, 2017, disciplinary proceeding included the right to a standard of proof commensurate with the interests at stake, namely, proof by clear and convincing evidence. The preponderance-of-evidence standard of proof employed by the Panel was inadequate especially given the fact that Ms. Feldbaum's previously advised them that the evidence "reasonably supported" that a violation occurred.

99. Defendant's violation of Doe's right to due process during the disciplinary process resulted in an erroneous finding of culpability and his effective removal[66] from Penn State, causing him to suffer far-reaching and rippling educational, vocational, reputational, and economic harm.

100. As a direct and proximate result of the above conduct, John Doe sustained damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

**COUNT II**

***Violation of Title IX of the Education Amendments of 1972***

101. Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

102. Title IX of the Education Amendments of 1972 (20 U.S.C. §1681) ("Title IX"), provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

---

[66] Doe was informed by OSC that if found responsible mid-semester in the spring of 2019, any sanction—including suspension—would likely take immediate effect. Doe would be unable to complete the semester and would not have been refunded tuition. Given the significant educational and financial impact a finding of responsibility would have on Mr. Doe, he withdrew his spring registration.

103. Title IX applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX. Penn State is the recipient of significant federal funding.

104. Upon information and belief, most, if not all students that have been suspended or expelled from Defendant Penn State for sexual misconduct charges such as those levied against Doe have been male.

105. Male respondents in sexual misconduct cases at Defendant Penn State are discriminated against solely on the basis of sex. They are invariably found guilty, regardless of the evidence, or lack thereof given the lack of safeguards and gatekeeping function.

106. The University violated Title IX based upon the "erroneous outcome" that occurred in this case because Mr. Doe was innocent and wrongfully found to have committed sexual assault, and gender bias was a motivating factor.

107. The denial of due process and the procedural errors made in this case resulted in an "erroneous outcome" based on a flawed and distorted conception of the facts.

108. The investigator failed to explore clear discrepancies in the case such as statements contained in the medical reports that contradicted statements Roe made to him during the interview.

109. Penn State's existing practices and procedures discriminate, on the basis of sex, against the male accused, including Doe. Penn State conducted its investigation of the allegations against Plaintiff in a manner that was slanted in favor of the female accusers. This bias is evident through: (1) a policy based on affirmative consent that improperly shifts the burden of proof to the accused when charges are brought forcing the accused to prove that affirmative consent was present through each and every moment of a sexual interaction; (2) PSU's policies containing numerous resources for complainants to utilize both on and off campus with few resources for respondents who are statistically more likely to be male; and (3) a single assigned investigator is solely responsible for weighing the probative value of witness testimony and the relevance of the evidence collected for inclusion in a final report that will be provided to a case manager using a gatekeeping standard equivalent to whether a violation is plausible.

110. Penn State erroneously placed the entire burden on Doe to prove his innocence, instead of setting forth competent evidence to demonstrate how he allegedly engaged in nonconsensual sex with Jane Roe.

111. Penn State's policies and procedures disproportionately affect the male population of the Penn State community as a result of the higher incidence of female complainants of sexual misconduct versus male complainants of sexual misconduct.

112. Penn State has created an environment in which an accused male student is effectively denied fundamental due process by being prosecuted through the conduct process under the cloud of a presumption of guilt. This one-sided process deprives Plaintiff, as a male student, of educational opportunities at Penn State on the basis of sex.

113. Penn State imposed sanctions on Plaintiff without conducting a fair, impartial investigation and without evidence that he engaged in nonconsensual sex with Roe. As a result, Plaintiff may face a permanent notation on his Penn State transcript labeling him a sexual predator, even though he was never given an opportunity for notice and a fair investigation and hearing.

114. The totality of the circumstances establish that Defendants acted out of gender bias in reaching the "erroneous outcome." Moreover, the Title IX Panel engaged in gender stereotyping by crediting Complainant's explanation of texts despite their plain meeting and discredited the Respondent because he waited to provide a statement until he could review investigative packet.[67]

---

[67] Specifically, the Panel credited Complainant's narrative that she was only interested in being friends and uninterested in sex (i.e., belief that women are incapable of asserting themselves in sexual situations with male counterparts, women as passive and males as sexual predators, etc.) despite various anomalies and counterintuitive behaviors and consistently presumed guilt by respondent. The credibility and responsibility determinations are influenced by outdated and discriminatory views of male and female roles in heterosexual relationships.

115. The totality of circumstances establishes that Defendant Penn State has demonstrated a pattern of inherent and systematic gender bias and discrimination against male students accused of misconduct.

116. In erroneously deciding the Doe engaged in sexual activity in violation of PSU's Code of Conduct, the Decision Panel relied on prejudicial assumptions and failed to apply the requisite preponderance of evidence standard required by both the University's own policies and Title IX. At all times, Mr. Doe was deemed guilty.

117. As a direct and proximate result of the above conduct, Doe sustained damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

118. As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction enjoining enforcements of the sanctions as a result of violations of the Title IX process of investigating and adjudicating sexual misconduct complaints and costs and disbursements.

## DEMAND FOR RELIEF

WHEREFORE, this Court should:

(i) declare, for the foregoing reasons, that Defendants violated Plaintiff's Fourteenth Amendment right to due process of law;

(ii) declare, for the foregoing reasons, that Defendants violated Plaintiff's statutory Title IX rights to equal treatment;

(iii) issue an injunction preventing Penn State from re-prosecuting Doe;

(iv) issue an injunction requiring that Penn State retain Plaintiff as a student in good standing at Penn State;

(v) in the alternative, issue an injunction requiring Penn State to reopen the investigation;

(iv) issue an injunction requiring that the Senior Director of the Office of Student Conduct expunge all aspects of Plaintiff's student disciplinary file pertaining to the allegations leveled against him by Complainant;

(v) award Plaintiff monetary damages, attorney's fees, and costs of suit; and

(vi) award such further relief as deemed necessary and just by this Court.

July 18, 2019

/s/ Andrew J. Shubin
Andrew J. Shubin, Esquire
Pa. Attorney ID No. 63263
333 South Allen Street
State College, PA 16801
(814) 867-3115
(814) 867-8811 fax
shubin@shubinlaw.com

*Counsel for Plaintiff,*
*John Doe*

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHN DOE,** *Plaintiff* | : | |
| **v.** | : | **Civil Action No.** |
| **THE PENNSYLVANIA STATE UNIVERSITY** *Defendants* | : | |

**CERTIFICATE OF SERVICE**

I, Andrew J. Shubin, do hereby certify that the above parties were served a true and correct copy of the foregoing Complaint via Federal Express to Attorney Zahraa Zalzala, Counsel for Defendants.

July 18, 2019

/s/ Andrew J. Shubin
Andrew J. Shubin, Esquire
Pa. Attorney ID No. 63263
333 South Allen Street
State College, PA 16801
(814) 867-3115
(814) 867-8811 fax
shubin@shubinlaw.com

*Counsel for Plaintiff,*
*John Doe*