UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN DOE, :
         *Plaintiff* :
     :
        v. :        Civil Action No. 4:19-CV-1234
     :
THE PENNSYLVANIA STATE :
UNIVERSITY :
     :
        *Defendant* :
     :

## BRIEF IN SUPPORT OF MOTION FOR EMERGENCY TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

Introduction

John Doe[1] is a 2nd-year Penn State University (hereinafter "PSU" or the "University") Schreyer Honor College student who Penn State University's Office of Student Conduct ("OSC") is re-prosecuting based upon an allegation by a former fellow student that he sexually assaulted her in January of 2018.  Mr. Doe filed a lawsuit alleging violations of his constitutional right to due process and his Title IX statutory right to equal treatment in the context of the ongoing sexual assault disciplinary prosecution.

In this filing, Mr. Doe seeks an immediate Court order enjoining PSU from re-instituting a University disciplinary prosecution against him following an appeals

---

[1]  A Motion for Leave to Proceed Under Pseudonym has been filed contemporaneously with the Complaint.

officer's decision to vacate a prior University Title IX Hearing Panel's ("Panel")
determination that his conduct, which largely consisted of "flattering" his accuser
by, for example, texting her that he thought she was "beautiful", amounted to
"pressuring" and "cajoling" which "coerced" her into agreeing to have sex.

The appeals officer vacated the prior decision after agreeing with an OSC
designee that the prior Panel misinterpreted PSU's "consent" definition.   As
requested by the designee, the officer ordered OSC to convene a newly constituted
Panel to preside over a second attempt to discipline him.   On July 16, 2019, just six
days before the July 23, 2019, hearing is set to occur, PSU's Title IX Coordinator
provided Mr. Doe with a copy of a new "coercion" definition that explicitly includes
"cajoling" as conduct that could negate consent.   Moreover, the University
retrofitted its existing definition, still in place for other students, in an attempt to
capture the conduct alleged in Mr. Doe's case.[2]

Doe requests an injunction so that the Court can provide relief to the
irreparable harm the University has and is causing him as a result of an unfair process
and delay.   Further, Doe requests that the University be enjoined from holding the
hearing which would be infected by its unconstitutional practices and policies and

---

[2] On July 16, 2019, Chris Harris notified Plaintiff via email of Penn State's updated definition of "coercion," which redefined "coercion" to mean an "unreasonable amount of pressure to engage in sexual activity" including "duress, cajoling, compulsion or abuse". See Complaint Exhibit W. However, PSU's public and student-facing website, as of July 16, 2019, publishes the prior definition of coercion that does not mention "cajoling" or "pressuring". See Complaint Exhibit X.

to permit Doe and the University's investigator to reopen the investigation to address the new definition and new information provided by the accuser during the first hearing.

A. Procedural and Factual History

**1. Title IX and Student Conduct Process**

In January of 2018, when John Doe was a second semester freshman enrolled in The Pennsylvania State University's ("Penn State" or the "University") prestigious Schreyer's Honor College, he and fellow student Jane Roe engaged in sexual conduct together.   Although Doe and Roe agree on many of the encounter details, they disagree on whether it was fully consensual.

Seven months later, on August 2, 2018, the University notified Doe that he "may have violated Pennsylvania State University's policies regarding sexual and/or gender based harassment" based on Roe's allegation that he "engaged in sexual intercourse and digitally penetrated [her] without consent."[3] The University investigated Doe throughout the Fall of 2018.  Roe left the University in the Spring of 2018 as a Cornell University transfer student.   Mr. Doe, knowing that the University would suspend him mid-semester if they found him liable, took a leave of absence during the winter break preceding the Spring 2019 semester.

---

[3] Complaint Exhibit F.

On February 18, 2019, case-manager and OSC Interim Director Karen Feldbaum advised Mr. Doe that she had concluded that the investigative packet "reasonably supported" a finding that he had violated the Code of Conduct. She officially charged Doe with sexual misconduct. Although the Code required Ms. Feldbaum to use a "reasonably supports" standard, on information and belief, she, in actuality, uses a watered down "plausibility" standard. Nonetheless, prior to Mr. Doe's hearing, Ms. Feldbaum advised the Title IX Decision Panel (the "Panel") that she believed the investigative materials "reasonably supported" a conclusion that Doe sexually assaulted Roe.

On April 12, 2019, a three-person panel convened a hearing on Roe's accusations. During the hearing, the panel permitted Ms. Roe to provide "new information" in direct violation of the University's Code of Conduct and over Mr. Doe's objection. Mr. Doe was unable to respond to the new evidence at the hearing because the University's Code, at least as it applied it to Doe, prevented him from providing information that was not already included in the investigative packet. The panel found Doe responsible for engaging in nonconsensual sexual intercourse and digital penetration and, among other sanctions, suspended him for one year. The University informed Doe of their formal decision and rationale on April 22, 2019.[4]

---

[4] Complaint Exhibit I.

On April 26, 2019, the University informed Doe that Title IX Coordinator Chris Harris halted the process so that he could review and clarify the panel's decision.  Mr. Doe submitted a timely appeal on April 29, 2019, because the University's Code does not provide for such a delay or review and contains strict deadlines which it historically enforces against respondents.  On May 14, 2019, the University informed Doe that Harris completed his review and the panel's April 12, 2019, decision remained unchanged. Unbeknownst to Doe, OSC Interim Director Karen Feldbaum, who had served as the University's presenter (prosecutor) during Doe's hearing, "designated" the former OSC Director and present Assistant Vice Present of Student Affairs, Danny Shaha, to act on her behalf.  On May 23, 2019—ahead of Mr. Doe's revised appeal deadline—Mr. Shaha, acting as Ms. Feldbaum's designee, requested that appeals officer, Assistant Vice President and Assistant Dean for Undergraduate Education Dr. Alan Rieck, "refer the case to a new hearing board" because the Board may have misinterpreted the University's definition and application of 'coercion.'"[5]  Mr. Shaha advised Dr. Rieck that the "Office of Student Conduct (under Interim Director Feldbaum's control) and the Title IX Coordinator

---

[5] Complaint Exhibit P. According to the Code of Conduct and PSU Administrative Directive 85, the "consent" definition currently applicable to the student body (with the apparent exception of Mr. Doe) is as follows: "Consent must be informed, freely given and mutual.  If coercion, intimidation, threats or physical force are used there is no consent.  If a person is mentally or physically incapacitated or impaired so that such person cannot understand the fact, nature or extent of the sexual situation, there is no consent. This includes impairment or incapacitation due to alcohol or drug consumption, or being asleep or unconscious, where the respondent knew or reasonably should have known that the person was incapacitated.  Inducement of incapacitation of another with the intent to affect the ability of an individual to consent or refuse to consent to sexual contact almost always, if not always, negates consent.  Silence does not necessarily constitute consent.  Whether a person has taken advantage of a position of influence over an alleged victim may be a factor in determining consent." Available at https://titleix.psu.edu/helpful-definitions/

will be sure to clarify the definition of coercion and related concepts to the new hearing board members."[6]

Mr. Doe submitted a second version of his appeal on May 28, 2019, and separately, a June 4, 2019, letter to Dr. Rieck requesting that he reverse the panel's decision. Dr. Rieck never responded to Doe's letter. Instead, as requested by Feldbaum designee Shaha, Dr. Rieck ordered that Roe be given the opportunity to present her allegations to a new Title IX Decision Board because the prior panel had misinterpreted the University's consent definition.  On July 5, 2019, the University scheduled the second hearing for July 26, 2019.  On July 11, 2016, the University moved the hearing date up to July 23, 2019.

On July 16, 2019, Ms. Feldbaum provided Doe with a new, seemingly retrofitted, consent definition:[7]

> "Coercion" is an *unreasonable amount of pressure* to engage in sexual activity. Coercion is more than an effort to gain consent, or persuade, entice, or attract another person to engage in sexual activity. Coercion includes elements of pressure, (e.g., duress, cajoling, compulsion or abuse).

> When determining if an individual's behavior constitutes coercion, context is everything. For example, seduction is reasonable, and coercion as unreasonable. Seduction is welcomed sexual advances that may initially be rebuffed but where the object of the pressure ultimately wants to be convinced to engage in sexual activity or welcomes the activity, or a reasonable person would perceive it so.

---

[6] *Id.*
[7] Complaint Exhibit W.

Coercion, however, is the point where the pressure is or becomes objectively unwelcomed and unreasonable, or the point when a person concedes to sexual activity due to the use of words or behavior that causes or threatens to cause severe emotional distress and/or psychological harm.

It's important to realize that people negotiate sex all of the time. Some amount of pressure may be okay, but too much pressure crosses the line and becomes unreasonable.

In determining what is an unreasonable amount of pressure, case managers, hearing officers, and panels should consider four factors: (1) duration (over what period of time is the pressure occurring?), (2) frequency (how many times is the pressure occurring?), (3) isolation (does the respondent isolate the complainant while pressuring, and does that change the dynamic?), and (4) intensity (does the respondent move beyond trying to convince the complainant of the respondent's sexual prowess or how badly the respondent wants sex and turn the tables on the complainant, attacking the complainant's values, morals, religion?).

After considering all of the factors noted above, if it is determined that the amount of pressure was *unreasonable*, then coercion was present and there was no consent. If, on the other hand, after considering the factors noted above, it is determined that the presented pressure does not rise to the level of unreasonable, then coercion was not present.

In sum and substance, the University's prosecutor, through her Vice President level designee, instructed the appeals officer on how to resolve Doe's appeal and the appeals officer precisely followed these instructions. Ms. Feldbaum and Mr. Harris then created an *ad hoc* "coercion" definition six days before the proposed second hearing that seemed specifically created to capture the conduct found to have occurred by the first Panel.

### 2. Doe's Attempts to Mitigate Prejudice

Mr. Doe initiated transfer applications and inquiries to multiple universities for the Spring 2019 semester in an attempt to mitigate the damages to his educational career, reputation, and employment opportunities. Doe has impressive academic credentials and would be a strong transfer candidate to most universities. Bucknell University accepted Mr. Doe for the Spring 2019 semester, but the admissions office withdrew their offer after Doe reported the pending PSU disciplinary proceeding. Drexel University and Rochester Institute of Technology also accepted Mr. Doe for the spring 2019 semester but he was unable to attend as the disciplinary proceedings were unresolved by the admission deadlines.

Mr. Doe, believing that the pending matter would surely be resolved during the Spring 2019 semester, continued to submit transfer applications[8] for the fall semester. Mr. Doe received numerous offers of acceptance[9], but all had timelines that Doe was unable to meet because of the University's failure to timely resolve the matter. Mr. Doe made a required initial deposit at University of North Carolina for the Fall of 2019; however, he had to withdraw his candidacy because of the lapsing of deadlines to complete his enrollment—which would have included the closure of

---

[8] For example, Mr. Doe applied to UNC, Boston University, Fordham University, George Washington University, New York University, University of Delaware, Maryland University, Northeastern University, University of Georgia, University of Delaware, Virginia Tech and University of Miami. Mr. Doe was precluded from applying to a number of schools because they required a letter or confirmation of good standing both academically and socially at the time of the application from PSU. Given the investigation and proceedings extended over the 2018/2019 school year, he was effectively barred from applying to these schools (e.g., University of Virginia and University of Michigan).
[9] For example, Mr. Doe was accepted to Virginia Tech, University of Miami, University of Georgia, University of Miami, UNC-Chapel Hill, George Washington University, and Arizona State University.

this disciplinary matter.[10] Mr. Doe also registered and paid tuition for PSU's Summer 2019 session.   However, given that the conduct matter was still unresolved in the spring and extending into the summer, Doe had to withdraw his registration or risk forfeiting full tuition if he were found wrongfully responsible in the pending proceeding.[11]

The Defendant's delay, procedural deviations, and substantive error in misapplying their own timeline and appeal policies has caused and will continue to cause irreparable harm to Mr. Doe and continues to cause severe detrimental consequences to Plaintiff's liberty interests, his education, and his career. He has been effectively prevented from pursuing his education and alternative opportunities at a time when he would be most competitive and when education is foundational to his future employment opportunities. He has been constructively separated from his participation in the prestigious Schreyer's Honor College and, in all likelihood, will be removed from the honors program if wrongfully found responsible in a new hearing.[12]

---

[10] After having to withdraw his deposit from UNC, Mr. Doe placed a deposit with the University of Miami. University of Miami rescinded their offer on July 3, 2019 due to the pendency of this matter.

[11] Due to delays in reaching a conclusion in the student conduct matter, Mr. Doe was unable to recover approximately $4,124 in tuition for the summer session given the timing of withdrawal from classes.

[12] See Complaint Exhibit Z, 2017-2018 Schreyer Student Handbook stating that "[a] Scholar is expected to maintain a high standard of behavior by adhering to Penn State's Student Code of Conduct and respecting the rights of others. Any member of the Schreyer Honors College who is found to have committed an act of behavioral misconduct that results in a transcript notation may be subject to immediate dismissal from the Schreyer Honors College." Available at https://www.shc.psu.edu/academic/resources/handbook/handbook_1718.cfm#responsibility.

Moreover, he is now subject to a rehearing under a policy for which he had no reasonable notice and that he was informed of approximately eighteen months *after* the alleged incident. Given the looming deadline for the last open transfer application[13], Doe is now at imminent risk of being prevented from completing the enrollment with another university and completing all the pre-registration requirements in time to complete the transfer.

B. Question Presented

**Question:** Has the Plaintiff met the legal requirements for the granting of a TRO/Preliminary Injunction to immediately prevent the University from conducting a second hearing on July 23, 2019 and to: enjoin the Defendant from forcing Doe to defend himself at a new hearing on July 23, 2019, applying retroactively a newly minted policy for which the Plaintiff had no reasonable notice; require the University to retain Plaintiff as a student in good standing at Penn State; require that the Senior Director of the Office of Student Conduct expunge all aspects of Plaintiff's student disciplinary file pertaining to the allegations leveled against him by the Complainant, and; prohibit the University from attempting to re-prosecute Mr. Ford for the January 2018 incident.

---

[13] Arizona State University is the only transfer school whose deadlines to complete the application—which require closure of this matter—has not passed yet.

**Suggested Answer:** Yes, Plaintiff meets all of the legal requirements for granting of said relief.

C. <u>Argument</u>

***Defendants Should Be Enjoined From Holding A Rehearing Of The Conduct Matter Because The Investigative Model And The Retroactive Application Of A Newly Minted Definition Of "Consent" Violate The Due Process Clause Of The Fourteenth Amendment And Title IX Of The Education Amendments Of 1972.***

To obtain a temporary restraining order or preliminary injunction, a plaintiff must prove by a preponderance of the evidence[14] that he is (1) likely to succeed on the merits of his claim;  (2) that he will suffer irreparable harm in the absence of injunctive relief;  (3) that the grant of a preliminary injunction will not result in harm to the nonmoving party that is greater than the harm to plaintiff; and (4)  that the public interest favors such relief.[15] "It is well established that 'a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.'"[16]

As laid out in his complaint and discussed more fully below, Doe is likely to proceed on the merits of his claim.  Doe has suffered, and will continue to suffer, irreparable harm, including the loss of liberty to transfer to another college or university, suspension or expulsion from the prestigious Schreyer's Honor College

---

[14]  *See O'Neill v. Secretary of Navy*, 76 F.Supp.2d 641, 645 (W.D. Pa. 1999)
[15] *Miller v. Mitchell*, 598 F.3d 139, 147 (3d Cir. 2010)
[16] *Kos Pharmaceuticals Inc. v. Andrx Corporation*, 369 F.3d 700, 718 (2004) (citing *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)).

program, suspension from college, denied or impaired career or graduate school opportunities, a gap in his education that will forever need to be explained to potential employers and graduate school admissions, and the lifelong stigma of being labeled a violent sex offender. The harm to the Plaintiff without question far outweighs any harm Defendants could possibly experience if the requested relief is granted. The public has an undeniable interest in ensuring the Defendant's wrongful, unfair, and discriminatory conduct is enjoined.  Given the record in this case, and the urgent need created by the Defendant's conduct and their rehearing timing, the Court should immediately issue a preliminary injunction preventing the University from forcing Doe to submit to a second panel hearing on July 23rd.

## I.  <u>There Is A Likelihood Of Succeeding On The Merits</u>

### a.  **Due Process**

Student disciplinary proceedings at state-funded universities must be conducted in conformity with the Due Process Clause of the Fourteenth Amendment.[17]  The fundamental requirements are, of course, notice and an opportunity to be heard.[18]  The exact nature of the process due is context specific for "'(t)he very nature of due process negates a concept of inflexible procedures universally applicable to every imaginable situation.'"[19]  To identify the "specific

---

[17] *Goss v. Lopez*, 419 U.S. 565 (1975).
[18] *Id.* at 579.
[19] *Id.* (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961)).

dictates of due process,"[20] district courts consider the three *Mathews v. Eldridge* factors:

> First, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used, and the probably value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[21]

At a minimum, due process requires notice, an impartial decision maker, an opportunity to be heard, and where important decisions turn on questions of fact, an opportunity to confront and question adverse witnesses. Penn State has, and in its proposed new hearing will continue to, violate Mr. Doe's right to due process.

### i. *Defendant Denied Doe The Opportunity To Be Heard*

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"[22] Contrary to Penn State's policy, the University permitted the complainant at the first hearing to submit "new evidence"—including a previously unidentified witness— all of which could have been raised during the course of the investigation. According to the University's Code when "new information to the hearing authority is allowed, the other party will

---

[20] *Furey v. Temple University,* 730 F.Supp. 380, 394 (2010). The District Court in *Furey* determined, on the basis of *Biliski v. Red Clay Sch. Dist. Bd. Of Educ.,* 574 F.3d 214 (3d Cir. 2009), that the *Mathew v. Eldridge* factors should be considered in determining the process that is due in school disciplinary proceedings.
[21] 424 U.S. 319, 335 (1976).
[22] Mathews v. Eldridge, 424 U.S. 319, 333 (1976)(quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)

have the opportunity to respond."  The University prevented Mr. Doe from making a timely objection to the new evidence.  The University also prevented Mr. Doe from following up on the new evidence because their policy, at least as applied to him, constrains his presentation to "highlighting" information in the packet only.  Finally, the University continues to prevent Mr. Doe from responding, and the investigator from addressing, the new information by refusing to reopen the investigation prior to the second hearing.

### ii.    *Defendants Violate Due Process By Denying Doe The Opportunity To Confront And Cross-Examine The Complainant And Other Adverse Witnesses In a He Said She Said Case*

When credibility is at issue in a more serious charge, "the importance of a fair tribunal, where the testimony of all of the witnesses is examined for truthfulness, is heightened."[23]  "In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses."[24]  Recently, in *Doe v. University of Cincinnati*[25], the Sixth Circuit held: "Accused students must have the right to cross-examine adverse witnesses in the most serious of cases."[26]  In that case, the court considered a situation where the alleged victim did not appear at an accused student's disciplinary hearing.  The court

---

[23] *Furey v. Temple*, et al., 884 F.Supp.2d 223, 254 (E.D. Pa. 2012).
[24] *Id.*
[25] *Doe v. University of Cincinnati*, 872 F.3d 393 (6th Cir. 2017).
[26] 872 F.3d at 401, *quoting Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 636 (6th Cir. 2005).

observed that, as a general rule, cross-examination is not required to satisfy due process in a school disciplinary proceeding.  However, the Sixth Circuit noted that this was not the full and complete statement of the law:  "The right to cross-examine witnesses generally has not been considered an essential requirement of due process in school disciplinary proceedings.  However, general rules have exceptions, and "the very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." [27]

In Doe's he said/she said credibility driven adjudication, Penn State's policies fell short of protecting Doe's due process rights.[28]  To the contrary, Penn State's policy handcuffs the accused, including Doe, by requiring him to submit questions to a Panel which, according to the Code, they should consider as merely "suggestions".   The panel only decides which "suggested" questions to ask – they will decline to ask a question unless they deem it to be "relevant" and "appropriate".  The Code does not define or cabin the panel's "appropriate" filter.[29]  The Panel alone determines what proposed questions it will ask and the order of potential questions.[30]

---

[27] 872 F. 3d at 400 (internal citations omitted).

[28] Contrary to the Defendant's assertation that permitting the respondent and complainant to submit a list of questions for the Title IX Panel to potentially ask a witness is not cross examination let alone *effective* cross examination; that is simply permitting the submission of a list of questions for the Title IX Panel to consider.

[29] See, e.g., *Doe v. Pennsylvania State Univ.*, 336 F.Supp. 3d 441, 450 (M.D. Pa. 2018)(court noting no guidelines exist in PSU's Code of Conduct to guide discretion of investigator with choosing to ask or rephrase questions requested by accused to ask of accuser).

[30] Complaint Exhibit C, 11/3/16 OSC policy, pg. 14.

There is no provision permitting the accused to request additional or follow up questions.

The panel rejected approximately 80% of Doe's suggested questions: approximately thirty-three of the approximately forty questions submitted. For example, the panel refused to ask Doe's suggested question, which goes to the heart of Roe's credibility, regarding the contradictions between Roe's texts and panel testimony on the one hand and on the other, what her medical records documented as to what she told her medical providers in seeking treatment. Similarly, the panel refused to ask Doe's suggested questions relating to Roe leaving her dorm room to use the bathroom in the midst of what she claims to be a sexual assault. Doe should have been able to ask questions relating as to why, as someone in the midst of being sexually assaulted, she would have told Mr. Doe to remain in her bedroom and why she returned to her room and to him after using the bathroom which was located outside of her dorm room. The panel dismissed the questions as "irrelevant". The panel's failure to ask these types of questions demonstrates that in assessing Roe's credibility it was not interested in considering her consistency in responses, demeanor, or any other confrontation tools which are attendant to a fair and accurate result.

This form of questioning, funneled and filtered by the Title IX Decision Panel, without an ability to follow up or impeach, bears no resemblance to meaningful cross

examination; it is not the "back-and-forth of adversarial questioning" that is required by due process when an accuser's credibility is the key consideration to ensure accurate results for the decisionmaker.[31] Instead, and as a practical matter, these questions provide the complainant with an unrestrained and unchecked platform to buttress her narration and leaves the accused without any ability to elicit narrow and responsive answers which would provide the panel with a meaningful opportunity to observe and assess the accuser's demeanor.  This is not confrontation nor cross examination and undercuts the panel's ability to make informed credibility assessments.  It is hard to imagine why an accused would "suggest" any questions given this process.

> iii.   ***Defendant Violates Due Process By Re-prosecuting Doe After the Factual Record From Their First Prosecution Failed to Demonstrate That He Violated the University's Sexual Misconduct Policy By "Coercing" Roe, Through Flattery and Cajoling, Into Having Sex With Him.***

"Although the double jeopardy clause does not apply to the student disciplinary context, the due process clause in all cases requires 'fundamentally fair procedures.'"[32] In *Tanyi*, the District Court recognized that "[t]he right to appeal is not equivalent to the right to a new hearing."[33] A "clearly articulated substantive

---

[31] *Doe v. Baum*, 903 F.3d 575, 581-583 (6th Cir. 2018)

[32] *Tanyi v. Appalachian State University*, No. 5:14-CV-170RLV, 2015 WL 4478853 *6 (W.D.N.C. July 22, 2015)(citing *Goss v. Lopez*, 419 U.S. 565, 565 (1975).

[33] *Id*. at *6.

basis must exist for granting a new trial."[34] Otherwise, a university "could simply order a new misconduct trial whenever the university did not prevail."[35]

The first panel's factual findings did not meet the existing "coercion" definition and as a result, its decision was vacated.  Instead of laying the matter to rest and, in an attempt to continue to prosecute Doe until the University prevails, it simply created an *ad hoc* "coercion" definition neatly tailored and retrofitted to capture the factual findings from the first hearing.  The fact that the University was unable to meet its burden the first time must not be license for them to re-prosecute with a different and more favorable set of rules which, apparently, apply only in Doe's case.

Even a cursory consideration of the second factor, the risk of erroneous deprivation through the challenged procedures, demonstrated a reasonable likelihood that Plaintiff will prevail. In fact, Danny Shaha, the Assistant Vice President of Student Affairs, intervened in the conduct matter and advised the Title IX Appeals Officer via letter on May 23, 2019 that the Decision Panel may have erroneously interpreted and applied the University's definition of "consent".[36]  If a trained panel doesn't understand the definition of coercion, how should they expect

---

[34] *Id.*
[35] *Id.*
[36] See Complaint Exhibit P.

that an 18 year old freshman will understand it and be on notice that excessive flattering invalidates an accuser's consent, even if orally given?

### iv.    Defendants Denied Doe The Right To An Impartial Decision Maker

"An impartial and unbiased adjudicator is a fundamental part of due process."[37] In *Withrow v. Larkin*[38], the Supreme Court noted that "various situations have been identified in which experience teaches that the probability of actual bias on the part of the judge or decision-maker is too high to be tolerable." A biased process is not fair; "due process demands impartiality on the part of those who function in judicial or quasi-judicial capacities."[39]

Penn State's policy delegated a "neutral fact-finding" role to the investigator. The policy purposefully makes him an information funnel: he alone decided what to include or exclude from the Packet; who to interview; how much or how little to follow-up on leads; how to characterize the information he had received, when and how to present the information he had received or not received; and, whether to pursue or require known exculpatory information. He alone decided what was "relevant" and "appropriate".

The policy did not and does not require that the investigator share with the accused, or anyone else, the information he has excluded or witnesses he decided

---

[37] *Furey v. Temple Univ.*, 884 F.Supp.2d, 223, 255 (E.D.Pa. 2012).
[38] 421 U.S. 35, 47 (1975)
[39] *McClure,* 456 U.S. at 195.

not to interview, let alone why.  Accordingly, these are practically the same procedures that were in place in *Doe v. Pennsylvania State University*[40] where this Court was concerned that the University's policies permitted an investigator to "filter" evidence with little to no visibility into the guidelines or parameters guiding these tasks or "cabining his discretion."[41]

University policy also undercuts Mr. Doe's right to a fair, impartial fact finder by requiring that the OSC case manager, in this case the Interim Director who functions as its prosecutor and the panel's overseer, advise the panel that she had already concluded that the information in the packet "reasonably supported" a finding that Doe engaged in misconduct.  Although not defined, it is fair to conclude that there is little, if any, real estate between "reasonably supports" and the panel's "preponderance of the evidence" standard.  The process treats the panel as an appeals court shifting the burden to the respondent to demonstrate why the OSC case-manager was wrong. This lack of impartiality and independence is further demonstrated by the panel's invitation to Ms. Feldbaum to edit their written decision. The University also violated Mr. Doe's right to have an unbiased and fair appeal process where the OSC prosecutor's "designee" tells the appeals officer to dismiss the appeal (instead of resolving it) and require OSC to convene a second panel to re-

---

[40] *Doe v. Pennsylvania State University*, 336 F.Supp. 3d 441, 449-450 (M.D.Pa. 2018).
[41] *Id.* at 450.

prosecute him.  As the record demonstrates, the appeals officer precisely followed these instructions.

Penn State undermined the integrity of Doe's adjudicative process because: (1) the Code delegated prosecutorial, adjudicative, and sanctioning roles to the OSC; (2)  the OSC Case Manager's "pre-hearing finding" substantially lessens the Title IX Decision Panel's fact-finding and adjudicatory autonomy; (3) the Panel solicits the OSC prosecutor's involvement in the crafting of their decision, and; (4) the OSC prosecutor's designee intervened in the appeals process and instructed the appeals officer to order a re-prosecution, instead of resolving the appeal. [42]

### v.    The University Violated Doe's Right to Due Process By Failing to Follow Its Policies

"[I]nconsistent application of procedures" and "significant and unfair departures from an institution's own procedures can amount to a violation of due process."[43]    The University failed to follow its own policies including, but not limited to: its prohibition against presenting "new evidence" at a hearing by: allowing the complainant to testify at length regarding facts and circumstances that were "new" and by simultaneously prohibiting Doe from making timely objections;

---

[42] See *Doe v. Brandeis Univ.*, 177 F.Supp. 3d 561, 606 (D.Mass. 2016)("The dangers of combining in a single individual the power to investigate, prosecute, and convict, with little effective power of review, are obvious. No matter how well-intentioned, such a person may have preconceptions and biases, may make mistakes, and may reach premature conclusions.").

[43]  *Johnson v. Temple University--of Commonwealth System of Higher Educ.*, 2013 WL 5298484, at *8 (E.D.Pa.,2013)(internal quotations and citations omitted).

prohibiting Doe and the investigator from responding to the new information; the OSC's case managers use of a "plausibility" gate-keeping burden of proof rather than the Code's required "reasonably supports" standard, and; failing to follow its explicit appeal timing and disposition requirements.  The University also violated its own policy by refusing to ask the overwhelming majority of Doe's questions.[44]

### b.  **Gender Discrimination—Title IX Claims**

Title IX guarantees that "[n]o person in the United States shall on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. §1681(a). Title IX "bar[s] the imposition of university discipline where gender is a motivating factor," and is enforceable through a private right of action for damages as well as for injunctive relief.[45] Penn State received federal funds, and so may be held liable under Title IX.[46]

In *Collick*, the Court held "[b]ecause Title IX prohibits (under covered circumstances) subjecting a person to discrimination on account of sex, it is understood to bar the imposition of university discipline where gender is a motivating factor in the decision to discipline." On the facts as alleged in the instant Complaint, Plaintiff will likely succeed on his Title IX claims. Gender

---

[44] *Doe v. Pennsylvania State University*, 276 F.Supp.3d 300, 310-311 (M.D. Pa. 2017).
[45] *Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016)(quoting Yusef v. Vassar Coll., 35 F.3d 709, 714-15 (2d Cir. 1994)), *Collick v. William Paterson University*, 2016 WL 6824374 (D.N.J. 2016).
[46] *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009

discrimination and gender stereotypes permeated the investigation, the original outcome, the rewrite of the definition of "consent", and the decision for a new hearing. The Title IX Panel's April 12, 2019 rationale and the new definition of "consent" is based on outdated stereotypes and a biased perspective regarding the behavior of women during sexual encounters.[47] Moreover, the investigative team and the Case Manager function as Roe's advocate—including moving the case forward if the Complainant's narrative is remotely plausible— rather than an objective fact finder and neutral gatekeeper.

As the Court in *Doe v. Brown*[48] recently stated: "requiring that a male student conclusively demonstrate, at the pleading stage, with statistical evidence and/or data analysis that female students accused of sexual assault were treated differently, is both practically impossible and inconsistent with the standard used in other discrimination contexts"[49] especially given that the facts are within the exclusive control of the defendants.[50] Although the *Brown* Court was deciding a motion to dismiss, their rationale would certainly be applicable to the issue before this Court.

## II.   Plaintiff Has And Will Continue To Suffer Irreparable Harm

---

[47] See e.g., *Doe v. Grinnell College*, no. 4:17-cv-00079-RGE-SBJ, 23 (S.D. Iowa. July 9, 2019)(finding demonstration of genuine dispute of material fact as to whether gender bias was motivating factor that caused inaccuracy in misconduct proceeding including basing determination that's on biased assumptions about behavior of women during sexual encounter).
[48] 166 F. Supp. 3d 177 (D. Rhode Island 2016)
[49] *Id*. at 189.
[50] *Id*. at 190.

"The irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages."[51] Irreparable harm is easily demonstrated when a student confronts removal from a university.  A plaintiff's inability to continue or complete his education is irreparable injury.[52] In *Jones v. Board of Governors of University of North Carolina,* 704 F.2d 713 (4th Cir. 1983), the Fourth Circuit affirmed the grant of a preliminary injunction ordering reinstatement of a nursing student pending resolution of her due process challenge to disciplinary action taken against her.   The Court found that the following considerations demonstrated irreparable harm:

> [Plaintiff Jones] will be barred from taking courses during the spring semester, delaying the time at which her ability to work as a nurse will come to fruition; she will have a gap in her education which she will be forced to explain throughout her professional life;  and she will be deprived of the opportunity to complete her education with her fellow classmates.

*Id.* at 716.   In *Doe v. Brandeis*[53] the Court found:

> [A] student who is found responsible for sexual misconduct will likely face substantial social and personal repercussions. It is true that the consequences of a university sanction are not as severe as the consequences of a criminal conviction. Nevertheless, they bear some similarities, particularly in terms of reputational injury…Certainly, stigmatization as a sex offender can be a harsh consequence for an

---

[51] *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85 (3d Cir. 2000).
[52] See, e.g., Gati v. Univ. of Pittsburgh, 91 A.3d 723, 729 n.10 (Pa.Super. 2014)(court "would have no trouble" finding irreparable harm when university dismissed student for dishonesty shortly before his graduation and Defendant's "argument to the contrary is entirely unpersuasive.").
[53] 177 F. Supp. 3d 561 (D. Mass. 2016).

individual who has not been convicted of any crime, and who was not afforded the same procedural protections of criminal proceedings.

The Court should issue an order enjoining the University from re-prosecuting Doe because the pendency of the matter has and is preventing him from transferring to another university and to complete his education, and constructively bars him from re-enrolling at Penn State. Further, a lingering disciplinary process irreparably harms Doe by doubling the gap in his education. As the Court in *King v. DePauw University* explained, Doe will "be asked to explain another situation by future employers or graduate school admissions committees, which would require him to reveal that he was found guilty of sexual misconduct . . . . Successfully seeing this lawsuit to its conclusion could not erase the gap or the transfer; the question will still be raised, and any explanation is unlikely to fully erase the stigma associated with such a finding."[54]

Doe has suffered emotionally as a result of the University's actions in wrongfully branding him as a sex offender. Being labeled a sexually violent offender—even if retracted temporarily a month later—irreparably harms Doe, his reputation, and his future educational, professional, and social prospects. He will have to disclose it whenever he is asked if he has been the subject of a disciplinary proceeding or been found responsible for a violation, a common question in

---

[54] 2014 WL 4197507 (S.D. Indiana August 22, 2014)

applications for graduate or professional school, professional licensure, and in employment. Having a disciplinary record for a sexual offense is particularly inflammatory and prejudicial.

In a recent unpublished injunction decision,[55] an Easter District of Michigan court intervened on the accused's behalf prior to a University hearing because it felt that due process would violated if the student "will have been forced to defend himself against serious sexual assault allegations without adequate constitutional safeguards." The court reasoned that it "cannot, and will not, simply standby as the fruit continues to rot on this tree."

Re-prosecuting Mr. Doe, using the same unconstitutional policies and process and a new "coercion" definition, will force him to defend himself using rules that are not enforced and which are designed to deny him and the panel the ability to test credibility and arrive at a fair and reliable result. Similarly, the University denies Mr. Doe due process by instructing a re-constituted panel to re-try him using a new and different "coercion" definition – rather than the one which the University published, that they have (ostensibly) been trained to use, and which seemingly applies only to him.

## III.   Injunctive Relief Will Not Cause Greater Harm To Penn State Than To Plaintiff

---

[55] *Doe v. University of Michigan*, 2:18-CV-11776-AJT-EAS, Dkt. No. 30 (E.D. Mich. July 6, 2018), attached hereto as Exhibit 1.

Defendants can point to no evidence that Defendants will suffer any semblance of the severe and lasting consequences confronting Plaintiff. Defendants cannot claim harm from being enjoined in their efforts to establish a new definition of "consent" in their university disciplinary proceedings. Because the University is a state actor, they have no cognizable interest in maintaining an adjudicatory regime that dispenses with traditional safeguards and rights long recognized as essential to the procedural due process guaranteed by the Fourteenth Amendment. Moreover, the Defendant can publicly share their new definition of consent with Penn State students and train OSC employees on the updates and implement the new definition in cases where students had prior notice of the policy. The harm Plaintiff will suffer if this tainted process is not stopped is greater than any potential harm to the university.

So far as Defendants may claim that Plaintiff could be a "danger" to the student community, that assertion is simply negated by the fact that Plaintiff has never been subjected to any other disciplinary claims or proceedings, has never had a "no contact" order against him, has never been arrested or charged criminally, has maintained good standing in a difficult curriculum, and has not been placed on any type of interim suspension despite the fact that the conduct occurred 18 months ago.

## IV.   INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST

The public interest almost always favors the applicant for relief if the applicant demonstrates both a likelihood of success on the merits and irreparable injury.[56] Most significantly, however, it is simply axiomatic that the public interest *always* favors the application of constitutional norms.

## <u>CONCLUSION</u>

It is respectfully submitted that the Plaintiff has amply demonstrated that Defendants committed grave and serious violations of Plaintiff's due process rights. Plaintiff's injuries are concrete while Defendant's are, at best, speculative. Granting an injunction to stop the new hearing and reinstating the Plaintiff in good standing will mitigate the concrete injury that the Plaintiff has already suffered.

For the foregoing reasons, Plaintiff respectfully requests that the Court enter a preliminary injunction enjoining:  OSC from holding a new hearing on July 23, 2019, and; the University to expunge any disciplinary record related to this matter and re-admit him as a student in good standing. In the event that the Court is unwilling to terminate the disciplinary prosecution, it should nonetheless enjoin the hearing from going forward unless and until the University: amends its policies so that they comport with constitutional requirements; agrees to enforce those policies it has ignored, and; re-opens the investigation to permit Doe to follow up on new information and to address the retrofitted "coercion" definition.

---

[56] *AT & T Co. v. Winback & Conserve Program*, 42 F.3d 1421, 1427 n. 8 (3d Cir. 1994).

Respectfully Submitted,

July 18, 2019

s/ Andrew Shubin
Andrew Shubin
ID #63263
333 South Allen Street
State College, PA 16801
(814) 867-3115
(814) 867-8811 fax
shubin@statecollegelaw.com

*Attorney for Plaintiff,*
*John Doe*

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN DOE, | : | |
| *Plaintiff* | : | |
| | : | |
| v. | : | Civil Action No. 4:19-CV-1234 |
| | : | |
| THE PENNSYLVANIA STATE | : | |
| UNIVERSITY | : | |
| | : | |
| *Defendant* | : | |
| | : | |

I, Andrew Shubin, do hereby certify that all parties were served a true and correct copy of the forgoing memorandum via electronic delivery and Federal Express to counsel of record for the Defendants:

James A. Keller, Esquire
SAUL EWING ARNSTEIN & LEHR LLP
1500 Market Street, 38th Floor West
Philadelphia, PA 19102
215-972-1964
James.Keller@saul.com
*Attorney for Defendant*

July 18, 2019

s/Andrew Shubin
Andrew Shubin
Pa. Attorney I.D. No. 63263
333 South Allen Street
State College, PA 16801
(814) 867-3115
(814) 867-8811 fax
shubin@statecollegelaw.com
*Attorney for Plaintiff*