# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN DOE, | : |
| Plaintiff, | : No.: 4:19-cv-01234-MWB |
| | : |
| | : (Hon. Matthew W. Brann) |
| vs. | : |
| | : |
| THE PENNSYLVANIA STATE UNIVERSITY, | : Electronically Filed |
| Defendant. | : |

**Defendant The Pennsylvania State University's
Brief in Opposition to Plaintiff's Motion for an Emergency
Temporary Restraining Order and/or Preliminary Injunction**


Dated:  July 21, 2019

James A. Keller, Esquire/78955
Carolyn A. Pellegrini, Esquire/307026
1500 Market Street, 38th Floor
Philadelphia, PA 19102
(215) 972-1964
james.keller@saul.com
carolyn.pellegrini@saul.com

Cory S. Winter, Esquire/306552
2 North Second Street, 7th Floor
Harrisburg, PA 17101
(717) 257-7562
cory.winter@saul.com

*Attorneys for Defendant
The Pennsylvania State University*

# Table of Contents

Table of Authorities ........................................................................................ iii

I.   Introduction.......................................................................................1

II.  Background.........................................................................................2

III. Questions Presented..........................................................................7

IV.  Argument. .........................................................................................8

    A.   Doe has not suffered and cannot demonstrate irreparable harm...........9

    B.   Doe has not and cannot show a likelihood of success on the
        merits of his claims...........................................................................11

        1.   Doe has not demonstrated a likelihood of success on
            the merits of his due process claim. ...........................................12

            a.   Student disciplinary proceedings at colleges and
                universities are entitled to deference. .............................13

            b.   Doe's complaints do not raise due process violations....17

                i.   Doe was not denied the opportunity to be
                    heard. ...............................................................18

                ii.  Doe's due process rights were not violated
                    by posing questions to Roe through the Panel. ....19

                iii. The University's procedures specifically
                    contemplate that a new hearing may be granted
                    on appeal, there is no Due Process violation. ......20

                iv.  The distribution of a clarifying document
                    regarding the meaning of "coercion" in advance
                    of the July 23, 2019 hearing is not a violation
                    of due process.....................................................24

                v.   The University's investigative and hearing
                    procedures were fair and impartial......................26

2.    Doe also has not demonstrated a likelihood of success on the merits of his Title IX claim. ........................................................29

a.    Doe cannot succeed on his Title IX claim under any recognized theory of Title IX liability. ............................29

C.    Granting the preliminary injunction will result in greater harm to the University and its students than to Doe. ....................................33

D.    The University and the public at large share a strong interest in providing a safe educational community and conserving resources. ...........................................................................................34

V.    Conclusion. ...................................................................................................35

Word Count Certificate ..........................................................................................37

Certificate of Service ..............................................................................................38

# Table of Authorities

**FEDERAL CASES**

*Borrell v. Bloomsburg Univ.*, 955 F. Supp. 2d 390 (M.D. Pa. 2013) ......................12

*Child Evangelism Fellowship of N.J., Inc. v. Stafford Twp. Sch. Dist.*, 386 F.3d 514 (3d Cir. 2004) ................................................................................8

*Cont'l Grp. Inc. v. Amoco Chems. Corp.*, 614 F.2d 351 (3d Cir. 1980) ...................9

*Doe v. Pa. State Univ.*, No. 4:18-cv-02350, 2019 WL 2324506 (M.D. Pa. May 31, 2019)...................................................................................passim

*Doe v. Pennsylvania State University*, 336 F. Supp. 3d 441 (M.D. Pa. 2018) ...................................................................................................27

*Doe v. Univ. of S.C.*, C/A No. 3:18-161-TLW-PJG, 2018 WL 1215045 (D.S.C. Feb. 12, 2018)..........................................................23

*Doe v. University of Michigan*, 325 F. Supp. 3d 821 (E.D. Mich. 2018), *appeal docketed*, No. 18-1870 (6th Cir. 2019)........................................11

*Flaim v. Med. Coll. of Ohio*, 418 F.3d 629 (6th Cir. 2005)....................................15

*Furey v. Temple Univ.*, 884 F. Supp. 2d 223 (E.D. Pa. 2012)...........................16, 22

*Gomes v. Univ. of Me. Sys.*, 365 F. Supp. 2d 6 (D. Me. 2005)................................15

*Gorman v. Univ. of R.I.*, 837 F.2d 7 (1st Cir. 1988)..........................................15, 33

*Goss v. Lopez*, 419 U.S. 565 (1975) ......................................................................15

*Harris v. St. Joseph's Univ.*, No. 13-3937, 2014 WL 1910242 (E.D. Pa. May 13, 2014)................................................................................33

*Howe v. Penn State – Harrisburg*, No. 16-cv-102, 2016 WL 393717 (M.D. Pa. Feb. 2, 2016) ........................................................................10, 14

*Hudson v. U.S.*, 522 U.S. 93 (1997).......................................................................23

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797 (3d Cir. 1989) .....................................................................................................9

iii

*Jaksa v. Regents of Univ. of Mich.*, 597 F. Supp. 1245 (E.D. Mich. 1984), *aff'd*, 787 F.2d 590 (6th Cir. 1986) ....................................14, 20

*Johnson v. Ebbert*, No. 15-cv-578, 2015 WL 1638612 (M.D. Pa. Apr. 13, 2015) ....................................................................................10, 35

*Jones v. Board of Governors of University of North Carolina*, 704 F.2d 713 (4th Cir. 1983) .................................................................10

*Kershner v. Mazurkiewicz*, 670 F.2d 440 (3d Cir. 1982) ..........................8

*Nash v. Auburn Univ.*, 812 F.2d 655 (11th Cir. 1987) .............................15

*Osei v. Temple Univ.*, No. 15-cv-2042, 2011 WL 4549609 (E.D. Pa. Sept. 30, 2011), *aff'd*, 518 F. App'x 86 (3d Cir. 2013).....................16

*Osteen v. Henley*, 13 F.3d 221 (7th Cir. 1993) .........................................13

*P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504 (3d Cir. 2005) ..........................................................8

*Palmer by Palmer v. Merluzzi*, 868 F.2d 90 (3d Cir. 1989) .....................34

*Reilly v. City of Harrisburg*, 858 F.3d 173 (3d Cir. 2017) ..................8, 11

*Ross v. Pa. State Univ.*, 445 F. Supp. 147 (M.D. Pa. 1978) .....................12

*Segal v. Temple Univ. Sch. of Law*, 1999 WL 1210838 (E.D. Pa. Dec. 8, 1999), *aff'd*, 242 F.3d 371 (3d Cir. 2000) .......................................16

*Sill v. Pa. State Univ.*, 462 F.2d 463 (3d Cir. 1972) ................................13

*Tanyi v. Appalachian State University*, No. 5:14-cv-170RLV, 2015 WL 4478853 (W.D.N.C. July 22, 2015)............................................24

*Yusuf v. Vassar Coll.*, 35 F.3d 709 (2d Cir. 1994)...................................31

## STATE CASES

*Gati v. Univ. of Pittsburgh*, 91 A.3d 723 (Pa. Super. Ct. 2014).............16

*Psi Upsilon of Philadelphia v. Univ. of Pa.*, 591 A.2d 755 (Pa. 1991)...................15

## OTHER AUTHORITIES

*Black's Law Dictionary* .............................................................................25

*Black's Law Dictionary* (11th ed. 2019)...................................................25

## I.      Introduction.

Plaintiff John Doe was found responsible for sexual misconduct at Defendant The Pennsylvania State University by a Title IX Decision Panel in April 2019.  He appealed.  **An appeal was granted**.  Consistent with University policy, a new Title IX Decision Panel hearing is now scheduled for July 23, 2019.

With his pending motion, Doe is asking the Court to **enjoin favorable relief obtained on his internal appeal** and prevent a new hearing from going forward.  There is no legal or logical basis for this position.  Doe also complains throughout his briefing[1] about a "delay" in proceedings while simultaneously **seeking to stop the hearing (which would of course end any "delay") from going forward**.

The Court should decline to intervene in the University's internal process in this way—particularly before Doe even knows what the outcome is.  He could prevail on July 23 and be found not responsible.  It is also notable that Doe intimates throughout his filing that he needs a final outcome soon so he can move forward with his life, while at the same time seeking to stop the very proceedings that would generate that outcome.

This internally contradictory position is subject to a simple explanation.  Doe's complaint of "delay" is a sideshow, a mere distraction from the real point of this exercise.  Doe does not want there to be any outcome, nor give Jane Roe an

---

[1]     Doe's brief significantly exceeds the Court's word count and page limitations, and no Order was entered allowing same.

opportunity to appear before a new Panel.  Doe instead wants to accelerate the

process, skip the hearing, and have this Court decree that he is not responsible for

any violation of the University's Code of Conduct.  This is not contemplated by

law nor by the University's policy.  If Doe's injunction request is granted, this

Court assuredly will be asked on an emergent and repeated basis to superimpose its

own view on internal, administrative student conduct procedures **before the**

**University even reaches a final decision**.  The Court should respectfully reject

this overture, let the University hearing go forward, and let the process play out as

it would in every other case.

## II.    Background.

Jane Roe, a University student, and Plaintiff John Doe, also a University

student, were in the Schreyer Honors College at Penn State.  Roe and Doe were

together on January 26-27, 2018.  Roe alleges that while they were together, Doe

digitally penetrated her vagina and had sexual intercourse with her without her

consent.  Doe disputes this.

The matter moved forward through the University's extensive investigation

and conduct process, proceeded to a hearing before a three-person Panel (one man

and two women), and a decision was rendered on April 12, 2019.  (Dkt. No. 1,

Compl., at Ex. I).  The Panel found Doe responsible for a violation of the

University's Code of Conduct, and specifically determined that Roe did not

2

consent to sexual activity, but instead was coerced by Doe.  The Panel determined that Doe should be suspended from the University for the summer 2019 and fall 2019 semesters, lose campus housing, complete counseling, and engage in education around sexual misconduct.

Consistent with the University's Special Protocols for Title IX Allegations, the University's Title IX Coordinator was notified of the outcome and "continue[d] to work with the parties as appropriate."  (*Id.* at Ex. C, at p. 20, § VI(D)(24)(d)).  In working through the Panel's decision, the Title IX Coordinator determined that he needed clarification of the rationale behind the Panel's findings.  Doe was notified of this in writing.  (*Id.* at Ex. J).

On April 26, 2019, the Title IX Coordinator wrote to the Panel chairperson and asked for clarification on how the Panel interpreted "coercion" in the context of reaching their decision.  (*See id.* at Ex. K).  The Panel explained to the Title IX Coordinator that they relied upon common dictionary definitions of "coercion," as well as training materials they received regarding consent that explained coercion could include such things as "pressure, duress, cajoling, compulsion, or abuse."  (*Id.* at Ex. M).  The Panel explained that it determined Doe "pressured" and "cajoled" Roe to engage in sexual conduct, thereby coercing her.  This was all explained to Doe, in turn, on May 15, 2019.  (*See id.* at Ex. L).

To Doe's benefit, the University stayed the deadline for a decision on his appeal of the Panel decision while this clarification was obtained.  After this clarification was obtained, on May 23, 2019, Danny Shaha, the University's Assistant Vice President for Student Affairs, wrote to appellate officer Dr. Alan Rieck.  In writing to Dr. Rieck, Mr. Shaha **acknowledged that the Panel may have misinterpreted** the term "coercion" and urged that the appellate officer refer this case to a new hearing panel.  (*See id.* at Ex. P).  Doe's appeal was then **granted** on June 13, 2019, and the case was referred to a new Title IX Decision Panel.  The hearing before that new Panel is scheduled to proceed on July 23, 2019.

In short, the process worked.

Despite *prevailing* on his request for an appeal, Doe suggests that a new hearing is not contemplated by the University's procedures.  This is simply wrong. The University's internal appeal procedures explicitly state that "[i]f an appeal is granted on the grounds that the respondent or complainant has been deprived of their rights and/or stated procedures were not followed that affected the outcome for the student(s), the matter ***will* be referred to a new hearing board or Title IX Decision Panel to be reheard**."  (*Id.* at Ex. C, at p. 26, § VI(G)(2)(g)(i) (emphasis added)).  As noted, the University determined that the Panel likely used an incorrect interpretation of coercion, which impacted the outcome for Doe.  Exactly

4

consistent with the University's procedures, the matter has been referred to a new Title IX Decision Panel.

In anticipation of this new hearing, on July 16, 2019, Doe was provided with the same document the new Panel has received clarifying the term "coercion." (*See id.* at Ex. W).  Doe intentionally misreads the language and purpose of this clarifying document.  Doe (and his advisor) received this document so they will know, as will Roe, *exactly* how the Panel will evaluate coercion.  This allows Doe to tailor his statements, his questions, or other aspects of his hearing presentation to the issue of "coercion" as he deems appropriate.  Despite his hollow protestations to the contrary, this guidance document is actually **incredibly helpful to Doe**.  For Doe to suggest that it is nefarious, or somehow improper, is remarkable.

In his briefing, Doe solely focuses on the word "cajoling" that appears in this clarifying document and says—"see, they 'retrofitted' the meaning of coercion to include 'cajoling,' knowing that the prior Panel found that I 'cajoled' Roe—and this means the outcome of the July 23 hearing is a *fait accompli*."  Indeed, Doe's brief rests almost entirely on this view.  Unfortunately for Doe, this intentionally restrictive view ignores **every other word** in the clarifying document.  (*See id.*). The clarifying document also explains, in pertinent part:

- "Coercion is an *unreasonable amount of pressure* to engage in sexual activity."  (italics in original).  In other words, while cajoling is defined as **a** type of pressure, simple "cajoling" is not enough to be coercion—it must be an "unreasonable amount" of cajoling.

5

- "Coercion is more than an effort to gain consent, or persuade another person to engage in sexual activity."

- "When determining if an individual's behavior constitutes coercion, **context is everything**."  (Emphasis added).  In other words, "cajoling" alone is not coercion.  It must be cajoling to the point "where the pressure is or becomes objectively unwelcomed and unreasonable."

- "It's important to realize that people negotiate sex all of the time.  Some amount of pressure may be okay, but too much pressure crosses the line and becomes unreasonable."

- The Panel should consider four factors in determining whether pressure (or cajoling) was unreasonable:  1) duration (how long is it occurring?); 2) frequency (how often pressuring?); 3) isolation (happening in isolated one-on-one setting?); and 4) intensity.

(*Id.*).  There is simply no doubt that this document is helpful to the Panel and helpful to the parties—including Doe—in evaluating the facts of this case.  It provides a much more robust explanation of coercion and, to Doe's benefit, explains that merely finding "cajoling" is not enough for coercion, absent, in context, an objectively unreasonable amount of pressure.  This is <u>not</u> a revision of the University's policy, contrary to Doe's suggestion.  It is guidance to help the Decision Panel in their deliberations.

Every single word in the University's policy is not defined—if that were the case, the definitions would run for thousands of pages and swallow the policy itself.  Exhibit W is a clarifying document provided to assist the Panel in assessing the evidence it receives.

What the University seeks to do on July 23 is convene a new Panel hearing using this clarifying definition of "coercion" and have the new Panel determine whether Doe is responsible for sexual misconduct based on the allegations made by Roe. There is zero reason to enjoin this hearing before it even occurs, and before we know what the outcome may be. Doe's request for a TRO and for injunctive relief should be denied.

### III.   Questions presented.

**A.**   Whether Doe is entitled to injunctive relief to preclude a new hearing he was granted after *his own successful internal appeal* before the hearing even occurs?
**Suggested Answer:** No.

**B.**   Whether Doe is entitled to a host of substantive remedies, from reinstatement in good standing at the University to expungement of his disciplinary file, as part of his relief in a TRO proceeding?
**Suggested Answer:** No.

**C.**   Whether Doe has demonstrated irreparable harm to support injunctive relief?
**Suggested Answer:** No.

**E.**   Whether the harm to the University from an injunction outweighs harm to the Plaintiff from denying it?
**Suggested Answer:** Yes.

**F.**   Whether the public interest supports granting or denying injunctive relief?
**Suggested Answer:** The public interest in allowing universities to enforce their internal, administrative policies regarding sexual misconduct, and have outcomes that result from those policies, supports the denial of injunctive relief.

## IV.    Argument.

Preliminary injunctive relief is an "extraordinary remedy." *P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005).  To obtain injunctive relief, a party must demonstrate:  (1) a likelihood of success on the merits; (2) that he or she will suffer irreparable harm if the injunction is denied; (3) that granting relief will not result in even greater harm to the non-moving party; and (4) that the public interest favors such relief.  *Child Evangelism Fellowship of N.J., Inc. v. Stafford Twp. Sch. Dist.*, 386 F.3d 514, 524 (3d Cir. 2004).  In *Yonkers*, the Court recognized that "[t]he burden lies with plaintiff to establish every element in its favor, or the grant of a preliminary injunction is inappropriate."  428 F.3d at 508.  Whether to grant or deny a preliminary injunction is within the sound discretion of the court.  *Kershner v. Mazurkiewicz*, 670 F.2d 440, 443 (3d Cir. 1982).  The first two factors—likelihood of success on the merits and irreparable harm—are the "gateway" factors and most critical.  *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017), on remand, 366 F Supp. 3d 451 (MD. Pa. 2018).  If a plaintiff cannot demonstrate those two factors, the analysis is over.  If he can, then the latter two factors are considered, and all four are balanced by the court.  *Id.*

8

### A.     Doe has not suffered and cannot demonstrate irreparable harm.

The simplest reason to deny Doe's request to enjoin the new Panel hearing is

this:  he cannot demonstrate irreparable harm.  None of us has any idea what the

outcome of the new Panel hearing will be.  For example, <u>Doe might be found not

responsible</u>, mooting a large percentage, if not the entirety, of his Complaint.

There is no good reason to stop the hearing from going forward on Tuesday, July

23.  By the end of the week, there will be a new outcome.  Doe may be satisfied

with it.  He may not be, in which case he can take an internal appeal and, if needed,

can proceed with this lawsuit and even seek to amend his Complaint.  In either

event, there is no "irreparable harm".  To the contrary, granting injunctive relief

and negating the hearing will do irreparable harm – both to the other party

involved (Ms. Roe) and to the University's process.

The hearing should go forward.

A showing of irreparable harm generally requires a "clear showing of

immediate irreparable injury."  *Cont'l Grp. Inc. v. Amoco Chems. Corp.*, 614 F.2d

351, 359 (3d Cir. 1980) (quotations and citation omitted).  The harm must be of a

type that money damages will not adequately compensate the plaintiff.  *Instant Air

Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801-02 (3d Cir. 1989).

"[M]ore than a risk of irreparable harm must be demonstrated.  The requisite for

injunctive relief has been characterized as a 'clear showing of immediate

irreparable injury,' or a 'presently existing actual threat.'" *Johnson v. Ebbert*, No. 15-cv-578, 2015 WL 1638612, at *2 (M.D. Pa. Apr. 13, 2015)[2] (quoting *Cont'l Grp., Inc.*, 614 F.2d at 359).

Doe simply cannot show irreparable injury if the hearing moves forward. He may have no injury. He may claim some injury. But we will not know until the actual hearing takes place. Additionally, to the extent Doe argues that the collateral impact of having another hearing is causing him lost wages or new educational opportunities, he still will not suffer irreparable harm. As Judge Mannion noted in the case of in *Howe v. Penn State – Harrisburg*, No. 16-cv-102, 2016 WL 393717, at *6 (M.D. Pa. Feb. 2, 2016), if the plaintiff can demonstrate lost scholarships or wages, those "can be compensated with monetary damages." Judge Mannion also logically held that "even if the plaintiff would experience a delay as a result of his suspension [or in this case, additional proceedings], this would not constitute irreparable harm which could not be compensated with monetary damages in the future, if warranted." *Id.* (citing *Schulman v. Franklin & Marshall Coll.*, 538 A.2d 49, 52 (Pa. Super. Ct. 1988)).

Finally, Doe's situation is easily distinguishable from the cases he cites in support of his irreparable harm argument. For example, in *Jones v. Board of Governors of University of North Carolina*, 704 F.2d 713 (4th Cir. 1983), the

---

[2]    All unpublished decisions cited herein are attached as Ex. 1.

university cancelled the plaintiff's registration as a result of the outcome of her disciplinary hearing—immediately barring the plaintiff from attending classes. Here, Doe voluntarily chose not to enroll in classes for the spring 2019 semester. (Dkt. No. 1. ¶ 99, n. 66).  Any alleged "gap in his education" is self-imposed.

Doe's attempt to analogize his position to that of the plaintiff in *Doe v. University of Michigan*, 325 F. Supp. 3d 821 (E.D. Mich. 2018), *appeal docketed*, No. 18-1870 (6th Cir. 2019), is also an overreach.  In that case, the court determined to take action because the plaintiff "may presently be without sufficient due process protection" and was at "immediate risk of expulsion."  *Id.* at 826.

The same cannot be said here.  There is no indication that Doe is currently being deprived of any sort of due process right – in fact, as of this moment, Doe's prior responsible finding has been vacated and a new hearing is scheduled.  He is not at immediate risk of expulsion.  He is not even enrolled.

Quite simply, Doe can neither plead nor demonstrate any irreparable harm from a hearing that has not even occurred.

### B.     Doe has not and cannot show a likelihood of success on the merits of his claims.

The lack of irreparable harm alone dooms Doe's TRO request.  *Reilly*, 858 F.3d at 179.  Doe also cannot demonstrate the other "most important" prong of injunctive relief—a likelihood of success on the merits.

11

### 1.    Doe has not demonstrated a likelihood of success on the merits of his due process claim.

To state a claim for a procedural due process violation under § 1983, a plaintiff must show:  (1) he was deprived of protected property or liberty interest; (2) the deprivation was without due process; (3) defendant subjected or caused plaintiff to be subjected to this deprivation without due process; (4) the defendant was acting under color of state law; and (5) the plaintiff suffered injury as a result. *Borrell v. Bloomsburg Univ.*, 955 F. Supp. 2d 390, 402 (M.D. Pa. 2013) (quoting *Sample v. Diecks*, 885 F.2d 1099, 1113-14 (3d Cir. 1989)).  In this circuit, courts have assumed, but have not specifically held, that a student at a public institution has a property interest in continuing his or her education.  *Ross v. Pa. State Univ.*, 445 F. Supp. 147, 152 (M.D. Pa. 1978).

In his Complaint, Doe alleges a violation of due process resulting in what he calls his "effective removal" from the University.[3]  Even assuming that a student voluntarily withdrawing from the University because of concerns about process somehow implicates a protected property interest, Doe was afforded all process required by the law and the Code.

---

[3]    *See* Dkt. No. 1 at ¶ 99.  What Doe buries in a footnote is that he actually was not suspended or "removed" at all—*he voluntarily withdrew from the University for Spring 2019*.  *See id.* at ¶ 99 n. 66.

a.    *Student disciplinary proceedings at colleges and universities are entitled to deference.*

As Judge Posner has noted, Courts should be "reluctant to encourage further bureaucratization by judicializing university disciplinary proceedings, mindful also that one dimension of academic freedom is the right of academic institutions to operate free of heavy-handed governmental, including judicial, interference." *Osteen v. Henley*, 13 F.3d 221, 225-26 (7th Cir. 1993).  The role of courts is not to retry, *de novo*, disciplinary charges against students.  *Sill v. Pa. State Univ.*, 462 F.2d 463, 470 (3d Cir. 1972).  Indeed, as this Court has stated, "it is not this Court's job to judge the wisdom of the University's disciplinary procedures, but instead to ask whether those procedures deserve a blow from the heavy hammer of the United States Constitution."  *Doe v. Pa. State Univ.*, No. 4:18-cv-02350, 2019 WL 2324506, at *5 (M.D. Pa. May 31, 2019).

This matter is not about a single letter from the Office for Civil Rights, a 2015 task force at the University, or any of the other distractions raised by Doe. This matter is squarely about the ability of a university to investigate an allegation that a student forced his fingers into the vagina of a classmate and had painful sexual intercourse with her, without her effective consent.  The University **must** be able to investigate such allegations.  It **must** be able to render a decision on responsibility.  It **must** be able to decide what sanctions are appropriate.  The strength of these considerations far outweigh Doe's request for injunctive relief,

13

for which he can neither show likelihood of success on the merits nor irreparable harm.

As alluded to above, Judge Mannion evaluated a very similar injunctive request, against this same University, in *Howe*, 2016 WL 393717. Doe (and his counsel) know full well that the *Howe* case is squarely on point.

The plaintiff in *Howe* sought an injunction to halt imposition of a suspension entered against him at the University's Harrisburg campus, and order the University to let him back into school. *Id.* at *1. He, much like Doe, primarily focused on the University's alleged breach of his due process rights. *Id.* at *4.

In denying the plaintiff's request for this extraordinary relief, Judge Mannion noted that all that due process requires is "notice of the charges they [the respondent] face and the nature of the evidence supporting those charges." *Id* at *5. As referenced above and detailed below, Doe here had abundant notice of the charges he faced, and multiple opportunities to discuss and review the evidence supporting those charges, both before and at the disciplinary hearing. Doe also had a chance to appeal the outcome, which he did, and **his appeal was granted**. Right now, his suspension is on hold, pending a new hearing.

"[T]he primary purpose of a university is to educate its students [and, accordingly] . . . a school disciplinary proceeding is not a criminal trial." *Jaksa v. Regents of Univ. of Mich.*, 597 F. Supp. 1245, 1250 (E.D. Mich. 1984) (internal

marks and citations omitted), *aff'd*, 787 F.2d 590 (6th Cir. 1986).  Unlike the

criminal setting, in a university disciplinary hearing, due process is sufficient so

long as the University provides the accused student notice and an opportunity to be

heard.  *Goss v. Lopez*, 419 U.S. 565, 579 (1975).  *See also Gomes v. Univ. of Me.

Sys.*, 365 F. Supp. 2d 6, 15 (D. Me. 2005) ("At a minimum, students facing

disciplinary action, such as a suspension, must be given some kind of notice and

afforded some kind of hearing." (internal citations omitted)); *Psi Upsilon of

Philadelphia v. Univ. of Pa.*, 591 A.2d 755, 760 (Pa. 1991); *Nash v. Auburn Univ.*,

812 F.2d 655, 664 (11th Cir. 1987) (student rights in the disciplinary context "are

not co-extensive with the rights of litigants in a civil trial or with those of

defendants in a criminal trial."); *Gorman v. Univ. of R.I.*, 837 F.2d 7, 12-14 (1st

Cir. 1988) (same).

　　　An accused student has the right to receive notice of the allegations against

him, and a right to respond and defend, which will generally include the

opportunity to make at least one statement and present evidence.  *Flaim v. Med.

Coll. of Ohio*, 418 F.3d 629, 636 (6th Cir. 2005).  Once a court has satisfied itself

that "fundamentally fair procedures to determine whether the misconduct has

occurred," the inquiry ends absent extraordinary circumstances.  *Id.* at 634

(quotations omitted).

Courts recognize that a state-related institution, such as the University, is entitled to establish rules and regulations for disciplinary proceedings.  Courts also recognize that disciplinary hearings are part of the educational process.  *See Furey v. Temple Univ.*, 884 F. Supp. 2d 223, 247 (E.D. Pa. 2012) (recognizing state-related university's  interest in administering "discipline in a way that contributed to the educational process").  Courts should only weigh in on these internal disciplinary proceedings where it is clear that constitutional rights have been infringed.  *Segal v. Temple Univ. Sch. of Law*, 1999 WL 1210838, at *1 (E.D. Pa. Dec. 8, 1999), *aff'd*, 242 F.3d 371 (3d Cir. 2000) (citing *Esteban v. Cent. Mo. State Coll.*, 415 F.2d 1077, 1090 (8th Cir. 1969)).  *See also Gati v. Univ. of Pittsburgh*, 91 A.3d 723, 731 (Pa. Super. Ct. 2014) (state-related university has broad discretion to implement and enforce disciplinary rules).

Additionally, universities in this Commonwealth enjoy a presumption of impartiality and fairness in favor of school administrators in a disciplinary proceeding setting.  *Furey*, 884 F. Supp. 2d at 255; *Osei v. Temple Univ.*, No. 15-cv-2042, 2011 WL 4549609, at *11 (E.D. Pa. Sept. 30, 2011), *aff'd*, 518 F. App'x 86 (3d Cir. 2013).  Doe bears the burden of rebutting this presumption with sufficient evidence.  *Furey*, 884 F. Supp. 2d at 255 (allegations of prejudice of university hearing bodies must be based on more than mere speculation and tenuous inferences).  Doe has not done so.

16

Before going through Doe's individual due process arguments, it must be noted that Doe manages to file a thirty-page brief about due process under the University's Title IX procedures without **once** mentioning this Court's ruling on May 31, 2019 that rejected many of these same arguments. *See Doe v. Pa. State Univ*., 2019 WL 2324506.  This is particularly remarkable as the same counsel represented the "John Doe" Plaintiffs in each case.  The failure to acknowledge, let alone distinguish, this Court's May 31 Memorandum Opinion is a glaring omission, at best.

> b.    *Doe's complaints do not raise due process violations.*

Doe claims his due process rights were violated in the following ways:

i.     Doe claims he was denied the opportunity to be heard because Roe was purportedly allowed to submit new evidence at the prior hearing, and he was not permitted to respond.  (Dkt. No. 4, Pl.'s Br. in Supp. of Mot. for TRO and/or Prelim. Inj., at 13).

ii.    Doe claims that he was denied the right to directly cross-examine Roe. He contends that submitting questions to the Panel, to in turn be asked of Roe, was insufficient.  (*Id.* at 14-17).

iii.   Doe claims that holding a new hearing, rather than simply vacating the prior Panel's finding, was a violation of due process.  (*Id.* at 17-19).

iv.    Doe claims that the University's investigative model and hearing process denied him the right to an impartial decision maker.  (*Id.* at 19-21).

v.     Doe claims that the University failed to follow its own policies at and since the hearing.  (*Id.* at 21-22).

These allegations will be addressed in turn.

    i. <u>Doe was not denied the opportunity to be heard.</u>

Under the University's procedures, Doe was permitted to personally address the Panel and submit questions to be posed to the other party by and through the Panel.  (*See* Dkt. No. 1 at Ex. C, at 19-20).  He was given the right to be heard in this way.

Stretching to articulate a due process claim, Doe contends that Roe was permitted to prevent "new information" during the hearing, that he was not given an opportunity to respond, and that this constituted a due process violation.  (*See id.* ¶¶ 62-65).  First of all, Doe's own words are as follows:  "[Roe] provided an *ad hoc* explanation of the meaning of her texts and prior statements to the investigator." (*Id.* ¶ 63).  In other words, Roe was permitted to personally address the hearing authority, just as Doe was.  This is no due process violation, this is exactly what is contemplated by the University's policy:

> The respondent and the complainant will each have the opportunity to personally address the hearing authority in person so that they may highlight the information that they believe is most relevant to the hearing authority's deliberation and so that they may respond to questions that may be posed by the hearing authority and the investigator, if any[.]

(*Id.* at Ex. C, at p. 20, § (VI)(D)(20)).  The notion that Roe talking to the Panel was somehow "new information" is absurd, and falls woefully short of stating any due process violation.

Perhaps more importantly, even if there was some due process issue with the April 2019 hearing, **the University has scheduled a new hearing** which can cure any such issues.  In other words, any impact of Doe's alleged failure to be heard at the last hearing is moot, because the last hearing Panel decision has been reversed and is no longer binding.

> ii.  <u>Doe's due process rights were not violated by posing questions to Roe through the Panel</u>.

The University's Code explains that parties may "suggest questions to be posed to the other party by and through the Panel," and that the Panel has authority to "review the proposed question(s) for relevance and appropriateness before they are posed to the other party."  (*Id.* at Ex. C, at p. 20, § VI(D)(22)).  Doe cites to non- binding Sixth Circuit opinions and a University decision **under a different policy** in support of his contention that this cross-examination process somehow deprived him of due process.  Amazingly, Doe completely fails to acknowledge this Court's opinion in May 31, 2019, where his counsel made this same exact argument about this exact same cross-examination procedure.  The Court rejected this argument in that May 2019 opinion and granted the University's motion to dismiss the due process claim, noting:  "courts have upheld cross-examination

19

procedures similar to the one offered to Mr. Doe." *Doe v. Pa. State. Univ.,* 2019 WL 2324506, at *2 (citing *Furey v. Temple Univ.*, 884 F. Supp. 2d at 252 (finding due process satisfied where the accused student "was able to cross examine the witness by posing questions through the Chair.")).  There was no due process violation here.  Both parties had the right to submit questions to the Panel, and the Panel had the authority to screen the questions and then ask those it deemed to be relevant and appropriate.

Finally, even if Doe disagrees with the decisions made by the Panel about what questions to ask, that disagreement is not a <u>due process</u> violation. *See., e.g.*, *Jaksa*, 597 F. Supp. at 1251 (university's "disregard of its own regulation is a constitutional deprivation only where there is an independent due process right to the procedure contained in the agency's rule").  Doe may not like certain decisions made by the Panel or decisions regarding evidence supplied to the Panel, but what matters is whether the University followed its process in making those decisions.

It did.

iii.  <u>The University's procedures specifically contemplate that a new hearing may be granted on appeal, there is no Due Process violation.</u>

Doe next seems to suggest that the University has violated due process by vacating the prior Panel decision and scheduling a new hearing, instead of just vacating the prior Panel decision, period.  (Dkt. No. 4 at pp. 17-19).  This argument

20

makes no sense and is directly belied by the applicable University appeal

procedures which state, in pertinent part, that:

> If an appeal is granted on the grounds that the respondent
> or complainant has been deprived of their rights and/or
> stated procedures were not followed that affected the
> outcome for the student(s), the matter **will** be referred to
> a new hearing board or Title IX Decision Panel to be
> reheard.  (Emphasis added).

(Dkt. No. 1 at Ex. C, at p. 26, § VI(G)(2)(i)).  The University is literally following

the exact procedures that apply when it believes that a student—in this case, Doe—

may have been impacted by a mistake in the prior hearing.  It granted Doe's

appeal, and it is referring the matter to a new Title IX Decision Panel.  If the

University did <u>not</u> schedule a new hearing, both parties might have a claim of a

due process violation.  But to suggest the University has somehow violated due

process by precisely following its process makes no sense, factually or legally.

To the extent that Doe is arguing that there was a "violation" of process

because Mr. Shaha, as designee of Ms. Feldbaum, interjected and recommended

that a new hearing occur, this argument, too, is unavailing.  First, Mr. Shaha

submitted his letter to the appeals officer as a designee of Senior Director

Feldbaum, who, on behalf of the University, has the authority to request a review

of a hearing decision under Section III(A)(8) of the Code of Conduct. (Dkt. 1 at

Ex. C, Section III(A)(8).  Moreover, the University's appeal processes clearly

state that "[n]o decision should be overturned or modified without consultation

with the Vice President for Student Affairs, **Senior Director**, or Chancellor."
(Dkt. No. 1 at Ex. C, at p. 26, § VI(G)(2)(f)).  Mr. Shaha had every right to
intervene as Ms. Feldbaum's designee.  In fact, had the University *not* solicited the
input of Senior Director Feldbaum (or her designee), one of the parties might claim
*that* to be a process violation.  Seeking input and consultation is exactly what is
expected.

Moreover, Doe flat-out misstates what Mr. Shaha wrote, arguing in his Brief
that Mr. Shaha "instructed the appeals officer to order a re-prosecution."  (Dkt. No.
4, at 21).  This is not accurate.  Instead, Mr. Shaha wrote as follows: "I formally
**request** that you refer the case to a new hearing board."  (Dkt. No. 1, at Ex. P
(emphasis added)).  This is not a demand or an instruction, but a "request," in Mr.
Shaha's own words.  Moreover, the word "prosecution" never appears, and Doe's
attempt to use this inflammatory word should be rejected.  The handling of Doe's
appeal was entirely consistent with the University's process, and most importantly,
<u>**he suffered no prejudice—his appeal was granted**</u>.

Finally, even if Mr. Shaha's involvement with the appeal could somehow be
construed as a literal "deviation" from the Code, it was minor and, as noted, did
not affect the outcome.  It is not as though Doe lost his appeal as a result.  His
appeal was granted, giving him a second chance to defend the merits of the charges
against him.  *See Furey*, 884 F. Supp. 2d at 249 ("A minor deviation from a

school's regulations that does not affect the fundamental fairness of the process is not itself a due process violation.") (citing *Winnick v. Manning*, 460 F.2d 545, 550 (2d Cir. 1972)).

Doe's "double jeopardy" argument against a new hearing is similarly unavailing.  At the outset, courts—including the United States Supreme Court—have routinely held the double jeopardy protections of the Constitution do not apply beyond criminal proceedings.  *See, e.g.*, *Hudson v. U.S.*, 522 U.S. 93, 98-99 (1997) ("The [Double Jeopardy] Clause protects only against the imposition of multiple <u>criminal</u> punishments for the same offense.") (citing *Helvering v. Mitchell*, 303 U.S. 391, 399 (1938) (the Double Jeopardy clause prohibits the government from "attempting a second time to punish criminally for the same offense")).  Moreover, numerous courts have explicitly confirmed that the Double Jeopardy Clause does not apply in the context of student conduct proceedings. *See, e.g.*, *Doe v. Univ. of S.C.*, C/A No. 3:18-161-TLW-PJG, 2018 WL 1215045, at *6 n.10 (D.S.C. Feb. 12, 2018) (holding that the Double Jeopardy Clause does not apply to university disciplinary proceedings), report and recommendation adopted, 2018 WL 1182508 (D.S.C. Mar. 6, 2018) (citing *Hudson*, 522 U.S. at 98-99; *Ctr. for Participant Ed. v. Marshall*, 337 F. Supp. 126, 137 (N.D. Fla. 1972) (finding a university disciplinary proceeding was civil in nature, rather than criminal, because it did not involve a loss of life or liberty and, therefore, the Double Jeopardy clause

23

was not implicated); *Paine v. Bd. of Regents of Univ. of Tex. Sys.*, 355 F. Supp. 199, 203 (W.D. Tex. 1972) (providing that a university's disciplinary rules were civil, remedial, or administrative in nature, and thus, did not implicate the Double Jeopardy Clause)).

To the extent Doe attempts to analogize his case to the unpublished, non-binding opinion of *Tanyi v. Appalachian State University*, No. 5:14-cv-170RLV, 2015 WL 4478853 (W.D.N.C. July 22, 2015), his argument falters. The court in *Tanyi* found that holding a second hearing was unfair where the university <u>admitted</u> that it had failed to prove its case against the accused student during the first hearing and could articulate no legitimate reason for a re-hearing. *Id.* at *6. Here, there was both a finding against Doe at the initial hearing and a legitimate reason for a new hearing – the procedural irregularity discussed at length above. (Dkt. No. 1 at Ex. C, at p. 26, § VI(G)(2)(f)). Not only having a new hearing fundamentally fair, it entitles Doe to the process he argues is due.

        iv.  <u>The distribution of a clarifying document regarding the meaning of "coercion" in advance of the July 23, 2019 hearing is not a violation of due process.</u>

Title IX Coordinator Harris has provided the Panel and the parties with clarifying information about the term "coercion." Doe's characterization of this document as a "new, seemingly retrofitted definition" is incorrect and misleading. (Dkt. No. 4 at 6 (citing Dkt. No. 1 at Ex. W)). Mr. Harris explained to Doe that the

24

document was a "clarification that will be provided to the decision panel."  (Dkt. No. 1 at Ex. W.)  This document does not modify University policy nor have the binding effect on the Panel of University policy.  It is illustrative and instructive.

Finally, despite Doe's argument, this clarifying document does not change the University's definition of "consent," which specifically references the concept of "coercion."  (*Id.* at Ex. X).  Though the University's policy does not define the term, *Black's Law Dictionary* defines "coercion" as the "[c]ompulsion of a free agent by physical, moral, or economic force or threat of physical force."  *Black's Law Dictionary* (11th ed. 2019).  Mr. Harris's document expounds on that concept but does not deviate from it:

> "Coercion" is an *unreasonable amount of pressure* to engage in sexual activity.  Coercion is more than an effort to gain consent, or persuade, entice, or attract another person to engage in sexual activity.  Coercion includes elements of pressure (e.g., duress, cajoling, compulsion or abuse).

(*Id.* at Ex. W (emphasis in original)).  The document also explains that coercion occurs "where the pressure is or becomes objectively unwelcomed and unreasonable, or the point when a person concedes to sexual activity due to the use of words or behavior that causes or threatens to cause severe emotional distress and/or psychological harm."  (*Id.*).

Notably, Doe fails to identify any portion of this document that Doe believes contravenes the meaning of coercion.  In other words, Doe does not argue that the

25

clarifications and examples of "coercion" are invalid.  More remarkably, Doe

intentionally ignores the reality that this document could well be **helpful to him**.

This document notes that "seduction is reasonable, and coercion [i]s unreasonable.

Seduction is welcomed sexual advances that may initially be rebuffed but where

the object of the pressure ultimately wants to be convinced to engage in sexual

activity or welcome the activity, or <u>a reasonable person would perceive it so</u>."

(Dkt. No. 1 at Ex. W (emphasis added)).  Further, the document emphasizes the

following:  "[i]t's important to realize that people negotiate sex all of the time.

Some amount of pressure may be okay, but too much pressure crosses the line and

becomes unreasonable." (*Id.*).  Finally, and critically, this document also makes

clear that "context is everything" when evaluating coercion and consent.

Doe has decided that this document will harm him at the hearing simply

because it has the word "cajoling" in it.  As detailed above, taken in its entirety,

this document will clearly help the new Panel, and it may actually help Doe.  The

Court should see what happens before enjoining a hearing that, again, could end in

Doe's favor.

v.   <u>The University's investigative and hearing procedures were fair and impartial</u>.

In attacking the University's investigation and decision making processes as

biased and unfair, Doe makes many of the same arguments his counsel

unsuccessfully made in *Doe v. Pennsylvania State University*, 2019 WL 2324506.

26

Doe conveniently ignores this extremely recent decision and harkens back to

earlier decisions of this Court that evaluated prior versions of the University's Title

IX process, like *Doe v. Pennsylvania State University*, 336 F. Supp. 3d 441 (M.D.

Pa. 2018).

The University's current investigative model does not violate due process.

The notion that Doe is excluded from the process and that the investigator acts as a

secret "funnel" of information is belied by the investigation process itself,

something which Doe conveniently omits from his Complaint and Exhibit package,

even though the procedures are referenced therein (and therefore incorporated).

Those procedures are attached hereto as Exhibit 2.  Pertinent provisions include:

- There will be a preliminary investigation, where the respondent (Doe, here) may provide his perspective on the allegations.  (Ex. 2, at 6-7).

- If, as here, there is a formal complaint made, the investigation will be handled by a trained investigator in a "prompt, thorough, fair, and impartial" manner.  (*Id.* at 8).

- The investigator will review the matter with the respondent and give him (and the complainant) a meaningful opportunity to be heard.  (*Id.*).

- When the investigator completes his initial investigation, he will provide a draft investigative packet to the parties, and the parties have the "opportunity to meet with the assigned investigator in order to review the draft Investigative Packet, submit additional information or comments, and submit any additional questions that they believe should be asked of any party or witness . . . the assigned investigator will review and address any questions or follow-up submitted by the parties in response to the draft Investigative Packet, as appropriate, [which] may include conducting additional investigation[.]  The

27

> parties will be provided with an opportunity to review any new information that is added to the Investigative Packet before it is finalized[.]  The assigned Investigator <u>will not include a recommended finding of responsibility</u> in the final Investigative Packet.  (*Id.* at 9).

Doe's argument that the investigator is pulling strings behind the scenes, and that he has little or no visibility into the investigator's procedures or guidelines, falls flat.  As the respondent, Doe gets to interact with a case manager once, with the investigator as many as three times, and literally gets to see and comment on the investigator's work product and thought process throughout the investigation.  This procedure provides more than adequate due process.  Other than generic complaints, Doe fails to explain how or why he was harmed by this process—let alone how he suffered a constitutional deprivation during the investigation.

Doe next moves to attack the Interim Senior Director of the Office of Student Conduct, Karen Feldbaum, for exercising "undue influence" over the process.  In doing so, John Doe uses the same exact vague allegations that were raised, and rejected, in the May 2019 *Doe* case, where the plaintiff was represented by the same counsel.  As this Court stated in the May 2019 *Doe* case, dismissing this same exact argument for failure to state a claim, "Mr. Doe's generic allegations that the panel was biased because it was somehow 'under [Ms. Feldbaum's] control is too vague to overcome the 'presumption of impartiality of

. . . school administrators." *Doe*, 2019 WL 2324506, at *2. Doe's claim here is no different, and equally unavailing.

Finally, Doe has a catch-all argument that "the University violated Doe's right to due process by failing to follow its policies," which is essentially a hodge-podge of everything addressed above. (Dkt. No. 4, at 21-22.) This argument fails for the same reasons already discussed.

Doe is not likely to succeed on the merits of any of his due process claims. There is no basis to grant an injunction or the extraordinary remedy of a temporary restraining order on this basis.

> **2.** ***Doe also has not demonstrated a likelihood of success on the merits of his Title IX claim.***

Doe also seeks injunctive relief based on his Title IX claim. (*Id.* at 23). His Title IX argument is half-hearted at best, taking up barely one page of his brief. (*Id.* at 22-23). In any event, the allegations in Doe's Complaint do not support a cognizable claim under Title IX, let alone one that warrants injunctive relief.

> *a.* *Doe cannot succeed on his Title IX claim under any recognized theory of Title IX liability.*

Doe cannot succeed on the merits of his Title IX claim. The entirety of his argument is conclusory and lacks any specific factual allegations:

> Gender discrimination and gender stereotypes permeated the investigation, the original outcome, the rewrite of the definition of "consent", and the decision for a new

hearing.  The Title IX Panel's April 12, 2019 rationale[4] and the new definition of "consent" is based on outdated stereotypes and a biased perspective regarding the behavior of women[5] during sexual encounters. Moreover, the investigative team and the Case Manager function as Roe's advocate – including moving the case forward if the Complainant's narrative is remotely plausible – rather than an objective fact finder and neutral gatekeeper.

(*Id.*).  That is it.  No specific allegations.  No evidence.  No explanation of how gender allegedly impacted anything.

As for the point about the Case Manager deciding to "move this case forward," the standard for proceeding to an investigation is the same for any complainant and respondent, regardless of gender, and Doe does not and cannot plead otherwise.  (*See* Dkt. No. 1 at Ex. C, at p. 18, § VI(D) (recommendation of charges and moving forward based on information from complainant and respondent, having literally nothing to do with their gender)).

Finding no rationale for Doe's Title IX claim in his briefing, we should also consider the Title IX allegations in Doe's Complaint.  While unclear, the Complaint suggests that Doe may be attempting to articulate both "erroneous outcome" and "selective enforcement" Title IX claims.

---

[4]     A rationale which is moot, of course, because the University has granted Doe's appeal.

[5]     This might be, if anything, a claim that a female student could assert—not a male student.

To prevail on a Title IX claim under an "erroneous outcome" theory, Doe must plead and then present evidence to "cast articulable doubt on the accuracy of the outcome of the disciplinary proceeding," and prove a causal connection between the flawed outcome and alleged gender bias. *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). To prevail on a "selective enforcement" theory, Doe must adequately plead that regardless of his guilt or innocence, he was treated differently in the process than a similarly situated female would have been. *Id.*

Doe will not be able to prevail on his "erroneous outcome" theory. Most fundamentally, this theory fails because the outcome about which he is complaining has been vacated, which is the entire reason for the new, upcoming July 23 hearing. In fact, is really is worth pausing to contemplate the Orwellian argument Doe is making: the Court should find that the prior hearing outcome was erroneous based on Doe's gender, while at the same time mark that hearing in stone and preclude the University from conducting a new hearing where theoretical gender-based issues could be rectified. This is a truly remarkable argument. Doe's argument actually counsels entirely for proceeding with a new hearing, not enjoining it.

Doe's allegation that he "may" face a permanent notation of his Penn State transcript also does not support his erroneous outcome claim, and certainly does

not support injunctive relief.  He "may not" face such a notation, too.  This

uncertainty is precisely why the hearing should proceed on July 23.

Finally, Doe makes no credible argument regarding selective enforcement in

violation of Title IX.  Doe alleges no facts to suggest that the University enforces

conduct matters only against males, or finds males responsible when similarly

situated female students are not held responsible.  He instead makes the blanket,

factually unsupported assertion that "[m]ale respondents in sexual misconduct

cases at Defendant Penn State are discriminated against solely on the basis of sex.

They are invariably found guilty, regardless of the evidence, or lack thereof [.]"

(Dkt. No. 1 at ¶ 105).[6]  Doe also suggests, seemingly, that Penn State selectively

enforces its sexual misconduct policies because there is a "higher incidence of

female complainants of sexual misconduct versus male complainants of sexual

misconduct."  (*Id.* at ¶ 111).  Of course, the University does not decide who comes

forward with allegations of sexual misconduct, and if the University refused to

respond to allegations because a complainant was female—well, it would then be

accused of a different type of bias.  Penn State addresses complaints made by

<u>complainants</u> against <u>respondents</u>, regardless of gender.  Period.

---

[6]     Doe's counsel, who has personally represented many other University
students in conduct proceedings, definitively knows the assertion that all male
respondents are "found responsible" at the University to be false.

Finally, Doe's vague and rambling claims about "gender discrimination and stereotypes" are nothing more than bald assertions unsupported by any facts or even credible allegations, and therefore do not support a Title IX claim.  (Dkt. No. 4, at pp. 20-25).  *See Gorman*, 837 F.2d at 15 (allegations of "prejudice of university hearing bodies must be based on more than mere speculation and tenuous inferences.") (quotation omitted); *see also Harris v. St. Joseph's Univ.*, No. 13-3937, 2014 WL 1910242, at *4 (E.D. Pa. May 13, 2014) (sweeping allegations of "impermissible gender bias" insufficient to state a claim for violation of Title IX).

### C. Granting the preliminary injunction will result in greater harm to the University and its students than to Doe.

If injunctive relief is granted here, every time a disciplined student is unhappy with the outcome of an internal, administrative student conduct process, he or she will run to Court.  The University's ability to enforce discipline on its campus and protect the safety of its students—particularly in the case of alleged sexual misconduct—will be diminished.  Granting injunctive relief here will result in greater harm to the University, its students, and institutions of higher education throughout this Commonwealth, than to Doe.  By contrast, if injunctive relief is denied, here is what will happen:  a new hearing, a result of <u>Doe's own, successful</u>

<u>internal appeal</u>, will move forward on July 23.[7]  We will all know what legal claims, if any, Doe may wish to pursue by the end of the week.  This civil action, if continued by Doe, can then proceed quickly to briefing (the University will be filing a 12(b)(6) motion), through any discovery, and to resolution.  If Doe prevails, he can seek money damages and reinstatement of his status at the University, if applicable.  Nothing is irreparable.

Granting injunctive relief, by contrast, creates a very real risk that our federal courts will be placed in the position of second-guessing every internal, administrative university conduct proceeding.  That is not good public policy, and not good for students, whether complainant or respondent.

> **D.     The University and the public at large share a strong interest in providing a safe educational community and conserving resources.**

The University has a significant interest in investigating and, when appropriate, disciplining students for misconduct.  The Third Circuit and Supreme Court have recognized "the need for maintaining order and discipline in our schools without prohibitive costs and in a manner that will contribute to, rather than disrupt, the educational process."  *Palmer by Palmer v. Merluzzi*, 868 F.2d 90, 95 (3d Cir. 1989) (citing *Goss*, 419 U.S. at 584).  Another court recognized that a

---

[7]     The University has offered to move the hearing to July 29 if that is preferable for Doe, or perhaps even a later date if he requires a bit more additional time.  He has not responded.  So, right now, the hearing will proceed on July 23.

state-related university "must maintain safety on its campus and protect its student body from intimidation, threats, and sexual assault." *Johnson*, 2013 WL 5298484, at *8.

## V.     Conclusion.

Doe wants to stop a new hearing that is intended to rectify concerns about his prior hearing.  The Court must allow educational institutions to complete their own internal processes before students can run to Court to disrupt them.

Doe can claim no irreparable harm resulting from a hearing that has not yet occurred.  He may have no harm at all.  Moreover, as detailed above, Doe is not likely to prevail on the merits of his claims.

Finally, the public's interest and the University's interest is in enforcing student discipline, to everyone's benefit.

Doe's Motion for injunctive relief should be denied.

35644241.12 07/21/2019

Respectfully submitted,

Date: July 21, 2019

/s/ Cory S. Winter
James A. Keller, Esquire/78955
Carolyn A. Pellegrini, Esquire/307026
1500 Market Street, 38th Floor
Philadelphia, PA 19102
(215) 972-1964
james.keller@saul.com
carolyn.pellegrini@saul.com

Cory S. Winter, Esquire/306552
Saul Ewing Arnstein & Lehr LLP
2 North Second Street, 7th Floor
Harrisburg, PA 17101
(717) 257-7562
cory.winter@saul.com

*Attorneys for Defendant*

35644241.12 07/21/2019

## Word Count Certificate

In accordance with L.R. 7.8(b)(2), I hereby certify that the foregoing Brief

contains 8,406 words as calculated by Microsoft Word.[8]

Dated: July 21, 2019                                    /s/ Cory S. Winter
                                                       Cory S. Winter

---

[8]      On July 19, 2019, the University filed a Motion to Exceed the Page
Limitation of L.R. 7.8(b) (Dkt. No. 10).  At the time this Brief was filed, that
Motion remained pending.  Counsel for the University would ordinarily wait until
the Court disposed of the Motion before filing this Brief.  But given the emergency
nature of Doe's Motion, and the telephonic conference scheduled for July 22,
2019, at 2:00 p.m., the University's counsel filed this Brief to ensure that the Court
had an opportunity to review it before the July 22 conference.

**Certificate of Service**

I hereby certify that on July 21, 2019, a copy of the foregoing was filed electronically with this Court.   Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.   Parties may access this filing through the Court's system.

/s/ Cory S. Winter
Cory S. Winter