# Exhibit 1

2019 WL 2324506
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

John DOE, Plaintiff.

v.

The PENNSYLVANIA STATE
UNIVERSITY, Defendant.

No. 4:18-CV-02350
|
Filed 05/31/2019

**Attorneys and Law Firms**

Andrew J. Shubin, State College, PA, for Plaintiff.

Amy L. Piccola, Pro Hac Vice, James A. Keller, Saul Ewing
Arnstein & Lehr LLP, Philadelphia, PA, for Defendant.

**MEMORANDUM OPINION**

Matthew W. Brann, United States District Judge

**\*1**  The Pennsylvania State University ("PSU") moved to
dismiss John Doe's complaint. That motion will be granted.

**Background** [1]

[1]    All material in this section is taken from Mr. Doe's
Complaint (ECF No. 1) and is presumed true.

In November 2016, John Doe and Jane Roe [2] were
both undergraduate students at The Pennsylvania State
University's ("PSU") Altoona campus. On the evening of
November 12, 2016, a sexual encounter occurred between the
two of them while they were alone in Mr. Doe's bedroom.
Although both agree that the encounter began consensually,
Ms. Roe maintains that Mr. Doe eventually exceeded the
bounds of that consent. Mr. Doe denies doing so.

[2]    To protect the students' privacy, Plaintiff is proceeding
before this Court under the pseudonym "John Doe," and
has referred to his accuser as "Jane Roe." ECF No. 7.

In September 2017, Ms. Roe filed a sexual assault complaint
against Mr. Doe with PSU's Office of Student Conduct
("OSC"). The school's Title IX Compliance Specialist,

Christopher Harris, was tasked with investigating the
incident.

After interviewing Mr. Doe, Ms. Roe, and others, Mr. Harris
prepared a draft report of the incident and gave Mr. Doe and
Ms. Roe until December 1, 2017, to review and respond to it.
Although Mr. Doe took timely advantage of that opportunity,
Ms. Roe did not, despite Mr. Harris's attempts to contact her.

Ms. Roe finally responded to Mr. Harris in January 2018.
Although Mr. Harris had already closed the investigation and
forwarded his report to OSC Director Karen Feldbaum, he
reopened the investigation and met with Ms. Roe to allow
her to explain perceived discrepancies in witness accounts.
After this meeting, Mr. Harris submitted a revised report to
Ms. Feldbaum, who in February 2018 decided that the revised
report "reasonably supported" the conclusion that Mr. Doe
engaged in nonconsensual intercourse.

In March 2018, Mr. Doe asked if the investigation could be
reopened to allow him to respond to the information provided
by Ms. Roe in January 2018 and included in the revised report.
Ms. Feldbaum denied that request. Mr. Doe, however, was
allowed to file a written response to the charges against him.

In April 2018, a hearing was held on those charges, at which
Mr. Doe and Ms. Roe spoke. The three-person decision-
making panel ultimately found Mr. Doe "responsible" for
nonconsensual intercourse with Ms. Roe, and suspended him
for one year.

Mr. Doe filed this action against PSU in December 2018.
His single-count complaint argues that various aspects of the
procedure used by PSU violated his rights under the Due
Process Clause. PSU now moves to dismiss that complaint,
arguing that Mr. Doe has failed to state a claim upon which
relief can be granted.

**Discussion**

Standard of Review

When considering a motion to dismiss for failure to state a
claim upon which relief may be granted, [3] a court assumes the
truth of all factual allegations in the plaintiff's complaint and
draws all inferences in favor of that party; [4] the court does
not, however, assume the truth of any of the complaint's legal

conclusions. [5] If a complaint's factual allegations, so treated, state a claim that is plausible—*i.e.*, if they allow the court to infer the defendant's liability—the motion is denied; if they fail to do so, the motion is granted.

[3]   Federal Rule of Civil Procedure 12(b)(6).

[4]   *Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

[5]   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016).


### Cross-Examination and Panel Composition

**\*2**  Mr. Doe argues that PSU violated his Due Process Clause rights by limiting his ability to cross-examine Ms. Roe during the hearing, and by failing to provide an unbiased tribunal for adjudication. Mr. Doe, however, cannot raise these claims when the hearing notes [6] reflect that Mr. Doe *declined* to pose any questions to Ms. Roe, and *declined* to challenge the panel for bias, despite being given the opportunity to do both of those things. [7] In other words, Mr. Doe cannot argue that PSU violated his Due Process Clause rights vis-à-vis the cross examination procedure or the panel composition when *no action of PSU* was the cause of any prejudice to Mr. Doe. And in any event, (1) courts have upheld cross-examination procedures similar to the one offered to Mr. Doe [8] and (2) Mr. Doe's generic allegations that the panel was biased because it was somehow "under [Ms. Feldbaum's] control" [9] is too vague to overcome the "presumption of impartiality in favor of ... school administrators." [10]

[6]   These notes were attached to Mr. Doe's Complaint, so may be considered at the motion-to-dismiss stage. *Estate of Roman v. City of Newark*, 914 F.3d 789, 794 (3d Cir. 2019).

[7]   Notes from Mr. Doe's Hearing (ECF No. 9-10) ("Neither the Panel nor [Mr. Doe] had questions for [Ms. Roe.]"); *id.* ("During the opening proceedings, [Mr. Doe] ... did not challenge any member of the Panel on the basis of bias."). *See Nash v. Auburn University*, 812 F.2d 655, 664 (11th Cir. 1987) ("[The accused student] w[as] clearly informed when the time came for [him] to ask questions in the prescribed manner. That [he] did not avail [him]sel[f] of the opportunity to question the witnesses through the chancellor cannot be characterized as a denial of process.").

[8]   According to written procedures, Mr. Doe was permitted to "suggest questions" for Ms. Roe which the panel would "review ... for relevance and appropriateness before ... pos[ing] [them] to [her]." PSU Code of Conduct & Student Conduct Procedures (ECF No. 9-5) at 14. *See, e.g., Furey v. Temple University*, 884 F. Supp. 2d 223, 252 (E.D. Pa. 2012) (finding due process satisfied where the accused student "was able to cross examine the witnesses by posing questions through the Chair.").

[9]   Mr. Doe argues that Ms. Feldbaum's conclusion regarding Ms. Harris's report (*i.e.*, that the report "reasonably supported" the conclusion that Mr. Doe engaged in nonconsensual intercourse) was an "all-but-dispositive implication that [Ms.] Roe was credible and [Mr.] Doe was not." Brief in Opposition (ECF No. 23) at 23. He also argues that Ms. Feldbaum's conclusion "substantially lessen[ed] the Title IX Decision Panel's fact-finding and adjudicatory autonomy" by creating a "presumption of guilt" that, "in effect, reversed the burden of proof." *Id.* at 23-24. Without more, these conclusory allegations cannot sustain Mr. Doe's claim, especially since it appears that Ms. Feldbaum did not even attend the hearing. *See* Notes from Mr. Doe's Hearing (listing everyone "[p]resent in the Title IX review room during the hearing," with no mention of Ms. Feldbaum).
Further, it appears that the review conducted by Ms. Feldbaum was actually intended to *benefit* Mr. Doe (and others in his position), since a contrary finding would have resulted in the immediate termination of the disciplinary proceedings. PSU Code of Conduct & Student Conduct Procedures at 13 ("If the acquired information does not reasonably support charges, then the case will be closed without charges...."). In fact, Mr. Doe himself analogizes Ms. Feldbaum's finding to a "probable cause-like determination." Brief in Opposition at 23. *But see. id.* at 23 n.80 ("Although Penn State does not define 'reasonably supports,' it would be disingenuous for [it] to dispute that there is very little, if any, distance between this [standard] and the Panel's preponderance standard.").

[10]   *Furey v. Temple University*, 884 F. Supp. 2d 223, 256 (E.D. Pa. 2012) ("In disciplinary hearings, there is a presumption of impartiality in favor of the school administrators. The plaintiff bears the burden of rebutting this presumption with sufficient evidence. Allegations of prejudice ... must be based on more than mere speculation and tenuous inferences.").


### Participation of Attorney Advisor

**\*3** Mr. Doe also argues that PSU violated his Due Process Clause rights by denying him "the active and meaningful participation of his attorney advisor." [11] However, other than to suggest that PSU could have allowed his advisor to conduct cross-examination, [12] Mr. Doe does not specify what his advisor should have—but was not—permitted to do. He also does not allege any facts [13] that would take his case outside the normal rule that "at most[,] the student has a right to get the advice of a lawyer" but not the right to have the lawyer "participate in the proceeding in the usual way of trial counsel." [14]

[11]   Complaint (ECF No. 1) ¶ 85.e.

[12]   Brief in Opposition at 19-20. This claim fails for the reasons stated above.

[13]   *Furey*, 884 F. Supp. 2d at 252 ("Several courts have held that a student is entitled to have legal counsel in a disciplinary hearing when the student is *also facing criminal sanctions* for the same underlying conduct.") (emphasis added); *id.* at 252 n.35 ("Courts have also speculated that due process could require active representation by counsel *when the school's case is presented by an attorney or the procedures are unusually complex.*") (emphasis added).

[14]   *Johnson v. Temple University*, Civil Action No. 12-515, 2013 WL 5298484, at \*10 (E.D. Pa. Sept. 19, 2013).

<u>Adherence to PSU Procedures</u>

Mr. Doe also argues that PSU violated his Due Process Clause rights by failing to follow its own procedures. In support of this argument, he notes (1) that PSU allowed Ms. Roe to respond to Mr. Harris's report after the December 1, 2017 deadline had passed; (2) that Mr. Harris modified his report because of Ms. Roe's feedback; and (3) that PSU denied Mr. Doe's request to reopen the investigation to allow him to respond to Mr. Harris's revised report.

PSU's "Title IX Report Procedures" [15] indicate the following:

Formal Investigations will be conducted by trained investigators designated by the Title IX Coordinator. When a formal investigation process is initiated, the assigned investigator will attempt to gather whatever relevant information may be reasonably available regarding the alleged incident. This may include interviewing the Complainant, Respondent, and/or any other witnesses who are identified during the course of the investigation, as well as gathering available documentary, electronic, or physical evidence. Parties will be provided with adequate notice of the investigation and a meaningful opportunity to be heard.

At the conclusion of the investigation, the assigned investigator will prepare a draft Investigative Packet, which will contain all material information gathered during the investigation and being put forward for consideration in determining whether to hold the Respondent responsible for the alleged incident. The draft Investigative Packet will not contain any findings of responsibility/non-responsibility. The assigned investigator will complete his or her investigation, in a timely manner.

The Complainant and Respondent will be provided with an opportunity to meet with the assigned investigator in order to review the draft Investigative Packet, submit additional information or comments, identify additional witnesses or evidence for the investigator to pursue, and submit any additional questions that they believe should be asked of any other party or witness. The parties will have up to 5 business days to submit any additional questions or follow-up after reviewing the draft Investigative Packet.

Once the parties have responded to the draft Investigative Packet or the 5 business days have elapsed, the assigned investigator will review and address any questions or follow-up submitted by the parties in response to the draft Investigative Packet, as appropriate. This may include conducting additional investigation. The assigned investigator will then incorporate any revisions or new information into a final Investigative Packet within 5 business days, if possible. The parties will be provided with an opportunity to review any new information that is added to the Investigative Packet before it is finalized.

**\*4** The final Investigative Packet will be forwarded to a Case Manager in the Office of Student Conduct. The assigned investigator will not include a recommended finding of responsibility in the final Investigative Packet.

On their face, these procedures (1) provide no deadline by which either Mr. Doe or Ms. Roe had to review the draft report (though the procedures indicate that responses to that report are due within 5 days of review); [16] (2) allowed Mr. Harris to revise his report after meeting with Ms. Roe; and (3) do not indicate that either party should have been given more than one opportunity to respond to the report. And despite Mr.

Doe's contentions,[17] he was in fact provided the opportunity to review the new information in the revised report before it was sent to Ms. Feldbaum.[18]

[15]   http://titleix.psu.edu/psu-title-ix-procedures; *see* PSU Code of Conduct & Student Conduct Procedures at 13 (noting that PSU "will typically investigate [sexual misconduct] allegations utilizing the process articulated at http://titleix.psu.edu").

[16]   To the extent Mr. Doe bases his claim on the fact that Ms. Roe was given *more time* to review the report—*i.e.*, that Ms. Roe was not forced to comply with the December 1, 2017 deadline—he also fails to explain, or allege any facts showing, how this prejudiced him in any way.

[17]   Brief in Opposition at 22 ("[Mr.] Harris immediately forwarded [Ms. Roe's] modifications and explanations to Ms. Feldbaum without ... providing [Mr.] Doe an opportunity to *review* and respond.") (emphasis added).

[18]   January 19, 2018 Email from Mr. Harris to Mr. Doe (ECF No. 9-8) ("I met with [Ms. Roe] today, and I asked her a couple of follow-up questions that I planned to ask her if we'd met at an earlier date. I've attached a document with two additions that were made to the report based on my conversation with [her].... I will submit a revised draft of the report to [Ms. Feldbaum] today.").

If Mr. Doe is arguing that due process *required* PSU to allow him to respond to the revised report, that argument fails. After all, he was permitted (1) to review the revised report with Ms. Feldbaum; (2) to submit a written response to that revised report and charges; and (3) to appear and speak before the panel at his hearing. And he alleges no facts showing that the panel prevented him from presenting any important testimony or other evidence because, *e.g.*, it was outside the scope of Mr. Harris's report.[19]

[19]   Mr. Doe alleges that "the Code limited him to 'highlighting' portions of the packet" during his panel appearance, Complaint ¶ 65, but does not indicate if there was other evidence he wanted to present, the exclusion of which might have risen to the level of a Due Process Clause violation. *See* PSU Code of Conduct & Student Conduct Procedures at 14 ("When the hearing convenes, no new information may be provided to the hearing authority, unless the person offering the information can show that the evidence was (1) not available during the investigation, and (2) is relevant to establishing whether or not the Respondent is responsible for misconduct.").

Preponderance of the Evidence Standard

Mr. Doe also argues that PSU violated his Due Process Clause rights by requiring the hearing panel to determine his guilt using the preponderance of the evidence standard.

**\*5**   As this Court has noted in a similar case:

When deciding "what process is due" in student disciplinary proceedings, courts ... consider[ ] (1) the students' "private interest[s] that will be affected by the official action"; (2) the schools' interest, "including the function involved and fiscal and administrative burdens that the additional or substitute procedural requirement would entail"; and (3) the accuracy of existing procedures and "the probable value, if any, of additional or substitute procedural safeguards."

[The accused student's] private interests are his continued education at PSU as well as his reputation. The Supreme Court has already noted that a ten-day suspension is "a serious event"; [a] year-long suspension, therefore, is correspondingly more grievous. And the potential damage to [the student's] reputation is at least equally weighty, if not more so—after all, in addition to a tarnished disciplinary record, he is also facing the stigma of being labeled "responsible" for engaging in nonconsensual sexual intercourse.

PSU, on the other hand, seeks to maintain a safe environment for its students—with an emphasis on the word "students." PSU's mission, after all, is foundationally educational. Although PSU has an interest in maintaining discipline and order on its campuses, that interest is a means to its ultimately pedagogic end, and every dollar spent regulating and investigating its students' behavior is a dollar not spent on teaching, learning, or scholarship.

Complimenting this interest in discipline, however, is PSU's interest in securing accurate resolutions of student complaints like the one at issue here. PSU's educational mission is, of course, frustrated if it allows dangerous students to remain on its campuses. Its mission is equally stymied, however, if PSU ejects innocent students who would otherwise benefit from, and contribute to, its academic environment.[20]

20    *Doe v. Pennsylvania State University*, 336 F. Supp. 3d 441, 446-47 (M.D. Pa. 2018).

Mr. Doe suggests that the burden of proof should be raised to the clear and convincing evidence standard. It cannot be denied that such a change—though perhaps virtually costless from a financial perspective—would harm the proceeding's accuracy, because it would statistically result in more actually guilty individuals being found "not responsible." While some may argue that such a result is acceptable in light of the enormous interests at stake,[21] this Court must uphold the principles of federalism embedded in our founding document and must remain "mindful of [the Supreme Court's] admonition [that] [j]udicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint."[22] In short, it is not this Court's job to judge the wisdom of PSU's disciplinary procedures, but instead to ask whether those procedures deserve a blow from the heavy hammer of the United States Constitution.

21    *Cf. In re Winship*, 397 U.S. 358, 372 (1970) (Harlan, J., concurring) ("[T]he requirement of proof beyond a reasonable doubt in a criminal case [is] bottomed on a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free.").

22    *Goss v. Lopez*, 419 U.S. 565, 578 (1975).

**\*6**   Courts have split on this issue.[23] However, in light of the other procedural protections in place—Mr. Doe's ability to address the panel personally; the (declined) opportunity to pose questions to Ms. Roe; the use of a multi-member panel; the presence of his attorney advisor—this Court cannot say that, by itself, PSU's use of the preponderance of the evidence standard violates the Due Process Clause of the United States Constitution, especially since Mr. Doe has been unable to successfully point out any other problematic aspects[24] of the process used to adjudicate his case.[25]

23    *Compare Doe v. Cummins*, 662 Fed. Appx. 437, 449 (6th Cir. 2016) (noting that a school's use of the preponderance of the evidence standard, "in addition to having other procedural mechanisms in place that counterbalance the lower standard used ... does not give rise to a due-process violation") *with Doe v. University*

*of Colorado*, 255 F. Supp. 3d 1064, 1082 n.13 (D. Colo. 2017) ("[T]here is a fair question whether preponderance of the evidence is the proper standard for disciplinary investigations such as the one that led to Plaintiff's expulsion.").

24    In his Brief in Opposition, Mr. Doe argues that PSU violated his Due Process Clause rights by "failing to limit [Mr. Harris's] power to funnel and filter evidence, including exculpatory evidence, related to the accusation."). Brief in Opposition at 20-21. This claim, however, does not appear in his Complaint, so it will not be considered. *See Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.").

25    *Cf. Plummer v. University of Houston*, 860 F.3d 767, 782 (5th Cir. 2017) (Jones, J., dissenting) ("[T]he process deployed against the students [accused of sexual misconduct] was fundamentally flawed because of ... the preponderance standard for adjudicating quasi criminal conduct ... *compounded by* [other problems].") (emphasis added).

### Conclusion

Mr. Doe has failed to support his Due Process Clause claim. His arguments—regarding (1) his opportunity to cross-examine Ms. Roe; (2) the bias of the hearing panel; (3) the participation of his attorney advisor; (4) PSU's adherence to its own procedures; and (5) PSU's use of the preponderance standard—have all been rejected. This Court, therefore, will grant PSU's motion and dismiss his Complaint for failure to state a claim upon which relief can be granted.

The Court, however, will allow Mr. Doe to file an amended complaint to allege facts that may sustain any of the claims made in his current complaint or to raise claims challenging other part of PSU's adjudication procedure which, on their own or when combined with PSU's use of the preponderance of the evidence standard, may rise to the level of a constitutional violation. An appropriate order follows.

### All Citations

Slip Copy, 2019 WL 2324506

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.                    5

Case: 4:19-cv-01234-MWB   Document 11-1   Filed 07/21/19   Page 7 of 73

Doe v. University of South Carolina, Not Reported in Fed. Supp. (2018)

2018 WL 1215045

2018 WL 1215045
Only the Westlaw citation is currently available.
United States District Court, D.
South Carolina, Columbia Division.

John DOE, Plaintiff,
v.
UNIVERSITY OF SOUTH CAROLINA;
Harris Pastides; Alisa Liggett; Carl
Wells; Dennis Pruitt, Defendants.

C/A No. 3:18-161-TLW-PJG
|
Signed 02/12/2018

**Attorneys and Law Firms**

John Doe, Columbia, SC, pro se.

Kenneth Paul Woodington, William Henry Davidson, II,
Davidson Morrison and Lindemann, Columbia, SC, for
Defendants.

**REPORT AND RECOMMENDATION**

Paige J. Gossett, UNITED STATES MAGISTRATE JUDGE

*1  The plaintiff, John Doe, [1] proceeding *pro se*, brings this
civil rights action against the defendants. The Complaint has
been filed pursuant to 28 U.S.C. § 1915. This matter is before
the court pursuant to 28 U.S.C. § 636(b) and Local Civil
Rule 73.02(B)(2) (D.S.C.) for a Report and Recommendation
on Doe's motions for a preliminary injunction. (ECF Nos. 4
& 13.) Following notice to the defendants, the court held a
hearing on Doe's motions on February 2, 2018. (ECF No. 37.)
In the hearing, the court provided the parties the opportunity
to file supplemental briefing and further evidence. (ECF Nos.
37 & 38.) The parties each filed supplemental briefs after
the hearing, and the defendants filed exhibits. (ECF Nos.
42 & 44.) Having carefully reviewed the parties' filings and
the evidence before the court in accordance with applicable
law, the court concludes Doe's motions for a preliminary
injunction should be denied.

[1]     The court finds that extraordinary circumstances support
        Doe's litigation of this matter under a pseudonym.
        *See* Doe v. Pub. Citizen, 749 F.3d 246, 273 (4th
        Cir. 2017) ("[I]n exceptional circumstances, compelling

concerns relating to personal privacy or confidentiality
may warrant some degree of anonymity in judicial
proceedings, including use of a pseudonym.") As
explained in more detail below, Doe has demonstrated
compelling interests in anonymity in this matter because
of the personal and sensitive nature of the underlying
facts of this case, which involve allegations of sexual
assault. The court finds that the privacy interests of
Doe (and the alleged victim, who is also identified by a
pseudonym) outweigh the public's interest in access to
their identities. Further, the court finds the defendants are
in no way prejudiced by Doe's use of a pseudonym, and
that using pseudonyms while permitting public access
to the court records themselves is narrowly tailored to
protect the privacy interests at stake here.

**BACKGROUND**

Doe, a citizen of Iran, was enrolled as a graduate student at the
University of South Carolina ("the University") pursuant to a
student F-1 non-immigrant visa. (Compl. ¶¶ 121-23, ECF No.
1 at 27.) However, Doe was suspended from the University
on January 17, 2018 as a result of disciplinary violations
stemming from another student's allegation against Doe of
sexual assault. (Id. ¶ 98, ECF No. 1 at 22.) Doe alleges his
visa status requires that he be enrolled as a student at the
University, and now that he is suspended, he is subject to
deportation by the United States. (Id. ¶ 124, ECF No. 1 at 27.)

The allegations against Doe were raised by Jane Roe, [2] a
fellow student, on August 22, 2017 by filing an incident report
in the University's Office of Equal Opportunity Programs.
(Id. ¶ 31, ECF No. 1 at 5; Incident Report, ECF No. 37-1.)
According to Doe, Roe and Doe met through an online dating
service, and on March 23, 2017, they met for a date at a
restaurant near the University. (Compl. ¶¶ 1-5; ECF No.
1 at 2.) They drove to Doe's house after dinner to watch
a movie. (Id. ¶¶ 9-25, ECF No. 1 at 3-4.) As alleged by
Roe in her incident report, after arriving at his house, Doe
sexually assaulted her and physically restrained her from
leaving. (Incident Report, ECF No. 37-1.) Doe denies Roe's
allegations and asserts that their encounter was consensual.
(Compl. ¶¶ 9-25, ECF No. 1 at 3-4.)

[2]     *See supra* note 1.

*2  A hearing was held before a panel from the University's
Office of Student Conduct on October 13, 2017 to consider
Roe's allegations against Doe and determine whether Doe
should be disciplined. (Id. ¶ 54, ECF No. 1 at 10-11.) Roe

Doe v. University of South Carolina, Not Reported in Fed. Supp. (2018)

Case 4:19-cv-01234-MWB Document 11-1 Filed 07/21/19 Page 8 of 73

2018 WL 1215045

did not attend the hearing, but she wrote a victim impact statement that was read in the hearing by a University staff member. (Id.) The hearing panel found Doe responsible for "non-consensual sexual penetration," and found him not responsible for "offensive touching" and "dangerous behaviors—intimidation, coercion, and abuse." (Id.; Ex. A, Mot. for TRO & Prelim. Inj., ECF No. 9-2 at 1-3.) The hearing panel sanctioned Doe by restricting the areas on campus that Doe could visit, and Doe alleges that the panel did not suspend him because the panel determined that such a punishment would be overly punitive in light of his visa status. (Compl. ¶ 54, ECF No. 1 at 10-11.) After the hearing, on the same day, Doe received a letter by email from the Office of Student Conduct that summarized the hearing and stated that both Doe and Roe had "five university business days from the date the decision letter was sent to submit a written request for an appeal." (Id. ¶ 56, ECF No. 1 at 11; Ex. A, Mot. for TRO & Prelim. Inj., ECF No. 9-2 at 1-3.)

On October 23, 2017, Roe appealed the hearing panel's decision to the University's Title IX Appellate Review Panel ("Title IX Panel"). (Compl. ¶ 60, ECF No. 1 at 12; Liggett Aff. ¶ 5, Def.'s 2d Suppl. to Resp., ECF No. 42-1 at 3.) Doe then cross-appealed on October 25, arguing Roe's appeal was untimely under university policy. (Compl. ¶ 63, ECF No. 1 at 13.) The Title IX Panel ordered that a new hearing panel rehear the case because the original panel improperly considered Doe's academic status and visa status when it fashioned Doe's sanction. (Id. ¶ 64, ECF No. 1 at 13-14.)

A new hearing was held in front of a new panel on December 13, 2017. (Id. ¶ 96, ECF No. 1 at 19-22.) Roe testified in this new hearing, but Doe claims Roe raised new allegations that he was not prepared to defend against. (Id.) The new hearing panel found Doe responsible for "non-consensual sexual penetration, offensive touching, and dangerous behaviors— abuse, intimidation, and coercion," and not responsible for "failure to comply—published policies." (Id.; Ex. G, Mot. for TRO & Prelim. Inj., ECF No. 9-2 at 21-25.) The hearing panel suspended Doe from the University for two and one half years, beginning on December 18, 2017. (Compl. ¶ 96, ECF No. 1 at 19-22.)

Doe's appeal of the new hearing panel's decision was denied by the Title IX Panel on January 17, 2018. (Id. ¶¶ 97-98, ECF No. 1 at 22.) On January 18, the University's Office of International Student Services notified Doe by email that his records would be terminated in the electronic database maintained by the United States Department of Homeland

Security that tracks students with F-1 visas, [3] and stated that "[a]ccording to immigration regulation you must leave the country immediately." (2d Mot. for TRO & Prelim. Inj. ¶ 12, ECF No. 13 at 3; Ex. A, 2d Mot. for TRO & Prelim. Inj., ECF No. 13-1.)

[3]     The database, known as Student and Exchange Visitor Information System ("SEVIS"), is a system that tracks and monitors schools, exchange visitor programs, and F, M, and J non-immigrants while visiting the United States to participate in the United States's education system. (https://www.ice.gov/sevis).

Doe filed this action on January 19, 2018 by filing a Complaint and his first motion for a temporary restraining order and preliminary injunction. (ECF Nos. 1 & 4.) In the Complaint, Doe expressly raises causes of action pursuant to Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), the Fifth Amendment's Double Jeopardy Clause, the Fourteenth Amendment's Due Process Clause, and state law causes of action for negligence, breach of contract, and intentional infliction of emotional distress. Doe seeks injunctive relief and damages. Doe filed a second motion for a temporary restraining order and preliminary injunction on January 26, 2018. (ECF No. 13.)

On January 22 and 29, 2018 the court recommended that Doe's motions be denied to the extent Doe sought an *ex parte* temporary restraining order under Rule 65(b) and set a hearing on the preliminary injunction motions for February 2, 2018, at which it heard oral argument from all parties on Doe's motions. (See ECF Nos. 10, 19, 20, & 37.)

### DISCUSSION

**A. Nature of Relief Sought**
 **\*3**  Through his motions, Doe seeks to enjoin the University from imposing the disciplinary suspension against him, (ECF No. 4 at 4), to compel the University to reinstate Doe's SEVIS records and visa status, (ECF No. 13 at 9), and to enjoin the University from forcing him to drop all of his classes for the Spring 2018 semester (ECF No. 13 at 9). Generally, state entities such as the University, and its employees acting in their official capacity, are immune from suits filed pursuant to § 1983. The Eleventh Amendment bars suits by citizens against non-consenting states brought either in state or federal court. See Alden v. Maine, 527 U.S. 706, 712-13 (1999); Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 54 (1996); Hans v. Louisiana, 134 U.S. 1 (1890). Such

Case: 4:19-cv-01234-MWB   Document 11-1   Filed 07/21/19   Page 9 of 73
Doe v. University of South Carolina, Not Reported in Fed. Supp. (2018)
2018 WL 1215045

immunity extends to arms of the state, including a state's agencies, instrumentalities, and employees. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 101-02 (1984); see also Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 429 (1997); Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989) (holding that neither a State nor its officials acting in their official capacities are "persons" under § 1983). While sovereign immunity does not bar suit where a state has given consent to be sued, or where Congress abrogates the sovereign immunity of a state, neither of those exceptions applies in the instant case. [4]

[4]   Congress has not abrogated the states' sovereign immunity under § 1983, see Quern v. Jordan, 440 U. S. 332, 343 (1979), and South Carolina has not consented to suit in federal district court. S.C. Code Ann. § 15-78-20(e).

Here, however, Doe seeks injunctive relief against the University and its employees. Therefore, the court construes Doe's motions as seeking injunctive relief pursuant to Ex parte Young, 209 U.S. 123 (1908). Under Ex parte Young, a federal court may "issue prospective, injunctive relief against a state officer to prevent ongoing violations of federal law, on the rationale that such a suit is not a suit against the state for purposes of the Eleventh Amendment." McBurney v. Cuccinelli, 616 F.3d 393 (4th Cir. 2010); see also Antrican v. Odom, 290 F.3d 178, 184 (4th Cir. 2002) ("This exception to sovereign immunity is based on the notion, often referred to as a fiction, that a State officer who acts in violation of the Constitution is stripped of his official or representative character.") (internal quotations omitted).

The parties dispute whether the injunctive relief sought by Doe is prospective in accordance with the exception recognized in Ex Parte Young, or retroactive, which would render Ex parte Young inapplicable. Compare Carten v. Kent State Univ., 282 F.3d 391, 396 (6th Cir. 2002) (finding requests for reinstatement to be prospective in nature and appropriately sought pursuant to Ex parte Young); Osteen v. Henley, 13 F.3d 221, 223 (7th Cir. 1993) (finding expelled student's suit against school for reinstatement to school was not barred by the Eleventh Amendment because it sought prospective injunctive relief); Kashani v. Purdue Univ., 813 F.2d 843, 848 (7th Cir. 1987) (collecting cases); and Doe v. Ohio State Univ., 219 F. Supp. 3d 645 (S.D. Ohio 2016) (finding reinstatement from school expulsion is prospective injunctive relief, and therefore, not barred by the Eleventh Amendment), with Jemsek v. Ryne, 662 Fed.Appx. 206 (4th Cir. 2016) (holding that a physician seeking rescission of a

state medical licensing board's order suspending his license and letter of concern was not seeking prospective relief); and Republic of Paraguay v. Allen, 134 F.3d 622, 628 (4th Cir. 1998) (holding that a suit to void a state capital sentence of a foreign national did not seek prospective relief). Because the court finds Doe's motions for a preliminary injunction should be denied on other grounds, the court need not resolve this dispute at this time.

**B. Motions for Preliminary Injunction**

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). A plaintiff seeking a preliminary injunction must establish all four of the following elements: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. Id. at 20; The Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 346-47 (4th Cir. 2009), vacated on other grounds by 559 U.S. 1089 (2010), reissued in part by 607 F.3d 355 (4th Cir. 2010), overruling Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co., 550 F.2d 189 (4th Cir. 1977). [5] A plaintiff must make a clear showing that he is likely to succeed on the merits of his claim. Winter, 555 U.S. at 22; Real Truth, 575 F.3d at 345-46; see also Dewhurst v. Century Aluminum Co., 649 F.3d 287, 290 (4th Cir. 2011). Similarly, he must make a clear showing that he is likely to be irreparably harmed absent injunctive relief. Winter, 555 U.S. at 20-23; Real Truth, 575 F.3d at 347. Only then may the court consider whether the balance of equities tips in the plaintiff's favor. See Real Truth, 575 F.3d at 346-47. [6] Finally, the court must pay particular regard to the public consequences of employing the extraordinary relief of injunction. Real Truth, 575 F.3d at 347 (quoting Winter, 555 U.S. at 24).

[5]   The portions of Real Truth that were reissued by the Fourth Circuit are Parts I and II found at 575 F.3d at 345-47, which are the sections addressing injunctions that are relied upon in the court's Report and Recommendation.

[6]   Based on Winter, the Real Truth Court expressly rejected and overruled Blackwelder's sliding scale approach, which generally allowed a plaintiff to obtain an injunction with a strong showing of irreparable harm even if he demonstrated only a possibility of success on the merits. Real Truth, 575 F.3d at 347; Winter, 555 U.S. at 21-23; see, e.g., Jones v. Bd. of Governors of N.C.,

Doe v. University of South Carolina, Not Reported in Fed. Supp. (2018)

2018 WL 1215045

Case 4:19-cv-01234-MWB   Document 11-1   Filed 07/21/19   Page 10 of 73

704 F.2d 713, 715 (4th Cir. 1983) (granting a preliminary injunction under the Blackwelder standard).

**1. Likelihood of Success on the Merits**

**\*4** Doe's basis for injunctive relief appears to rest only on his claims for violations of Title IX, the Fifth Amendment's Double Jeopardy Clause, and the Fourteenth Amendment's Due Process Clause. [7] Doe brings these claims pursuant to 42 U.S.C. § 1983. (Compl. ¶ 140, ECF No. 1 at 37.) A legal action under § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 707 (1999). To state a claim under § 1983, a plaintiff must allege: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of state law. West v. Atkins, 487 U.S. 42, 48 (1988).

[7]     Consequently, the court will not consider Doe's state law claims for the purpose of the motions for a preliminary injunction.

**a. Fourteenth Amendment—Due Process**

Doe claims the University's disciplinary process violated his right to due process under the Fourteenth Amendment. Specifically, Doe alleges he was deprived of due process because Defendant Wells modified the incident report in which Roe made allegations against Doe; Roe's appeal from the first hearing was filed late; the Title IX Panel instructed the new hearing panel to not consider Doe's visa status or academic status when fashioning a sanction; and Roe made new allegations at the second hearing.

In relevant part, the Fourteenth Amendment provides that "no state shall make or enforce any law which shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The adequacy of due process is governed by the balancing test set forth in the United States Supreme Court's decision in Matthews v. Eldridge, 424 U.S. 319, 335 (1976). In Matthews, the Court provided that sufficiency of due process in administrative procedures requires an analysis of the governmental and private interests that are affected, which requires consideration of three factors:

(1) the private interest that will be affected by the official action,

(2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, and

(3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

Matthews v. Eldridge, 424 U.S. 319, 335 (1976).

State university disciplinary proceedings may implicate the Due Process Clause, [8] which generally requires "the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." Goss v. Lopez, 419 U.S. 565, 581 (1975) (addressing due process requirements in a public high school setting); see also Bd. of Curators of Univ. of Mo. v. Horowitz, 435 U.S. 78, 85-86 (1978) ("All that Goss required was an 'informal give-and-take' between the student and the administrative body dismissing him that would, at least, give the student 'the opportunity to characterize his conduct and put it in what he deems the proper context.' ") (quoting Goss, 419 U.S. at 584). The United States Court of Appeals for the Fourth Circuit has most recently stated that students facing disciplinary action at universities must only be "afforded a meaningful hearing." Tigrett v. Rector & Visitors of Univ. of Va., 290 F.3d 620, 630 (4th Cir. 2002); but see Goss, 419 U.S. at 584 (suggesting suspensions longer than ten days, or expulsions, may require more formal procedures). Previously, the Fourth Circuit has adopted the summary of minimum due process requirements for disciplinary hearings in an academic setting provided by the United States Court of Appeals for the Fifth Circuit in 1961 in Dixon v. Ala. State Bd. of Ed., 294 F.2d 150,158-59 (4th Cir. 1961). See Henson, 719 F.2d at 73 ("Although Dixon was decided more than twenty years ago, its summary of minimum due process requirements for disciplinary hearings in an academic setting is still accurate today.") [9]

[8]     Courts have generally assumed without deciding that a student has a protected liberty or property interest in continued enrollment at a state college or university. See, e.g., Tigrett v. Rector & Visitors of Univ. of Va., 290 F.3d 620, 627 (4th Cir. 2002) ("The Supreme Court has assumed, without actually deciding, that university students possess a 'constitutionally protectible property right' in their continued enrollment in a university.") (quoting Regents of the Univ. of Mich. v. Ewing, 474

Doe v. University of South Carolina, Not Reported in Fed. Supp. (2018)
2018 WL 1215045

Case 4:19-cv-01234-MWB    Document 11-1    Filed 07/21/19    Page 11 of 73

U.S. 214, 223 (1985)); Henson v. Honor Comm. of Univ. of Va., 719 F.2d 69, 73 (4th Cir. 1983) (assuming without deciding plaintiff had a protected liberty or property interest in an honor code proceeding); Lewin v. Med. Coll. of Hampton Rds., 910 F. Supp. 1161, 1165 (E.D. Va. 1996) (collecting cases); see also Doe v. Alger,175 F. Supp. 3d 646, 656-58 (W.D. Va. 2016).

9    Other courts in this circuit, even recently, have adhered to Dixon's standard in similar factual circumstances. See Doe v. Alger, 175 F. Supp. 3d 646, 661 (W.D. Va. 2016); but cf. Doe v. Rector & Visitors of George Mason Univ., 149 F. Supp. 3d 602, 615 n.10 (E.D. Va. 2016) (noting that "although Dixon was decided pre-Mathews, Henson was decided post-Mathews, and therefore Dixon must be understood in this circuit as consistent with Mathews.").

*5  In Dixon, the Fifth Circuit stated,

[W]e state our views on the nature of the notice and hearing required by due process prior to expulsion from a state college or university.... The notice should contain a statement of the specific charges and grounds which, if proven, would justify expulsion under the regulations of the Board of Education. The nature of the hearing should vary depending upon the circumstances of the particular case. The case before us requires something more than an informal interview with an administrative authority of the college. By its nature, a charge of misconduct, as opposed to a failure to meet the scholastic standards of the college, depends upon a collection of the facts concerning the charged misconduct, easily colored by the point of view of the witnesses. In such circumstances, a hearing which gives the Board or the administrative authorities of the college an opportunity to hear both sides in considerable detail is best suited to protect the rights of all involved. This is not to imply that a full-dress judicial hearing, with the right to cross-examine witnesses, is required.

Such a hearing, with the attending publicity and disturbance of college activities, might be detrimental to the college's educational atmosphere and impractical to carry out. Nevertheless, the rudiments of an adversary proceeding may be preserved without encroaching upon the interests of the college.

Dixon, 294 F.2d at 158-59.

Beyond setting minimum standards that comport with due process in disciplinary hearings, the Fourth Circuit has also found that significant departures from state government procedures which have induced reasonable and detrimental reliance may, if sufficiently unfair and prejudicial, constitute a procedural due process violation in a university disciplinary hearing. See Jones v. Bd. of Governors of Univ. of N.C., 704 F.2d 713, 717 (4th Cir. 1983) (citing United States v. Caceres, 440 U.S. 741, 752-53 & n.15 (1979)).

Here, the Court finds that Doe's allegations, addressed in turn below, do not clearly show that he was not afforded due process in his disciplinary hearing. Consequently, the court finds Doe has failed to clearly show that he is likely to succeed on the merits of his due process claim.

### i. Modification of the Incident Report

As to the allegation that Wells modified the incident report in which Roe originally made allegations against Doe, the court finds this allegation is not supported by the record. At the hearing on Doe's motion for a preliminary injunction, Doe explained that this allegation arises from his realization that a printed electronic copy of the incident report contains a notation at the end of the document that states it was "modified by Carl R. Wells on August 23, 2017," one day after Roe first brought the allegations against Doe. (Incident Report, ECF No. 37-1.) Doe appears to be concerned that Wells may have modified the substance of the incident report without his knowledge and to his detriment. However, Wells submitted a sworn affidavit in which he swears that the only modification he made to the incident report was to add demographic and contact information that was missing from the original version, and which was linked to another University database. (Wells Aff. ¶ 5, Def.'s 2d Suppl. in Resp.,

Doe v. University of South Carolina, Not Reported in Fed. Supp. (2018)

2018 WL 1215045

Case 4:19-cv-01234-MWB   Document 11-1   Filed 07/21/19   Page 12 of 73

ECF No. 42-2 at 2-3.) Wells swears he did not modify the substance of the incident report, (id. ¶ 6, ECF No. 42-2 at 3), and Doe provides no evidence to the contrary. Accordingly, the court finds that this conjectural allegation by Doe does not support a claim that his right to due process was violated by the University's disciplinary process.

### ii. Timeliness of Roe's Appeal

**\*6** As to Doe's claim that Roe's appeal from the original hearing was untimely, the court finds such a claim is not supported by the facts in the record at this time and, in any event, fails to suggest a constitutional violation. The University's policies allow for appeals up to five "business days" after a disciplinary hearing. (Ex. 4, Def.'s 2d Suppl. in Resp., ECF No. 42-4 at 2.). Doe's first disciplinary hearing was held on October 13, 2017, a Friday. (Compl. ¶ 54, ECF No. 1 at 11.) Roe filed an appeal on October 24, 2017, which Doe alleges is seven "business days" from October 13. (Id. ¶ 60, ECF No. 1 at 12.) However, Defendant Liggett filed a sworn affidavit swearing that, as a matter of practice, the Office of Student Conduct does not count days when there are no classes for students as "business days" for purposes of deadlines for actions by students. (Liggett Aff. ¶ 5, Def.'s 2d Suppl. in Resp., ECF No. 42-1 at 3.) Liggett also swears that the University's students were on fall break on October 19 and 20, and that Roe filed her appeal on October 23. (Id. ¶¶ 4 & 6.) Thus, Liggett swears, Roe's appeal was filed on the fourth "business day" after the October 13 hearing. (Id. ¶ 7.) Doe provides the court with no evidence to refute Liggett's statement. Accordingly, the court finds that Doe's allegation that Roe filed a late appeal is unsupported by the evidence in the record. Moreover, Doe identifies no authority to support the proposition that, assuming Roe's appeal was late, a discretionary extension by the University would violate Doe's due process rights, especially considering that the University considered Doe's cross appeal as well. Consequently, the court finds this allegation does not support his claim that the University's disciplinary process violated his right to due process.

### iii. Title IX Panel's Instructions

Doe also claims that the Title IX Panel instructed the new hearing panel not to consider Doe's visa status or academic status when it determined the appropriate sanction for his offenses. However, the court finds that this allegation does not clearly show that Doe is likely to succeed on the merits of any constitutional claim. [10] As detailed above, due process requires at least that Doe be notified of the disciplinary charges against him and an opportunity to be heard to defend against those charges. See Goss, 419 U.S. at 581. Here, Doe fails to forecast any evidence that the Title IX Panel's instructions deprived him of a meaningful hearing on remand. See Tigrett, 290 F.3d at 629 (noting in a student expulsion case that the crux of the due process inquiry was whether the students received a meaningful hearing) (citing Mathews, 424 U.S. at 333). Moreover, nothing indicates that the University failed to give an opportunity to both sides to be heard in detail at the second hearing. See Dixon, 294 F.2d at 158-59. Consequently, the court finds Doe fails to clearly show that he is likely to succeed on the merits of his due process claim based on the Title IX Panel's instructions on remand.

[10]   To the extent Doe relies on the Double Jeopardy Clause with regard to his challenge to the second hearing, he again fails to show a likelihood of success on the merits, as it is well settled that the Double Jeopardy Clause does not apply to academic disciplinary proceedings. See, e.g., Hudson v. United States, 522 U.S. 93, 98-99 (1997) ("The [Double Jeopardy] Clause protects only against the imposition of multiple *criminal* punishments for the same offense[.]") (citing Helvering v. Mitchell, 303 U.S. 391, 399 (1938)); Ctr. for Participant Ed. v. Marshall, 337 F. Supp. 126, 137 (N.D. Fla. 1972) (finding a university disciplinary proceeding was civil in nature, rather than criminal, because it did not involve a loss of life or liberty, and therefore, the Double Jeopardy Clause was not implicated); Paine v. Bd. of Regents of Univ. of Tex. Sys., 355 F. Supp. 199, 203 (W.D. Tex. 1972) (providing that a university's disciplinary rules were civil, remedial, or administrative in nature, and thus, they did not implicate the Double Jeopardy Clause).

### iv. Roe's Allegations in the Second Hearing

Finally, Doe alleges Roe added new allegations of sexual misconduct in the second disciplinary hearing that Doe was unable to defend against. Doe argues this violated his right to due process because he had no notice of this claim—which asserted coerced oral sex—and was not prepared to defend against it. [11] However, the court finds Doe's allegation is belied by the evidence in the record. The incident report, which Doe alleges he had access to "throughout the whole process," (Compl. ¶ 31, ECF No. 1 at 7), contains the allegations by Roe that Doe now contends were never raised

Case 4:19-cv-01234-MWB Document 11-1 Filed 07/21/19 Page 13 of 73

Doe v. University of South Carolina, Not Reported in Fed. Supp. (2018)

2018 WL 1215045

until the second hearing. (ECF No. 37-1 at 1.) Therefore, by Doe's own account, he was on notice that Roe alleged that the oral sex was not consensual. Consequently, the court finds this allegation of procedural error does not demonstrate that the University's disciplinary process violated his right to due process.

11   To the extent Doe also alleges that Roe filed a second incident report detailing violations of the no-contact order against him, and that Roe's reference to the second incident report in the second disciplinary hearing violated his right to due process, the court finds no clear showing of a likelihood of success on the merits, since Doe was found not responsible for those allegations. (Ex. G., Suppl. to Mot. for TRO & Prelim. Inj., ECF No. 9-2 at 22.)

### b. Title IX—Disparate Treatment

*7 Doe claims the defendants violated his rights under Title IX because the disciplinary hearing process amounted to sex discrimination. However, the court finds Doe has also failed to clearly show he is likely to succeed on the merits of this claim.

Title IX provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). A student may raise a claim of disparate treatment in a disciplinary proceeding based on sex pursuant to Title IX. Brzonkala v. Va. Polytechnic Inst. & State Univ., 132 F.3d 949, 961 (4th Cir. 1997) (reversed *en banc* on other grounds) (relying on Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994) (referring to the claim as one for "erroneous outcome discrimination")). [12] To state a claim for disparate treatment, a plaintiff must allege: (1) "a procedurally or otherwise flawed proceeding"; (2) "that has led to an adverse and erroneous outcome"; and (3) "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." Doe v. Salisbury Univ., 123 F. Supp. 3d 748, 766 (D. Md. 2015) (quoting Yusuf, 35 F.3d at 715); see also Doe v. Rector & Visitors of George Mason Univ., 132 F. Supp. 3d 712, 732 (E.D. Va. 2015) (same). [13]

12   Such a claim is cognizable in a § 1983 action. See Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246 (2009).

13   The Fourth Circuit has found that Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq, "provide[s] a persuasive body of standards to which we may look in shaping the contours of a private right of action under Title IX." See Brzonkala, 132 F.3d at 961 (quoting Preston v. Commonwealth of Va. ex rel. New River Cmty. Coll., 31 F.3d 203, 207 (4th Cir. 1994)).

Here, Doe fails to provide specific arguments or evidence that would show he is likely to succeed on the merits of this claim. The only argument the court can find in Doe's various motions and pleadings that would address a Title IX claim is Doe's assertion that "Defendants evidenced a gender bias against [Doe] as the male accused throughout the investigative and hearing process." (Compl. ¶ 103, ECF No. 1 at 23.) However, Doe fails to identify "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." See Yusuf, 35 F.3d at 715. Allegations of such circumstances could entail "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender," but conclusory allegations of discrimination will not suffice. Brzonkala, 132 F.3d at 961-62 (quoting Yusuf, 35 F.3d at 715). Because Doe's allegation is merely conclusory and unsupported by specific factual allegations, the court finds Doe has failed to clearly show he is likely to succeed on the merits of this claim.

Based on the foregoing, Doe has failed to clearly show that he is likely to succeed on the merits of his federal claims. Thus, Doe fails to satisfy the first Winter factor.

### 2. Irreparable Injury

As to the second Winter factor, Doe alleges he will be harmed in numerous ways if the court does not grant preliminary relief. Chief among his concerns are that his suspension has resulted in the illegality of his presence in the United States, and the prospect of his deportation to Iran, his native country. Doe alleges that if he were to be deported to Iran, he could face legal trouble, including death, because of the allegations of sexual misconduct. Doe also argues the court should consider the harms he presently faces in the United States because of his suspension—the disruption of his pursuit of his Ph. D., the loss of his job at the University, and the resulting financial hardships. However, even if this factor weighed in Doe's favor as to the preliminary injunction motion, because

Doe v. University of South Carolina, Not Reported in Fed. Supp. (2018)

Case 4:19-cv-01234-MWB   Document 11-1   Filed 07/21/19   Page 14 of 73

2018 WL 1215045

the court has already found that Doe has not clearly shown that he is likely to succeed on the merits of his claims, this factor is insufficient to warrant relief. See Real Truth, 575 F.3d at 347 (stating that Winter requires all four factors be satisfied as articulated to grant a motion for a preliminary injunction).

### 3. Balance of the Equities & the Public Interest

**\*8** As to the third and fourth Winter factors, [14] the court finds that the competing interests between these parties reveal the balance of equities does not clearly tip to either side. As explained above, Doe's interests lie in regaining lawful immigration status in the United States, completing his academic work, and regaining his employment. But the University retains an interest in protecting the safety and order of its student body through its disciplinary procedures. See Goss, 419 U.S. at 591-93. The public interest aligns with the University's here and supports denial of the preliminary injunction as well. Notably, the law recognizes that federal courts should generally refrain from interfering in the affairs of state institutions of higher learning, absent some extraordinary justification. See id. at 578 ("Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint.... By and large, public education in our Nation is committed to the control of state and local authorities.") (quoting Epperson

v. State of Ark., 393 U.S. 97 (1968)); Tigrett, 290 F.3d at 629 ("In the absence of a constitutional or statutory deprivation, the federal courts should be loathe to interfere with the organization and operation of an institution of higher education."). Thus, the third and fourth factors also do not warrant the extraordinary remedy of a preliminary injunction. Further, as noted above, because the court has already found that Doe has not clearly shown that he is likely to succeed on the merits of his claims, an injunction cannot be granted. See Real Truth, 575 F.3d at 347 (stating that Winter requires all four factors be satisfied as articulated to grant a motion for a preliminary injunction).

14    Int'l Refugee Assistance Project v. Trump, 857 F.3d 554, 602 (4th Cir. 2017) (considering the balance of equity and public interest factors together), vacated and remanded on other grounds, 137 S. Ct. 2080 (2017).

### RECOMMENDATION

Based on the foregoing, the court recommends Doe's motions for a preliminary injunction be denied. (ECF Nos. 4 & 13.)

### All Citations

Not Reported in Fed. Supp., 2018 WL 1215045

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Harris v. Saint Joseph's University, Not Reported in F.Supp.2d (2014)
Case 4:19-cv-01234-MWB Document 11-1 Filed 07/21/19 Page 15 of 73
2014 WL 1910242

KeyCite Yellow Flag - Negative Treatment
Distinguished by Galarza v. Dick, D.N.M., July 25, 2016

2014 WL 1910242
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Brian HARRIS
v.
SAINT JOSEPH'S UNIVERSITY, et al.

Civil Action No. 13–3937.
|
Signed May 12, 2013.
|
Filed May 13, 2014.

**Attorneys and Law Firms**

Kenneth M. Dubrow, The Chartwell Law Offices LLP, Philadelphia, PA, for Brian Harris.

James A. Keller, Joshua W.B. Richards, Saul Ewing LLP, Daniel J. Rucket, John H. McCarthy, Rawle & Henederson LLP, Timothy Burke, Eckert Seamans Cherin & Mellott LLC, Philadelphia, PA, for Saint Joseph's University, et al.

*MEMORANDUM*

RESTREPO, District Judge.

**\*1** This case arises from an internal administrative disciplinary investigation and student conduct hearing at Saint Joseph's University ("SJU") resulting in plaintiff, Brian Harris, being found responsible for sexually assaulting defendant Jane Doe, both of whom were SJU students at the time. Plaintiff brought this action against defendants: SJU; Joseph Kalin, a Public Safety Officer at SJU; and Jane Doe. Against SJU only, plaintiff alleges: breach of contract (Count I); violation of Title IX of the Education Act Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681, et seq. (Count II); negligence (Count III); and violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa.C.S.A. § 201–1, et seq. (Count IV). Against all defendants, plaintiff alleges: defamation (Count V); making public statements about plaintiff placing him in a false light (Count VI); and intentional infliction of emotional distress ("IIED") (Count VII). Finally, against Jane Doe only, plaintiff

alleges intentional interference with contractual relations (Count VIII).[1]

[1]    Although Count VIII of the Amended Complaint was mistakenly identified as Count IX, by stipulation of the parties approved by the Court (ECF Document 22), the Amended Complaint was corrected in that regard.

Pending before the Court are the Motions to Dismiss Plaintiff's Amended Complaint filed by defendants, SJU and Joseph Kalin (collectively, "University Defendants") (ECF Doc. 23) and defendant Jane Doe (Doc. 24), under Federal Rule of Civil Procedure 12(b)(6). For the reasons which follow, defendants' motions to dismiss are granted in part and denied in part.

## 1. LEGAL STANDARD UNDER FED. R. CIV. P. 12(b)(6)

Dismissal under Rule 12(b)(6) is proper where the Amended Complaint fails to state a claim upon which relief may be granted, such as where the plaintiff is unable to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Conclusory allegations are insufficient to survive a motion to dismiss. *See Fowler v. UPMC Shadyside,* 578 F.3d 203, 210 (3d Cir.2009).

The Court must consider only those facts alleged in the complaint and accept all of those allegations as true. *Wiest v. Lynch,* 2014 WL 1490250, *8 (E.D.Pa.2014) (citing *ALA, Inc. v. CCAIR, Inc.,* 29 F.3d 855, 859 (3d "Cir.1994)). However, the Court "need not accept as true unsupported conclusions and unwarranted inferences," *see id.* (citing *Doug Grant, Inc. v. Greate Bay Casino Corp.,* 232 F.3d 173, 183–84 (3d Cir.2000) (citations and internal quotation marks omitted)), and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," *see Iqbal,* 556 U.S. at 678.

## 2. DISCUSSION

### (A) Count I—Breach of Contract
Plaintiff's Amended Complaint alleges:

At all times material hereto, a contractual relationship purportedly existed between SJU and [plaintiff]. The [Student] Handbook, [2] the terms of which were unilaterally drafted by SJU, was deemed part of that contract. Pursuant thereto, SJU was required to act in accordance with the Handbook in resolving complaints of misconduct and violations of SJU's policies and regulations, in the investigation of those complaints, in the process of adjudicating complaints of sexual misconduct, and in resolving appeals brought challenging disciplinary decisions.

[2]     A copy of the 2012/2013 SJU Student Handbook ("Handbook") is attached as Exhibit A to the Declaration of Joshua W.B. Richards, counsel for University Defendants, accompanying the University Defendants' brief in support of their motion to dismiss.

**\*2** Pl.'s Am. Compl. (Document 20), ¶ 81 (footnote added). The Amended Complaint further alleges: "SJU **breached** its contract with Harris by failing to comply with **the Handbook, a contract between Harris and SJU,** including, without limitation, SJU's implicit duties of good faith and fair dealing in connection therewith, by: ..." *Id.* ¶ 83 (emph.added). Paragraph 83 of the Amended Complaint then includes 23 general averments regarding policies and procedures for investigation and adjudication of complaints of alleged sexual misconduct wherein plaintiff alleges SJU breached its contract with plaintiff. *Id.* ¶ 83(a)-(w). Finally, the Amended Complaint alleges damages as a result of SJU's alleged breach of contract including:

having [plaintiff's] SJU school record improperly include a conviction and/or other finding of guilt of sexual misconduct (assault) based upon the unfounded charges brought against him, marring [his] ability to enroll in another college or university of similar or greater stature as SJU, stigmatizing

[plaintiff] with a finding of guilt for an act he did not commit, and monetary losses.

*Id.* ¶ 84. Thus, although the Amended Complaint states that "a contractual relationship purportedly existed between SJU and Harris" and that the "Handbook ... was deemed part of that contract," *id.* ¶ 81, the specific allegations of breach of contract assert that "SJU breached its contract with [plaintiff] **by failing to comply with the Handbook.**" *Id.* ¶ 83 (emph.added). The breach alleged was "failing to comply with the Handbook." *Id.*

The parties acknowledge that to state a claim for breach of contract, a plaintiff must plead the following elements: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resulting damages, *see Dempsey v. Bucknell Univ.,* 2012 WL 1569826, \*17 (M.D.Pa.2012) (citing *Lackner v. Glosser,* 892 A.2d 21, 30 (Pa.Super.2006)). *See* Univ. Defs.' Br. 8; Pl.'s Br. 10. Initially, it is noted that University Defendants "concede[ ] that 'the relationship between a private educational institution and an enrolled student is contractual in nature,' *Swartley v. Hoffner,* 734 A.2d 915, 919 (Pa.Super.1999), and here the terms of that contract are outlined in the Handbook."[3] *See* Univ. Defs.' Br. 8 (footnote omitted). Thus, it appears that for purposes of the motions to dismiss, the parties agree that if plaintiff has sufficiently and properly pled **a violation by SJU of the rules and regulations set forth in the Handbook,** plaintiff's claim of breach of contract survives the motion to dismiss with regard to the breach of contract claim.

[3]     As reflected by the caselaw cited by the parties in support of their respective positions, the parties appear to agree that Pennsylvania substantive law governs plaintiff's state law claims. *See, e.g.,* Univ. Defs.' Br. 8 n. 3 (citing cases) ("Pennsylvania substantive law governs Harris' breach of contract claim.").

Indeed, under Pennsylvania law, "[t]he relationship between a private educational institution and an enrolled student is contractual in nature; therefore, a student can bring a cause of action against said institution for breach of contract where the institution ignores or violates portions of the written contract." *Dempsey,* 2012 WL 1569826, at \*17 (quoting *Swartley,* 734 A.2d at 919). "The contract between a private institution and a student is comprised of written guidelines, policies, and procedures as contained in the written materials distributed to the student over the

course of their enrollment in the institution." *Kimberg v. Univ. of Scranton,* 2007 WL 405971, *3 (M.D.Pa.2007) (quoting *Swartley,* 734 A.2d at 919). Thus, it appears that plaintiff has sufficiently pled the **existence** of a contract between plaintiff and SJU, and the remaining issue is whether plaintiff's allegations are sufficient to support a finding that SJU breached the terms of the contract as contained in the Handbook. [4] *See, e.g., id.; Reardon v. Allegheny College,* 926 A.2d 477, 480 (Pa.Super.2007) ("The relationship between a privately funded college and a student has traditionally been defined in this Commonwealth as strictly contractual in nature.... As such, we review the agreement between the parties concerning disciplinary procedures, contained within a portion of the student handbook ... as we would any other agreement between two private parties.") (citations omitted).

[4]    In an attempt to show that there are "questions of unresolved fact" on which a denial of the University Defendants' motion may be based, *see* Pl.'s Resp. to Univ. Defs.' Mot. 8, plaintiff points to what he perceives to be a contradiction between SJU's concession that the Handbook **is** a contract and the Handbook's language that it "is not a contract," *id.* at 8, 11 (quoting Handbook at 3). However, this issue appears to be a red herring with regard to resolution of the motion to dismiss. As mentioned, **plaintiff** specifically **pleads** in his Amended Complaint: "SJU **breached** its contract with Harris **by failing to comply with the Handbook, a contract between Harris and SJU** ..." *See* Pl.'s Am. Compl. ¶ 83 (emph.added). Thus, the allegations in the Amended Complaint **upon which plaintiff basis his breach of contract claim** assert that SJU breached its contract "by failing to comply with the Handbook." *Id.* To the extent that plaintiff is now arguing that, based on the Handbook's language, the Handbook may not be a contract, it would appear that plaintiff's breach of contract claims—which are based on the averment that the Handbook **is** a contract and that SJU breached that contract—must be dismissed for failure to state a claim.

**\*3**  In evaluating whether allegations in a Complaint survive a Rule 12(b)(6) motion, the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *see Iqbal,* 556 U.S. at 678, and conclusory allegations are insufficient to survive a motion to dismiss, *see Fowler,* 578 F.3d at 210. Here, plaintiff's breach of contract claim in the Amended Complaint relies on conclusory and insufficient allegations. *See, e.g.,* Pl.'s Am. Compl. ¶ 83(a)-(w). For example, plaintiff alleges that SJU "breached its contract with Harris by failing to comply with the Handbook" in "[f]ailing to provide **adequate** policies and procedures for

the investigation and adjudication of complaints," "[f]ailing to provide **adequate** notice of the polices and procedures," and "failing to provide **fair** notice of the parameters of the charged offense." *Id.* ¶ 83(a), (b), and (e) (emph.added). Conclusory allegations such as these, with no clear averments as to what statement or regulations included in the Handbook (which the parties appear to agree for present purposes was a contract) were violated or breached, are insufficient to survive a motion to dismiss. *See, e.g., Bradshaw v. Pa. State Univ.,* 2011 WL 1288681, *2 (E.D.Pa.2011) (giving plaintiff former student opportunity to amend her complaint to "allege specifically the terms of the contract in dispute").

To survive a motion to dismiss, *Iqbal* explains, "a complaint must contain sufficient factual matter," that if accepted as true, states a claim for relief "that is plausible on its face." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 556. In this case, plaintiff has failed to plead sufficient factual content to support his claim that SJU breached the contract. *See* Am. Compl. ¶ 83(a)-(w). For example, it is not at all clear which policy(ies) or procedure(s) in the Handbook plaintiff is alleging SJU breached.

"[I]f a [claim] is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." *Wiest,* 2014 WL 1490250, at *8 (quoting *Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 236 (3d Cir.2008)). Therefore, here, the Amended Complaint is dismissed without prejudice to plaintiff's right to amend the Complaint to include sufficient factual allegations to support his claim of breach of contract. [5]

[5]    Plaintiff would be well-advised to include in any amended pleading factual allegations identifying the specific provisions of the 120–page Handbook that SJU allegedly breached. *See, e.g., Bradshaw,* 2011 WL 1288681, at *2 (dismissing without prejudice breach of contract claim where plaintiff former student failed to sufficiently "identify in the complaint the provisions of the handbook that the defendant [University] allegedly breached," the Court gave plaintiff an opportunity to amend the Complaint "to allege specifically the terms of the contract in dispute, the defendant's breach thereof, and the harm that resulted").

If plaintiff chooses to amend the Complaint, he should be mindful that "[w]hen a contract so specifies, generally

Harris v. Saint Joseph's University, Not Reported in F.Supp.3d (2014)
Case 4:19-cv-01234-MWB   Document 11-1   Filed 07/21/19   Page 18 of 73
2014 WL 1910242

applicable principles of contract law will suffice to insulate the institution's internal, private decisions from judicial review." *See Reardon,* 926 A.2d at 480–81. The Handbook clarifies that, among other things:

> **\*4** Community Standards proceedings are not criminal or civil proceedings, but rather, internal administrative determinations of violations of institutional policy. Civil or criminal rules of procedure and evidence do not apply.... After receiving information at the hearing, the Hearing Officer, Peer Review Board, or Community Standards Board shall determine ... whether the respondent(s) is responsible for violating the Community Standards.... **Subsequent reviewers shall not determine anew whether there was a Community Standards violation.**

Handbook 35–36 (emph.added). The Handbook further provides: "The decision made on appeal [by the Vice President for Student Life/Associate Provost ('VPSL') ] **will be final.** If the VPSL and Provost/designee find no merit to the appeal, the decision of the original hearing shall stand." *Id.* at 39–40 (emph.added). Plaintiff's Amended Complaint does not appear to allege that this provision is ambiguous. Under Pennsylvania law, to the extent that the unambiguous terms of the Handbook were not breached, "[t]his clause is adequate to insulate the merits of [SJU's] decision from intensive review." *See Reardon,* 926 A.2d at 482 (citing *Murphy v. Duquesne Univ. of the Holy Ghost,* 565 Pa. 571, 777 A.2d 418, 429 (Pa.2001)) (finding that plaintiff's request that the Court review the "private, internal decisions" of the defendant College was something that was "forbidden by the terms of both [the handbook] and case law, where a clause in the student handbook stated 'The decision of the President is final.' "). [6]

[6]  "A distinction must be made between the allegation that [SJU] breached the terms of [the Handbook] by failing to adhere to its provisions, which is a reviewable claim, and the allegation that the way in which these provisions were implemented, or the outcome arrived at by such implementation, was unfair-a claim which

is **not** reviewable according to the provisions of [the Handbook]." *See Reardon,* 926 A.2d at 482 n. 5 (citing *Murphy,* 777 A.2d at 429). That having been said, although SJU's "internal, private decisions," *see Reardon,* 926 A.2d at 480–81, on whether there was a "Community Standards violation," *see* Handbook 35– 36, may be insulated from judicial review, *see Reardon,* 926 A.2d at 480–81, by the Handbook's own terms "Community Standards proceedings are not criminal or civil proceedings, but rather, **internal administrative determinations of violations of institutional policy,**" *see* Handbook 35–36 (emph.added). Defendant Doe argues that since SJU's administrative determination that plaintiff's conduct violated Community Standards and institutional policy was "final" under the terms of the Handbook, "Jane Doe **cannot** be found by this court to have made any statements regarding the sexual assault that are false, defamatory, or place Harris in a false light," or to have intentionally inflicted any emotional distress or intentionally interfered with the contract between SJU and Harris. *See* Doe's Br. 13 (emph. in orig.). However, defendant fails to cite specific authority or caselaw to support the proposition that because the contract (the Handbook) indicates that SJU's determination was final for purposes of making an internal administrative determination that Community Standards were violated, the Court is bound by SJU's findings of fact for purposes of plaintiff's civil action claims, such as defamation and intentional interference with contractual relations.

**(B) Count II—Violation of Title IX**

Plaintiff's Amended Complaint alleges that SJU used "impermissible gender bias against Harris in the investigation and adjudication of Doe's accusations," *see* Pl.'s Am. Compl. ¶ 92, and "violated Title IX in the manner in which it improperly adjudicated the baseless charge of sexual misconduct by Doe against Harris," *id.* ¶ 93, 777 A.2d 418. Thus, plaintiff alleges that plaintiff "has been discriminated against by SJU on the basis of his gender in violation of Title IX." *Id.* ¶ 95, 777 A.2d 418.

Title IX provides in pertinent part: "No person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance ." *Tafuto v. N.J. Inst. of Tech.,* 2011 WL 3163240, *2 (D.N.J.2011)* (quoting 20 U.S.C. § 1681(a)). "A plaintiff alleging racial or gender discrimination by a university [under Title IX] must do more than recite conclusory assertions." *Yusuf v. Vassar Coll.,* 35 F.3d 709, 715 (2d cir.1994); *see Tafuto,* 2011 WL 3163240, at *2 (quoting *Yusuf* ) ("[W]holly

conclusory allegations ... [do not] suffice for purposes of Rule 12(b)(6).").

In *Yusuf,* two categories of claims of gender bias in university discipline were recognized: claims of an erroneous outcome from a flawed proceeding and claims of selective enforcement. *Scott v. Worldstarhiphop, Inc.,* 2011 WL 5082410, *4 (S.D.N.Y.2011)* (citing *Yusuf,* 35 F.3d at 714–16). However, "in neither case do wholly conclusory allegations suffice for the purposes of Rule 12(b)(6)." *Id.* (quoting *Yusuf* ). When a plaintiff claims a flawed outcome, he must allege, among other things, "particular circumstances suggesting that **gender** bias was a motivating factor behind the erroneous finding." *Id.* (quoting *Yusuf* ) (emph.added). Similarly, when a plaintiff claims selective enforcement, a plaintiff must allege, among other things, "particular circumstances suggesting that **gender** bias was a motivating factor behind the inconsistency." *Id.* (citing *Yusuf* ) (emph.added). Here, plaintiff fails to allege facts sufficient to meet either standard. *See, e.g., Scott,* 2011 WL 5082410, at *5* ("there is no **nonconclusory** allegation of gender bias") (emph.added); *Tafuto,* 2011 WL 3163240, at *3.* The averments in the Amended Complaint which purport to identify "[e]vidence of SJU's impermissible gender bias against Harris," *see* Am. Comp. ¶ 92(a)-(f), do not suggest gender bias as a motivating factor. Dismissal of the Amended Complaint is proper where plaintiff fails to plead "enough facts to state a claim to relief that is plausible on its face." *See Twombly,* 550 U.S. at 570; *see also Iqbal,* 556 U.S. at 678. Conclusory allegations are insufficient to survive a motion to dismiss. *See Fowler,* 578 F.3d at 210.

**(C) Count III—Negligence**

 **\*5** Plaintiff's Amended Complaint alleges generally that SJU "had a duty to hire competent personnel, adequately train its personnel, adequately supervise its personnel, and terminate and/or sanction personnel for substandard performance," *see* Am. Compl. ¶ 100, and that "SJU owed a separate duty of care to Harris to ensure that its staff and personnel were properly trained and supervised," *id* . ¶ 101. The Amended Complaint further alleges that SJU was negligent and breached its duty to Harris in failing to: "hire well-trained agents and employees, including, without limitation, investigators and community standards board panel members, including, without limitation, the proper selection of student panelist with requisite knowledge and majority"; "train its employees, agents or representatives in the proper method to thoroughly investigate and adjudicate, without bias, complaints of sexual misconduct";

"properly train its employees, agents or representatives regarding the requirements of Title IX"; "properly train its employees, agents or representatives in the discovery and preservation of relevant evidence"; "properly train its employees, agents or representatives in basic due process as it pertains to the investigation, adjudication, and appeal from adjudication of complaints of sexual misconduct"; "supervise its employees, agents or representatives to ensure complaints of sexual misconduct are adequately investigated and fairly adjudicated." *Id.* ¶ 102(a)-(f). Plaintiff further alleges that SJU was negligent and breached its duty to Harris in "[c]ontinuing to employ substandard employees, including investigators and community standards panel members." *Id.* ¶ 102(g).

SJU argues that there is no articulated basis for these alleged duties other than plaintiff's self-serving conclusory averments that SJU had a duty "because it did." *See* Univ. Defs.' Br. 20. SJU further argues that even assuming the Amended Complaint identifies a plausible duty, plaintiff's negligence claims are barred by Pennsylvania's gist of the action doctrine. *See* Univ. Defs.' Br. 21.

In Pennsylvania, the gist of the action doctrine maintains the distinction between breach of contract claims and tort claims by precluding recovery in tort in the following situations:

> (1) where liability arises solely from the contractual relationship between the parties; (2) when the alleged duties breached were grounded in the contract itself; (3) where any liability stems from the contract; and (4) when the tort claim essentially duplicates the breach of contract claim or where the success of the tort claim is dependent on the success of the breach of contract claim.

*Dempsey,* 2012 WL 1569826, at *21* (citing *Sarsfield v. Citimortgage, Inc.,* 707 F.Supp.2d 546, 553 (M.D.Pa.2010)); *see Sarsfield,* 707 F.Supp.2d at 553 (citing *eToll v. Elias/ Savion Adver., Inc.,* 811 A.2d 10, 14 (Pa.Super.2002)). In *Reardon v. Allegheny College,* 926 A.2d 477 (Pa.Super.2007), a former student sued a college asserting, among other things, breach of contract and negligence claims against the private college and a professor arising from the college's determination that the student was guilty of plagiarizing her

classmate's work. With regard to the plaintiff's negligence claim against the college and the professor, Pennsylvania's Superior Court found that "[t]he only duties owed by [the private college] and [the professor] we can discern are rooted in [the student handbook]—not some external and undefined general duty of care.... Indeed, [the handbook] represents the sole basis for the relationship between the parties—[plaintiff] promises to adhere to the Honor Code in exchange for an education at [the college], while [the college, and to a lesser degree [the professor], promises to adhere to the terms of [the handbook] in giving this education in exchange for monetary compensation." *Id .* at 487 (citations omitted). Accordingly, the Superior Court found that the trial court "correctly applied the gist of the action doctrine in dismissing [the plaintiff's] negligence claim as legally defective." *Id.*

**\*6** Similarly, here, in that it appears that plaintiff's negligence claims arise from the contractual relationship between plaintiff and SJU, these negligence claims are barred by the gist of the action doctrine. [7] *See id.* Indeed, plaintiff's allegations regarding damages suffered as a result of the alleged negligence, *see* Am. Compl. ¶ 104, are identical to the alleged damages suffered as a result of the alleged breach of contract, *id.* ¶ 84. Furthermore, as University Defendants point out, plaintiff fails to point to any caselaw indicating that a private university owes these specific duties to its students under Pennsylvania negligence law. *See, e.g., Tran v. State Sys. of Higher Educ.,* 986 A.2d 179, 182 (Pa.Commw.2009) (citing *Reardon,* 926 A.2d at 480) ("Pennsylvania courts have held consistently that the relationship between a student and a privately funded college is **'strictly contractual** in nature.' ") (emph.added). Moreover, other than making **conclusory** allegations and implications from its breach of contract claims, the Amended Complaint does not allege any facts "to support an inference that Defendant [SJU] breached a duty in the [actual] areas of hiring, training, or supervising its employees." *See, e.g., Dempsey,* 2012 WL 1569826, at \*22; *see Iqbal,* 556 U.S. at 678. Accordingly, University Defendants' motion to dismiss is granted with respect to plaintiff's claim of a Title IX violation and that claim is dismissed.

[7] It is noted that Count VI of the Amended Complaint, alleging a violation of the UTPCPL, specifically alleges that SJU "[r]epresent[ed], warrant[ed] and guarantee[ed] **in writing** that SJU trained its employees and agents in the proper and unbiased investigation and adjudication of complaints of sexual misconduct, when in fact it had not." *See* Am. Compl. ¶ 107(a) (emph.added).

Arguably, this averment lends support to the contention that plaintiff's negligence claims sound in terms of breach of contract rather than tort.

### (D) Count IV—Violation of Pennsylvania's UTPCPL

The UTPCPL creates a private right of action for "[a]ny [person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property" as a result of the seller's deceptive or unlawful actions. *Wise v. Am. Gen. Life Ins. Co.,* 2005 WL 670697, \*7 (E.D.Pa.2005) (quoting 73 Pa.C.S. § 201–9.2(a)). Plaintiff's Amended Complaint alleges that "SJU committed various unfair and deceptive acts and practices in violation of the [UTPCPL], including, but not limited to":

> a. Representing, warranting and guaranteeing in writing that SJU trained its employees and agents in the proper and unbiased investigation and adjudication of complaints of sexual misconduct, when in fact it had not;

> b. Representing that Harris would receive a fair and impartial hearing in connection with any allegation of sexual misconduct, when he would not;

> c. Representing that Harris would receive adequate notice of and due process in connection with allegations of sexual misconduct, when he would not; and,

> d. Misrepresenting SJU's compliance with Title IX[.]

Pl.'s Am. Compl. ¶ 107.

Initially, SJU contends that "to have standing to state a claim under the UTPCPL, a party must be, as a threshold matter, someone who 'purchases or leases' goods or services for 'personal, family, or household purposes,' " *see* Univ. Defs.' Br. 23 (quoting 73 Pa. Pa.CS. § 201–9.2(a)), and that "[i]t seems likely that Harris' parents, not Harris, paid for his tuition," *id.* However, the Amended Complaint **does** allege that plaintiff "purchased, inter alia, educational services from SJU for which he remitted payment in the form of tuition and fees." *See* Am. Compl. ¶ 108. Therefore, at this stage of the proceedings, the Complaint appears sufficient in that regard.

**\*7** "To state a claim under the UTPCPL, a plaintiff must show: (1) deceptive conduct; (2) an ascertainable loss; (3) justifiable reliance on the defendant's wrongful conduct or misrepresentations; and (4) that such reliance caused an injury." *Pellegrino v. State Farm Fire and Cas. Co.,* 2013 WL 3878591, \*8 (E.D.Pa.2013) (citing *Caroselli, Sr.*

Harris v. Saint Joseph's University, Not Reported in F.Supp.3d (2014)
2014 WL 1910242
Case 4:19-cv-01234-MWB Document 11-1 Filed 07/21/19 Page 21 of 73

*v. Allstate Prop. & Cas. Ins. Co.,* 2010 WL 3239356, *7 (E.D.Pa.2010)). Although SJU contends that plaintiff's averments are insufficient to make out a claim under Pennsylvania's UTPCPL, it appears that considering the facts alleged in the Complaint and accepting all of those allegations as true, *see Wiest,* 2014 WL 1490250, at *8 (citing *ALA, Inc.,* 29 F.3d at 859), plaintiff has made sufficient allegations to allege a claim for a violation of the UTPCPL at this stage of the proceedings.

**(E) Count V—Defamation (against SJU, Doe, and Kalin)**

Plaintiff's Amended Complaint alleges that each of the defendants made communications about plaintiff which were defamatory in nature in that "each referred to Harris as the perpetrator of a sexual assault on Doe, even though they knew the allegations were false, or with reckless indifference to the truth or falsity of said allegations." *See* Am. Compl. ¶¶ 113–114. To state a claim for defamation under Pennsylvania law, a plaintiff must establish: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of the defamatory meaning; (5) the understanding by the recipient that the statement refers to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a constitutionally privileged occasion. *Dempsey,* 2012 WL 1569826, at *13 (citing 42 Pa.C.S. § 8343). "A publication is defamatory if it tends to blacken a person's reputation or expose him to public hatred, contempt or ridicule or injure him in his business or profession." *Id.* (quoting *Dunlap v. Phila. Newspapers, Inc.,* 301 Pa.Super. 475, 448 A.2d 6, 10 (Pa.Super.1982)) (citation and internal quotation marks omitted). "In order to be actionable, the words must be untrue, unjustifiable, and injurious to the reputation of another." *Id.* (quoting *Joseph v. Scranton Times L.P.,* 959 A.2d 322, 334 (Pa.Super.2008)).

University Defendants argue that plaintiff's defamation claims fail because plaintiff alleges that individuals within the University shared information about allegations of sexual misconduct with one another. "In general, publication of defamatory matter is its communication intentionally or by a negligent act to one other than the person defamed." *Agriss v. Roadway Exp., Inc.,* 334 Pa.Super. 295, 483 A.2d 456, 463 (Pa.Super.1984). Viewing plaintiff's Amended Complaint under the appropriate motion to dismiss standard, plaintiff appears to have sufficiently alleged, *see* Am. Compl. ¶¶ 112–130, publication of defamatory matter "to one other than the person defamed," *see id.*

*8 Next, University Defendants briefly argue that plaintiff does not allege "special harm" and that his defamation claims therefore fail. *See* Univ. Defs.' Br. 25. The term "special harm" is defined as "actual damages that are economic or pecuniary losses." *Klimaski v. Parexel Intern.,* 2008 WL 2405006, *3 (E.D.Pa.2008) (citing *Sprague v. Am. Bar Ass'n,* 276 F.Supp.2d 365, 368–69 (E.D.Pa.2003)). However, a "plaintiff may succeed in a claim for defamation absent proof of special harm where the spoken words constitute slander per se." *Id.* There are four categories of words that constitute slander per se: words that impute (1) criminal offense; (2) loathsome disease; (3) business misconduct; or (4) serious sexual misconduct. *Id.* Here, applying this standard, plaintiff's allegation that "each [defendant] referred to Harris as the perpetrator of a sexual assault on Doe, even though they knew the allegations were false, or with reckless indifference to the truth or falsity of said allegations," *see* Am. Compl. ¶¶ 113–114, would be considered slander per se.

"In Pennsylvania, a defendant who publishes a statement which can be considered slander per se is liable for the proven, *actual* harm that the publication causes." *Klimaski,* 2008 WL 2405006, at *4. Actual damages are divided into two types: general and special. *Id.* General damages typically flow from defamation, such as "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." *Id.* (citing *Sprague,* 276 F.Supp.2d at 368). Plaintiff's Amended Complaint includes averments of these types of damages caused by defendants' defamatory communications. *See, e.g.,* Pl.'s Am. Compl. ¶¶ 128–29. Thus, in *Agriss,* Pennsylvania's Superior Court found that the trial court erred in granting nonsuit where the Superior Court found evidence was sufficient to show that the alleged defamatory remarks could have "impaired appellant's reputation and caused him personal humiliation and mental anguish" and that testimony "tended to show that the charge held appellant up to ridicule and speculation among fellow employees that his dismissal was imminent." *Agriss,* 483 A.2d at 467. University Defendants' motion to dismiss is denied to the extent that it argues that the claim of defamation should be dismissed as failing to allege "special harm."

University Defendants further argue that truth is a defense to plaintiff's defamation claim. In particular, defendants state that "Harris' specific allegations are that the University and Kalin repeated information about 'Harris' alleged sexual misconduct' as reported by Doe," and that "[t]he fact that Harris was **alleged** to have engaged in such sexual

misconduct, however, is true-such allegations were made against Harris, and he acknowledges and pleads this himself." *See* Univ. Defs.' Br. 25 (citing Am. Comp. ¶¶ 122, 67) (emph.added). However, contrary to University Defendants' contention, plaintiff's Amended Complaint alleges that "each [defendant] referred to Harris *as the perpetrator* of a sexual **assault on Doe,** even though they knew the allegations were false, or with reckless indifference to the truth or falsity of said allegations." *See* Am. Compl. ¶ 114 (emph.added). Therefore, based on the allegations in the Amended Complaint, which must be taken as true at this stage in the litigation, University Defendants' contention in that regard is without merit. [8]

[8]    It is noted University Defendants do not argue that, for purposes of plaintiff's defamation claim, the Court is bound by the findings of fact made during SJU's internal administrative determination with regard to plaintiff's violation of Community Standards and institutional policy. To the extent that defendant Doe makes that argument, it is addressed *supra* note 6.

 **\*9**  University Defendants also point to the common interest privilege as a defense to plaintiff's defamation claim. *See* Univ. Defs.' Br. 26. Under Pennsylvania statutory law, someone accused of defamation may assert the affirmative defense of "the privileged character of the occasion on which [the allegedly defamatory comment] was published." *Aydin Corp. v. RGB Sales,* 1991 WL 152465, \*10 (E.D.Pa.1991) (citing 42 Pa.C.S. § 8343(b)(2)). As defendants and plaintiff appear to acknowledge, *see* Univ. Defs.' Br. 26 (citing *Aydin Corp.*); Pl.'s Br. 34 (citing *Aydin Corp.*), "[s]uch a conditional privilege attaches where the circumstances are such that facts exist which another sharing such common interest is entitled to know" and further, "a communication must be made on a proper occasion, with a proper motive, in a proper manner, and based upon reasonable cause," *see Aydin Corp.,* 1991 WL 152465, at \*10. Accepting all of the allegations in the Amended Complaint as true, defendants' motion to dismiss the defamation claim on the basis of the common interest privilege is denied at this stage of the proceedings, without prejudice to defendants' right to raise the defense again at a later stage of the litigation. *See, e.g., id.* (holding at the summary judgment stage that, after reviewing evidence of record, the communications made in the course of an investigation were not defamatory in light of Pennsylvania's common interest privilege).

Defendants contend that statements made regarding the alleged sexual assault "are **absolutely privileged** and cannot be the basis for a claim of defamation or false light invasion of privacy." *See* Def. Doe's Br. 16 (emph. in orig.); *see also* Univ. Defs.' Br. 26. In support of this contention, defendants state that "Pennsylvania ... applies this absolute privilege to **quasi-judicial proceedings."** *See* Doe's Br. 17 (emph. in orig.); *see also* Univ. Defs.' Br. 26. However, as the Third Circuit has pointed out, "under Pennsylvania law **government involvement** is ... a **necessary condition** for according quasi-judicial status to grievance procedures." *Overall v. Univ. of Pa.,* 412 F.3d 492, 497 (3d Cir.2005) (emph.added). Indeed, our Court of Appeals clarified that "Pennsylvania cases finding quasi-judicial privilege consistently involve proceedings before federal, state, or local **governmental bodies,** or proceedings held **pursuant to a statute or administrative regulation."** *Id* . (emph.added). In that this case involves an entirely private grievance procedure, the privilege available in Pennsylvania for communications made during quasi-judicial proceedings does not apply. Defendants' motions to dismiss are denied with regard to plaintiff's defamation claims.

### (F) Count VI—False Light (against SJU, Doe, and Kalin)

Plaintiff's Amended Complaint avers that "SJU, Doe and Kalin each made public statements about Harris which placed him in a false light." *See* Am. Compl. ¶ 132. University Defendants argue that plaintiff's false light claim is insufficient because the Amended Complaint fails to sufficiently allege the publicity element of such a claim. *See* Univ. Defs.' Br. 26–27. In particular, University Defendants state:

>     **\*10**    Although the Amended Complaint alleges in conclusory fashion that the University and Kalin "made public statements about Harris," [*see* ] Am. Compl. ¶ 132, the Amended Complaint contains not a single factual allegation about that purported publication, where it was made, and to whom. The first "publicity" that has resulted from Doe's allegations, ironically, occurred when Harris filed this lawsuit.

*Id.* at 27.

Harris v. Saint Joseph's University, Not Reported in F.Supp.3d (2014)
2014 WL 1910242
Case 4:19-cv-01234-MWB   Document 11-1   Filed 07/21/19   Page 23 of 73

In order to sustain a claim for false light, "the element of publicity must be satisfied by widespread dissemination of the material." *Jones v. City of Phila.,* 73 Pa. D. & C.4th 246, 256 (C.P.Phila.2005) (citing *Weinstein v. Bullick,* 827 F.Supp. 1193, 1202 (E.D.Pa.1993)); *see Herron v. MortgageNOW Inc.,* 2013 WL 867177, *2 (E.D.Pa.2013) (false light claims in Pennsylvania require "publicity"). A plaintiff making such a claim must sufficiently allege "that a matter is made public by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Id.* (quoting *DeBlasio v. Pignoli,* 918 A.2d 822, 824 n. 3 (Pa.Commw.2007)). Publicity for purposes of a false light claim "requires more than the 'publication' required to sustain a claim for defamation." *Schatzberg v. State Farm Mut. Auto. Ins. Co.,* 877 F.Supp.2d 232, 245 (E.D.Pa.2012) (citing *Harris v. Easton Pub. Co.,* 335 Pa.Super. 141, 483 A.2d 1377, 1384 (Pa.Super.1984)). "Rather, it requires that 'the matter is made public by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Id.* (quoting *Harris,* 483 A.2d at 1384). In this case, plaintiff fails to sufficiently allege facts, *see, e.g.,* Am. Compl. ¶¶ 131–137 (Count VI "False Light"), to support a claim that defendants publicized information about plaintiff so as to constitute publicity for a false light claim. *See Iqbal,* 556 U.S. at 678; *Twombly,* 550 U.S. at 570. Conclusory allegations are insufficient to survive a motion to dismiss. *See Fowler,* 578 F.3d at 210.

### (G) Count VII—Intentional Infliction of Emotional Distress ("IIED") (against SJU, Doe, and Kalin)

"The elements of [IIED] are: (1) a person who by extreme and outrageous conduct (2) intentionally or recklessly causes (3) severe emotional distress to another." *Manley v. Fitzgerald,* 997 A.2d 1235, 1241 (Pa.Commw.2010). In order for a plaintiff to recover on an IIED claim:

> [T]he conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in any civilized society ... [I]t has not been enough that the defendant has acted with intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that

his conduct has been characterized by "malice," or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort.

**\*11** *Reardon,* 926 A.2d at 488 (quoting *Hoy v. Angelone,* 554 Pa. 134, 720 A.2d 745, 753–54 (Pa.1998) (internal citation omitted)). "It is [the] Court's responsibility to determine if conduct alleged in the cause of action reaches the requisite level of outrageousness to support such a claim." *Britt v. Chestnut Hill College,* 429 Pa.Super. 263, 632 A.2d 557, 561 (Pa.Super.1993). In addition, "the Pennsylvania Supreme Court has required that the plaintiff present competent medical evidence to support the [IIED] claim," *id.* (citing *Kazatsky v. King David Memorial Park, Inc.,* 515 Pa. 183, 527 A.2d 988 (Pa.1987)), and the extreme and outrageous conduct must result in some physical injury, *Hart v. O'Malley,* 436 Pa.Super. 151, 647 A.2d 542, 554 (Pa.Super.1994) (citing cases) ("it is clear that in Pennsylvania, in order to state a claim under which relief can be granted for the tort of [IIED], the plaintiffs must allege physical injury.").

University Defendants argue that plaintiff's allegations do not rise to the requisite level of outrageousness to support a claim for IIED. Count VII of the Amended Complaint alleges in relevant part that "SJU, Doe and Kalin made public statements which were not true and took actions based upon false information to falsely portray Harris as a cruel sex offender, which was not true and caused him severe distress." *See* Am. Compl. ¶ 139. The Amended Complaint avers that, "[a]s a direct and proximate result of the aforementioned extreme, outrageous, intentional, willful and malicious conduct of SJU, Doe, and Kalin, Harris suffered and will continue to suffer, inter alia, severe emotional distress, mental anguish, embarrassment and humiliation, all of which may be permanent in nature." *Id.* ¶ 143, 647 A.2d 542.

In *Reardon,* the plaintiff former student claimed that Allegheny College and a professor "intentionally and wrongly targeted and accused [her] of violations of the college's honor code," despite their knowledge of the falsity of these allegations, and that the defendants deprived plaintiff of her "rights to a fair and impartial hearing." *See Reardon,* 926 A.2d at 488. Affirming the trial court's determination that the alleged actions of the defendants were not sufficient to support an action for IIED, *see id.* at 487, Pennsylvania's Superior Court found that, even if accepted as true, plaintiff's

allegations "do not rise to a level that could be described as "clearly desperate and ultra extreme conduct." *Id.* at 488 (quoting *Hoy,* 720 A.2d at 754).

In *Stokley v. Bristol Borough School Dist.,* 2013 WL 4787297 (E.D.Pa.2013), plaintiff argued that "subjecting an African American student to harsher discipline than white students, particularly for an offense the African American student did not commit, is patently outrageous." *Id.* at *2. The Court pointed out that, "[a]s reprehensible as deliberate discrimination can be, '[c]ourts in this District have repeatedly found that racial discrimination alone does not meet the extreme and outrageous conduct standard necessary to state a claim for intentional infliction of emotional distress.' " *Id.* at *3 (citing *Hargraves v. City of Phila.,* 2007 WL 1276937, *3 (E.D.Pa.2007) (collecting cases)). "Although racial discrimination is completely unacceptable in our society, ... the plaintiff must prove that the conduct is outrageous in **character,** and not just in **motive .**" *Id.* (citing *Forbes v. Rhode Island Brotherhood of Correctional Officers,* 923 F.Supp. 315, 330 (D.R.I.1996) (emph.added)). "Discrimination cases in which accompanying [IIED] claims also are allowed to proceed involve much more egregious conduct than even that which is alleged here, most often involving assault or threats of assault." *Id.* (citing *e.g.,* *DiSalvio v. Lower Merion High Sch. Dist.,* 158 F.Supp.2d 553 (E.D.Pa.2001) (denying motion to dismiss IIED claim when a teacher repeatedly sexually harassed a student, including by inappropriately touching her on multiple occasions); *Lane v. Cole,* 88 F.Supp.2d 402, 406 (E.D.Pa.2000) (noting that while "[i]nvidious discrimination is not alone sufficient to support an [IIED] claim," "[t]he ejection of a tenant from her home with threats of violence in retaliation for her refusal to accede to racial discrimination is another matter")).

 **\*12** In this case, the facts, as set forth by plaintiff in his Amended Complaint, are insufficient to support his claim of IIED. The averments fail to satisfy the requisite outrageous conduct for such a claim, under Pennsylvania law. Furthermore, the Amended Complaint fails to allege physical injury, *see, e.g., Hart,* 647 A.2d at 554 (where plaintiffs "fail[ed] to allege physical injury," court found that "under the tort of [IIED] in Pennsylvania, [plaintiffs] have failed to state a claim"), and that defendants' conduct caused him to seek medical treatment, *see, e.g., Britt,* 632 A.2d at 562 (affirming the trial court's Order dismissing the IIED claim as alleging insufficient facts, the Superior Court stated "it is apparent that Appellant has failed to allege that Appellees' conduct caused him to seek medical treatment").

## 3. CONCLUSION

Defendants' motions to dismiss are granted in part and denied in part. The motions are granted with regard to plaintiff's claims of breach of contract (Count I), violation of Title IX (Count II), negligence (Count III), making public statements which place plaintiff in a false light (Count VI), and intentional infliction of emotional distress (Count VII). Defendants' motions to dismiss are otherwise denied. Accordingly, plaintiff may continue to pursue his claims of a violation of the UTPCPL against defendant SJU (Count IV), defamation (Count V) against all defendants, and intentional interference with contractual relations (Count VIII) against defendant Jane Doe only. [9]

[9]    Although defendant Jane Doe argues that plaintiff cannot bring a claim of intentional interference of contractual relations against her in light of SJU's finding that plaintiff violated institutional policy, as explained above, the fact that the contract indicates that SJU's determination that plaintiff's conduct violated institutional policy was "final" for purposes of the internal administrative determination under the contract does not mean that the Court is bound by SJU's findings for purposes of plaintiff's civil action claims in this Court. *See supra* note 6. Therefore, plaintiff may continue to pursue the intentional interference with contractual relations claim against defendant Doe as alleged in the Amended Complaint.

As mentioned, "if a [claim] is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." *Wiest,* 2014 WL 1490250, at *8 (quoting *Phillips,* 515 F.3d at 236). Therefore, plaintiff's claims of breach of contract, violation of Title IX, negligence, making public statements placing plaintiff in a false light, and intentional infliction of emotional distress (Counts I through III, and VI & VII) are dismissed without prejudice to the right of plaintiff to file a Second Amended Complaint to include any of these claims if he can within the confines of Rule 11(b), *see* Fed.R.Civ.P. 11(b), within twenty (20) days. [10] Otherwise, these claims are dismissed with prejudice.

[10]    The University Defendants request that defendant Kalin be dismissed in his individual capacity in that SJU "concedes an agency relationship with Kalin, and concedes that if Kalin were liable under any theory pleaded in the current Amended Complaint, [SJU] would be liable for Kalin's acts pursuant to principles of

Harris v. Saint Joseph's University, Not Reported in F.Supp.3d (2014)
Case 4:19-cv-01234-MWB    Document 11-1    Filed 07/21/19    Page 25 of 73
2014 WL 1910242

respondeat superior." *See* Univ. Defs.' Br. 29. However, defendants' request is declined as premature at this juncture, especially in light of the dismissal of the aforementioned claims without prejudice.

An appropriate Order follows.

## ORDER

**AND NOW,** this 12th day of May, 2014, upon consideration of the Motions to Dismiss of Defendants, Saint Joseph's University and Joseph Kalin ("University Defendants") (ECF Document 23) and Defendant Jane Doe (Document 24), and plaintiff's opposition thereto, for the reasons explained in the accompanying Memorandum, it is hereby **ORDERED** that:

1. Defendants' Motions to Dismiss Plaintiff's Amended Complaint (Docs. 23 & 24) are **GRANTED in part** and **DENIED in part;**

2. Defendants' motions (Docs. 23 & 24) are **GRANTED** with respect to Plaintiff's claims of breach of contract (Count I), violation of Title IX (Count II), negligence (Count III), making public statements placing plaintiff in a false light (Count VI), and intentional infliction of emotional distress (Count VII), and those claims are DISMISSED without prejudice to filing a Second Amended Complaint, if Plaintiff can do so under the confines of [Fed.R.Civ.P. 11(b)](), within twenty (20) days of the filing of this Memorandum and Order. Otherwise, these claims are dismissed with prejudice;

**\*13** 3. Defendants' motions (Docs. 23 & 24) are otherwise **DENIED;**

4. Plaintiff may continue to pursue his claims of a violation of the UTPCPL (Count IV), defamation (Count V), and intentional interference with contractual relations (Count VIII).

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1910242

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Haney v. West Chester University, E.D.Pa., August 16, 2018

1999 WL 1210838

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.

Albert SEGAL, pro se, Plaintiff

v.

TEMPLE UNIVERSITY SCHOOL
OF LAW, et al. Defendants

No. 99–CV–3220.
|
Dec. 8, 1999.

**Attorneys and Law Firms**

Albert Segal, Philadelphia, PA, Plaintiff, pro se.

Michael E. Sacks, Hamburg & Golden, P.C., Phila, PA, for Temple University School of Law, Defendant.

Michael E. Sacks, (See above), for Dean Reinstein, Defendant.

Michael E. Sacks, (See above), for Epps, Assistant Dean, Defendant.

*MEMORANDUM AND ORDER*

KAUFFMAN, J.

**\*1** Before the Court is Defendants' Motion for Summary Judgment. For the reasons set forth herein, the Motion will be GRANTED.

I. BACKGROUND

Plaintiff Albert Segal ("Segal") attended Defendant Temple University School of Law ("Temple" or "the Law School") from September, 1996 until May, 1999. He completed the requirements for the Juris Doctor ("J.D.") degree imposed by the Law School, but because of conduct judged by the Law School's Disciplinary Committee (the "Committee") to be a violation of the Law School's Code of Student Conduct (the "Code"), Temple expelled Segal on May 19, 1999 and refused to confer upon him the J.D. degree.[1] Segal appealed and the Committee's findings were upheld.

Segal originally filed this action in the Court of Common Pleas of Philadelphia County, alleging a violation of due process by the Law School, Dean of the Law School Robert Reinstein and Assistant Dean Joanne Epps. Defendants removed the case to this Court on June 24, 1999, based on federal question jurisdiction. Defendants moved for summary judgment on November 5, 1999.

II. SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure requires the district court to grant a motion for summary judgment when "there is no genuine issue of material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "When the nonmoving party bears the burden of persuasion at trial, the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion at trial." Lawrence v. National Westminster Bank New Jersey, 98 F.3d 61, 65 (3d Cir.1996) (quoting Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 320 (3d Cir.1995)). A nonmoving party creates a genuine issue of material fact when it provides evidence "such that a reasonable jury could return a verdict for the nonmoving party." Lawrence, 98 F.3d at 65 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

III. DISCUSSION

Segal's claim against the Law School is essentially that he has been denied his rights under the Due Process Clause of the 14th Amendment to the United States Constitution.[2] He argues that, once the Disciplinary Committee began acting on the complaints against him, he was not afforded the notice and opportunity necessary to present an adequate defense. The Law School counters with numerous documents confirming the ample notice and opportunities afforded Segal during the investigation and proceedings against him.

With respect to the disciplinary proceedings, Segal indisputably was entitled to procedural due process under the 14th Amendment. Goss v. Lopez, 419 U.S. 565, 576 (1975). The requirements of due process vary with the type of proceeding involved, but the basic elements are notice and the opportunity to be heard by a fair and impartial tribunal. Sill v. Pennsylvania State University, 462 F .2d 463, 469 (3d Cir.1972). Universities like Temple are entitled to establish their own rules and regulations, including disciplinary proceedings, and the courts should interfere only

where it is clear that Constitutional rights have been infringed. *Esteban v. Central Missouri State College,* 415 F.2d 1077, 1090 (8th Cir.1969).

#### A. Notice
**\*2** Segal argues that he had inadequate notice of the charges against him. The record overwhelmingly refutes this charge. In his deposition testimony Segal acknowledges that early in the Spring semester of 1998, he was notified that a student named Laura Testa had complained about his behavior.[3] (Segal Depo. at 44–45.) Later that semester, Dean Reinstein spoke with Segal about an additional complaint against him and in June, 1998 he received a letter formally notifying him that the Law School was investigating the claims against him. (*Id.* at 43; Def. Ex. 2.)[4] The investigation was delayed by the summer recess, which caused difficulty in locating complainants and witnesses willing to testify against Segal. (Reinstein Depo. at 34.)

On March 1, 1999, Professor Susan DeJarnatt ("DeJarnatt") formally notified Segal in writing that she had received numerous complaints from Law School students during the 1998–99 school year concerning his behavior. (Def.Ex. 3.) The March 1 letter also notified him that he had a right to respond and that a formal hearing before the Law School Disciplinary Committee would be scheduled.[5] On or about March 25, 1999, Segal received a letter hand-delivered to him at the Law School. This letter notified Segal that a hearing to consider the charges against him had been scheduled for April 11, 1999.[6] (Segal Depo. at 89; Def. Ex. 5.) Segal subsequently requested and was granted two continuances of the hearing date. (Def.Ex. 7, 9.) In mid-April, 1999, Segal received a more detailed summary of the charges against him alleging violations of Sections II N and II R of the Code. (Def.Ex. 8.)

It is thus clear from the record that beginning in early 1998, Segal received more than adequate notice of the charges against him that the Law School was investigating.

#### B. Opportunity to Present a Defense
Segal argues that the Law School failed to provide him with information he requested necessary to prepare his defense; namely, written complaints allegedly filed with the Dean's office by the persons complaining about his behavior. The Law School represented to Segal that it did not have written complaints as all charges against him were made orally.

(Def. Ex. 9; Def. Ex. 34 at 4, 5.) He was provided with a list of witnesses prepared to testify against him, including their phone numbers or email addresses (Def.Ex. 6), as well as a detailed summary of the charges brought against him, which included the names of the women involved, the time and place of the alleged activity, and the type of behavior complained of. (Def.Ex. 8.)[7] Given that Segal received the above information on April 13 or 14, 1999 (Segal Depo. at 133), approximately one month before the Committee held its hearing on May 16 and 17, 1999, his claim that he did not have either enough time or enough information to prepare his defense is manifestly frivolous.

#### C. Segal's Right to be Heard
Segal's claim that he had insufficient information to prepare his defense, meritless as it is, forms the basis for his argument that he was not afforded adequate opportunity to be heard by a fair and impartial tribunal. In fact, he never challenged for cause any member of the panel or the Hearing Judge, but rather simply chose to boycott the scheduled hearing.

**\*3** Under the Code, a Disciplinary Committee composed of 4 students and 3 faculty members conducts a hearing to evaluate the charges brought against a student after an investigation of complaints of violations of the Code has been conducted and probable cause has been found to charge the student with a violation. (Def. Ex. 1 at IV A(1).) A faculty member presides as the Hearing Judge and "conduct[s] the hearings in a neutral and detached manner." (*Id.* at IV B(3).) The Code mandates that, at least 7 days before the hearing, Law School Counsel and the Student shall exchange witness lists containing the names, addresses, and telephone numbers of any persons they may call as witnesses at the hearing." (*Id.* at IV C(9).)

Segal's hearing was initially scheduled for April 11, 1999. (Def.Ex. 5.) After he had requested, and received, two continuances, (Def.Ex. 7, 9) Segal's third request for a continuance was rejected and the final hearing dates were set for May 16 and 17, 1999.[8] Notwithstanding the fact that Segal was warned and understood that the hearing could be held in his absence if he chose not to appear (Def. Ex. 5; Segal Depo. at 102), he failed to appear at the hearing on May 16, 1999. The Hearing Judge determined that Segal had received adequate notice of the hearing as mandated by the Code and proceeded in his absence. (Def. Ex. 1 at IV D(1).)

After hearing the evidence presented by the Law School Counsel, including the testimony of 21 witnesses, the Committee ruled that Segal was in violation of the Code and that sanctions should be imposed. (Def.Ex. 15.) Segal was expelled from the Law School and banned from all of Temple's campuses. He was also prohibited from participating in the Law School's graduation exercises. Although given the opportunity to speak on his own behalf at the review hearing held on July 13, 1999, Segal chose not to do so. (Segal Depo. at 182.) The review panel adopted the Disciplinary Committee's findings in its own report affirming the decision:

> The Committee believes that Mr. Segal's violations of the Code are extremely serious. He has caused significant distress to a substantial number of individual students and created an overall atmosphere of intimidation for female students. He has shown disrespect for law school authority and process.
>
> In meetings during the spring semester of 1998, Mr. Segal received explicit warnings from Dean Robert Reinstein that his behavior could jeopardize his standing at the law school and his future career as a lawyer. Nevertheless, Mr. Segal persisted in his inappropriate conduct. Mr. Segal refused to participate in meetings career as a lawyer. Nevertheless, Mr. Segal persisted in his inappropriate conduct. Mr. Segal refused to participate in meetings scheduled by the law school Disciplinary Counsel at which he would be permitted to offer his responses to the charges against him. Once notified of the scheduling of a disciplinary hearing, he failed to appear at meetings designed to address preliminary procedural matters. He demanded and received two postponements of the hearing date, but then failed to appear when the hearing finally occurred.
>
> **\*4** Mr. Segal's conduct throughout this matter has demonstrated that he should not be granted the law degree necessary for admission to the legal profession. He has shown disrespect for the legal rights of others. He has

shown disregard for his own substantive legal obligations, including those embodied in the Code of Student Conduct, and for legal process, including the procedures applicable to the disciplinary charges against him. In addition, testimony during the sanctions stage of the Committee's deliberations indicated that he has been a significantly disruptive presence in the classroom for at least one professor, interfering with the learning experience of his classmates. All of this leads the Committee to conclude that he must be expelled from the law school. In addition, in order to protect the members of the Temple community from further inappropriate and unwanted attention from Mr. Segal, we conclude that he must be banned from entering onto any of the Temple University campuses.

(Def.Ex. 24.)

## IV. CONCLUSION

Segal's argument that he did not receive procedural due process is frivolous. Having received ample notice of the charges against him and having arbitrarily failed to avail himself of numerous opportunities to be heard, Segal cannot now complain that his Constitutional rights were violated. He must accept the consequences of his inappropriate conduct, and, accordingly, Defendants' Motion for Summary Judgment will be granted.

*ORDER*

AND NOW, this 7 th day of December, 1999, for the reasons set forth in the attached Memorandum, Defendants' Motion for Summary Judgment is GRANTED.

## All Citations

Not Reported in F.Supp.2d, 1999 WL 1210838

---

Footnotes

1    The Law School qualifies as a "state-related" institution in the Pennsylvania Commonwealth System of Higher Education pursuant to the Temple University Commonwealth Act, ("the Act") Pa. Stat. Ann. tit. 24, § 2510–1 et seq. The Act provides that a Board of Trustees has the power to "make by-laws for their own government, as well as for the university." Pa. Stat. Ann. tit. 24, § 2510–5.

2    Segal incorrectly argues that 22 Pa Code § 505.3 provides him procedural due process as well. However, 22 Pa.Code § 505.3 covers institutions that comprise the State System of Higher Education, and, as a "state-related" institution, Temple University and its Law School do not fall into this category.

3    The complaints asserted against Segal by at least 14 women included allegations that he followed women students, demanded their names, phone numbers, and addresses, blocked their paths, touched them and their possessions without

their permission, rubbed against them and pretended to fall into them, refused to leave them alone when asked, repeatedly called them at home, touched the minor daughter of a law student, and that he waited in the Temple parking lot by the car of one of his targets. All of the alleged conduct, except for the phone calls, occurred on Law School property. (Def.Ex. 8.)

**4**  Professor Singley, Disciplinary Counsel for Temple, notified Segal of the initial complaints by letter dated June 29, 1998. (Def.Ex. 2.)

**5**  DeJarnatt replaced Professor Singley as Disciplinary Counsel for the 1998–99 school year. Her letter was a reiteration of the June 29, 1998 letter sent to Segal by Professor Singley and notified Segal that his alleged behavior violated Sections II R and II N of the Code, which governs disciplinary investigations and proceedings as well as the conduct of students. Every student receives a copy of the Code in the student handbook, *The Wise Guide.* (Reinstein Depo. at 12; Def. Ex. 1.)

> Section II N of the Code prohibits a student from engaging in "expressive, visual or physical conduct of a sexual or gender-motivated nature [that] has the purpose or effect of creating an intimidating, hostile or offensive environment." Section II R provides that it is a violation of the Code for a student "knowingly to do or attempt to ... engage in a course of conduct, including but not limited to stalking, directed at a member of the Law School community which would cause a reasonable person in the victim's position severe emotional distress...." DeJarnatt's letter stated, *inter alia:*

>> 1. On February 9, you followed a fellow student and repeated (sic) asked her personal questions, despite her response that the matters were not your business. When this student put her book bag down briefly, you opened it without her permission and began examining her possessions and stopped only when a friend of the student objected to your invasion of the student's property.

>> 2. This complaint follows a lengthy pattern of complaints from a number of students that you have followed women students, persistently asked them for personal information, interfered with their movements, interfered with books and other personal items, touched them and continued to engage in such behavior after you were asked to stop or asked to leave the person alone. The complainants include the following students: Alissa Heenan, Sofia Taj, Jennifer Kloss, Emily Kiser, Emmett Finocche, Myrto Flessas, Shannon Ryan, Hannah Shapiro, Laura Testa and Darlene Chan. I am continuing to investigate additional reports of these problems.

>> Before I make a determination to charge you with violations of the Code, you are entitled to respond. You may be represented by counsel or an advisor of your choice or you may proceed pro se. Please provide me with your response by Monday March 15, 1999 ... If this matter results in formal charges, they will be resolved by a hearing before the Law School Disciplinary Committee. Again, you have the right to representation at all stages of the proceedings by counsel or an advisor of your choice.

> (Def.Ex. 3.)

**6**  The letter stated, *inter alia:*

>> At the hearing, Law School Counsel will present witnesses and other evidence in support of the charges, and you will have an opportunity to challenge that evidence and present your own rebuttal witnesses. Section IV.C.(9) of the Code requires you and Prof. DeJarnatt "at least seven (7) days before the hearing" to "exchange witness lists, containing the names, addresses, and telephone numbers of any persons they may call as witnesses at the hearing, and lists designating any documents or physical evidence they may present at the hearing...."

>> Under Section IV.C.(10), you have the right to challenge for cause any member of the panel or the Hearing Judge. Such a challenge must be made in writing at least five (5) days before the date of the hearing. You have the right to representation at the proceedings by an advisor of your choice or you may proceed pro se. Section IV.D .(1) of the Code provides that the committee "may proceed with the hearing and determination in the Student's absence when the Student fails to appear without justification, as determined by the Hearing Judge."

> (Def.Ex. 5.)

**7**  The Code mandates the provision of the witness list to defendants, but does not require a detailed summary of the charges such as that provided to Segal. (Def. Ex. 1 at IV.)

**8**  On May 12, 1999, Segal sent a letter to the Hearing Judge, Dean Epps, which closed with the statement, "There will not be a disciplinary hearing until I receive [the written complaints he had been told didn't exist]. Prof. DeJarnatt will have to get me the information I am hereby requesting if she wants to have a disciplinary hearing ..." (Def.Ex. 13.)

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

⚑ KeyCite Yellow Flag - Negative Treatment
Called into Doubt by Neal v. Colorado State University-Pueblo, D.Colo.,
February 16, 2017

2015 WL 4478853
Only the Westlaw citation is currently available.
United States District Court, W.D. North Carolina,
Statesville Division.

Lanston TANYI, Plaintiff,

v.

APPALACHIAN STATE UNIVERSITY, University of
North Carolina, Cindy A. Wallace, in her individual
and official capacities, Judith Haas, in her individual
and official capacities, and Lori S. Gonzalez, in
her individual and official capacities, Defendants.

Civil Action No. 5:14–CV–170RLV.
|
Signed July 22, 2015.

**Attorneys and Law Firms**

S. Luke Largess, Tin, Fulton, Walker & Owen, Charlotte, NC,
for Plaintiff.

Laura Howard McHenry, Stephanie Ann Brennan, NC
Department of Justice, Raleigh, NC, for Defendants.

### *ORDER AND MEMORANDUM*

RICHARD L. VOORHEES, District Judge.

**\*1 THIS MATTER** is before the Court on a Motion to
Dismiss on the grounds of qualified immunity, and for failure
to state a claim upon which relief can be granted under Federal
Rule of Civil Procedure 12(b)(6). (Doc. 30).

### I. BACKGROUND FACTS

Lanston Tanyi ("Tanyi"), an African–American male,
enrolled at Appalachian State University on a football
scholarship in the fall of 2008. (2d. Am.Compl.¶ ¶ 8, 10).
On September 14, 2011, Tanyi attended an off-campus party
where alcohol was served. (Id. ¶ 16). Tanyi and his roommate
went into an upstairs bedroom with Student A, whom Tanyi
did not previously know, and the trio had sex. (Id. ¶¶ 17–18).

On September 19, 2011, Tanyi and his roommate received
letters from the Appalachian State Dean of Students, ordering
them to have "no contact" with Student B. Student B
claimed to have been raped by Tanyi, his roommate, and
three other "big and black" athletes in April. (Id. ¶¶ 35–
36). On September 23, 2011, Tanyi was informed by
Defendant Haas [1] that he was being charged with various
violations of the student code of conduct stemming from rape
allegations made by both Student A and Student B, including
sex offenses, sexual misconduct, harassment and hostile
communications. (Id. ¶ 39). Tanyi's disciplinary hearing, and
that of his roommate, regarding Student A's allegations was
set for October 18, 2011. (Id. ¶ 55).

[1]      According to Tanyi's Second Amended Complaint, at all
         times relevant to the complaint Defendant Judith Haas
         was the Director of the Office of Student Conduct at
         ASU, Defendant Cindy Wallace was the Vice Chancellor
         of Student Development at ASU, and Defendant Lori
         Gonzalez was the Provost and Executive Vice Chancellor
         at ASU. (2d. Am.Compl.¶¶ 4–6).

At the October 18 hearing, Defendants Wallace and Haas
assigned Tanyi a philosophy graduate student with no legal
expertise as his defense counsel. Student A was assigned
a licensed attorney. (Id. ¶ 57). Although Tanyi presented
several potential witnesses with prepared written statements
to Wallace and Haas, the administrators permitted only a
student who walked in on Tanyi's sexual encounter with
Student A to testify on behalf of Tanyi. (Id . ¶ 61). Tanyi
also contends that Wallace and Haas knew of two potential
witnesses that would corroborate Tanyi's version of events,
but did not inform Tanyi of the existence of these witnesses.
(Id. ¶¶ 85–86). The hearing panel found against both Tanyi
and his roommate (their cases were decided together), and
Tanyi was suspended for eight (8) semesters. (Id. ¶¶ 64–
65). At the hearing, Tanyi learned for the first time that
his roommate had prior disciplinary violations, and later
discovered that one of the jurors on the hearing panel had
decided an earlier case against his roommate. (Id. ¶¶ 64, 68).

Tanyi appealed the panel's decision, and his appeal was denied
by a committee selected by Wallace. (Id. ¶ 70). Tanyi spoke
with the Chancellor of Appalachian State in early November,
and the Chancellor told Tanyi that he would look into the
matter. On November 18, 2011, Wallace granted Tanyi a new
hearing regarding Student A's allegations, stating that Tanyi
had been denied his right to a hearing separate from his
roommate. (Id. ¶¶ 71–72). On January 27, 2012, a hearing was

held regarding student B's allegations, and the panel found in favor of Tanyi. (*Id.* ¶ 78).

**\*2** Following Tanyi's exoneration by the Student B panel, Student A posted a message on Facebook naming Tanyi and his roommates as rapists, and alleging that Appalachian State was attempting to protect them because they were football players. The post garnered statewide media attention. (*Id.* ¶ 79–80). Student B appealed the panel's ruling, and on March 9, 2012, Defendant Gonzalez granted Student B's appeal. (*Id.* ¶¶ 84, 89). At the new Student B hearing, Student B also accused Tanyi of harassing her on campus, in addition to the original allegations. (*Id.* ¶ 97). Tanyi alleges he was not informed of the new harassment charge until the night before the hearing, and had no time to prepare witnesses to rebut the charge. (*Id.* ¶ 98). On March 29, 2012, the panel cleared Tanyi of Student B's sexual misconduct allegations, but did find Tanyi responsible for the new charge of harassment. (*Id.* ¶ 102).

On April 18, 2011, Tanyi's appeal of Student A's rape allegations was heard. (*Id.* ¶ 106). For the appeal, Student A also added a charge of harassment to her original allegations. (*Id.*) The panel found in favor of Tanyi on all charges. (*Id.* ¶ 114). Tanyi graduated from Appalachian State in the summer of 2012. (*Id.* ¶ 121). He enrolled in a graduate program at Colorado State University and used his final year of football eligibility at Colorado State. (*Id.*) Tanyi was not drafted by any NFL team, and is not currently on any NFL roster. Tanyi brought this suit on February 24, 2015, alleging violations of his Fourteenth Amendment procedural due process, substantive due process, and equal protection rights under 42 U.S.C. § 1983, as well as gender discrimination in violation of 20 U.S.C. § 1681.

## II. STANDARD OF REVIEW

A Rule 12(b)(6) motion is a defense to a claim for relief and provides for dismissal where a party has failed "to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). To survive a Rule 12(b)(6) motion, the facts alleged must be sufficient "to raise a right to relief above the speculative level" and state a claim for relief "that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 564 (2007). A district court reviewing a Rule 12(b)(6) motion "assumes all well-pled facts to be true" and "draw[s] all reasonable inferences in favor of the [non-moving party]." *Tasz, Inc. v. Industrial Thermo Polymers, Ltd.,* 2015 WL 268500, at \*5 (W.D.N.C.2015). However, a reviewing district court comes to its own legal conclusions based on the

facts and "need not accept as true unwarranted inferences, unreasonable conclusions or arguments." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 253 (4th Cir.2009) (citations and quotations omitted).

## III. DISCUSSION

### A. Section 1983 Procedural Due Process Claim

In order to state a § 1983 claim based on procedural due process, Tanyi must first demonstrate that he has been deprived of a cognizable liberty or property interest under the Fourteenth Amendment. *Ingraham v. Wright,* 430 U.S. 651, 672 (1977). The Court must then determine whether the procedures employed to effect this deprivation were constitutionally adequate. *Id.* The Court assumes that students at public universities maintain protected property interests in their continued enrollment. *See Cobb v. The Rector and Visitors of the Univ. of Va.,* 69 F.Supp.2d 815, 826 (W.D.Va.1999); *Henson v. Honor Committee of Univ. of Va.,* 719 F.2d 69, 73 (4th Cir.1983). Students facing school discipline also possess a liberty interest in their reputations. *See Goss v. Lopez,* 419 U.S. 565, 576 (1975). Citing *Tigrett v. Rector and Visitors of the Univ. of Va.,* Defendants claim Tanyi cannot state valid procedural due process claims on procedures that led to his exoneration. (Doc. 31, p. 11; 290 F.3d 620, 627–28 (4th Cir.2002)). Defendants, however, mischaracterize the holding in *Tigrett.* In that case, although a student disciplinary panel recommended the defendants for expulsion, the University Vice President refused to ratify the panel's recommendation. The defendants in *Tigrett* never had their enrollment discontinued, and were not prevented from attending classes. *Id.* The Fourth Circuit found no procedural due process violation in *Tigrett* because no actual deprivation occurred, not because the defendants were ultimately exonerated. *Id.* Tanyi, by contrast, served multiple lengthy suspensions pursuant to ASU's allegedly flawed student disciplinary procedures. (2d. Am.Compl.¶¶ 65, 89).

**\*3** The question before the Court, then, is whether the procedures used to suspend Tanyi provided him sufficient due process to satisfy the Fourteenth Amendment. In the student disciplinary context, procedural due process minimally requires notice and an opportunity to be heard. *See Goss,* 419 U.S. at 579. Further, fundamental fairness requires that the hearing take place "at a meaningful time and in a meaningful manner." *Matthews v. Eldridge,* 492 U.S. 319, 333 (1976). Although a full-scale trial is never required in student disciplinary proceedings, the level of procedural protection necessary "depends on three variables: 1) the nature of the

interest protected; 2) the danger of error and the benefit of additional or other procedures; and 3) the burden on the government such procedures would present." *See Matthews,* 492 U.S at 321. Thus, whether due process has been satisfied in a particular student hearing is heavily context-dependent. Tanyi points to seven separate actions taken by the defendants which he claims violated his procedural due process rights. The Court will address each in turn.

### 1.) *Defendants Haas and Wallace excluded Tanyi's proffered witnesses from testifying at the first Student A hearing*

Tanyi's first claimed due process violation concerns the exclusion of testimony from several character witnesses Tanyi intended to call, largely regarding Student A's sexual history, and from whom he had obtained written statements. None of the excluded witnesses were eyewitnesses, although one, who had allegedly been dating Student A, intended to testify that Student A had previously performed oral sex on himself and three other males on the night of her encounter with Tanyi. Student A's field hockey teammate, who entered the room during Student A's sexual encounter with Tanyi, was permitted to testify.

Federal Rule of Evidence 412(b)(2) provides that, for civil cases, a court may only admit evidence "offered to prove a victim's sexual behavior or sexual predisposition if its probative value substantially outweighs the danger of harm to any victim." Fed.R.Evid. 412(b)(2). Although the Federal Rules of Evidence do not apply to student disciplinary proceedings, the additional burdens they impose on testimony concerning sexual history weighs against deeming Defendants' decision to exclude such testimony a violation of procedural due process.

Regarding the proffered testimony of Student A's alleged boyfriend, the scheme of Rule 412 limits "the scheme of specific prior acts ... to directly probative evidence." *United States v. Saunders,* 943 F.2d 388, 391 (4th Cir.1991). Although Student A's alleged boyfriend intended to testify about Student A engaging in group sexual acts earlier in the evening on the night in question, he had no firsthand knowledge of Student A's encounter with Tanyi. Haas and Wallace's decision to allow testimony only from the student who witnessed Tanyi's encounter with Student A is defensible as an effort to eliminate testimony regarding sexual history from the proceeding. As such, it does not give rise to a cognizable procedural due process claim.

### 2.) *Tanyi was assigned a philosophy graduate student as defense counsel, while Student A was assigned a licensed attorney*

**\*4** The Due Process Clause does not necessarily require that students facing expulsion be represented by licensed attorneys. *See Henson,* 719 F.2d at 74 (the right to a practicing attorney is "not a right generally available to students facing disciplinary charges"); *Osteen v. Henley,* 13 F.3d 221, 225 (7th Cir.1993) ("at most the student has the right to get the advice of a lawyer; the lawyer need not be allowed to participate in the proceeding"). The crux of Tanyi's claim, however, concerns the fairness of assigning a graduate student to Tanyi, while providing a licensed attorney to Student A.

In determining whether or not this discrepancy amounts to a due process violation, the balancing test from *Matthews* is instructive. The test looks at the interest protected, the danger of error without additional procedures, the potential benefits of implementing such procedures, and the burden such procedures would place on the government. *See Matthews,* 492 U.S. at 321. Here Tanyi faced expulsion, so his interest was substantial. The danger of error and the potential benefits to be gained from providing Tanyi with an attorney, however, seem relatively minimal. Although the record is not explicit, the only apparent role played by counsel at Tanyi's hearing was to call and examine witnesses. No intricate knowledge of the law or extensive legal training was required. Finally, the burden placed on Appalachian State, if required to provide counsel to every student facing expulsion, would be substantial. Any counsel provided to Tanyi would need to come from outside the University to avoid a conflict of interest, and thus would impose a significant financial burden on Appalachian State. On balance, Tanyi's claim regarding his lack of a licensed attorney appointed by ASU does not survive Defendants' Motion to Dismiss.

### 3.) *Appalachian State did not advise Tanyi of his right to a separate hearing*

Deviation from stated internal policies does not equate to a denial of due process. *See Jones v. Bd. Of Governors of Univ. of NC,* 704 F.2d 713, 717 (4th Cir.1983). However, "to the extent a state's procedures directly embody fundamental guarantees grounded in the due process clause, a significant departure" from those procedures can constitute a denial of procedural due process. *Id.* The question, then, is not whether Defendants deviated from ASU policy by failing to provide Tanyi with a separate hearing (they admit as

much), but whether the lack of a separate hearing provided constitutionally inadequate due process.

Under Federal Rule of Criminal Procedure 14(a), if the joinder of defendants appears to prejudice a defendant, the court may sever the defendants' trials. (Fed.R.Crim.P. 14(a)). [2] However, severance should only be granted "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States,* 506 U.S. 534, 539 (1993). Further, "a defendant is not entitled to severance merely because he might have a better chance of acquittal in a separate trial." *United States v. Verges,* 997 F.Supp.2d 398, 404 (E.D.Va.2014). Here, Tanyi was tried together with his roommate, who had previous disciplinary violations on his student record. The panel that found Tanyi responsible for sexually assaulting Student A knew of these prior violations, and read out Tanyi's roommate's disciplinary record prior to announcing its decision. (2d. Am.Compl.¶ 64). Although Tanyi might have benefited from a separate trial, "the mere showing of prejudice is not enough to require severance." *United States v. Hayden,* 85 F.3d 153, 160 (4th Cir.1996). In any event, the panel's knowledge of his roommate's prior record did not seriously jeopardize its ability to sit in reliable judgment of Tanyi's case. Accordingly, Tanyi's claim will not survive Defendants' Motion to Dismiss.

[2]   By citing the Federal Rules of Criminal Procedure, the Court does not imply that they are at all events applicable in the context of student disciplinary hearings. They may be utilized for guidance.

**4.) Defendants did not inform Tanyi that a member of his hearing panel had previously found against Tanyi's co-defendant in a prior proceeding**

**\*5** Tanyi next contends that a biased panel member tainted the result in his first Student A hearing. Juror impartiality is "not a technical conception. It is a state of mind. For the ascertainment of this mental attitude ... the Constitution lays down no particular tests and procedure is not chained to any ... formula ." *Irvin v. Dowd,* 366 U.S. 717, 724–25 (1961) (*citing United States v. Wood,* 299 U.S. 123, 145–46 (1936)). Further, jurors are presumed impartial, and the existence of preconceptions regarding guilt or innocence in the mind of a juror is not enough to rebut this presumption. *Id.* at 723. In *Poynter by Poynter v. Ratcliff,* a medical malpractice case, the Fourth Circuit ruled that the district judge did not err in refusing to excuse two jurors for bias. 874 F.2d 219, 221.

One of the jurors was the defendant doctor's patient, and the other was herself a defendant in a medical malpractice suit. *Id.* Given that student disciplinary proceedings are subject to lower procedural standards than full-scale trials, as well as the precedent set by *Poynter,* Tanyi's claim for bias does not survive Defendants' Motion to Dismiss.

**5.) Wallace failed to inform Tanyi of the existence of two potentially exculpatory witnesses**

Tanyi argues that his procedural due process rights were further violated when Wallace failed to notify him that, in the days following Student A's rape allegation, but before Tanyi's hearing, two witnesses potentially favorable to Tanyi went to Wallace's office unprompted, and informed her that they did not believe Student A was raped. (2d Am.Compl.¶ 53). These two students watched Student A engage Tanyi and his roommate in conversation, and lead them into the bedroom. *Id.* Tanyi further alleges the two students spoke to Student A in the bedroom immediately following her sexual encounter with Tanyi, and that Student A was not upset. *Id .*

In a series of opinions beginning with *Brady v. Maryland,* the Supreme Court clarified the circumstances under which a prosecuting official is required to disclose potentially exculpatory evidence. *See, e.g.,* 373 U.S. 83 (1963); *United States v. Agurs,* 427 U.S. 97 (1976); *United States v. Bagley,* 473 U.S. 667 (1985). In *Brady,* the Court held that suppression of exculpatory evidence by the prosecution "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87 (1963). However, the Supreme Court "never stated that the *Brady* rule applies in civil cases," *Demanjuk v. Petrovsky,* 10 F.3d, 338, 353 (6th Cir.1993), and this Court is aware of no Fourth Circuit case law extending the rule to civil matters, much less student disciplinary proceedings. In essence, Tanyi wishes to apply the standards of *Brady* disclosure, developed for federal criminal proceedings, to a university student conduct hearing. Such a standard would be wholly without precedent, and this Court declines to adopt it. As a result, Tanyi's claim will not survive Defendants' Motion to Dismiss.

**6.) No legitimate reason existed for granting the second Student B hearing**

**\*6** Tanyi further claims his procedural due process rights were violated by Defendants' decision to re-hear Student B's sexual assault allegations. The Fifth Amendment provides, in part, that no person shall "be subject for the same offense to be

twice put in jeopardy of life or limb." U.S. CONST. Amend. V. Although the double jeopardy clause does not apply to the student disciplinary context, the due process clause in all cases requires "fundamentally fair procedures." *Goss,* 419 U.S. at 565.

In defending their decision to re-hear Student B's allegations, Defendants attach a "Dear Colleague" letter prepared by the United States Department of Education. (Doc 31–1).[3] The Court may take judicial notice of the "Dear Colleague" letter, as it is well established that "a [c]ourt may consider and take judicial notice of matters of public record when considering a motion to dismiss." *Philips v. Pitt Cnty. Mem'l Hosp.,* 572 F.3d 176, 180 (4th Cir.2009).

[3]    The letter is published on the U.S. Department of Education Office for Civil Rights' website. U.S. DEP'T OF EDU. *Dear Colleague Letter* (Apr. 4, 2011), *available at* http://www2.ed.gov/about/off ices/list/ocr/ letters/colleague–201104.html.

According to the letter, federal regulations require that, if universities provide an appeals process for sexual assault cases, both parties must be allowed to appeal. (Doc 31–1, p. 12). The right to appeal is not equivalent to the right to a new hearing, however. In civil proceedings, although "the trial judge must be allowed wide discretion in granting a new trial," new trials should only be ordered "if the verdict is against the clear weight of the evidence ... or substantial errors occurred during the proceedings." *Ford Motor Credit Co. v. Minges,* 473 F.2d 918, 923 (4th Cir.1972); *Whelan v. Abell,* 939 F.Supp. 44, 46 (D.D.C.1996). Thus, a clearly articulated substantive basis must exist for granting a new trial. Otherwise, as Tanyi argues, ASU could simply order a new misconduct trial whenever the university did not prevail —which is exactly what is alleged here. (Doc. 34, p. 15–16).

Defendant Gonzalez failed to articulate a legitimate reason for re-hearing Student B's rape allegations. In her letter to Tanyi, Gonzalez essentially wrote that a second hearing was necessary because ASU did not adequately prove its case against him at the first hearing. (2d. Am.Comp.¶ 90). Such reasoning is a plainly inadequate basis for granting a new hearing, and fundamentally unfair to Tanyi. Accordingly, Tanyi's claim regarding the decision to re-hear Student B's rape allegations will survive Defendant's Motion to Dismiss.

### 7.) *Tanyi's allegations regarding inadequate notice of Student B's new harassment charge survive dismissal*

The essence of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." *Matthews,* 492 U.S. at 333. Tanyi learned of Student B's additional harassment charge the night before the second hearing, after he had designated his witnesses. (2d Am.Compl.¶ 97–98). In *Tigrett v. Rector and Visitors of the Univ. of Va.,* the defendants were informed of a disorderly conduct charge at least 48 hours prior to their hearing, although the "new" charge was effectively a lesser included of another charge they already knew about. 137 F.Supp.2d 670, 679 (W .D. Va., 2001). It strains credulity to argue, as Defendants contend, that the decision in *Tigrett* can be comfortably extended to cover Tanyi's situation. For all intents and purposes, Tanyi received notice of the new harassment charge at the eleventh hour, when it was too late to mount an effective defense. Educational institutions are largely left to their own devices regarding student disciplinary proceedings. However, at a minimum due process requires adequate notice. *See Goss,* 419 U.S. at 579 (1975). Because Tanyi received less than 24 hours' notice of a new charge, this allegation will survive Defendants' Motion to Dismiss.

### B. Section 1983 Substantive Due Process Claim

**\*7** In order to state a § 1983 claim based on substantive due process, Tanyi must demonstrate that Gonzalez' actions in granting Student B's appeal amounted to an arbitrary abuse of executive power so egregious that it "shocks the conscience." *Cnty. Of Sacramento v. Lewis,* 523 U.S. 833, 846 (1998). Further, Tanyi must have suffered a deprivation resulting from the substantive due process violation. *See McFadyen v. Duke Univ.,* 786 F.Supp.2d 887, 945 (M.D.N.C.2011). Regarding the deprivation requirement, Defendants contend that Tanyi cannot bring a substantive due process claim for the re-opening of Student B's rape allegations because he was eventually exonerated on those charges. Tanyi, however, was suspended for twenty days while awaiting the second Student B hearing, thus suffering a deprivation. (2d Am.Compl.¶¶ 89, 96). His eventual exoneration of the rape allegations has no bearing on Tanyi's ability to bring a claim for the re-opening of those charges. The critical inquiry, then, is whether Gonzalez' decision to grant Student B's appeal was arbitrary and shocking to the conscience.

The Supreme Court has repeatedly held that "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.' " *Cnty. of Sacramento,* 523 U.S. at 846 (1998) (quoting *Collins v. City of Harker Heights, Tex.,* 503 U.S. 115, 129 (1992)). Further, "conduct intended to injure in some way unjustifiable by any governmental interest" is most

likely to rise to the conscience-shocking level. *Id.* at 849. In the student disciplinary context, a student must show that a university official's decision lacked any rational basis, or "was motivated by ill will or bad faith." *Tigrett,* 137 F.Supp.2d 670, 678 (W.D.Va.2001).

Tanyi alleges that Gonzalez acted arbitrarily and in bad faith, motivated solely by the negative publicity generated by Student A's Facebook post. (2d Am.Compl.¶ 135). Defendants contend that Gonzalez' actions do not shock the conscience, and were neither arbitrary nor unjustifiable, pointing to the Department of Education's "Dear Colleague" letter on Title IX, which directs universities to allow appeals by both parties in sexual assault cases. (Doc. 31–1 p. 12). The Department of Education does not dictate, however, that new hearings are granted in all cases. Indeed, beyond the unusual contention that a second hearing was required because ASU did not adequately prove its case against Tanyi, Gonzalez provided no reasoning for her decision to grant a re-hearing of Student B's rape allegations. (2d. Am.Comp.¶ 90).

Although "it is not the role of the federal courts to set aside decisions of school administrators ... lacking a basis in wisdom or compassion," a decision may nevertheless be "so extreme as to violate due process." *Wood v. Strickland,* 420 U.S. 308, 326 (1975); *Board of Education v. McCluskey,* 458 U.S. 966, 970 (1982). In *Evans v. Bd. of Regents of West Virginia,* for example, a medical student was granted a medical leave of absence for one year, but, upon reapplying, was refused re-admittance without any explanation whatsoever. 165 W.Va. 780, 781 (1980). There, the court found a violation of the plaintiff's due process rights. Taking Tanyi's allegations as true, Gonzalez' decision here was similarly arbitrary, and motivated by bad faith. As a result, Tanyi's substantive due process claim will survive Defendant's Motion to Dismiss.

### C. **Section 1983** Equal Protection Claim

**\*8** In order for his equal protection claim to survive a motion to dismiss, Tanyi "must plead sufficient facts to demonstrate plausibly that he was treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus." *Equity in Athletics, Inc. v. Dept. of Educ.,* 639 F.3d 91, 108 (4th Cir.2011); (citing *Morrison v. Garraghty,* 239 F.3d 648, 654 (4th Cir.2001)). Further, Tanyi's alleged facts must amount to more than a "formulaic recitation of the elements" of his cause of action to be entitled to the presumption of truth. *Bell Atl. Corp.,* 550 U.S. at 545.

Regarding the first prong that an Equal Protection claim must satisfy, unequal treatment of those similarly situated, Tanyi alleges that no female student and no white student facing expulsion for misconduct has been treated similarly by ASU. (2d Am.Compl.¶ 146). In *Nofsinger v. Virginia Commonwealth Univ.,* the plaintiff, who was dismissed from her graduate physical therapy program for academic reasons, alleged that, "[d]uring the same time period relevant to [the plaintiff], at least three and ... as many as six or more other students similarly situated" faced VCU's dismissal procedures, and none had their due process rights violated in a manner similar to the plaintiff. 2012 WL 2878608, at \*9 (E.D.Va. July 13, 2012) *aff'd,* 523 F. App'x 204 (4th Cir.2013). There, the court dismissed the equal protection claim, finding the plaintiff "offer[ed] an allegation, but fail[ed] to plead any facts whatsoever, with respect to how the three to six students described in her Complaint were similarly situated to her." *Id.*

Here, Tanyi alleges even fewer facts than the plaintiff in *Nofsinger,* offering only conclusory generalizations that no female or white student has been treated similarly. Without more, this claim does not rise above a "formulaic recitation of the elements." Moreover, Tanyi's complaint fails to demonstrate that his allegedly unequal treatment resulted from a "discriminatory animus." Other than noting that Tanyi is an African–American male attending college in the South, Tanyi's complaint contains nothing, besides an offhand remark from Haas concerning Tanyi's clothing, to indicate racial or gender bias. (2d Am.Comp.¶ 144). As a result, Tanyi fails to state a valid Equal Protection claim.

### D. Qualified Immunity

Qualified immunity protects government officials from monetary damages in a suit brought under 42 U.S.C. § 1983, so long as their conduct does not violate any clearly established constitutional or statutory rights of which a reasonable person would have been aware. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). In *Saucier v. Katz,* the Supreme Court noted the proper progression of a court's qualified immunity analysis:

> The first inquiry must be whether a constitutional right would have been violated on the facts alleged; second, assuming the violation is established,

the question whether the right was clearly established must be considered.

**\*9** 533 U.S. 194, 200 (2001). The Court has found that two of Tanyi's procedural due process claims will survive Defendants' Motion to Dismiss: Defendants' failure to provide Tanyi with adequate notice of Student B's harassment allegations, and the decision to reopen Student B's rape allegations without a legitimate basis for doing so. The Court has also found that Tanyi's substantive due process claim will survive Defendants' Motion to Dismiss. Per *Saucier,* the Court now examines whether these actions constituted violations of clearly established rights.

In order for a right to be clearly established, "every reasonable official" who transgresses the right "must have understood that what he is doing violates that right." *Ashcroft v. al-Kidd,* 131 S.Ct. 2074, 2083 (2011). A case directly on point is not required, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* According to the Supreme Court, the qualified immunity doctrine protects "all but the plainly incompetent and those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

Regarding the short notice Tanyi received of Student B's harassment allegations, "the essence of due process is the requirement that a person in jeopardy of serious loss be given notice of the case against him and opportunity to meet it." *Matthews,* 492 U.S. at 348 (citation omitted). Providing Tanyi with less than 24 hours' notice of an entirely new charge, after he had submitted his list of proposed witnesses, did not provide Tanyi with adequate notice, and violated a clearly established right that Defendants should have been aware of. Therefore, concerning the short notice Tanyi received of Student B's new harassment allegation, Defendants' Motion to Dismiss on grounds of qualified immunity is denied.

Regarding Tanyi's procedural due process claim based upon Defendants' decision to rehear Student B's rape allegations without providing adequate justification, the Court will hear additional arguments at summary judgment concerning whether Defendants' actions violated a clearly established right.

Given that Tanyi's substantive due process claim is based upon the same action, rehearing Student B's rape allegation,

the Court will also hear additional arguments from the parties at summary judgment regarding this claim.

### E. 20 U.S.C. § 1681 (Title IX) Claim

20 U.S.C. § 1681 (commonly referred to as Title IX), states, in pertinent part, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C.A. § 1681(a). Title IX "bars the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Yusuf v. Vassar College,* 35 F.3d 709, 715 (2nd Cir.1994). Tanyi's Title IX claim is virtually identical to his equal protection claim, alleging that no female ASU student facing discipline for misconduct has been treated in a manner similar to Tanyi. (2d. Am.Compl.¶ 152). In support of his claim, Tanyi cites *Yusuf,* a Second Circuit case that also involved an educational institution's handling of sexual assault allegations. (Doc. 34, p. 23). There, the court allowed the plaintiff's Title IX claim to survive because he alleged that male students at Vassar College were "historically and systematically" and "invariably found guilty, regardless of the evidence." *Yusuf,* 35 F.3d at 716 (1994). As the court noted in *Doe v. Columbia Univ.,* however, *Yusuf* was decided in 1994, long before the *Twombly* and *Iqbal* standards came into effect. 2015 WL 1840402, at \*13 (S.D.N.Y.2015). Since the Supreme Court clarified the pleading standards, "the Court is no longer required to consider as true—and, in fact, for the purposes of evaluating the Complaint's sufficiency, is compelled to disregard" allegations "devoid of factual support." *Id.*

**\*10** Tanyi also cites *Wells v. Xavier University,* another case in which a male student's Title IX claim survived a 12(b)(6) motion to dismiss. (Doc. 34, p. 24; 7 F.Supp.3d 746 (S.D.Ohio, 2014)). In *Wells,* the plaintiff claimed he was scapegoated by the Xavier administration, which was already under fire for mishandling two previous sexual assault claims against male students, "because he was a male accused of sexual assault." *Wells,* 7 F.Supp.3d at 751 (2014). However, as the Southern District of New York noted in *Doe,* "that sort of subjective belief, devoid of factual support, is plainly insufficient after *Iqbal* and *Twombly.*" 2015 WL 1840402, at \*14 (S.D.N.Y.2015). Accordingly, the Court declines to follow the *Wells* ruling. Thus, given the lack of factual support for Tanyi's allegations, his Title IX claim will not survive Defendants' Motion to Dismiss.

### F. Limitation of Damages

Defendants' argue that Tanyi's damages should be limited to exclude any lost income from a potential professional football career. Tanyi is not seeking damages for a lost NFL career, however. The Second Amended Complaint alleges only that Tanyi's invitation to the Carolina Panthers' training camp was rescinded once the Panthers learned of the allegations made against Tanyi while at Appalachian State. (2d. Am.Compl.¶ 123). This is a specific lost opportunity that Tanyi can point to, rather than a speculative career, and Tanyi is entitled to whatever damages he can prove. *See Wofford v. Evans,* 2002 WL 3295799, at *9 (M.D.N.C.2002). At this stage, the Court is not prepared to make a ruling regarding the limitation of damages.

### IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that Defendants' Motion to Dismiss (Doc. 30) be **GRANTED** in part and **DENIED** in part. Plaintiff's 42 U.S.C. § 1983 procedural due process claims (III)(A)(1)-(5), as well as Plaintiff's 42 U.S.C. § 1983 equal protection claim and 20 U.S.C. § 1681 (Title IX) claim, are hereby **DISMISSED.** Plaintiff's 42 U.S.C. § 1983 procedural due process claim (III)(A)(7) may proceed to summary judgment. The Court will hear additional arguments at summary judgment regarding Plaintiff's 42 U.S.C. § 1983 procedural due process claim (III)(A)(6) and 42 U.S .C. § 1983 substantive due process claim.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 4478853

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Howe v. Pennsylvania State University — Harrisburg, Not Reported in Fed. Supp. (2016)
2016 WL 393717

Case 4:19-cv-01234-MWB   Document 11-1   Filed 07/21/19   Page 38 of 73

2016 WL 393717
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Timothy HOWE, Plaintiff

v.

The PENNSYLVANIA STATE UNIVERSITY
– HARRISBURG, Chancellor Mulkund
Kulkarni, Thomas Strohm, Karl Martz,
and Donald Holtzman, Defendants

CIVIL ACTION NO. 1:16-0102
|
Signed 02/02/2016

**Attorneys and Law Firms**

Timothy Howe, Elizabethtown, PA, pro se.

### MEMORANDUM

MALACHY E. MANNION, United States District Judge

 **\*1** Pending before the court is the plaintiff's motion for
an emergency temporary restraining order and/or preliminary
injunction, ("TRO/PI"). (Doc. 5). In accordance with the
court's oral ruling at the hearing on this matter, the plaintiff's
motion for an emergency TRO/PI will be denied.

### I. PROCEDURAL HISTORY

By way of relevant background, the plaintiff filed a *pro
se* complaint on January 19, 2016, in which he challenges
disciplinary action taken against him by officials at the
Pennsylvania State University, ("Penn State"), Harrisburg
Campus, which includes a suspension for the Spring 2016
semester. (Doc. 1). On the following day, the plaintiff filed
the instant motion for emergency injunctive relief, (Doc. 5),
along with a supporting brief, (Doc. 6), in which he seeks to
have this court "[halt] the imposition of the... suspension".
The plaintiff filed an "additional" brief on January 21, 2016.
(Doc. 8).

By order dated January 21, 2016, the court granted the
plaintiff permission to proceed *in forma pauperis*, directed
that the plaintiff's complaint be served upon General Counsel
for Penn State, and set a hearing on the plaintiff's motion for
TRO/PI for January 25, 2016. (Doc. 10).

On January 22, 2016, counsel entered their appearance on
behalf of all defendants, (Doc. 14, Doc. 15). A brief in
opposition to the plaintiff's motion for TRO/PI was filed on
January 25, 2016, (Doc. 19), along with exhibits, (Doc. 17).
The plaintiff filed his own exhibits that same day. (Doc. 20) [1].

[1]    As these exhibits contain personal information, including
       cell phone numbers, the court has placed these
       documents under seal.

At the hearing on the motion for injunctive relief, the court
heard from the plaintiff; John A. Snyder, counsel for the
defendants; and Karl Martz, the Assistant Director of Career
Development and Student Affairs at Penn State. Given the
time sensitive circumstances of this case, after hearing from
the parties and considering the materials submitted by both
sides, the court issued an oral ruling denying the plaintiff's
motion for injunctive relief with an indication that this written
decision would follow.

### II. LEGAL STANDARD

The United States Court of Appeals for the Third Circuit
has outlined four factors that a court ruling on a request for
injunctive relief must consider: (1) whether the movant has
shown a reasonable probability of success on the merits; (2)
whether the movant will be irreparably injured by denial of
the relief; (3) whether granting preliminary relief will result
in even greater harm to the nonmoving party; and (4) whether
granting the preliminary relief will be in the public interest.
Crissman v. Dover Downs Entertainment Inc., 239 F.3d 357,
364 (3d Cir. 2001). These same factors are used to determine
a motion for a temporary restraining order. Bieros v. Nicola,
857 F.Supp. 445, 446 (E.D.Pa.1994). The moving party bears
the burden of establishing each of the four elements. Adams
v. Freedom Forge Corp., 204 F.3d 475, 486 (3d Cir. 2000).

### III. DISCUSSION

 **\*2** The instant request for injunctive relief centers around
the plaintiff's suspension from Penn State for the Spring
2016 semester. Testimony and documentation submitted by
the parties indicate that the plaintiff is a third-year electrical
engineering student at Penn State, Harrisburg Campus. In an
"Allegation of Student Misconduct" report dated November
2, 2015, Richard Rocco, a Police Services Officer, reported to
defendant Martz that, on October 30, 2015 another student [2]
reported to officials at the Penn State Harrisburg Police
Department that the plaintiff had been harassing her both

Howe v. Pennsylvania State University - Harrisburg, Not Reported in Fed. Supp. (2016)

Case 4:19-cv-01234-MWB Document 11-1 Filed 07/21/19 Page 39 of 73

2016 WL 393717

on and off campus. (Doc. 17, App'x 2). The complainant indicated that local police had been contacted and that the Pennsylvania State Police had advised the plaintiff not to have any contact with her for any reason. According to the report, the plaintiff would text and call the complainant repeatedly, even after having been advised to stop by the complainant. The reporting officer indicated that he was shown several text messages that contained "round about threats" from the plaintiff to the complainant. In addition, the complainant reported that the plaintiff would enter the same area of the library and sit close to her during her tutoring sessions with other students. On November 2, 2015, the date of the report, the complainant indicated that she moved from her regular seat in class to get away from the plaintiff, but that the plaintiff proceeded to move his seat near her, sit sideways facing her and did not say anything, but simply stared at her knowing that it was causing her distress.

2      For reasons of privacy, the court identifies this individual as the "complainant".

After having received the Allegation of Student Misconduct, on November 9, 2015, defendant Thomas Strohm, Case Manager, Office of Student Conduct, issued the plaintiff a Notification of Administrative Directive, in which the plaintiff was given formal notification that he was to have no contact, "either directly or indirectly, in person, electronically, by telephone or any other medium, physical or verbal with [the complainant]." (Doc. 17, App'x 3). The plaintiff was advised that indirect contact included "friends and acquaintances contacting [the complainant] on [the plaintiff's] behalf." The plaintiff was further advised not to post any remarks regarding the complainant on any social network. As per the Code of Conduct, the plaintiff was advised that "violation of this Administrative Directive is a violation of the student code of conduct and you may be subject to disciplinary action and sanctions including interim suspension, suspension, or expulsion from the University."

In accordance with the Code of Conduct and Student Conduct Procedures, ("Code of Conduct"), on November 17, 2015, defendant Strohm held a status conference with the plaintiff to discuss the allegations against him and inform him of his procedural rights, including the right to have an advisor throughout the process. (Doc. 17, App'x. 1, 4) [3] . A Student Conference Summary Form reflects that the plaintiff acknowledged having been advised of the charges against him, which included violations of Section 3.02 of the Student Code, Conduct which Threatens or Alarms, and Section

3.03 of the Student Code, Harassment by Communication. The plaintiff was also advised of the proposed sanctions for these violations, which included an academic suspension through the end of the Spring 2016 semester, participation in counseling, a favorable evaluation, participation in an online educational program, adherence to the administrative directive of no contact with the complainant and conduct probation with attendant transcript notation concluding in 2016. The plaintiff signed the Student Conference Summary Form acknowledging that he was advised of the allegations against him; that, if he accepted the charges and sanctions, the sanctions would go into effect immediately, unless otherwise indicated; he could contest the charges and request a hearing; if the recommended sanctions included probation with a transcript notation or a form of separation, he could request a sanction review; and that he could take three business days to respond to the charges and/or sanctions and, if he did not do so, the charges and sanctions would be assigned without further notice or option for review. At the student conference, the plaintiff chose to contest the charges and requested a hearing. Given the plaintiff's choice, a hearing was set on the charges for December 9, 2015.

3      Section V (A) (2) of the Code of Conduct provides:
       After a report is filed, the Case Manager will meet with the respondent in a Conference. The Conference is an informal, non– adversarial meeting intended to allow the Case Manager to explain the conduct process, examine the complaint, listen to the respondent, discuss circumstances regarding the incident, and address the respondent's questions.
       (Doc. 17, App'x 1).

**\*3** Prior to the stated hearing, on November 30, 2015, the plaintiff violated the Administrative Directive by having direct contact with the complainant at her job at the Penn State Milton S. Hershey Medical Center. The complainant reported the incident to defendant Strohm. As a result, Mr. Strohm contacted the plaintiff to discuss the matter, advising him that he could bring his advisor if he wished. (Doc. 17, App'x 5). As the plaintiff was advised may happen, because of his violation of the Administrative Directive and the complainant's reported concern for her safety, on December 1, 2015, defendant Strohm issued the plaintiff a Notice of Interim Suspension in accordance with the Code of Conduct procedures. [4] (Doc. 17, App'x 6). The Notice informed the plaintiff that he was being assigned an interim suspension for approaching the complainant on the evening of November 30, 2015 and attempting to make contact with her knowing that the Administrative Directive of no contact

Howe v. Pennsylvania State University – Harrisburg, Not Reported in Fed. Supp. (2016)

Case 4:19-cv-01234-MWB Document 11-1 Filed 07/21/19 Page 40 of 73

2016 WL 393717

was in place, as well as directives of no contact by the Pennsylvania State Police and the Penn State Harrisburg campus police. The plaintiff was advised that the interim suspension was immediate and that he was not to "utilize or visit the campuses, programs or classes of The Pennsylvania State University unless given express written permission from the Senior Director of Student Conduct." The plaintiff was informed that failure to comply would lead to additional charges being brought against him by Penn State [5], as well as potential arrest by University police for criminal trespass. Again, the plaintiff was advised that he was to have no contact with the complainant. The plaintiff was advised of his right to contest the interim suspension in writing. [6]

[4]    Section V(F)(2) of the Code of Conduct provides, in
       relevant part,:
           On rare occasion, the Office of Student Conduct
           may become aware of a student whose continued
           participation with the University community may pose
           an immediate threat to the student or others or may
           pose an imminent threat of a disruption to normal
           campus operations. If the Senior Director or designee
           reasonably believes that such a threat is posed, an
           interim suspension may be assigned.
       (Doc. 17, App'x 1).

[5]    While the Notice informed the plaintiff that he may have
       violated additional provisions of the Penn State Student
       Code of Conduct, including Section 3.05, Stalking, and
       Section 11.03, Failure to Comply with Directive or
       Condition, the plaintiff was not formally charged with
       violations of those provisions.

[6]    Section V(F)(2) of the Code of Conduct provides, in
       relevant part:
           c. Students wishing to contest an interim suspension
           action may do so through the Office of the
           Assistant Vice President for Student Affairs at
           University Park. At other Penn State locations,
           students may contest through the Director of
           Student Affairs (or equivalent) or Chancellor.
           The student's appeal must be in writing and
           include the following information:
           • Name
           • Student ID
           • Rationale for the request
           • Any documentation that supports that the student
           would not pose a risk
           * * *
           e. The interim suspension does not replace the
           regular conduct process, which shall proceed on
           the normal schedule.

(Doc. 17, App'x 1).

On December 1, 2015, the plaintiff e-mailed defendant Strohm reminding him of "the interim suspension and the sanction review." (Doc. 17, App'x 7). On the following day, defendant Strohm responded, in part, by informing the plaintiff of what a sanction review would entail:

> When a student accepts responsibility
> for the Code of Conduct violation(s)
> in a disciplinary conference [7], but
> contests the sanction(s) assigned by
> the case manager, the student may
> request that the assigned sanction be
> reviewed. The Sanction Review will
> ordinarily be a review of the written
> record of the case, unless otherwise
> determined by the person reviewing
> the sanction. The student will compose
> a written explanation of the rationale
> for contesting the sanction and will
> submit this statement to the Office of
> Student Conduct case manager. The
> statement, as well as a memo from
> the case manager, will be forwarded
> with the student's file to the sanction
> reviewer. The sanction reviewer has
> the ability to sustain or modify the
> sanctions. The student is then notified
> by the case manager once a decision
> has been reached.

(Doc. 17, App'x 7). Mr. Strohm then directed the plaintiff to "let [him] know what [the plaintiff] [was] thinking". The plaintiff responded that same morning that he was thinking about doing the sanction review. Defendant Strohm informed the plaintiff that, if he wanted a sanction review, he should "...state in [his] email that [he] would like a sanction review, and then work on explanation of the rationale for contesting the sanction and submit [it] to [defendant Strohm] as soon as possible..." so they could "get the ball rolling". The plaintiff was directed to let defendant Strohm know if he was going to opt for the sanction review so that defendant Strohm could "cancel the hearing". [8] The plaintiff responded that he wished to have a sanction review and was informed by defendant Strohm that he should get in his statement "by Friday". The plaintiff submitted his sanction review statement

Howe v. Pennsylvania State University - Harrisburg, Not Reported in Fed. Supp. (2016)

2016 WL 393717

Case 4:19-cv-01234-MWB  Document 11-1  Filed 07/21/19  Page 41 of 73

on the following day, December 3, 2015, in which he made various admissions with respect to his behavior toward the complainant, including circumventing a block she had placed on her phone so that he could send her text messages and violating the Administrative Directive. (Doc. 17, App'x 9). The plaintiff argued why he felt the sanctions against him were too harsh and asked that he be allowed to return to classes.

[7]     It is important to note here that the plaintiff had only one disciplinary conference – that which took place on November 17, 2015.

[8]     The only hearing that the plaintiff had scheduled at the time was the hearing that he had requested after the November 17, 2015, conference.

**\*4** Defendant Donald Holtzman, Penn State's Senior Director of Student Conduct and Special Projects, conducted the plaintiff's sanction review and concluded that the proposed sanctions, including the Spring 2016 semester suspension, were appropriate. Despite the interim suspension, the plaintiff was allowed to make arrangements to take his final exams and receive credit for the courses he took in the Fall 2015 semester. (Doc. 17, App'x 11).

The plaintiff petitioned for a review of defendant Holtzman's decision, which was conducted by Senior Director Danny Shaha on January 15, 2016. After reviewing the record in the plaintiff's case, Mr. Shaha concluded that it was "clear that the conduct process articulated in the OSC Procedures document were followed." (Doc. 17, App'x 12).

Just prior to the hearing in this matter, on January 22, 2016, the plaintiff was convicted on a charge of Harassment – Course of Conduct with No Legitimate Purpose after a summary trial before a magisterial district judge in Dauphin County. The charges were initiated by the Penn State University Police Department and were based upon the plaintiff's behavior toward the complainant which led to his suspension. See Commonwealth of Pa. v. Timothy Scott Howe, Docket No. MJ-12201-NT-0000741-2015. [9]

[9]     The plaintiff is currently awaiting another summary trial on a charge of Harassment – Following in a Public Place issued by the Pennsylvania State Police, Harrisburg. See Commonwealth of Pa. v. Timothy S. Howe, Docket No. MJ-12304-NT-0000591-2015.

**A. Reasonable Probability of Success on the Merits** [10]

[10]     As indicated at the hearing in this matter, this merits determination is only for purposes of the instant motion for injunctive relief.

With the above in mind, the court looks to the factors which must be considered in ruling on the plaintiff's motion for injunctive relief. The first is whether the plaintiff has established a reasonable probability of success on the merits of his claims. Although the plaintiff argues that he is "likely to prevail on the merits of his due process and breach of contract claims", he only discusses issues of due process in his filings. In order to establish a claim for breach of contract under Pennsylvania law, the plaintiff must establish: (1) the existence of a contract and its terms, (2) the breach of a duty created by the contract, and (3) damages resulting from that breach. CoreStates Bank v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. 1999). The plaintiff has addressed none of these factors in the materials supporting his motion for injunctive relief. In fact, his only reference to a contract in his materials is that "published procedures for students...are in fact a contract." However, the Pennsylvania courts have "declined to construe the student handbook of a public university as a contract between the public university and the student." See Tran v. State Sys. of Higher Educ., 986 A.2d 179, 183 (Pa. Cmwlth. 2009). The plaintiff has therefore not established a reasonable probability of success on the merits of his breach of contract claim. [11]

[11]     In any event, as discussed at the hearing on this matter, any breach of contract by the defendants would be compensable by monetary damages. As such, the plaintiff can not establish irreparable injury and is not entitled to injunctive relief as to this claim.

As for the plaintiff's claim of due process violations, "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)). However, due process, "unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances"; instead, it is "flexible and calls for such procedural protections as the particular situation demands." Id. at 334 (citations and internal quotation marks omitted).

**\*5** In support of his claim of due process violations, the plaintiff argues that he was entitled to receive, but did not receive, notice of the charges against him prior to the informal disciplinary conference. (Doc. 6, Ex. A). As to this claim, the court notes initially that the plaintiff cites to a version of

Howe v. Pennsylvania State University – Harrisburg, Not Reported in Fed. Supp. (2016)

Case 4:19-cv-01234-MWB    Document 11-1    Filed 07/21/19    Page 42 of 73

2016 WL 393717

the Code of Conduct which was not in effect at the time he received his disciplinary conference. The version which was in effect at the time of the plaintiff's conference is attached to the defendants' opposing brief. (Doc. 17, App'x 1). In any event, neither version of the Code of Conduct requires that the plaintiff receive notice of the charges prior to the conference. In fact, one of the reasons for the informal conference is to provide the plaintiff with notice of the charges against him. The court finds no due process violation with respect to the notice provided.

The plaintiff next argues that his due process rights were violated when he was not given the hearing he requested when he contested the charges at his disciplinary conference. However, the record demonstrates that, while the plaintiff initially contested the charges and requested a hearing, he later waived his right to a hearing by requesting a sanction review. The plaintiff has insisted throughout his filings and at the hearing in this matter that he only filed the sanction review in order to challenge his interim suspension. However, as outlined in the Code of Conduct, this is not the avenue by which one challenges an interim suspension. As set forth above, the sanction review would entail when a student accepts responsibility for Code of Conduct violations in a disciplinary conference. The plaintiff acknowledges in his filings that he was not issued new charges in relation to his interim suspension and that he had only one disciplinary conference at the time he requested his sanction review. Moreover, in explaining to the plaintiff what a sanction review would entail, defendant Strohm advised the plaintiff of the consequences of requesting a sanction review, namely that his hearing would be cancelled. The plaintiff had only one hearing pending at the time he requested his sanction review, which was the one he requested at the disciplinary conference. Knowing this, the plaintiff decided to request the sanction review. At the hearing on this matter, the plaintiff stated that he did not realize he could waive his right to a hearing. However, it is clear from the Code of Conduct that a student can waive the right to a hearing by requesting a sanction review. This is exactly what the plaintiff did in this case.

Next, the plaintiff argues that his due process rights were violated when he was not allowed to examine all of the evidence against him. As to this contention, a student is not entitled to "discovery" as if he were a litigant in a civil or criminal proceeding. Schools must simply provide an accused student with notice of the charges they face and the nature of the evidence supporting those charges. See Johnson v. Temple Univ. of Commonwealth Sys. of Higher Educ., 2013 WL

5298484, at *12 (E.D. Pa. Sept. 19, 2013) (citing Flaim v. Medical College of Ohio Univ., 418 F.3d 629, 639 (6th Cir. 2005)) (finding that notice was sufficient where the plaintiff was made aware of the charges against him, but was not provided with full witness list or indication of the documents that were to be introduced at the hearing); Gomes v. Univ. of Maine Sys., 365 F.Supp.2d 6, 22 (D.Me. 2005) (finding no violation of due process where a university failed to produce an entire police report to an accused student prior to a disciplinary hearing in light of a general rule against imposing discovery requirements on university disciplinary proceedings). The plaintiff acknowledged in his Student Summary Conference Form that he was advised of the charges against him and the allegations supporting those charges, among other things. No more was required in this respect.

 *6  Finally, in his additional brief, the plaintiff raises a claim that he was discriminated against because of his sex in violation of Title IX, 20 U.S.C. §§ 1681, et seq. The court finds no evidence in support of this claim, especially in light of the plaintiff's decision to admit to the charges against him and opt for a sanction review. In his sanction review statement, the plaintiff admitted to harassing behavior toward the complainant, as well as to violating the administrative directive to not have any contact with her. The court finds that the plaintiff has no reasonable probability of success on the merits of this claim.

**B. Irreparable Injury**

The plaintiff argues that he will suffer irreparable injury if an injunction is not issued in this case. Specifically, he argues that his current suspension will interfere with his ability to complete his education "in a timely and ordinary manner" and that, if he is not immediately reinstated, he "will be forced to take an entire year off of his education since the courses [he] needs to continue his engineering degree are only offered in the Spring semester." Financially, the plaintiff argues that he will lose scholarship money, as well as wages from his positions as a teacher's assistant, student grader and peer tutor.

As indicated by the court at the plaintiff's hearing on this matter, there is no doubt that the plaintiff has suffered harm in this case. The question is whether he has suffered irreparable harm. Irreparable injury is "potential harm which cannot be redressed by a legal or equitable remedy following a trial." Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 801 (3d Cir. 1989). A court may not grant preliminary injunctive relief unless "[t]he preliminary

Howe v. Pennsylvania State University - Harrisburg, Not Reported in Fed. Supp. (2016)

Case 4:19-cv-01234-MWB Document 11-1 Filed 07/21/19 Page 43 of 73

2016 WL 393717

injunction [is] only way of protecting the plaintiff from harm." Id. Speculative injury does not constitute a showing of irreparable harm. Continental Group, Inc. v. Amoco Chemicals Corp., 614 F.2d 351, 359 (3d Cir. 1980); see also Public Serv. Co. of N.H. v. Town of West Newbury, 835 F.2d 380, 383 (1st Cir. 1987). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." Instant Air Freight, 882 F.2d at 801 (quoting Sampson v. Murray, 415 U.S. 61 (1964)).

The court finds that the plaintiff has not suffered irreparable injury. With respect to the plaintiff's claims of lost scholarships and wages, clearly the plaintiff can be compensated for these with monetary damages. Moreover, with respect to the plaintiff's claim of a delay in education, the plaintiff did not establish by a preponderance of evidence, as he is required to do, that he is entitled to injunctive relief. To this extent, it was proffered at the hearing that, regardless of the plaintiff's suspension for the Spring 2016, he would not finish his required course studies in the time in which he alleges. To this extent, the plaintiff apparently contemplated changing majors and, as a result, did not take any engineering courses in the Fall of 2015. (Doc. 17, App'x 13). Because the plaintiff did not take any of the mandatory engineering classes in the Fall semester, he would now require at least four additional semesters of matriculation, irrespective of whether he attends classes in the Spring 2016 semester or not. In any event, the court finds that even if the plaintiff would experience a delay as a result of his suspension, this would not constitute irreparable harm which would not be compensated with monetary damages in the future, if warranted. See e.g., Schulman v. Franklin & Marshall Coll., 538 A.2d 49, 52 (Pa. Super. 1988) (student failed to establish that he would be irreparably harmed absent an injunction, as he could be compensated by money damages for time lost from the classroom). Thus, the plaintiff has failed to establish irreparable injury to support his request for injunctive relief.

## C. Harm to the Defendants/Public Interest

*7 The factors concerning whether the issuance of an injunction would cause greater harm to Penn State than the benefit which would be realized by the plaintiff if an injunction were issued and the public interest in this case go

hand in hand. Here, the court considers that Penn State not only has an obligation to the plaintiff, but also to the many other students of the Penn State community. As such, when allegations arise such as those presented in this case against the plaintiff, Penn State has an obligation to act in a manner which is reasonable and just. The court finds Penn State's response was reasonable and just. The plaintiff was given an opportunity to attend Penn State without interruption. He could have done so by abiding by the Code of Conduct and the Administrative Directive. The plaintiff chose not to do so. Even with the violation of the Administrative Directive, the plaintiff essentially suffered only those sanctions which were related to the original charges, although he faced far greater sanctions than those imposed, including expulsion. [12]

[12]    Even with the interim suspension, the plaintiff was allowed to take his finals and receive credit for the courses he took in the Fall 2015 semester.

The court considers that Penn State has a significant interest in disciplining students who engage in misconduct and protecting the other students within its community. The Third Circuit and the Supreme Court have both long recognized "the need for maintaining order and discipline in our schools without prohibitive costs and in a manner that will contribute to, rather than disrupt, the educational process." Palmer by Palmer v. Merluzzi, 868 F.2d 90, 95 (3d Cir. 1989) (citing Goss, supra.). The plaintiff admitted to various infractions in this case in his sanction review statement. Were the court to grant injunctive relief in this case, that would put Penn State in a position of being second-guessed by the court every time it imposes a sanction upon a student for this type of behavior. This is in the interest of neither Penn State nor the community. Unless there is a clear violation of rights, which the court has not found for purposes of the instant motion, the courts should not be involved in the determination of disciplinary matters in the university setting.

In light of all of the foregoing, the court finds that the plaintiff has failed to meet his burden to establish that a TRO/PI is warranted in this case. An appropriate order shall issue.

## All Citations

Not Reported in Fed. Supp., 2016 WL 393717

---

Johnson v. Temple University—Of the Commonwealth System of..., Not Reported in...

2013 WL 5298484

Case 4:19-cv-01234-MWB   Document 11-1   Filed 07/21/19   Page 44 of 73

🏷 KeyCite Yellow Flag - Negative Treatment
Declined to Follow by Marshall v. Indiana University, S.D.Ind., March 15, 2016

2013 WL 5298484
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Tyler JOHNSON

v.

TEMPLE UNIVERSITY—OF the
COMMONWEALTH SYSTEM
OF HIGHER EDUCATION, et al.

Civil Action No. 12–515.
|
Sept. 19, 2013.

**Attorneys and Law Firms**

William C. Reil, Philadelphia, PA, for Tyler Johnson.

Edward J. Heffernan, Michael J. Fortunato, Rubin Fortunato & Harbison P.C., Paoli, PA, for Temple University of the Commonwealth System of Higher Education, et al.

*MEMORANDUM*

SURRICK, District Judge.

**\*1** Presently before the Court is Defendants Temple University—Of The Commonwealth System of Higher Education and Professor Richard Greenstein's Motion for Summary Judgment. (ECF No. 19.) For the following reasons, Defendants' Motion will be granted.

## I. BACKGROUND

### A. Procedural History

Plaintiff filed a Complaint in the Court of Common Pleas of Philadelphia County on December 9, 2011. (Compl., Notice of Removal Ex. A., ECF No. 1.) On January 31, 2012, Defendants filed a Notice of Removal and removed the action in accordance with 28 U.S.C. §§ 1441 and 1446. (Notice of Removal.) On December 24, 2012, Defendants jointly filed the instant Motion for Summary Judgment. (Defs.' Mot., ECF No. 19; Defs.' Mem., ECF No. 19.) That same day, Defendants separately filed a Statement of Undisputed Material Facts.

(Defs.' Statement of Facts, ECF No. 20.) On January 12, 2013, Plaintiff filed a Response to Defendants' Motion. (Pl.'s Resp., ECF No. 21.) Defendants filed a Reply on January 18, 2013. (Defs.' Reply, ECF No. 22.)

In this lawsuit, Plaintiff Tyler Johnson brings three claims against Defendant Temple University—Of the Commonwealth System of Higher Education ("Temple") and one claim against Defendant Professor Richard Greenstein ("Greenstein"). Plaintiff alleges that Temple violated his due process rights (Count I), breached its contractual obligations (Count II), and was unjustly enriched (Count III). (See Compl. ¶¶ 12–19.) Plaintiff further alleges that Greenstein violated his civil rights. (Id. at ¶¶ 20–21.)

### B. Factual History [1]

[1] We view all of the facts and draw all reasonable inferences therefrom in the light most favorable to Plaintiff, the non-moving party. P.N. v. Clementon Bd. of Educ., 442 F.3d 848, 852 (3d Cir.2006).

At all relevant times, Plaintiff was an adult student at Temple. (Pl.'s Resp. 4.) Temple is an educational institution located at 3307 North Broad Street, Philadelphia, PA 19140. (Id.) Greenstein is a professor at Temple. (Id.)

#### 1. The Code

Temple's Student Code of Conduct ("Code"), promulgated on January 1, 2004, governs student conduct at Temple. (Code, Defs.' Mot. Ex. 5.) The Code provides: "[t]o fulfill its functions of promoting and disseminating knowledge, the university has authority and responsibility for maintaining order and for taking appropriate action, including, without limitation, exclusion of those who disrupt the educational process." (Id. at 1.) Article I of the Code defines the key actors and entities involved in the adjudication of alleged violations of the Code. (Id. at 2–4.) Article III.C of the Code prohibits "Intimidation" and "Sexual Assault." (Id. at 6.) That same provision of the Code references the University Policy on Sexual Assault, which outlines potential sanctions for violations of the policy "subjecting the perpetrator to disciplinary sanctions up to and including expulsion from the University." (University Policy on Sexual Assault 4, Defs.' Mot. Ex. 6.)

Article IV of the Code outlines the Student Conduct Code Procedures, which govern the process for alleged Code violations. (Code 9–17.) The Code describes a Pre–Hearing

Johnson v. Temple University--Of Commonwealth System Of..., Not Reported in...

Case 4:19-cv-01234-MWB   Document 11-1   Filed 07/21/19   Page 45 of 73

2013 WL 5298484

Meeting, the Student Conduct Board Hearings ("Hearings"), and the Appeals process. (*Id.*) The University Code Administrator ("Code Administrator") oversees Temple's disciplinary system. (*Id.* at 3–4.) When there is an allegation of a Code violation, the Code Administrator determines whether to charge the student. (*Id.* at 9.) If the student is charged, the Code Administrator is then responsible for notifying the student of the specific charges, the identity of any witnesses, and a description of any physical or documentary evidence filed along with the charges. (*Id.* at 9–10 .) The student charged with violating the Code then meets with the Code Administrator at a Pre–Hearing Meeting, which is an informal and non-adversarial meeting at which the charges, the incident, the hearing procedures, and possible sanctions are discussed. (*Id.* at 10.) If the student does not accept responsibility for the charges, the Code Administrator determines the appropriate hearing process. (*Id.*)

**\*2** Hearings are non-adversarial proceedings conducted by an administrative fact-finding panel ("SCB Panel"), at which the rules of evidence, burdens of proof, and other judicial standards do not apply. (*Id.* at 10–12.) Determinations of whether a student has violated a Code provision are made based on whether the SCB Panel finds that it is more likely than not that a violation occurred. (*Id.* at 11.) At the Hearing, the accused student may offer testimony, witnesses, and other evidence. (*Id.*) The student may request that the Code Administrator's Office secure witnesses for the Hearing. (*Id.*) An accused student may pose questions to a witness through the presiding Chairperson of the SCB Panel. (*Id.*) The student need not provide testimony and the SCB Panel may not draw any inference from the student's failure to testify. (*Id.*) Throughout the process, an accused student may have an advisor or attorney assist them in preparing for the Hearing. (*Id.*) An advisor or attorney may also be present at the hearing, although they may not ask questions of witnesses or address the SCB Panel. (*Id.*)

If, at the conclusion of the Hearing, the SCB Panel determines that it is more likely than not that the accused student violated the Code, the Panel recommends sanctions to the Code Administrator who then imposes such sanctions. (*Id.* at 12–13.) A student may appeal the decision reached by the SCB Panel or the sanctions imposed by the Code Administrator to an Appellate Board. (*Id.* at 16.)

*2. Initial Report and Communication of Charges*
On November 17, 2010, J.P., a Temple student, reported an assault to Detective Melanie Haworth, a member of

the Temple Campus Safety Services ("Campus Safety"). (Investigation Interview Records, Defs.' Mot. Ex. 1.) [2] J.P. described an incident that occurred on November 12, 2010 involving J.P., Plaintiff, and another student, M.E. (Investigation Interview Record 1–2.) Campus Safety referred the matter to Temple's Office of Student Conduct and Community Standards. (Student Conduct Referral, Defs.' Mot. Ex. 4.)

[2]     To maintain confidentiality, we refer to the other students at Temple involved in the incident and administrative hearing by their initials rather than their full names.

As a result of J.P.'s report, on December 13, 2010, Brian Foley, Program Coordinator at Temple, sent an e-mail to Plaintiff informing him that he had been charged with violating the Code. (*See* Dec. 13, 2010 E-mail, Defs.' Mot. Ex. 7.) The Charge related to the November 12, 2010 incident, where Plaintiff allegedly violated Article IV.D.3 (Intimidation or Assault) and Article IV.D.4 (Assault) of the Code. (*Id.*) Foley's e-mail set forth the aforementioned charges, included a summary of J.P.'s account of the events, and informed Plaintiff that he was to schedule a Pre–Hearing Meeting, which would provide him with an opportunity to discuss the case and allow him to ask any questions that he might have about the proceedings. (*Id.* at 2.) The e-mail also informed Plaintiff that he could have an advisor present throughout the disciplinary process and encouraged Plaintiff to read the Code prior to the Pre–Hearing Meeting. (*Id.*) The e-mail included a link to the Code and a separate link to Temple's University Policy on Sexual Assault. (*Id.*)

**\*3** Either right before, or soon after, Temple's holiday break in December of 2010, Plaintiff had his Pre–Hearing Meeting with Foley. (Johnson Dep. 150, Defs.' Mot. Ex. 3.) At that meeting, Foley explained the charges pending against Plaintiff, J.P.'s factual allegations, and the possible sanctions Plaintiff could receive. (*Id.* at 84–87.) Foley told Plaintiff that the most common sanction would be a suspension or probation. (*Id.* at 86.) Foley explained to Plaintiff how the process would play out. (*Id.* at 85.)

On January 14, 2011, Foley contacted Plaintiff by e-mail to inform him that the date for his Hearing had been set for January 21, 2011, that Professor Richard Greenstein would Chair the Hearing, that witnesses would include J.P. and Campus Safety Services Officer/Detective(s), and that the Incident Report and Incident Referral Summary would be introduced at the Hearing. (Jan. 14, 2011 E-mail, Defs.' Mot. Ex. 8.) Foley's e-mail noted that "[t]he documents are

Johnson v. Temple University of Commonwealth System of..., Not Reported in...

Case 4:19-cv-01234-MWB   Document 11-1   Filed 07/21/19   Page 46 of 73

2013 WL 5298484

available for review by you and your advisor at the Office of Student Conduct...." (*Id.*) Five days later, Foley contacted Plaintiff to inform him that the Hearing was postponed. (Jan. 19, 2011 E-mail, Defs.' Mot. Ex. 9.) Foley informed Plaintiff that he would be notified when additional documentation would be ready for review. (*Id.*)

On or around January 21, 2011, Campus Safety Detective Melanie Haworth contacted Plaintiff to discuss the incident. (Investigation Interview Records 6.) During the ensuing interview, Plaintiff acknowledged that he was present when the incident occurred, but said that he had his own version of events, which he declined to provide at that time. (*Id.* at 120–21.) That same day, Foley informed Plaintiff by e-mail that the Hearing would take place on January 28, 2011. (Jan. 21, 2011 E-mail, Defs.' Mot. Ex. 10.) Once again, Foley attached information pertaining to the witnesses and documents that would be offered at the Hearing. (*Id.*) The attachment to the January 21, 2011 E-mail referenced an additional set of documents—Temple University's Police Department Incident Report Packet—which contained the interview records of J.P., Plaintiff, and M.E. (*Id.*) On January 26, 2011, Foley sent an e-mail to Plaintiff reminding him that the Hearing was scheduled for January 28, 2011, and attached the same information with regard to the witnesses and records to be introduced at the Hearing. (Jan. 26, 2011 E-mail, Defs.' Mot. Ex. 11.)

Later that day, Foley contacted Plaintiff by e-mail to inform him that his Hearing had once again been postponed and was rescheduled for January 31, 2011. (January 26, 2011 P.M. E-mail, Defs.' Mot. Ex. 12.) In the attachment to the e-mail, Foley provided notice of the witnesses and documents to be introduced, adding that N.S., a student at Temple, and Lt. Edward Woltemate of Campus Safety Services, would provide testimony at the Hearing. (*Id.*)[3] On January 28, 2011, Foley e-mailed Plaintiff to confirm the Hearing time for Monday, January 31, 2011. (January 28, 2011 E-mail, Defs.' Mot. Ex. 13.) As with the prior e-mails, Foley attached a document indicating the witnesses and documents to be admitted at the Hearing. (*Id.*)

[3]    Lt. Woletemate was to replace Detective Haworth at the Hearing. Detective Haworth could not attend. (Defs.' Statement of Facts ¶ 40.)

**\*4**  Between the date of the Charge Notice, December 13, 2010, and the date of the Hearing, January 31, 2010, Foley met with Plaintiff five to eight times. (Johnson Dep. 81.) The meetings were brief—approximately fifteen minutes. (*Id.*

at 355–56.) During each meeting, Plaintiff received more information from Foley. (*Id* . at 85.) Foley reviewed the Police Incident Report and Incident Referral Summary with Plaintiff. (*Id.* at 107.) Plaintiff repeatedly asked Foley if he needed an attorney and Foley replied that he did not.

Plaintiff informed his parents about the Hearing on January 27, 2011, just four days before it was to take place. (Johnson Dep. 234; Thomas Johnson Affidavit, Defs.' Mot. Ex. 14.) Plaintiff's father, Thomas Johnson, immediately contacted Plaintiff's football recruiter, Ed Foley. (*Id.*) Johnson asked Ed Foley if Plaintiff needed an attorney. (*Id.*) Ed Foley said that the Hearing was informal and that Plaintiff did not need an attorney. (*Id.*) On the day of the Hearing, Johnson again asked Ed Foley if Plaintiff needed an attorney and Foley responded that there would be some disciplinary action, but that it was "nothing to worry about." (*Id.;* Thomas Johnson Dep. 28, Defs.' Mot. Ex. 15.) No one told Plaintiff or his father that they could not retain a lawyer. (Thomas Johnson Dep. 28.) Neither Plaintiff nor his father asked for a postponement of the Hearing. (Johnson Dep. 235.)

### 3. Hearing

The Hearing took place on January 31, 2011 before Greenstein, Rodney Prad (Resident Director), Carey Seymore (Resident Director), Eileen Weinberg (Assistant Director for Graduate Services), and John Detwiler (Temple student). (Hr'g Tr. 1, Defs.' Mot. Ex. 18; Defs.' Statement of Facts ¶ 45.) On the morning of January 31, prior to the hearing, Plaintiff and his father reviewed the documents that were to be introduced at the Hearing. (Johnson Dep. 152–55; Thomas Johnson Affidavit.) After Thomas Johnson reviewed the Complaint, he asked Brian Foley, the Code Administrator for the Hearing, if Plaintiff needed a lawyer, and Foley replied that he did not. (*Id.*) Thomas Johnson then attended the Hearing with his son. (Hr'g Tr. 5.) At the beginning of the Hearing, all witnesses were administered an oath. (*Id.* at 8.)

Foley provided Plaintiff and M.E. with an opportunity to challenge any member of the SCB Panel for bias. (*Id.*) Neither of them challenged any member of the panel. (*Id.* at 9.) Each member of the panel was then asked if there was any reason that they could not be fair and impartial. (*Id.*) No member provided a reason. (*Id.*) Greenstein, who served as Chair of the SCB Panel, then asked Plaintiff and M.E. to respond to the charges; both students said that they were not responsible. (*Id.* at 10.) Greenstein then provided a summary of the process, including the standard the SCB Panel would use in reaching its determination of responsibility. (*Id.* at 10–

Johnson v. Temple University-Of Commonwealth System Of..., Not Reported in...

Case 4:19-cv-01234-MWB Document 11-1 Filed 07/21/19 Page 47 of 73

2013 WL 5298484

15.) Specifically, Greenstein informed Plaintiff that he would be adjudged individually, that he could provide an opening statement, could present witnesses, and could testify, although no negative inference would be reached if he decided not to testify. (*Id.* at 12–14.)

**\*5** J.P. provided an opening statement. (*Id.* at 16–17.) Plaintiff declined to make an opening statement. (*Id.* at 17.) Foley then called J.P. on behalf of Temple. (*Id.*) J.P. presented her recollection of the incident on November 12, 2010. (*Id.* at 17–21.) Greenstein and the other panel members asked J.P. questions. (*Id.* at 17–27, 30–35.) M.E. and Plaintiff both asked J.P. questions through Greenstein. (*Id.* at 28–30, 35–38, 40–46.) M.E. testified next. (*Id.* at 47.) Greenstein and the other panel members questioned M.E. (*Id.* at 53–57.) J.P. and Plaintiff directed questions to M.E. through Greenstein. (*Id.* at 57–59.) Plaintiff then provided testimony. (*Id.* at 59.) He was questioned by the panel. (*Id.* at 61–67.) J.P. and M.E. declined to provide questions for Plaintiff to answer. (*Id.* at 67.) N.S., J.P.'s housemate and a fellow Temple Student, and Lt. Woltemate also provided testimony. (*Id.* at 68, 78.) Plaintiff declined to present witnesses at the Hearing. (*Id.* at 95.) J.P., M.E., and Plaintiff each provided a closing statement. (*Id.* at 96–97.) The closing statements concluded the fact-finding portion of the Hearing. The SCB Panel then adjourned to consider the evidence and charges. (*Id.* at 98.)

When the Hearing resumed, Greenstein informed Plaintiff that the SCB Panel had unanimously concluded that it was more likely than not that J.P.'s version of events was truthful and that Plaintiff's conduct constituted a violation of Sections Three and Four of the Code. (*Id.* at 100.) Prior to recommending sanctions, Ed Foley, Director of Football Operations, spoke on Plaintiff's behalf. (*Id .* at 103.) J.P. once again read her impact statements. (*Id.* at 105.) Plaintiff declined to make any additional statements to the SCB Panel. (*Id.* at 106–07.)

*4. Decision Letter*
Later that day, Foley sent an e-mail to Plaintiff attaching the Decision Letter, which indicated that the SCB Panel had found Plaintiff responsible for Intimidation or Assault and for violating the Sexual Assault Policy. (Jan. 31, 2011 E-mail, Defs.' Mot. Ex. 19.) The Decision Letter was authored by Andrea Caporale Seiss, Senior Associate Dean of Students. (*Id.*) Seiss recommended sanctions, including suspension from Temple, effective immediately and lasting through the end of the fall 2011 semester (a two semester suspension). (*Id.*) In addition, Seiss imposed the sanctions of expulsion

from university housing and probation for two calendar years upon Plaintiff's return to Temple. (*Id.*) Foley's e-mail and Seiss's letter provided information regarding the appeals process. (*Id.*)

*5. Appeal*
On February 3, 2011, Plaintiff's attorney, Joseph Mitchell, requested an extension of the appeal deadline. (Feb. 3–4, 2011 E-mails, Defs.' Mot. Ex. 20.) Brian Foley granted the request and the deadline to appeal the SCB Panel's findings was extended to February 10, 2011. (*Id.*) Plaintiff filed a timely appeal. (February 10, 2011 E-mail, Defs.' Mot. Ex. 21.) Plaintiff's mother sent a supplemental filing to be added to the appeal, which was received by Temple. (February 11, 2011 E-mails, Defs.' Mot. Ex. 22.) On February 22, 2011, Foley contacted Plaintiff and his parents by e-mail and attached the Appeal Decision Letter, which reflects that the Appellate Board voted unanimously to uphold the SCB Panel's decision of responsibility and the imposed sanctions. (Appeal Decision Letter, Defs.' Mot. Ex. 23.)

*6. Post–Suspension*
**\*6** After Plaintiff was suspended, he enlisted in the United States Coast Guard. (Johnson Dep. 30–31.) His commitment to the Coast Guard is eight years, which includes six years of active duty and two years of inactive duty. (*Id.* at 38.) Plaintiff has not returned to Temple, nor has he made any attempts to do so.

## II. LEGAL STANDARD
A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."). Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.,* 391 F.3d 497, 502 (3d Cir.2004). If the moving party carries this initial burden, the nonmoving party must

WESTLAW  © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Johnson v. Temple University-Of Commonwealth System of..., Not Reported in...

Case 4:19-cv-01234-MWB Document 11-1 Filed 07/21/19 Page 48 of 73

2013 WL 5298484

set forth specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(c)(1) ("A party asserting that a fact ... is genuinely ... disputed must support the assertion by ... citing to particular parts of materials in the record."); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). "Where the record taken as a whole could not lead a reasonable trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Id.* at 587 (citations omitted). When deciding a motion for summary judgment, courts must view facts and inferences in the light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255. Courts must not resolve factual disputes or make credibility determinations. *Siegel v. Transfer, Inc. v. Carrier Express, Inc.,* 54 F.3d 1125, 1127 (3d Cir.1995).

### III. DISCUSSION

#### A. Procedural Due Process Claim (Count I)

Plaintiff contends that Temple violated his procedural due process rights by, *inter alia:* (1) failing to allow Plaintiff to have an attorney to represent him at the Hearing; (2) failing to provide Plaintiff with a meaningful transcript before the Hearing; and (3) revoking Plaintiff's football scholarship. (Compl.¶ 13.) In addition, Plaintiff maintains that Temple failed to supply relevant documentation to Plaintiff in time for its effective use at the Hearing, gave the complainant, J.P., enhanced standing, denied Plaintiff the right to cross-examine witnesses, denied Plaintiff the right to counsel at the Hearing, and failed to allow Plaintiff to meaningfully challenge the SCB Panel. (Pl.'s Resp. 13–17.)

 **\*7** The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property without due process of law...." U.S. Const. amend. XIV, § 1. The Due Process Clause is implicated when a student in a school run by a state faces non de minimis sanctions imposed by the school. *See Goss v. Lopez,* 419 U.S. 565, 576, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (finding that student facing a ten-day suspension from a public high school was entitled to the protections of the Due Process Clause). While there is no fixed standard for due process, the concept "implies a flexible standard that varies with the nature of the interests affected and the circumstances of the deprivation." *Furey v. Temple Univ.,* 884 F.Supp.2d 223, 246 (E.D.Pa.2012) (citing *Gorman v. Univ. of R.I.,* 837 F.2d 7, 12 (1st Cir.1988)); *see also Sill v. Pa. State Univ.,* 462 F.2d 463, 469 (3d Cir.1972)

("[T]he requirements of due process frequently vary with the type of proceeding involved.").

"Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). In *Goss,* the Supreme Court held that, at a minimum, the Due Process Clause requires a school to provide an accused student with "oral or written notice of the charges against [the student] and, if [the student] denies them, an explanation of the evidence the authorities have and an opportunity to present [the student's] side of the story." *Goss,* 419 U.S. at 581. Rather than dictate the terms of each school's unique policy, the Court held only that "in being given an opportunity to explain his version of the facts at this discussion, the student first be told what he is accused of doing and what the basis of the accusation is." *Id.* at 582. The Court explicitly avoided holding that the Due Process Clause requires that hearings afford students the opportunity to secure counsel, to confront or cross-examine witnesses, or even the ability to call his or her own witnesses. *Id.* at 583.

The Third Circuit considered an analogous set of facts in *Palmer v. Merluzzi,* 868 F.2d 90 (3d Cir.1989). There, a student was suspended from school for ten days and from the football team for sixty days upon admitting to smoking marijuana and consuming beer at the school's radio station. *Id.* at 92. The court concluded that the student received the process contemplated by *Goss* for his suspension from school. *Id.* at 994–95. In light of the Supreme Court's guidance that "longer suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures," *Goss,* 419 U.S. at 584, the Third Circuit balanced the interests of the student and the school and concluded that the procedure in *Palmer* was sufficient under the circumstances. *Palmer,* 868 F.2d at 95. In so deciding, the court weighed "(1) the private interests at stake, (2) the governmental interests at stake, and (3) the fairness and reliability of the existing procedures and the probable value, if any, of additional procedural safeguards." *Id.* (citing *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). For suspensions exceeding ten days, courts routinely apply the three *Mathews* factors in determining whether the school's procedure was appropriate. *See, e.g., G.C. v. Bristol Twp. Sch. Dist.,* No. 05–4800, 2006 WL 2345939, at \*3 (E.D.Pa. Aug.10, 2006) (finding no violation of due process where victim did not testify at disciplinary hearing).

Johnson v. Temple University - of Commonwealth System of Un..., Not Reported in...
Case 4:19-cv-01234-MWB   Document 11-1   Filed 07/21/19   Page 49 of 73
2013 WL 5298484

**\*8** Inconsistent application of procedures governing a disciplinary hearing may offend due process. In *Furey v. Temple University,* 730 F.Supp.2d 380, 383, 387 (E.D.Pa.2010), a Temple student challenged his expulsion from the university after he was found responsible for violating three sections of the Code. The court observed that "[s]ignificant and unfair departures from an institution's own procedures can amount to a violation of due process." *Id.* at 396–97 (citing *Winnick v. Manning,* 460 F.2d 545, 550 (2d Cir.1972)). In denying portions of the University's motion for summary judgment, the court found that there were significant departures from the Code. These included Temple's failure to recommend a new hearing upon the discovery that a panel member was Facebook friends with the officer that testified and the Vice President of Student Affairs' failure to give presumptive weight to the recommendations of the Review Board. *Id.* at 397. Here, Plaintiff does not allege that Temple departed from the Code, but rather that the Code, as written and as applied, denied Plaintiff due process of the law.

### *1. Mathews Factors*

Considering the factors set forth in *Mathews,* clearly Plaintiff's private interests are significant. Plaintiff attended Temple on an athletic scholarship. The imposition of a year-long suspension kept Plaintiff from participating in the school's football program and prevented Plaintiff from obtaining academic credits and advancing towards his degree. Plaintiff relies on *Dixon v. Ala. State Bd. of Educ.,* 294 F.2d 150, 157 (5th Cir.1961) to argue that he was entitled to the most formal procedural protections. (Pl.'s Resp. 16.) However, in *Dixon,* the Fifth Circuit confronted a student facing expulsion. *Dixon,* 294 F.2d at 157. In this case, Plaintiff was suspended and not expelled from Temple. Temple's interests are also significant. Temple is an educational institution that must maintain safety on its campus and protect its student body from intimidation, threats, and sexual assault. *See Furey,* 884 F.Supp.2d. at 248. The University also has an interest in reducing the fiscal and administrative burdens that a more adversarial litigation system would impose. Finally, the fairness and reliability of the procedures set forth in Temple's Code are sufficient. There is no necessity for additional procedural safeguards.

### a. *Notice*

As discussed above, in the disciplinary setting, schools must provide sufficient notice and an opportunity to be heard to ensure due process. *Goss,* 419 U.S. at 579. " '[T]he timing

and content of the notice and the nature of the hearing will depend on appropriate accommodation of the competing interests involved.' " *Hubel v. W. Va. Racing Comm'n,* 513 F.2d 240, 243 (4th Cir.1975) (quoting *Goss,* 419 U.S. at 579). In *Goss,* oral notice of charges leveled against a student were sufficient. *Goss,* 419 U.S. at 581. In *Flaim v. Med. Coll. of Ohio,* 418 F.3d 629, 635 (6th Cir.2005), the Sixth Circuit held that proper notice requires identification of the charged violations and possible penalties. *See Osei v. Temple Univ. of Commw. Sys. of Higher Educ.,* No. 10–2042, 2011 WL 4549609, at \*9 (E.D.Pa. Sept.30, 2011) (finding that plaintiff was on reasonable notice of the charges pending against him and that the notice provided by Temple was sufficient, even where the University failed to identify a witness until the day of the hearing).

**\*9** Courts within the Third Circuit have considered Temple's Code, including its notice provisions. In *Furey,* the court found that:

> on its face, [the Code] complies with the requirements of procedural due process. The student is provided a notice of the charges against him and a copy of the basis of those charges. The student is given the opportunity to be heard by disciplinary committee members. For serious cases, the University holds a full panel hearing, where the student can hear the testimony against him, testify, and present witnesses and evidence.

884 F.Supp.2d at 258–59. We agree that the Temple Code provides due process. In addition, we conclude that Temple complied with its stated policies and provided Plaintiff with notice that was more than sufficient to satisfy the requirements of due process. On December 13, 2010, Brian Foley, Program Coordinator at Temple, sent an e-mail to Plaintiff informing him that he had been charged with violating the Code. (*See* Dec. 13, 2010 E-mail.) Foley's e-mail set forth the aforementioned charges, included a summary of J.P.'s account of the events, and informed Plaintiff that he was to schedule a Pre–Hearing Meeting, which would provide him with an opportunity to discuss the case and allow him to ask any questions that he might have about the proceedings. (*Id.* at 2.) The e-mail also informed Plaintiff that he could have

an advisor present throughout the disciplinary process and encouraged Plaintiff to read through the Code prior to the Pre–Hearing Meeting. (*Id.*) Embedded in the e-mail was a link to the Code and a separate link to Temple University's Policy on Sexual Assault. (*Id.*) Plaintiff then had a Pre–Hearing Meeting with Foley. (Johnson Dep. 150.) At that meeting, Foley explained the charges pending against Plaintiff, J.P.'s factual allegations, and the possible sanctions Plaintiff that could receive. (*Id.* at 84–87.) Foley told Plaintiff that the most common sanction was a suspension or probation. (*Id.* at 86.) Foley also explained to Plaintiff how the process works. (*Id.* at 85.)

In the ensuing weeks, Plaintiff received a number of e-mails from Foley keeping him up to date on the proceedings, informing him of the charges, identifying the documents and the witnesses that Temple intended to offer at the Hearing, and informing him of his rights under the Code. (*See, e.g.,* Jan. 14, 2011 E-mail; Jan. 19, 2011 E-mail; Jan. 21, 2011 E-mail; Jan. 26, 2011 E-mail; Jan. 28, 2011 E-mail.) Between December 13, 2010 and the date of the Hearing, January 31, 2010, Foley met with Plaintiff five to eight times. (Johnson Dep. 81.) The meetings lasted for approximately fifteen minutes. (*Id.* at 355–56.) During each meeting, Plaintiff received more information from Foley. (*Id.* at 85.) At one meeting, Foley reviewed the Police Incident Report and Incident Referral Summary with Plaintiff. (*Id.* at 107.)

Plaintiff clearly received sufficient notice of the charges he was facing, the procedures for the disciplinary hearing, and his rights under the Code.

### b. *Right to an attorney*

**\*10** Accused students do not have the right to be actively represented by an attorney at a disciplinary hearing. The general consensus on a student's right to an attorney is that "at most the student has a right to get the advice of a lawyer; the lawyer need not be allowed to participate in the proceeding in the usual way of trial counsel, as by examining and cross-examining witnesses and addressing the tribunal." *Osteen v. Henley,* 13 F.3d 221, 225 (7th Cir.1993). To require that schools permit students to have counsel that may examine witnesses "would force student disciplinary proceedings into the mold of adversary litigation." *Id.* A student may nevertheless be entitled to legal counsel at a disciplinary hearing if the student is also facing criminal sanctions for the same underlying conduct. *Furey,* 884 F.Supp.2d at 252 (citing *Gabrilowitz v. Newman,* 582 F.2d 100, 103 (1st Cir.1978), *Osteen,* 13 F.3d at 225).

Temple's Code advises accused students that they may retain an advisor and have that advisor with them throughout the disciplinary process. The Code states that "[t]he Complainant and the Accused Student have the right to be assisted by any advisor they choose, at their own expense. The advisor may be an attorney." (Code 11.) The advisor may attend the entire SCB Hearing. (*Id.* at 10.) A lawyer may well have assisted Plaintiff in preparing for and more aptly representing himself at the Hearing. To that end, Brian Foley repeatedly advised Plaintiff that he could retain the services of a lawyer, but that it was not necessary for him to do so. (*See* Dec. 13, 2010 E-mail; Jan. 14, 2011 E-mail; Jan. 19, 2011 E-mail; Jan. 21, 2011 E-mail; Jan. 26, 2011 E-mail; Jan. 28, 2011 E-mail.) In fact, Plaintiff's father, Thomas Johnson, said that had Plaintiff informed him of the nature of the charges pending against him at an earlier point, he would have hired an attorney. (Thomas Johnson Dep. 28–29; *see also* Feb. 8, 2011 E-mail, Defs.' Mot. Ex. 17 ("I wish Tyler had said something to us when he first found out, we would have hired a lawyer then.").) Despite Code provisions permitting Plaintiff to retain a lawyer, and ample notice beginning approximately six weeks before the Hearing informing him that he was free to do so, Plaintiff chose not to independently retain a lawyer as his advisor. This was Plaintiff's decision. Plaintiff also chose not to inform his parents of the disciplinary proceedings until four days before the SCB Hearing. (Johnson Dep. 151.) Plaintiff's decisions in no way indicate that Temple violated his due process rights.

Plaintiff was not facing criminal sanctions for his conduct on November 12, 2010. When J.P. gave her statement to the Philadelphia Special Victims Unit, she indicated that she did not want to prosecute Plaintiff or M.E. (*See* Student Conduct Referral.) The Philadelphia Police Department interviewed Plaintiff, but never pursued charges against him. Accordingly, Plaintiff was not entitled to any additional considerations with respect to counsel at the disciplinary Hearing.

**\*11** Moreover, we cannot say that the additional cost of requiring Temple to provide counsel to Plaintiff and creating a formal adversarial environment would have substantially improved the fairness and reliability of the SCB Hearing. As the Seventh Circuit observed when performing its *Mathews* analysis in *Osteen,* "[t]he cost of judicializing disciplinary proceedings by recognizing a right to counsel is nontrivial, while the risk of error ... is rather trivial." *Osteen,* 13 F.3d at 226.

### c. *Right to cross-examination*

Plaintiff contends that he was denied the right to confront the witnesses against him because he was unable to directly cross-examine the witnesses. (Pl.'s Resp. 15.) Generally, the right to directly cross-examine witnesses is not a necessary part of due process in the student disciplinary context. *See Flaim,* 418 F.3d at 641 (finding no due process violation where student at medical college was able to listen to and observe officer's testimony at disciplinary hearing and had the opportunity to present his version of events); *Newsome v. Batavia Local Sch. Dist.,* 842 F.2d 920, 925 (6th Cir.1988) (finding that the necessity of protecting student witnesses outweighed the value of permitting cross-examination of students and that the burden of permitting cross-examination of administrators outweighed the benefits of such a procedure); *Gorman,* 837 F.2d at 16 ("[S]uffice it to state that the right to unlimited cross-examination has not been deemed an essential requirement of due process in school disciplinary cases."); *Winnick,* 460 F.2d at 549 (finding that while "the right to confront witnesses may be essential in some disciplinary hearings," such a right did not exist where the exercise would have been fruitless in presenting the facts).

In the instant matter, Plaintiff, M.E., and J.P. were all able to functionally cross-examine witnesses by presenting questions to Greenstein to be asked to the witness. Each individual availed himself or herself of that procedure. (Jan. 31 Hr'g Tr. 28–30, 35–38, 40–46, 57–59.) Plaintiff does not suggest that his direct cross-examination of the witnesses would have brought forth exculpatory facts. As the Code permitted, Plaintiff submitted questions through the SCB Chair, provided his version of events during the Hearing, and presented a closing argument. (*See id.*) We are satisfied that this procedure was sufficient. Due process was not violated here.

### d. Additional due process challenges
Plaintiff also claims that Temple: (1) enhanced the standing of the complainant, J.P., relative to Plaintiff; (2) did not provide him with a sufficient ability to challenge the SCB Panel; (3) failed to provide him with relevant documentation; and (4) revoked his athletic scholarship in violation of his due process rights. These allegations are meritless.

As discussed above, Plaintiff and J.P. were each provided with an opportunity to present an opening statement, to submit questions to the SCB Panel to be asked to witnesses, to present witnesses, and to offer closing remarks. The Hearing Transcript does not reflect that J.P. received preferential treatment. As Temple argues, pursuant to the Code, Plaintiff

and J.P. were permitted to testify in a narrative fashion, were allowed to be present during the entire Hearing, and were able to read prepared statements if they so chose. (Defs.' Reply 6.)

**\*12** With regard to the composition of the SCB Panel, "in examining administrative proceedings, the presumption favors the administrators, and the burden is upon the party challenging the action to produce evidence sufficient to rebut this presumption." *Gorman,* 837 F.2d at 15. Plaintiff does not now argue that a member of the panel was biased or prejudiced. Moreover, Plaintiff was provided with the opportunity to challenge panel members before the Hearing began and he failed to do so. (*See* Hr'g Tr. 8.) We find no support for Plaintiff's claim that he should have been provided with additional background material with regard to the potential panel members prior to the Hearing. We reject Plaintiff's assertion that under the *Mathews* framework, an accused student is entitled to discovery regarding panel members at a student disciplinary hearing. Such a burden would create needless administrative cost that would be unlikely to benefit a student facing administrative discipline.

As to Temple's failure to provide Plaintiff with relevant documentation, Plaintiff contends that Temple did not provide him with a "meaningful transcript" prior to the Hearing. (Compl.¶ 13.) Plaintiff also contends that he was not allowed to copy documentation shown to him on the morning of the Hearing. (Pl.'s Resp. 13.) A student is not entitled to "discovery" as if he were a litigant in a civil or criminal proceeding. Schools must, however, provide an accused student with notice of the charges they face and the nature of the evidence to be presented at the hearing. *See Flaim,* 418 F.3d at 639 (finding that notice was sufficient where the plaintiff was made aware of the charges against him, but was not provided with full witness list or indication of the documents that were to be introduced at the hearing); *Gomes v. Univ. of Maine Sys.,* 365 F.Supp.2d 6, 22 (D.Me.2005) (finding no violation of due process where a university failed to produce an entire police report to an accused student prior to a disciplinary hearing in light of "[t]ight time constraints, a general rule against imposing discovery requirements on university disciplinary proceedings, the Complainant's access to the same material from a non-university source, and the Plaintiffs' failure to identify the statement ...."). The requirement of notice "does not necessarily require students be given a list of witnesses and exhibits prior to the hearing, provided the students are allowed to attend the hearing itself." *Id.* at 23 (citing *Nash v. Auburn Univ.,* 812 F.2d 655, 662–63 (11th Cir.1987)).

Johnson v. Temple University-Of Commonwealth System Of..., Not Reported in...

2013 WL 5298484

Case 4:19-cv-01234-MWB   Document 11-1   Filed 07/21/19   Page 52 of 73

Here, Foley repeatedly informed Plaintiff by e-mail and personally of the evidence that was going to be introduced at the Hearing. He also informed Plaintiff that "[t]he documents are available for review by you and your advisor at the Office of Student Conduct, Monday–Friday, 8:30–5:00 p.m." (*See* Jan. 14, 2011 E-mail; Jan. 19, 2011 E-mail; Jan. 21, 2011 E-mail; Jan. 26, 2011 E-mail; Jan. 28, 2011 E-mail.) Plaintiff never made an appointment to review the evidence. Foley even took it upon himself to review the Incident Referral Summary with Plaintiff. (Johnson Dep. 106–07.) On the morning of the Hearing, Plaintiff and his father were given the Investigation Interview Records, which they were able to briefly review. (*Id.* at 152, 155.) Plaintiff has failed to establish that Temple should have a more robust disclosure policy. As the Sixth Circuit observed in *Flaim*, requiring formal discovery in a school disciplinary setting "would be nothing more than an additional and unnecessary expense and administrative burden for the college without any corresponding benefit to [the student]." *Flaim,* 418 F.3d at 639. Temple's conduct satisfied the requirements of due process.

**\*13** Finally, Plaintiff alleges that Temple violated his due process rights when it revoked his scholarship. (Compl.¶ 13.) After the Hearing, Foley e-mailed Plaintiff attaching the Decision Letter, which indicated that the SCB Panel found Plaintiff responsible for Intimidation or Assault and for violating the Sexual Assault Policy. (Jan. 31, 2011 E-mail.) Seiss, the Senior Associate Dean of Students, recommended sanctions, including Plaintiff's suspension from Temple, effective immediately and lasting through the end of the fall 2011 semester, expulsion from university housing, and probation for two calendar years upon Plaintiff's return to Temple. (*Id.*) These sanctions are permitted by the Code. (Code 13–14.) Although the Code does not specifically reference athletic scholarships, it does provide that "[w]hen a sanction of suspension is imposed, the student MAY NOT ... [p]articipate in university registered or recognized clubs or organizations or university sponsored programs, activities, or related events ..." Plaintiff's due process rights were not violated. (*Id.* at 14.)

The procedures used by Temple to provide notice to Plaintiff of the hearing and the conduct of the hearing itself were perfectly proper. Plaintiff has failed to establish any issue of material fact in support of his claim that his due process rights were violated. Accordingly, Temple's Motion as to Count I must be granted.

**B. Breach of Contract Claim (Count II)**

Plaintiff alleges that Temple breached its contractual obligations to him by violating covenants in the Temple University Handbook pertaining to the evaluation and dismissal of Plaintiff, failing to allow Plaintiff to have legal representation at his dismissal Hearing, violating Plaintiff's right to know the evidence against him, failing to allow Plaintiff to present exculpatory evidence, and failing to allow Plaintiff to confront the witnesses against him in a fair and impartial manner. (Compl.¶ 15.) Plaintiff merely repackages his due process arguments as a breach of contract claim.

To establish a claim for breach of contract, a plaintiff must establish (1) the existence of a contract and its terms, (2) the breach of a duty created by the contract, and (3) damages resulting from that breach. *CoreStates Bank v. Cutillo,* 723 A.2d 1053, 1058 (Pa.Super.Ct.1999). Temple maintains that Plaintiff has failed to establish the existence of any contract. We agree. Plaintiff's refers to "the university handbook" in Count II of the Complaint. (*See* Compl. ¶ 15.) However, the Supreme Court of Pennsylvania "has declined to construe the student handbook of a public university as a contract between the public university and the student." *Tran v. State Sys. of Higher Educ.,* 986 A.2d 179, 183 (Pa.Commw.Ct.2009); *Hart v. Univ. of Scranton,* No. 11–1576, 2012 WL 1057383, at \*3 (M.D.Pa. Mar.28, 2012) (dismissing breach of contract claim where student failed to identify a specific contract provision that was breached); *Manning v. Temple Univ.,* No. 03–4012, 2004 WL 3019230, at \*12 (E.D.Pa. Dec.30, 2004) (acknowledging that "[t]he first page of the handbook, however, states that '[t] he rules, regulations, and information provided in this handbook are announcements only and in no way serve as a contract between the student and Temple University' " and finding no contract between the student and the University).

**\*14** The only other basis for a contract identified by Plaintiff was his athletic scholarship. (Johnson Dep. 256.) Temple argues that Plaintiff has failed to point to any provision within his scholarship that Temple violated by suspending him for two semesters, placing him on probation upon his return, and excluding him from University housing. (Defs.' Mem. 27 n. 11.) We agree. Moreover, as discussed above, Plaintiff has failed to establish that any of his due process rights were violated in any way. Therefore, even if one were to find that there was a contract in place, Plaintiff cannot plausibly maintain that any of its essential terms were breached by Temple, under the circumstances presented here.

Johnson v. Temple University-of Commonwealth System of..., Not Reported in...

Case 4:19-cv-01234-MWB    Document 11-1    Filed 07/21/19    Page 53 of 73

2013 WL 5298484

Accordingly, there is no genuine issue of material fact with regard to Plaintiff's breach of contract claim in Count II.

**C. Unjust Enrichment Claim (Count III)**

Plaintiff maintains that Temple was unjustly enriched by accepting services from Plaintiff while failing to allow him to attend courses necessary for him to finish his degree. (Compl.¶ 17.) To establish unjust enrichment, a plaintiff must prove: (1) benefits conferred on defendant by plaintiff; (2) knowledge or appreciation of those benefits by a defendant; and (3) acceptance and retention of such benefits where it would be inequitable for a defendant to retain the benefits without value under the circumstances. *Mitchell v. Moore,* 729 A.2d 1200, 1203–04 (Pa.Super.Ct.1999). Under the equitable doctrine of unjust enrichment, "the law may imply a contract, requiring the defendant to pay to the plaintiff the value of the benefit conferred." *Villoresi v. Femminella,* 856 A.2d 78, 84 (Pa.Super.Ct.2004) (citing *Mitchell,* 729 A.2d at 1203).

Plaintiff's claim of unjust enrichment is unfounded. During his time at Temple, Plaintiff had an athletic scholarship. He was a red-shirt freshman on the Temple football team. To the extent Temple received a benefit from Plaintiff, it was from his participation on the football team, for which he was compensated with a scholarship and enrollment at the University. This included the ability to take courses and pursue a degree, free room and board, and free books for his courses. (Defs.' Mem. 29.)

Once the SCB Panel determined that Plaintiff was responsible for violating Sections Three and Four of the Code, Temple stopped accepting any benefits from Plaintiff. At that point, Plaintiff was suspended from the University for approximately a year, excluded from University housing, and placed on probation upon his return to school. (Jan. 31, 2011 E-mail.) Months after the suspension was imposed, Plaintiff joined the United States Coast Guard. (Johnson Dep. 30.) He did not return to Temple and has not attempted to do so. (Johnson Dep. 38.) There was no enrichment after Plaintiff's suspension, let alone unjust enrichment.

**D. Due Process Claim Against Greenstein (Count IV)**

Plaintiff brings the due process claims alleged in Count I against Professor Greenstein, who served as the Chairman of the SCB Panel. Greenstein contends that he can not be liable based on the doctrine of qualified immunity. (Defs.' Mem. 29.) The doctrine of qualified immunity shields government officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The applicability of the prophylactic protections of the doctrine is based on two factors: (1) "whether the plaintiff has alleged that the defendant violated a constitutional right, and [ (2) ] 'whether the right that was violated was clearly established, or, in other words, whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " *Jarovits v. Monroe Cnty. Children & Youth Servs.,* 345 F. App'x 784, 788 (3d Cir.2009) (quoting *Curley v. Klem,* 499 F.3d 199, 206–07 (3d Cir.2007)). Greenstein is "entitled to qualified immunity if reasonable officials in [his] position at the relevant time could have believed, in light of clearly established law, that [his] conduct comported with established legal standards." *Stoneking v. Bradford Area Sch. Dist.,* 882 F.2d 720, 726 (3d Cir.1989).

**\*15** Plaintiff alleges that Greenstein violated his due process rights. As discussed above, we have determined that Plaintiff's due process rights were not violated. Plaintiff was provided with adequate notice and an opportunity to be heard. Even if one were to somehow conclude that there was a violation of due process with regard to the Hearing, we are compelled to conclude that Greenstein is entitled to qualified immunity. The only specific allegation Plaintiff raises with regard to Greenstein is that he permitted the introduction of hearsay statements and conclusions on the ultimate issue of responsibility by Lieutenant Woltemate. (Pl.'s Resp. 17.) The Code provides that "[f]ormal rules of process, procedure, and/or technical rules of evidence, as are applied in criminal or civil court, are not used in Student Conduct Board proceedings." (Code 12.) This is permissible. *See Newsome,* 842 F.2d at 926 (citing with approval *Boykins v. Fairfield Bd. of Educ.,* 492 F.2d 697 (5th Cir.1974)); *Tasby v. Estes,* 643 F.2d 1103, 1106 (5th Cir.1981) ( "[R]ights in a student disciplinary hearing may properly be determined upon the hearsay evidence of school administrators who investigate disciplinary infractions."). Accordingly, there was nothing improper about Greenstein's conduct at the Hearing.

Greenstein, a Temple professor, served as the SCB Chairman. In doing so, his conduct comported with established legal standards in conducting such a hearing. The claim against Greenstein must be dismissed.

## IV. CONCLUSION

For the foregoing reasons, Defendants Temple University —Of The Commonwealth System of Higher Education and Professor Richard Greenstein's Motion for Summary Judgment Motion will be granted.

An appropriate Order follows.

## ORDER

**AND NOW,** this *19th* day of *September,* 2013, upon consideration of Defendants Temple University—Of the Commonwealth System of Higher Education and Professor Richard Greenstein's Motion for Summary Judgment (ECF No. 19), and all papers submitted in support thereof and in opposition thereto, it is **ORDERED** that the Motion is **GRANTED,** and judgement is entered in favor of Defendants.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5298484

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

🏷 KeyCite Yellow Flag - Negative Treatment
Distinguished by Haney v. West Chester University, E.D.Pa., August 16, 2018

2011 WL 4549609
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Michael OSEI, Plaintiff,

v.

TEMPLE UNIVERSITY OF the COMMONWEALTH SYSTEM OF HIGHER EDUCATION; Dr. Anne Weaver Hart, individually and in her official capacity as President of Temple University; Brian C. Foley, individually and in his official capacity as Vice Chair, University Disciplinary Committee, Temple University; Dr. Keith Gumery, individually and in his official capacity as Vice Chair, University Disciplinary Committee, Temple University; Andrea C. Seiss, individually and in her official capacity as Code Administrator, University Disciplinary Committee, Temple University; Dr. Mia K. Luehrmann, individually and in her official capacity as Associate Dean of Undergraduate Studies, College of Science & Technology, Temple University; Dr. Robert J. Levis, individually and in his official capacity as Chairman and Professor, Department of Chemistry, Temple University; Dr. Grant Krow, individually and in his official capacity as Professor of Chemistry, Department of Chemistry, Temple University, Defendants.

Civil Action No. 10–2042.
|
Sept. 30, 2011.

**Attorneys and Law Firms**

Joseph R. Viola, Padova Lisi & Della Guardia, Philadelphia, PA, for Plaintiff.

Edward J. Heffernan, Michael J. Fortunato, Rubin Fortunato & Harbison P.C., Paoli, PA, for Defendants.

*MEMORANDUM*

JONES, District Judge.

**I. Introduction**

*\*1* The within action stems from Plaintiff Michael Osei's disciplinary suspension from a graduate studies program at Defendant Temple University's institution in Philadelphia, Pennsylvania. After exhausting all internal remedies within the University, Plaintiff filed a *pro se* appeal to the Commonwealth Court of Pennsylvania on April 12, 2010. On April 21, 2010, the Commonwealth Court *sua sponte* transferred the matter to the Philadelphia Court of Common Pleas, based upon lack of jurisdiction over Temple University. One week later, Plaintiff formally withdrew his appeal and subsequently filed the instant action on May 5, 2010, naming as Defendants: Temple University of the Commonwealth System of Higher Education; Dr. Mia K. Luehrmann; Andrea C. Seiss; Dr. Robert J. Levis; and Dr. Grant Krow. Said Defendants filed a Motion to Dismiss and in response thereto, Plaintiff sought and obtained leave of Court to file a counseled Amended Complaint, which he did on December 1, 2010. Plaintiff's Amended Complaint contained two additional defendants: Brian C. Foley and Dr. Keith Gumery. All Defendants filed the instant Motion to Dismiss Plaintiff's Amended Complaint. Plaintiff has responded to this Motion and the matter is now ripe for disposition. For the reasons set forth herein, Defendants' Motion will be granted.

**II. Factual Background** [1]

[1]   Defendants have noted that for purposes of the instant Motion only, they will accept the material allegations of Plaintiff's Amended Complaint as true. (Mot. Dismiss 2 n.2) This Court also notes that the extensive factual history which follows is necessary in order to adequately address Plaintiff's claims.

Plaintiff is originally from the Republic of Ghana in West Africa and his first language is Ghana Twi of the Akan (Asante) tribe. (Am.Compl.¶ 12) In 2003, after obtaining a visa from government officials in Ghana, Plaintiff immigrated to the United States for the purpose of attending Temple University. (Am.Compl.¶ 13) He acquired sufficient proficiency in English to attend classes conducted in English, and subsequently graduated with a Bachelor of Science in Biology in 2006. (Am.Compl.¶ 14) In pursuance of his Healthcare Management degree, Plaintiff enrolled in Defendant Dr. Krow's Organic Chemistry course in the Fall of 2009. (Am.Compl.¶ 17) Said course is a prerequisite for most healthcare professional school admissions. (Am.Compl.¶ 18) On December 14, 2009, Plaintiff took the final examination

Osei v. Temple University of Commonwealth System of..., Not Reported in...

Case 4:19-cv-01234-MWB Document 11-1 Filed 07/21/19 Page 56 of 73

2011 WL 4549609

for Dr. Krow's course and ultimately received a grade of "C" for the semester, which was entered by the University Registrar's Office. (Am.Compl.¶ 19)

Plaintiff felt he has been graded unfairly by Dr. Krow and sought to rectify the situation in accordance with Temple University's *Student Code of Conduct and Policy on Student and Faculty Academic Rights and Responsibilities,* which encourages students to first discuss their concerns with their instructor and if that does not resolve the matter, make an informal complaint to the Student Ombudsperson (Student Ambassador) for the appropriate School or College. (Am.Compl.¶ 20) Therefore, Plaintiff decided to communicate with Dr. Krow via e-mail to attempt to resolve the Organic Chemistry grade dispute. (Am.Compl.¶ 21)

### Grievances About the Grade

**\*2** On December 16, 2009, Plaintiff sent his first e-mail to Dr. Krow, which he titled "Grade details." (Am.Compl.¶ 22) In the e-mail, Plaintiff requested the details of all the scores upon which his final grade was based, as well as a copy of his graded final exam. (Am.Compl.¶ 22) Because Plaintiff did not feel that Dr. Krow responded adequately to his e-mailed request, he sent two subsequent, general "mass" e-mails via Temple University's portal system to all students enrolled in Dr. Krow's Organic Chemistry course. (Am.Compl.¶¶ 23–24) The e-mails were entitled "Important: Support Joint Complaints about Orgo 2202 with Dr. Krow" and it was Plaintiff's belief that Dr. Krow had read same. (Am.Compl.¶¶ 23–25) After receiving positive responses from the students who had taken Dr. Krow's course, Plaintiff sent another e-mail to the entire Organic Chemistry class and to all the users of the portal system, which he entitled "Refuse to change career goals/major because of Dr. Krow and his words. There are guaranteed ways to still get into Med. School. I will show you." (Am.Compl.¶¶ 26–27) Plaintiff avers that as a user of the portal system, Dr. Krow also read this mass e-mail. (Am.Compl.¶ 28)

On December 20, 2009, Plaintiff sent another e-mail directly to Dr. Krow entitled "Appointment to see final exam," in which he again sought the details of all scores upon which his grade was based, as well as a copy of his final examination. (Am.Compl.¶ 29) The final three paragraphs of the e-mail read as follows:

If my final grade was not a genuine or fair grade, and the examinations you gave up was [sic] rather honors exams when this class was not an honors class, **It will be a curse against your life and family forever. I am serious!** You are free of [sic] you make amends for everyone's grade, you are also free if the grades were not motivated by your jealousies and presuppositions.

I will not let you get away with this! If in the past you had gotten away with such thin ds [sic], this will be different for you. You had an encounter with OSEI this time. Let me know when I can see my final exam.

Michael

(Am.Compl.¶ 30) (emphasis in original)

Again, Plaintiff felt Dr. Krow did not respond adequately to his request, so on December 22, 2009, he sent his third e-mail to Dr. Krow, entitled "I have NO PLACE for your ego in this, so cooperate," which stated the following:

I still have not heard from you about when I can look at my final exam in the meantime.

I have no place for your ego when my tuition money and grade is involved. I can not let you do anything and get away with it.

I want full accountability and transparency for how the minitest and group work factored into the final grading as well. You wasted our time with a last minitests [sic] which you considered to ne [sic] 'noodles' when a whole chapter on amino acids was not completed.

I could discern through all your soliloquys [sic] and pantomimes to me. This grade was intentional and unfair. I[sic] does not hurt me. I just want justice on you physically and spiritually.

**\*3** Your game is over! Mine begins. You played with the wrong person this time.

Cooperate to prevent things from escalating.

This is my last email requesting to see how my final exam was graded and to have it back.

(Am.Compl.¶¶ 31–32)

Dr. Krow responded to the above quoted e-mail by explaining that he would be available when the University reopened

Osei v. Temple University of Commonwealth System of..., Not Reported in...

Case 4:19-cv-01234-MWB Document 11-1 Filed 07/21/19 Page 57 of 73

2011 WL 4549609

in January, at which time, Dr. Krow, Plaintiff, and Dr. Levis could meet to discuss Plaintiff's grade grievance. (Am.Compl.¶ 33) Upon receiving Dr. Krow's response, Plaintiff sent the following e-mail:

> I was not looking for mu [sic] exam to be reviewed in January 2010[;] I want the review right now. temple [sic] was officially open this week. You graded and posted final grades rightaway, [sic] yet you are not available to account for your discrepancies right now? I cannot accept this. Your official turnaround time was very poor. You have caused a delay which I will charge you for. The review will be done in a different setting, perhaps in a court of law with my attorneys if I decide to sue you. At that time you can choose to bring Dr. Levis along with you, without my appointment, I am not interested in booking an appointment with him for the review.
>
> You still owe me full accountability for how the group work/minitests factored into the final grades.
>
> Your pointless minitests prevented us from finishing the course syllabus. Further, you still owe me my final exam paper which you have given no legitimate reason to keep. I will ask you to produce it in a different setting.
>
> Marl [sic] my words: The year 2010 will not start well for you.

(Am.Compl.¶ 34)

Dr. Krow reported receipt of Plaintiff's e-mails to Dr. Levis, who was the Chairperson of Temple's Chemistry Department, and to the Campus Police. (Am. Compl. ¶ 35; Mot. Dismiss 2–3) On December 23, 2010, Plaintiff received telephone calls and voicemail messages from Temple University Campus Police headquarters, as well as a visit to his residence by Detective Agoi Ombima while he was absent. (Am.Compl.¶¶ 35–36) After hearing the voicemail message left by the Temple University Campus Police, Plaintiff contacted their headquarters and spoke with Detective Ombima, who advised Plaintiff to stop e-mailing Dr. Krow. (Am. Compl. ¶¶ 37–38; Mot. Dismiss 3) Detective Ombima also informed Plaintiff that Dr. Levis would contact him to resolve the matter. (Am. Compl. ¶ 38; Mot. Dismiss 3)

On December 24, 2010, after having exhausted all informal attempts to resolve the grade dispute with Dr. Krow, Plaintiff sent an e-mail to Joshua Puricelli, Student Ambassador/ Ombudsperson for the College of Science and Technology, in an attempt to file a formal grievance. (Am.Compl.¶ 41)

Additionally, on January 7, 2010, Plaintiff met with Dr. Levis and Dr. Strongin (Vice Chair of Temple University's Chemistry Department), to possibly resolve his grade dispute. (Am.Compl.¶ 43) Dr. Krow did not attend that meeting but Dr. Levis did make reference to his knowledge of "threatening" e-mails that Plaintiff had sent to Dr. Krow. (Am.Compl.¶ 44) Dr. Levis's statements apparently prompted Plaintiff to visit the Temple University Campus Police headquarters and personally inquire about the e-mail situation, at which time he was informed that it was a "non-criminal" situation that did not involve charges being filed against him, but that a disciplinary hearing would be held by the Disciplinary Committee of Temple University's Office of Student Conduct and Community Standards. (Am.Compl.¶ 45)

**\*4** After being advised that his grievance and joint complaint had been delegated to Dr. Mia K. Luehrmann, Plaintiff contacted Dr. Luehrmann by e-mail on January 10, 2010 and learned that she had not taken any action on his formal grievances, but rather "placed them on hold" due to pending University Disciplinary Committee proceedings. (Am.Compl.¶¶ 46–48) Two days later, Plaintiff received an e-mail from the University Disciplinary Committee and Office of Student Conduct and Community Standards ("UDC/OSCCS"), advising him that he had been charged with violating the Temple University Student Code of Conduct ("Student Code") and instructing him to read the attached "Notice of Disciplinary Action," which was dated January 8, 2010. (Am. Compl. ¶ 49; Mot. Dismiss 3)

The "Code Violation" section of the Notice indicated that Plaintiff was being charged with a violation of "Section 3," which provides for "[a]ny act or threat of intimidation or physical violence toward another person including actual or threatened assault or battery." (Am. Compl. ¶ 50; Mot. Dismiss n 3) The "Specifications" section of the Notice stated:

> Temple Student Michael Osei sent what was believed to be threatening emails to Dr. Grant Krow in reference to receiving a poor grade. In an email sent by Osei to Krow dated December 22, 2009, "This grade was intentional an unfair. It does not hurt me. I just want justice on you physically and spiritually. Your game is over! Mine begins. You played with the wrong person this time. Cooperate to prevent things from escalating."

(Am.Compl.¶ 51)

Case 4:19-cv-01234-MWB Document 11-1 Filed 07/21/19 Page 58 of 73

Osei v. Temple University of Commonwealth System of..., Not Reported in...

2011 WL 4549609

On January 14, 2010, Plaintiff attended a pre-hearing meeting with Dennesha Brown, Program Coordinator of the University's Student Conduct Board ("SCB"), to discuss the disciplinary proceeding. (Am.Compl.¶ 52) On January 28, 2010, Plaintiff received another email from the SCB entitled, "Office of Student Conduct: Notice of Hearing," which advised him that his Student Conduct Hearing was scheduled for February 3, 2010 at 2:00 p.m., and that Professor Keith Gumery would be the Chair of the hearing. The Notice also stated that the University planned to call Dr. Krow, Dr. Levis, and Detective Ombima as witnesses. (Am.Compl.¶¶ 53–55)

The day before the hearing, Plaintiff received an e-mail from Defendant Brian C. Foley, Program Coordinator of "UDC/OSCCS," indicating that Dr. Luehrmann, Associate Dean of Undergraduate Studies at the College of Science and Technology, would also be called as a witness for the University. (Am.Compl.¶ 56) Additionally, prior to commencement of the hearing, Mr. Foley handed Plaintiff copies of two other e-mails which the University believed contained threats from Plaintiff and which they intended to present as exhibits during the hearing. (Am. Compl. ¶ 58; Mot. Dismiss 4) Also prior to commencement of the hearing, Plaintiff was informed that Dr. Krow would not be attending the hearing. (Am.Compl.¶ 59)

### *Student Conduct Hearing ("The Hearing")*

**\*5**  Plaintiff attended the hearing on February 3, 2010 with Attorney Trevan Borum. (Am. Compl. ¶ 57; Mot. Dismiss 4) During the hearing, Dr. Levis read Plaintiff's e-mail to Dr. Krow, entitled, "I have NO PLACE for your ego in this, so cooperate." (Am.Compl.¶ 60) Both Dr. Levis and Dr. Leuhrmann testified that Dr. Krow felt "threatened" after reading the e-mail. (Am. Compl. ¶ 60; Mot. Dismiss 4) Dr. Levis further testified that he was advised by Dr. Luehrmann that "we've had this [sic] similar sorts of incidents or interactions between Mr. Osei and, uh, his General Chemistry lecturer, his General Chemistry laboratory instructor, uh, last year." (Am.Compl.61)

With further regard to the "NO PLACE" e-mail, Dr. Luehrmann testified that Dr. Krow "was worried about what to do" and that Dr. Krow was "a little spooked by ... by even the first e-mail." (Am.Compl.¶¶ 62–63) Additionally, Dr. Luehrmann testified that it was Dr. Krow who reminded her that "this same student had some issues with, with another faculty member in Chemistry, um. [sic] at which point I, I,

I did a little bit of, of, um, checking and, and confirming and making sure of what the scope of the things was." [2] (Am.Compl.¶ 64)

[2]     Dr. Luehrmann's reference to prior "incidents" and "interactions" with Plaintiff referred to a formal grievance Plaintiff had presented to Drs. Luehrmann and Levis in January, 2009 concerning the alleged improper mishandling of student evaluation forms and violation of confidentiality rules by another professor during the Fall 2008 semester. (Am.Compl.¶ 71)

Temple's final witness, Detective Ombima, testified that he advised Plaintiff about the need for a disciplinary hearing and that "he needed to make sure that in the future when he uses certain words that he has to understand that when we send emails, the nature of the emails can often be misconstrued if you're not going to say these things personally. (Am. Compl. ¶¶ 67–68; Mot. Dismiss 4) When asked to compare Plaintiff's e-mails to others of which he had been made aware, Detective Ombima responded, "I've seen worse," noting that there were "implied things" in Plaintiff's e-mails for which there was room for "interpretation." (Am.Compl.¶ 69)

During Plaintiff's opportunity to speak, he apologized for the way Dr. Krow had interpreted his e-mails and attempted to explain his intention behind the words which the panel found troublesome. (Am. Compl. ¶ 72; Mot. Dismiss 4) In addition, Plaintiff apologized for his flawed use of English, explaining that he learned English while at Temple with a tutor and was still trying to master the language. (Am.Compl.¶ 73) Plaintiff also submitted three character letters; one written by the senior pastor of a church in Philadelphia and two written by Temple faculty members. (Am.Compl.¶ 73)

After the witnesses were presented, the panel took a recess and upon reconvening, announced their oral decision that Plaintiff had violated Section 3 of the Code by sending what were deemed to be "threatening" e-mails to Dr. Krow. (Am. Compl. ¶ 75; Mot. Dismiss 5)

### *Sanctions Phase of Hearing*

Although not specifically set forth in the Code of Conduct, it was the usual practice for the panel to ask for a recommendation regarding sanctions from a representative of the school or college in which the student was currently enrolled. (Am.Compl.¶ 77) Plaintiff was currently enrolled in the Fox School of Business. However, Mr. Foley invited Dr.

Case 4:19-cv-01234-MWB Document 11-1 Filed 07/21/19 Page 59 of 73
Osei v. Temple University of Commonwealth System of..., Not Reported in...
2011 WL 4549609

Luehrmann as Associate Dean of the College of Science and Technology (where Plaintiff was also taking classes), to make a recommendation. (Am.Compl.¶ 78) Dr. Gumery questioned whether it was appropriate for Dr. Luehrmann to make the recommendation since she had been called by the University as a witness in the case, and Mr. Foley ruled that it was appropriate because "the courses do involve [sic] College of Science and Technology." (Am.Compl.¶¶ 79–80)

 **\*6** Dr. Luehrmann then asked whether her "entire role" was "to give a recommendation, or to give any information?" (Am.Compl.¶ 81) Plaintiff avers that after being told by Dr. Gumery that "any information relating to the case should have been given as a part of testimony," Dr. Luehrmann then remarked, "So history is not relevant?" (Am.Compl.¶ 83) Ultimately, Dr. Gumery ruled that Dr. Luehrmann could make a recommendation concerning sanctions, as well as offer her own additional testimony in support of her recommendation. (Am.Compl. ¶ 84) Dr. Luehrmann went on to recommend that Plaintiff be dismissed from the University based upon the fact that she found the mass e-mails he sent out to all the students "to be a little hostile," and the fact that she discovered an inappropriate pattern of intimidation involving Plaintiff and Temple faculty, which appeared to be escalating. (Am Compl. ¶ 85) [3]

[3]  Dr. Luehrmann testified that she was aware of at least nine different faculty members who had experienced some form of intimidation by Plaintiff while he attended classes at the University. (Am.Compl.¶ 85)

### *Sanctions*

On February 8, 2010, Defendant Andrea C. Seiss, then-Student Conduct Code Administrator for the University Disciplinary Committee, notified Plaintiff that based upon the findings of responsibility for violating Section 3 of the Student Code, Temple University was imposing a University Suspension lasting through August 15, 2010, CERT Track I (anger management classes), and probation lasting through graduation. (Am. Compl. ¶ 87; Mot. Dismiss 5) Furthermore, Plaintiff was advised that he remained responsible for payment of all tuition and fee charges "in accordance with payment information contained in University policy." (Am. Compl. ¶ 89; Mot. Dismiss 6) Because the suspension was imposed after the course drop deadline for the Spring 2010 semester, Plaintiff received a non-passing grade of "WS" in all courses for which he had been registered. (Am.Compl.¶

91) Ms. Seiss's letter also informed Plaintiff of his right to file an appeal. (Am. Compl. ¶ 92; Mot. Dismiss 6)

### *Appeal*

Plaintiff filed an appeal by letter, in which he asserted two procedural defects that he felt substantially prevented him from obtaining a full and fair hearing on the merits. First, Plaintiff took issue with the fact that Dr. Krow did not participate in the hearing. Secondly, Plaintiff complained of the fact that Dr. Luehrmann was able to give a recommendation. (Am.Compl.¶ 93)

Plaintiff's sanctions were held in abeyance while his appeal was pending but on March 12, 2010, Plaintiff was notified that the Appellate Board unanimously voted to uphold the original Board's finding of responsibility and sanctions. (Am. Compl. ¶¶ 94, 96; Mot. Dismiss 6) On March 18, 2010, after an e-mail inquiry from Plaintiff, Ms. Seiss advised him that no further appeal was available. (Am.Compl.¶ 98)

### III. Discussion

#### A. Standard of Review

Defendants contend that Plaintiff has failed to state any claim upon which relief may be granted. When assessing a motion brought pursuant to Fed.R.Civ.P. 12(b)(6), courts must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny,* 515 F.3d 224, 233 (3d Cir.2008) (internal quotation and citation omitted). As a result of the Supreme Court's decision in *Bell Atlantic Corporation v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 556). This standard, which applies to all civil cases, "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 129 S.Ct. at 1949.

 **\*7** Specifically,

Osei v. Temple University of Commonwealth System of..., Not Reported in...

Case 4:19-cv-01234-MWB Document 11-1 Filed 07/21/19 Page 60 of 73

2011 WL 4549609

Applying the principles of *Iqbal,* the Third Circuit in *Fowler v. UPMC Shadyside,* 578 F.3d 203 (3d Cir.2009), articulated a two-part analysis that district courts in this Circuit must conduct in evaluating whether allegations in a complaint survive a Motion to Dismiss. First, the factual and legal elements of a claim should be separated, meaning "a District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Id.* at 210–11. Second, the Court must determine whether the facts alleged in the complaint demonstrate that the plaintiff has a "plausible claim for relief." *Id.* at 211. In other words, a complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. *Id.* (citing *Phillips,* 515 F.3d at 234–35). "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'shown'-'that the pleader is entitled to relief.' " *Iqbal,* 129 S.Ct. at 1950. This "plausibility" determination under step two of the analysis is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

*Perano v. Twp. of Tilden,* No. 09–754, 2010 U.S. Dist. LEXIS 36781, at ——15–17, 2010 WL 1462367 (E.D.Pa. Apr. 12, 2010), *aff'd,* 2011 U.S.App. LEXIS 7655 (3d Cir.Pa., Apr. 13, 2011).

### B. Plaintiff's Claims [4]

[4] Plaintiff has opted to not address any of the legal bases presented in Defendants' Motion to Dismiss. Instead, he notes that "[e]xpending the time and effort necessary to refute legal propositions which have nothing to do with the viability of Osei's claims as set forth in the Amended Complaint would be a pointless exercise at this stage of the case and would do nothing to facilitate the Court's resolution of the matter at hand." (Resp. Mot. Dismiss 6) Therefore, Plaintiff has instead filed an eight-page discussion of federal pleading standards and urges this Court to rely upon his extensive Amended Complaint in support of denial of Defendants' Motion.

### I. 42 U.S.C. § 1983: Violation of Procedural Due Process

Plaintiff first claims that he was entitled to due process regarding the disciplinary hearing because Defendants' actions were conducted under color of state law and

their action of suspending Plaintiff deprived him of his constitutionally-protected property interest in his continued enrollment in the University, as well as future educational opportunities, employment opportunities, and his "good name and reputation." (Am.Compl.¶¶ 109–113)

Preliminarily,

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV. To state a due process claim under § 1983, [a plaintiff] must identify a "recognized 'liberty or property' interest within the purview of the Fourteenth Amendment, and [show] that [they were] intentionally or recklessly deprived of that interest, even temporarily, under color of state law." *Griffith v. Johnston,* 899 F.2d 1427, 1435 (5th Cir.1990) (citations omitted), *cert. denied,* 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991).

*Anspach v. City of Philadelphia,* 503 F.3d 256, 262 (3d Cir.2007).

Defendants do not dispute the fact that Temple University and its professors are state actors. *Manning v. Temple Univ.,* No. 03–4012, 2004 U.S. Dist. LEXIS 26129, at *19, 2004 WL 3019230 (E.D.Pa.2004) (citing *Molthan v. Temple Univ.,* 778 F.2d 955, 961 (3d Cir.1985)), *aff'd,* 171 Fed. App'x 509 (3d Cir.2005). It is also true that a student's interest in pursuing or continuing an education is included within the Fourteenth Amendment's protection of liberty and property and is therefore entitled to some level of due process. *Goss v. Lopez,* 419 U.S. 565, 574, 95 S.Ct. 729, 42 L.Ed.2d 725 (U.S.1975). *See also Gorman v. Univ. of Rhode Island,* 837 F.2d 7, 12 (1st Cir.1988) (relying on *Goss* to find that a student has a protected property interest in continuing education); *Ross v. Pennsylvania State Univ.,* 445 F.Supp. 147, 152 (M.D.Pa.1978) (stating that under Pennsylvania law, a graduate student has a property interest protected by procedural due process in the continuation of her course of study). Moreover, the Supreme Court has also recognized a liberty interest and the need for procedural due process, "where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him." *Goss,* 419 U.S. at 574–75.

**\*8** In addition to establishing deprivation of a property interest, Plaintiff's averments must demonstrate that the procedural safeguards surrounding his suspension were

Osei v. Temple University of Commonwealth System of..., Not Reported in...
Case 4:19-cv-01234-MWB Document 11-1 Filed 07/21/19 Page 61 of 73
2011 WL 4549609

inadequate. *Manning,* No. 03–4012, 2004 U.S. Dist. LEXIS 26129, at ——21–22, 2004 WL 3019230 (citing *Bd. of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 33 L.Ed.2d 548 (U.S.1972)). According to *Segal v. Temple Univ. Sch. of Law,* No. 99–3220, 1999 U.S. Dist. LEXIS 19073, 1999 WL 1210838 (E.D.Pa.1999), "Universities like Temple are entitled to establish their own rules and regulations, including disciplinary proceedings, and the courts should interfere only where it is clear that Constitutional rights have been infringed." *Id.* at *4 (citing *Esteban v. Cent. Mo. State Coll.,* 415 F.2d 1077, 1090 (8th Cir.1969)). The basic elements of due process in the school disciplinary setting require that a student facing suspension be given some type of notice and an opportunity to be heard by a fair and impartial tribunal before any deprivation of life, liberty, or property may occur. *Goss,* 419 U.S. at 579. *See also Sill v. Pa. State Univ.,* 462 F.2d 463, 469 (3d Cir.1972) (noting that the procedure required to afford due process of law is not of a fixed and invariable character but instead, "the requirements of due process frequently vary with the type of proceeding involved.") Beyond the minimum requirements, courts generally look to the particular situation to determine which procedures and safeguards the situation demands. *See e.g., Gorman,* 837 F.2d at 14 (finding "[b]eyond the right to notice and hearing, the span of procedural protections required to ensure fairness becomes uncertain, and must be determined by a careful weighing or balancing of the competing interests implicated in the particular case.")

Inasmuch as the instant suspension was for a period exceeding ten days ...

The Court will apply the general procedural due process factors set forth in *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1975): First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substantive procedural requirement would entail.

*G.C. v. Bristol Twp. Sch. Dist.,* No. 05–4800, 2006 U.S. Dist. LEXIS 56108, at *8, 2006 WL 2345939 (E.D.Pa. Aug. 10, 2006).

In specifically addressing due process in university disciplinary settings, the Third Circuit has held that there is no specific format the proceedings must follow, as long as the university provides sufficient due process protections. *Sill,* 462 F.2d at 469–70. Recently, this Court applied the three factors articulated in *Mathews* and reiterated the need for a fair and impartial tribunal in the university setting. *Furey v. Temple,* 730 F.Supp.2d 380, 395 (E.D.Pa.2010). In *Furey,* a full-time undergraduate Temple University student alleged violation of his procedural due process rights after the university disciplinary panel recommended that he be expelled for violations of the Code of Conduct. [5] *Id.* at 382. Although the court found that departing from the Code of Conduct, preventing a right to counsel, preventing witness cross-examination, and the panel's failure to examine certain evidence could be considered due process violations *in certain situations,* they were not instrumental requirements of procedural due process in the student disciplinary context. *Id.* at 396. Instead, only "significant and unfair departures from an institution's own procedures can amount to a violation of due process." *Id.* at 396–97 (citing *Winnick v. Manning,* 469 F.2d 545, 550 (2d Cir.1972)). In addressing the right to counsel and cross-examination of witnesses, the court found that neither are usually considered a necessary part of due process in the student disciplinary context, however "if an institution decides not to allow counsel or cross-examination to avoid an adversarial hearing, it must make sure that the hearing it does provide is fair and impartial." *Id.* at 398.

[5]     The disciplinary proceedings against Furey stemmed from his arrest for an altercation with a police officer within 500 yards of the Temple University campus and therefore involved a criminal charge component, which is absent from the instant case.

**\*9** In the present case, Defendants concede that Plaintiff was entitled to due process protections in connection with his disciplinary hearing. The dispute arises over exactly *what level* of protection was necessary to satisfy due process under the 14th Amendment. Plaintiff argues that the procedures afforded to him were insufficient because he did not receive adequate notice of the charges against

him, he was not given adequate opportunity to prepare to meet those charges, he had no right to be represented or heard by counsel, he had no right to confront his accusers, he had no right to cross-examine witnesses, he was not judged by a fair and impartial tribunal, and the University departed from the "usual practice" routinely utilized in the disciplinary proceedings. (Am.Compl.¶ 115) However, Defendants maintain that the procedures utilized in Plaintiff's case satisfied the minimum requirements of due process in a university setting because they provided Plaintiff with notice and an opportunity to be heard. (Mot. to Dismiss 7)

### a. Adequate Notice

As discussed above, due process requires that a student have adequate notice of the charges pending against him. In this case, Plaintiff's Amended Complaint clearly demonstrates that he was given both formal and informal notice of the charges against him. First, the Temple University Campus Police informed Plaintiff that although criminal charges were not being filed against him, a disciplinary hearing would be held by the University Disciplinary Committee. (Am.Compl.¶ 45) On January 10, 2010, Plaintiff was informed that his formal grievances were "placed on hold" because of pending disciplinary proceedings. (Am.Compl.¶¶ 47–48) Most importantly, on January 12, 2010, Plaintiff received formal written notice of the charges against him, including the specific section of the Code of Conduct he was charged with violating, a quote from the allegedly threatening e-mail sent to Dr. Krow, and instructions regarding the scheduling of a pre-hearing meeting with a program coordinator. (Am.Compl.¶¶ 49–52) Furthermore, after attending the pre-hearing meeting on January 28, 2010, Plaintiff received another e-mail from Temple stating that the actual hearing would be held on February 3, 2010. The e-mail also disclosed the identity of the Chair of the hearing, and the witnesses the University planned to call at the hearing. (Am.Compl.¶¶ 54–55)

Plaintiff's due process claim is based largely on the fact that he was not informed of an additional witness the University intended to call until the day before his hearing, and that he was not given copies of the two additional e-mails referenced by the panel until the day of the hearing. (Am. Compl. at ¶¶ 56–58) Despite the fact that Plaintiff did not have the complete witness list or a complete list of the e-mails that would be referenced, Plaintiff was clearly on reasonable notice of the charges pending against him. *See e.g., Van Le v. Univ. of Med. & Dentistry,* 379 Fed. App'x 171, 175 (3d Cir.2010) (finding notice adequate despite the introduction of

evidence of other related incidents, because the student was aware of the other information).

**\*10** As for Plaintiff's claims that he did not have an adequate opportunity to prepare for the pending charges, there is no allegation that he ever requested a continuance or a delay to have more time to prepare for the hearing, or that Temple would not have granted a delay, had they known Plaintiff did not feel adequately prepared. *See e.g., Furey v. Temple Univ.,* 730 F.Supp.2d at 398 (declining to grant summary judgment in favor of University because the denial of continuance to locate witnesses may raise a question in due process under certain circumstances); *Van Le,* 379 Fed. App'x at 174 (finding several days to prepare a defense adequate because it was undisputed that student was educated and capable).

In view of the foregoing, the notice afforded to Plaintiff was adequate.

### b. Opportunity to Be Heard, Including the Right to Counsel, Right to Confront Accuser & Right to Cross–Examination

In the university disciplinary context, the right to counsel, the right to confront witnesses, and the right to cross-examine witnesses generally have not been deemed necessary elements of due process of law. *Furey,* 730 F.Supp.2d at 397. *See also Flaim v. Med. Coll. of Ohio,* 418 F.3d 629, 636 (6th Cir.2005) (applying *Goss* and *Mathews* and concluding that counsel was unnecessary for hearings that are "not procedurally complex and that cross-examination would have added no value" to the proceeding.); *Murakowski v. Univ. of Del.,* 575 F.Supp.2d 571, 585 (D.Del.2008) (recognizing "the right to a hearing does 'not imply that a full-dress judicial hearing, with the right to cross-examine witnesses, is required.' Due process is satisfied 'by way of adequate notice, definite charge, and a hearing with opportunity to present one's own side of the case and with all necessary protective measures.' ") (quoting *Esteban v. Central Missouri State College,* 415 F.2d 1077, 1089 (8th Cir.1969)).

Preliminarily, this Court notes that an attorney did accompany Plaintiff to the hearing as his "advisor." (Am.Compl.¶ 57) That aside, Plaintiff was not facing any criminal charges for the e-mails to Dr. Krow, and he was assured of that fact when he inquired with the Temple Police Department. (Am.Compl.¶ 45) There is no allegation that the hearing involved any procedurally complex issues that would require the presence of counsel or additional protections, nor did counsel represent the University at the hearing. Furthermore,

Osei v. Temple University of Commonwealth System of..., Not Reported in...
Case 4:19-cv-01234-MWB Document 11-1 Filed 07/21/19 Page 63 of 73
2011 WL 4549609

Plaintiff was given formal written notice of the charges against him, he scheduled and attended a pre-hearing meeting to discuss the actual hearing, and was able to speak in his own defense and submit character letters to rebut the charges. (Am.Compl.¶¶ 49, 52, 57, 72, 74) The procedures utilized in this case provided Plaintiff with adequate due process protections, despite his inability to cross-examine Dr. Krow or other University witnesses, since he was able to submit his own evidence, give his side of the story, and submit a timely appeal. *See e.g., Tasby v. Estes,* 643 F.2d 1103, 1106 (5th Cir.1981) ( "rights in a student disciplinary hearing may properly be determined upon the hearsay evidence of school administrators who investigate disciplinary infractions."); *Murakowski,* 575 F.Supp.2d at 584–87 (finding due process satisfied despite the fact that the hearing officer relied on double hearsay because the student was given "adequate notice of the charge and grounds, the opportunity to participate in the hearing, and an opportunity to present one's own side of the case through his own statements and statements of witnesses.").

### c. *Impartial Tribunal*

**\*11** Plaintiff further claims that he was denied due process because he was "judged" by Dr. Luehrmann. In making this claim, he alleges that by inviting a faculty member (Dr. Luehrmann) who was not associated with the school in which Plaintiff was enrolled, the University departed from its Code of Conduct, which in turn deprived him of his right to procedural due process. (Am.Compl.¶ 115(g)-(h))

In *Furey,* the Third Circuit addressed Temple University's departure from the student Code of Conduct and concluded that a school's failure to follow its own policies is not, in itself, a violation of due process but instead, only *significant and unfair departures* can amount to a violation. *Id.* 730 F.Supp.2d at 396–397 (citing *Winnick v. Manning,* 460 F.2d 545, 550 (2d Cir.1972) (emphasis added). In Plaintiff's case, the University did acknowledge that their usual practice was to ask for a recommendation from the school the student was attending, but also stated that the practice was not set forth in the Student Code of Conduct. (Am.Compl.¶ 77) In fact, Plaintiff does not cite to any specific provision of the Code regarding this particular allegation. Even if Plaintiff could prove that it was the official policy of the University to obtain recommendations from a faculty member who is associated with the college or school in which the student is enrolled, the departure could hardly be classified as a "significant" or "unfair" departure, as Plaintiff was enrolled in courses at the College of Science and Technology, where Dr. Luehrmann

served as the Associate Dean. (Am.Compl.¶ 78) Given all the protections discussed above, the University's departure from its "usual practice" does not amount to a deprivation of due process.

Plaintiff further alleges that Dr. Luehrmann already had pre-conceived notions about him and displayed animosity toward him, therefore allowing her to testify, "judge," and recommend sanctions, deprived him of a fair and impartial panel. (Am.Compl.¶ 115.) Specifically, Plaintiff complains of personal knowledge Dr. Leuhrmann possessed regarding other conduct for which Plaintiff was not charged. (Am.Compl.¶ 115)

There is a presumption of fairness in administrative proceedings which favors administrators and "alleged prejudice of university hearing bodies must be based on more than mere speculation and tenuous inferences." *Gorman,* 837 F.2d at 15 (citing *Duke v. North Texas State Univ.,* 469 F.2d 829, 834 (5th Cir.1972). *See also Van Le,* 379 Fed. App'x at 174 (due process was not violated by consideration of past instances); *Manning,* 2004 U.S. Dist. LEXIS 26129, at ——22–23, 2004 WL 3019230 ("Procedural safeguards are adequate if the student is notified of her impending dismissal, if the student can engage in an 'informal give-and-take' with the administrative body dismissing her, and if the decision to dismiss the student is 'careful and deliberate.' ") (quoting *Bd. of Curators of the Univ. of Mo. v. Horowitz,* 435 U.S. 78, 84–85, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978)).

**\*12** Plaintiff's Amended Complaint makes the bald assertion that Dr. Leuhrmann participated in the hearing as a judge when in fact, all other relevant allegations within said Complaint demonstrate otherwise. Clearly, Dr. Luehrmann's testimony was used for the same purpose as Plaintiff's: fact-finding. Moreover, although Dr. Luehrmann made a recommendation of sanction, *the Board declined to follow same and instead, imposed a less harsh sanction.* (Am.Compl.¶¶ 84–87) Under the circumstances, Dr. Leuhrmann's participation in the process did not violate Plaintiff's right to a fair and impartial proceeding. *See e.g., Manning,* 2004 U.S. Dist. LEXIS 26129, at \*24, 2004 WL 3019230 (finding that a professor's double role as advocate and member of the dismissal committee did not constitute a violation of procedural due process because the final arbiter was made fully aware of "any potential taint in the proceeding" and was able to weigh the professor's actions against the evidence, and the decisions of the committee were "only advisory to him). The fact that Plaintiff had

Case 4:19-cv-01234-MWB Document 11-1 Filed 07/21/19 Page 64 of 73

Osei v. Temple University Of Commonwealth System Of..., Not Reported in...

2011 WL 4549609

previous interactions with Dr. Luehrmann is also insufficient to overcome the presumption of fairness in the disciplinary proceedings. *See e.g., Gorman,* 837 F.2d at 15 (finding that "in the intimate setting of a college or university, prior contact between the participants is likely, and does not per se indicate bias or partiality"); *Alex v. Allen,* 409 F.Supp. 379, 388 (W.D.Pa.1976) (stating that "to a certain extent, the federal courts must rely on the discretion, honor, and good judgment of school officials. The only alternative is to accord a right to appeal all suspensions to the federal courts—a process which would overwhelm the already crowded court dockets.") Just as importantly, the other protections afforded to Plaintiff during the proceeding, including his ability to have counsel present, the opportunity to rebut the testimony of the witnesses, and the holding of his sanction in abeyance pending appeal, all demonstrate the existence of adequate due process protection in a university disciplinary setting.

#### d. *Mathews Factors*

In sum, even after accepting all of the factual allegations in Plaintiff's Amended Complaint as true, Plaintiff has failed to allege sufficient facts to support the inference that Defendants violated his right to due process in connection with his disciplinary hearing and ultimate suspension. Plaintiff did have a private interest in pursuing his education, which was affected by the suspension. However, this Court finds no "erroneous deprivation" of said interest by reason of the procedures utilized by Defendants. Instead, based upon the averments set forth in Plaintiff's Amended Complaint, it is quite apparent that under the circumstances, Plaintiff was afforded additional procedural safeguards. Moreover, by his own admission, Plaintiff conceded that the "intended" use of the words contained within his e-mails to Dr. Krow might not have come across properly and he apologized for the troublesome nature of the language. (Am.Compl.¶¶ 72–73) As such, the University can hardly be faulted for upholding its interest in maintaining what it perceived to be a potential threat to the safety of its faculty. Additionally, inasmuch as this matter did not involve criminal charges, the University should not be expected to incur the cost of conducting an unnecessary and more formal adversarial proceeding.

**\*13** Accordingly, Count I of Plaintiff's Amended Complaint shall be dismissed.

#### ii. Violation of Substantive Due Process Claim

Plaintiff next avers that by enacting and enforcing Section 3 of the Student Code of Conduct, which prohibits "any

act or threat of intimidation or physical violence toward another person including actual or threatened assault and battery," Defendants committed an arbitrary and deliberate abuse of law because Section 3 unjustifiably restricts and impairs the fundamental rights of freedom of expression and association of all the students. (Am.Compl.¶¶ 121–22) Plaintiff further asserts that Section 3 is vague and overbroad in its scope. (Am.Compl.¶¶ 123–24) Defendants rebut these claims, arguing that Section 3 does not impair the fundamental right to freedom of speech because it only regulates "true threats," which are not protected by the First Amendment. (Mot. to Dismiss 14–15)

The Fourteenth Amendment's guarantee of "due process of law" includes a substantive component, which forbids the government from infringing upon certain "fundamental" liberty interests unless the infringement is narrowly tailored to serve a compelling state interest. *Reno v. Flores,* 507 U.S. 292, 301–302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (U.S.1993). Additionally,

> When a plaintiff challenges a non-legislative state action (such as an adverse employment decision), [the court] must look, as a threshold matter, to whether the property interest being deprived is "fundamental" under the Constitution. If it is, then substantive due process protects the plaintiff from arbitrary or irrational deprivation, regardless of the adequacy of procedures used. If the interest is not "fundamental," however, the governmental action is entirely outside the ambit of substantive process and will be upheld so long as the state satisfies the requirements of procedural due process.

*Nicholas v. Pennsylvania State Univ.,* 227 F.3d 133, 142 (3d Cir.2000). *See also, Manning,* 2004 U.S. Dist. LEXIS 26129, at \*20–21, 2004 WL 3019230 (substantive due process rights prohibit those acting under color of state law from taking away a person's property interest for reasons that are "arbitrary, irrational, or tainted by improper motive.").

Osei v. Temple University of Commonwealth System of..., Not Reported in...

2011 WL 4549609

Case 4:19-cv-01234-MWB   Document 11-1   Filed 07/21/19   Page 65 of 73

Accordingly, in order for Plaintiff to state a meritorious claim for violation of substantive due process, he must first establish that the speech regulated in Section 3 of the Code of Conduct is protected by the First Amendment, and is therefore considered a fundamental right under the Constitution. Plaintiff must then demonstrate that the deprivation of the right was arbitrary or capricious.

**a. Freedom of Speech**

It is undisputed that the First Amendment's freedom of speech and association is considered a fundamental right inside and outside of school. *See e.g., Tinker v. Des Moines Indep. Cnty. Sch. Dist.,* 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). To that end,

> The Supreme Court has held time and again, both within and outside of the school context, that the mere fact that someone might take offense at the content of speech is not sufficient justification for prohibiting it." *Saxe,* 240 F.3d at 215, 240 F.3d at 215; *see Papish,* 410 U.S. at 670; *Tinker,* 393 U.S. at 509; *Sypniewski,* 307 F.3d at 259 n. 16. While "[t]he precise scope of *Tinker's* interference with the rights of others' language is unclear" it is "certainly not enough that the speech is merely offensive to some listener." *Saxe,* 240 F.3d at 217, 240 F.3d at 217.

**\*14** *McCauley v. University of the Virgin Islands,* 618 F.3d 232, 251 (3d Cir.2010).

However, it is equally undisputed that the right of free speech "is not absolute" and certain classes of speech may be regulated, or even punished, by government without violating the Constitution. *Chaplinsky v. New Hampshire,* 315 U.S. 568, 571, 62 S.Ct. 766, 86 L.Ed. 1031(1942). Specifically, speech that is "likely to cause or inflict unacceptable harm" such as "true threats," shall not be protected by the First Amendment. *Murakowski v. Univ. of Del.,* 575 F.Supp.2d at 588–89 (citing *Watts v. United States,* 394 U.S. 705, 708, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969)). *See also Saxe v. State College Area Sch. Dist.,* 240 F.3d 200, 206 (3d Cir.2001) ("there is no question that non-expressive, physically harassing conduct is entirely outside the ambit of the free speech clause.").

As Defendants correctly note, the Supreme Court has defined "true threats" as follows:

"True threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. *See Watts v. United States, supra,* at 708 ("political hyberbole" is not a true threat); *R.A.V. v. City of St. Paul,* 505 U.S., at 388. The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats "protects individuals from the fear of violence" and "from the disruption that fear engenders," in addition to protecting people "from the possibility that the threatened violence will occur." *Ibid.* Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.

*Virginia v. Black,* 538 U.S. 343, 359–360, 123 S.Ct. 1536, 155 L.Ed.2d 535 (U.S.2003).

In *Lovell v. Poway Unified Sch. Dist.,* 90 F.3d 367 (9th Cir.1996), a 10th grade student was suspended after she allegedly threatened to shoot a school guidance counselor because she could not effectuate changes to her class schedule. *Id.* at 368. The court concluded that:

> Threats of physical violence are not protected by the First Amendment under either federal or state law, and as a result, it does not matter to our analysis that [Plaintiff] uttered her comments while at school. To resolve the federal claim, we need not rely upon the Supreme Court cases that limit students' free speech rights; because we hold that **threats such as [Plaintiff's] are not entitled to First Amendment protection in any forum,** it does not matter that the statement was made by a student in the school context. Thus, our analysis focuses upon whether [the School District] could punish [Plaintiff] based on her statement, without violating her First Amendment free speech rights,

regardless of whether the conduct occurred on or off campus.

*Lovell,* 90 F.3d at 371 (emphasis added).

In order to make this determination, the court employed the following standard:

> **\*15** We have set forth an objective test for determining whether a threat is a "true threat" and, thus, falls outside the protection of the First Amendment: "whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault." *United States v. Orozco–Santillan,* 903 F.2d 1262 (9th Cir.1990). Furthermore, "alleged threats should be considered in light of their entire factual context, including the surrounding events and the reaction of the listeners." *Id.*

*Id.* at 372.

Applying this standard, it was ultimately determined that a reasonable person in the student's position would have foreseen that the counselor would interpret the statement, "If I don't get this schedule change, I am going to shoot you," as a serious expression of intent to harm or assault. *Id.*[6]

[6]   This standard has in fact been applied in a University setting by our sister court in Delaware. *See Murakowski,* 575 F.Supp.2d 571 at 590.

In the present case, several e-mail statements are at issue. Namely, "It will be a curse against your life and family forever ... you are free if you make a mends [sic]," "I want justice on you physically and spiritually," and "Your game is over mine begins, you played with the wrong person this time." As noted hereinabove, Section 3 forbids "acts or threats of intimidation or physical violence toward another person." This Court finds that the University properly determined that the contents of Plaintiff's e-mails constituted "true threats," as any reasonable person in Plaintiff's position should have foreseen that Dr. Krow would interpret these statements as a serious intent to inflict harm. The University was further justified in categorizing Plaintiff's speech as a "true threat," given the conditional nature of the statements, the fact that Plaintiff directly contacted Dr. Krow, the clearly apparent anger displayed by Plaintiff, and the intimidation Dr. Krow

felt, as evidenced by the fact that he forwarded the e-mails to both the department head and University Police.

The University's actions in punishing Plaintiff's speech after looking at the context and determining it constituted a "true threat," cannot be described as arbitrary or capricious. This finding, coupled with those set forth above, clearly establish that the University's actions did not run afoul of Fourteenth Amendment substantive due process.

### iii. Vagueness & Overbreadth

Plaintiff further alleges that Section 3 of the Student Code of Conduct is impermissibly vague and overbroad in its scope because it does not define "intimidation" or "threat of intimidation," and it unnecessarily impairs his freedoms and interests as a student. (Am.Compl.¶¶ 123–124.)

### a. Vagueness

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (U.S.1972). A vague rule "may authorize and even encourage arbitrary and discriminatory enforcement, by failing to 'establish minimal guidelines to govern ... enforcement.' " *Sypniewski v. Warren Hills Reg'l Bd. of Educ.,* 307 F.3d 243, 266 (3d Cir.2002) (quoting *City of Chicago v. Morales,* 527 U.S. 41, 56, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999)).

**\*16** The Third Circuit has declared that the "void for vagueness" rule applies to Codes of Conduct that regulate the behavior of students in the University setting ...

> It is true that a prohibitory law of a state which is so vague as to require speculation as to its meaning runs afoul of the Fourteenth Amendment and that this rule extends to rules regulating the conduct of students in educational institutions chartered or supported by the state. *Soglin v. Kauffman,* 7 Cir.1969, 418 F.2d 163. *See Tinker v. Des Moines, Independent Community School Dist.,* 1969, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731, and *Keyishian v. Board of Regents of*

Osei v. Temple University of Commonwealth System of..., Not Reported in...

2011 WL 4549609

Case 4:19-cv-01234-MWB   Document 11-1   Filed 07/21/19   Page 67 of 73

*New York,* 1967, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629. ***It is also true, however, that codes of conduct prescribed for students by educational institutions are not required to satisfy the same rigorous standards in this regard as are criminal statutes.*** *Soglin v. Kauffman,* 7 Cir.1969, 418 F.2d 163, 168. ***For student discipline is not analogous to criminal prosecution.***

*Sill v. Pennsylvania State University,* 462 F.2d 463, 467 (3d Cir.Pa.1972) (emphasis added). *See also Alex v. Allen,* 409 F.Supp. 379, 384 (W.D.Pa.1976) (noting that "all courts seem to agree that the same specificity is not required in college rules as is necessary in criminal statutes" (citing *Sword v. Fox,* 446 F.2d 1091, 1099 (4th Cir.1971)); *Esteban v. Central Missouri State College,* 415 F.2d 1077, 1089–1090 (8th Cir.Mo.1969) (holding that a college has the power to promulgate regulations and expect that students adhere to the standards of conduct prescribed, and that flexibility and elbow room are preferred over specificity). Thus, a school regulation is not unconstitutionally vague, provided an individual of ordinary intelligence would be on notice that certain behavior could put them at risk for disciplinary action, and would not have to guess at the regulation's meaning and application. *Grayned,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (U.S.1972). Furthermore, school regulations will only be struck down when the vagueness is especially problematic. *Sypniewski,* 307 F.3d at 266. Such is not the case herein.

### b. Overbreadth

A regulation is unconstitutional on its face on overbreadth grounds where there is "a likelihood that the statute's very existence will inhibit free expression" by "inhibiting the speech of third parties who are not before the Court." *Saxe v. State College Area Sch. Dist.,* 240 F.3d 200, 214 (3d Cir.2001) (quoting *Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 799, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)). To render a law unconstitutional, the alleged overbreadth must be "not only real but substantial in relation to the statute's plainly legitimate sweep." *Id.* (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)). The Third Circuit has noted that the overbreadth doctrine may be applied to Student Codes of Conduct in the school setting. *See DeJohn v. Temple Univ.,* 537 F.3d 301,

313 (3d Cir.2008) (striking down Temple University's sexual harassment policy as overbroad because the Policy "punished speech that merely intends to harass.").

**\*17** However, in *Furey v. Temple University,* 730 F.Supp.2d 380, 395 n. 15 (E.D.Pa.2010), our District determined that any allegation that Section 3 of Temple University's Student Code of Conduct was unconstitutionally vague and overbroad on its face would fail because "Codes of Conduct for students do not have to satisfy the same standards for clarity as criminal statutes." *Id.* [7]

[7]    The court did not elaborate on the issue because the Plaintiff failed to properly raise it in his Complaint. However, the court's ultimate finding is pertinent to the instant action.

Section 3 of the Student Code of Conduct directly states that the prohibited conduct includes "act or threats of intimidation," and sufficiently puts students on notice of the prohibited conduct. For purposes of further clarification, the Code provides an example of the prohibited conduct by adding the phrase, "including actual or threatened assault and battery." (Am.Compl.¶ 122) Accordingly, Plaintiff's vagueness an overbreadth challenges lack merit and Count II of his Amended Complaint must be dismissed.

### iv. First Amendment

#### a. Retaliation

Next, Plaintiff alleges that his suspension was in reaction to the mass e-mail he sent to other students and that Dr. Luehrmann's recommendation and sanctions were in retaliation for said e-mails, as well as other protected speech. (Am.Compl.¶ 132)

To sustain an action for retaliation under the First Amendment, Plaintiff must prove that his constitutionally protected conduct was a "substantial" or "motivating factor" in the University's decision to suspend him. *See Nicholas v. Pennsylvania State Univ.,* 227 F.3d 133, 144 (3rd Cir.2000) (citing *Mt. Healthy Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (U.S.1977)). *See also Furey v. Temple Univ.,* 730 F. Supp 2d at 401 ("In order to maintain a retaliation claim, a plaintiff must show the exercise of a constitutionally protected activity and that the activity was a substantial factor in the alleged retaliatory action.") (citing *Hill v. City of Scranton,* 411 F.3d 118, 125 (3rd Cir.2005)). However, a defendant is able to defeat a First Amendment

Osei v. Temple University of Commonwealth System of..., Not Reported in...

Case 4:19-cv-01234-MWB    Document 11-1    Filed 07/21/19    Page 68 of 73

2011 WL 4549609

retaliation claim by demonstrating that they would have taken the same actions in the absence of the protected speech. *Kovac v. Pa. Tpk. Comm'n,* No. 10–4730, 2011 U.S.App. LEXIS 18960, at *6, 2011 WL 4037420 (3d Cir.Pa. Sept. 13, 2011).

In applying the standard to the present case, Plaintiff has failed to adequately satisfy the second factor, as he has not pled sufficient facts that could demonstrate that the suspension was motivated by the mass e-mails. Plaintiff sent the mass e-mails to the students on December 18, 2009, prior to sending the series of "threatening" e-mails to Dr. Krow, which didn't begin until December 20, 2009. (Am.Compl.¶¶ 24–27) Plaintiff was warned by the Police department to stop e-mailing Dr. Krow only after sending his December 22, 2009 e-mail directly to Dr. Krow, and in his meeting with Dr. Levis and Dr. Strongin, Dr. Levis only referenced the allegedly "threatening" e-mails that were sent to Dr. Krow and made no mention of the mass-emails sent to the students. (Am.Compl.¶¶ 38–44) Furthermore, the Notice of Disciplinary Action specifically cited "threatening emails to Dr. Grant Krow in reference to receiving a poor grade" as the basis for the disciplinary hearing. (Am.Compl.¶ 51) Similarly, the two additional e-mails that were handed to Plaintiff prior to the hearing were those which Plaintiff sent directly to Dr. Krow. (Am.Compl. ¶ 58) The only time that the mass e-mails were even mentioned, was when Dr. Luehrmann recommended sanctions against Plaintiff, and even then, the University declined to follow her recommendation. (Am.Compl.¶ 85) Assuming *arguendo* that the University had decided to follow Dr. Luehrmann's recommendation, none of the facts alleged in Plaintiff's Amended Complaint support the inference that the mass e-mails were a "substantial" or "motivating factor," which is required to sustain a First Amendment retaliation claim. Accordingly, Plaintiff's First Amendment retaliation claim on this basis fails.

### b. Discrimination

**\*18** In addition to his allegations regarding the mass e-mails, Plaintiff further alleges that he was discriminated against on the basis of points of view expressed in the content of his protected speech. (Am.Compl.¶ 133)

A regulation is considered content-based, and subject to strict scrutiny, when speech or expressive content is proscribed because of the disapproval of the ideas expressed. *See e.g., R.A. V. v. St. Paul,* 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (U.S.1992) (finding an ordinance facially unconstitutional because it only restricted "fighting words" that "insult or provoke violence on the basis of race,

color, creed, or gender," and "fighting words" connected with other ideas were not covered). On the other hand, "content-neutral" speech restrictions proscribe classes of speech without reference to the content of the regulated speech. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 771, 96 S.Ct. 1817, 48 L.Ed.2d 346 (U.S.1976). Section 3 of the Code in this case makes no reference to any content-based criteria; it references acts or threats or intimidation or physical violence toward another person. As such, said provision must therefore be considered content-neutral.

In view of the foregoing, Plaintiff's various allegations of First Amendment violations. Plaintiff's Amended Complaint clearly demonstrates that the "threatening" e-mails he sent to Dr. Krow were the "motivating factor" that led to his suspension; not the mass e-mails. Furthermore, Section 3 of the Code is a content-neutral regulation that does not implicate constitutionally-protected speech and is justified by the University's interests in keeping their students and faculty safe from threats of physical violence. Accordingly, Count III of Plaintiff's Complaint must be dismissed.

### v. 42 U.S.C. § 1981: Intentional Discrimination on the Basis of Race or National Origin

Plaintiff next alleges that all of the defendants, individually and collectively, intentionally discriminated against him on the basis of his race (African), and national origin (Republic of Ghana) in the assessment, institution, investigation, prosecution, and imposition of sanctions during the disciplinary proceeding. (Am.Compl.¶ 139) Furthermore, Plaintiff alleges that said Defendants denied him the enjoyment of the rights and reasonable expectations of a student because of his race and national origin, and because of suspicion and mistrust of his motivations based on false stereotypes concerning his cultural and moral background. (Am.Compl.¶ 139)

As the court in *Manning v. Temple Univ.,* 2004 U.S. Dist. LEXIS 26129, 2004 WL 3019230 (E.D.Pa. Dec. 30, 2004) recognized,

> In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the United States Supreme Court outlined the formula for making out a prima facie case of race discrimination in employment. ***This formula has been adapted for the educational context*** and requires the plaintiff to prove that "(1) she is a member of a protected class; (2) she suffered

Osei v. Temple University of Commonwealth System Of..., Not Reported in...

Case 4:19-cv-01234-MWB Document 11-1 Filed 07/21/19 Page 69 of 73

2011 WL 4549609

an adverse action at the hands of the defendants in her pursuit of her education; (3) she was qualified to continue in her pursuit of her education; and (4) she was treated differently from similarly situated students who are not members of the protected class." *Bell v. Ohio State Univ.,* 351 F.3d 240, 252–53 (6th Cir.2003).

**\*19** *Id.* at \*15 (emphasis added).

In the instant case, Plaintiff has failed to allege *any* facts supporting an inference that Defendants discriminated on the basis of race or national origin. Plaintiff's Amended Complaint is similarly devoid of *any* facts that could establish an intent to discriminate by Defendants, which is a required element of the § 1981 claim. Plaintiff's allegation is nothing more than a bald accusation of race or national origin discrimination that cannot be sustained. Accordingly, Count IV of Plaintiff's Amended Complaint shall be dismissed.

### vi. 42 U.S.C. § 1985(3): Conspiracy to Deprive Civil Rights

The Fifth Count of Plaintiff's Complaint alleges that all Defendants, "conspired to deprive him of the due process and equal protection of the laws and/or his other civil rights and engaged in acts in furtherance of the conspiracy, which resulted in injury to him," in violation of 42 U.S.C. § 1985(3). (Am.Compl.¶ 141)

42 U.S.C. § 1985(3) provides a remedy against those who conspire to deprive another of his or her civil rights. [8] In order to state a claim under § 1985(3), a plaintiff must adequately allege four elements:

[8]     The statute reads in relevant part:
        If two or more persons ... conspire ... for the purpose
        of depriving, either directly or indirectly, any person
        or class of persons of the equal protection of the
        laws, or of equal privileges and immunities under
        the laws ... the party so injured or deprived may have
        an action for the recovery of damages occasioned by
        such injury or deprivation, against any one or more
        of the conspirators.
        42 U.S.C. § 1985(3).

(1) [A] conspiracy; (2) motivated by a racial or class-based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to the person or

property or the deprivation of any right or privilege of a citizen of the United States.

*Herring v. Chichester Sch. Dist.,* No. 06–5525, 2007 U.S. Dist. LEXIS 82571, at ——33–34, 2007 WL 3287400 (E.D.Pa. Nov. 6, 2007) (citing *Lake v. Arnold,* 112 F.3d 682, 685 (3d Cir.1997)).

"A conspiracy claim based upon § 1985(3) requires a clear showing of invidious, purposeful and intentional discrimination between classes or individuals." *Robinson v. McCorkle,* 462 F.2d 111 (3d Cir.1972). *See also Farber v. City of Paterson,* 440 F.3d 131, 135 (3d Cir.2006) (explaining that the second element of § 1985(3) requires "a plaintiff to allege both that the conspiracy was motivated by discriminatory animus against an identifiable class and that the discrimination against the class was invidious.") (citing *Aulson v. Blanchard,* 83 F.3d 1, 4–5 (1st Cir.1996)). "To withstand a motion to dismiss, a Complaint alleging a civil rights conspiracy should identify with particularity the conduct violating plaintiff's rights, the time and place of the actions, and the people responsible therefor." *Boddorff v. Publicker Indus. Inc.,* 448 F.Supp. 1107, 1112 (E.D.Pa.1980) (citing *Hall v. Pa. State Police,* 570 F.2d 86 (3rd Cir.1978)). In this case, Plaintiff's Amended Complaint lacks any specific allegations of a conspiracy amongst the defendants, but instead, claims only that "all of the defendants have conspired to deprive [him] of the due process and equal protection of the laws." (Am.Compl.¶ 141) "Courts have nearly unanimously required more than conclusory allegations of deprivations of constitutional rights." *Robinson,* 462 F.2d at 113 (collecting cases). *See also Herring,* 2007 U.S. Dist. LEXIS 82571 at \*32, 2007 WL 3287400 (finding that the Plaintiff's § 1985(3) claim must be dismissed because it contained nothing more than conclusory statements that the defendants conspired, without alleging any facts to demonstrate a conspiracy).

**\*20** Since Plaintiff has failed to allege the first prong of the § 1985(3) claim regarding specific averments of a conspiracy, this Court need not assess the remaining elements of the claim and Count V of Plaintiff's Amended Complaint is accordingly dismissed.

### vii. 42 U.S.C. § 1986: Neglect to Prevent Conspiracy

Next, Plaintiff alleges that all of the Defendants violated § 1986 [9], in that "they all had knowledge that the wrongs conspired to be done were about to be committed, had the power to prevent or to aid in preventing the commission of the same and neglected to do so, even though the wrongs which

Osei v. Temple University of Commonwealth System of..., Not Reported in...

2011 WL 4549609

Case 4:19-cv-01234-MWB   Document 11-1   Filed 07/21/19   Page 70 of 73

were committed could have been prevented by the exercise of reasonable diligence." (Am.Compl.¶ 143)

9    42 U.S.C. § 1986 provides in pertinent part that:

     Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in the preceding section [42 U.S.C. § 1985], are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented ...

"Because transgressions of § 1986 by definition depend on a preexisting violation of § 1985, if the claimant does not set forth a cause of action under the latter, its claim under the former necessarily must fail also." *Rogin v. Bensalem Township,* 616 F.2d 680, 696 (3d Cir.1980). *See also Grimes v. Smith,* 776 F.2d 1359, 1363 n. 4 (7th Cir.1985) ("Liability under § 1986 is derivative of § 1985(3) liability; without a violation of § 1985(3), there can be no violation of § 1986."); *Koorn v. Lacey Twp.,* 78 Fed. App'x 199, 208 (3d Cir.2003) ("Without a cognizable § 1985(3) claim, a claim for violation of § 1986 must also fail").

Accordingly, since Plaintiff has failed to adequately allege a conspiracy under § 1985(3), his § 1986 claim is rendered moot.

### viii. Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d

In Count Seven of his Amended Complaint, Plaintiff alleges that Temple University engaged in intentional discrimination against him on the basis of race and/or national origin, in violation of 42 U.S.C. § 2000d. (Am.Compl.¶ 147)

In *Manning,* the plaintiff alleged race discrimination claims against all defendants in violation of 42 U.S.C. § 1981, Title

VI of Civil Rights Act 42 U.S.C. § 2000d, and Pennsylvania state laws. *Id.* at *14. The court held that "whether a plaintiff has made out a claim for racial discrimination is essentially the same whether the claim is brought under § 1981, Title VI or the PHRA." *Id. See also Pryor,* 288 F.3d at 569 (3d Cir.2002) (stating that the standard for establishing an "intent to discriminate on the basis of race is identical in the Title VI and § 1981 contexts.").

Applying the same standard that was applied when analyzing Plaintiff's § 1981 claim, Count VII of Plaintiff's Amended Complaint must similarly be dismissed.

### ix. Supplemental Jurisdiction

Inasmuch as Plaintiff's Amended Complaint fails to sufficiently allege any federal claim upon which relief can be granted, this Court declines to exercise supplemental jurisdiction over the remaining state claims. *See* 28 U.S.C. § 1367(c)(3) (discretion to decline supplemental jurisdiction when all claims over which court had original jurisdiction have been dismissed).

### IV. Conclusion

**\*21**   For the reasons set forth hereinabove, Counts One through Seven of Plaintiff's Amended Complaint are hereby dismissed with prejudice. Inasmuch as: (1) Plaintiff has already been granted the opportunity to amend his Complaint; (2) Plaintiff has done so, apparently leaving no fact unstated; and (3) further amendment would be futile, the instant dismissal is with prejudice. Additionally, this Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state claims.

An appropriate Order follows.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 4549609

---

2015 WL 1638612
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

Charles JOHNSON, Plaintiff,
v.
Warden EBBERT, Defendant.

Civil No. 3:15–CV–578.
|
Signed April 13, 2015.

**Attorneys and Law Firms**

Charles Johnson, Lewisburg, PA, pro se.

***MEMORANDUM***

EDWIN M. KOSIK, District Judge.

**\*1** Before the court is a Report and Recommendation of Magistrate Judge Karoline Mehalchick filed on March 25, 2015 (Doc. 7), recommending that Plaintiff's Motion for an Emergency Preliminary and Permanent Injunction be denied. For the reasons which follow, we will adopt the Report and Recommendation of the Magistrate Judge. [1]

[1] Because of the nature of the allegations in the Plaintiff's motion, the U.S. Probation Office contacted officials at the Bureau of Prisons about Plaintiff's allegations and was informed that they will look into the matter.

*BACKGROUND*

Plaintiff, Charles Johnson, an inmate confined at the United States Penitentiary, Lewisburg, Pennsylvania, filed an Emergency Preliminary and Permanent Injunction Motion on March 23, 2015. A Memorandum of Law (Doc. 2) was submitted in support of the Motion. In his Motion, Plaintiff raises concerns for his safety from prison officials and other inmates. As relief, Plaintiff requests that he be transferred to a state prison in Missouri, that he be placed in protective custody until the transfer, and that we direct prison officials to cease certain conduct toward Plaintiff. On March 25, 2015, the Magistrate Judge issued a Report and Recommendation (Doc. 7), wherein she recommends that Plaintiff's motion be denied. Specifically, after reviewing the law regarding preliminary injunctive relief and considering the four factors

for granting preliminary injunctive relief, the Magistrate Judge found that no immediate irreparable injury was alleged.

In response to the Report and Recommendation, Plaintiff sent a letter to the Magistrate Judge (Doc. 10), wherein he reiterates the sincerity of his claims and repeats the allegations set forth in his motion. We will construe Plaintiff's letter as Objections to the Report and Recommendation.

*DISCUSSION*

When objections are filed to a Report and Recommendation of a Magistrate Judge, we must make a *de novo* determination of those portions of the Report to which objections are made. 28 U.S.C. § 636(b)(1)(c); *see Sample v. Diecks,* 885 F.2d 1099, 1106 n. 3 (3d Cir.1989). In doing so, we may accept, reject or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. 28 U.S.C. § 636(b)(1); Local Rule 72.3. Although our review is *de novo,* we are permitted by statute to rely upon the Magistrate Judge's proposed recommendations to the extent we, in the exercise of sound discretion, deem proper. *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980); *Goney v. Clark,* 749 F.2d 5, 7 (3d Cir.1984).

After reviewing the Report and Recommendation of the Magistrate Judge, in light of Plaintiff's Objections, we agree with the Magistrate Judge that no immediate irreparable injury is alleged. As the Magistrate Judge points out, the materials submitted by Plaintiff outline nothing more than a speculative possibility of future harm, based upon generalized allegations of threats and harassment. Accordingly, we will adopt the Report and Recommendation of the Magistrate Judge.

***ORDER***

AND NOW, THIS 13th DAY OF APRIL, 2015, IT IS HEREBY ORDERED THAT:

(1) The Report and Recommendation of Magistrate Judge Karoline Mehalchick filed on March 25, 2015 (Doc. 7) is **ADOPTED;**

**\*2** (2) The Plaintiff's Motion for an Emergency Preliminary and Permanent Injunction (Doc. 1) is **DENIED;** and

(3) The above-captioned action is **REMANDED** to the Magistrate Judge for further proceedings.


*REPORT AND RECOMMENDATION*

KAROLINE MEHALCHICK, United States Magistrate Judge.

This matter comes before the Court upon the Plaintiff's Motion for an Emergency Preliminary and Permanent Injunction. (Doc.1). For the reasons stated herein, it is recommended that the motion be denied.

### I. *BACKGROUND*

On March 23, 2015, the Court received the instant Motion for an Emergency Preliminary and Permanent Injunction (Doc. 1), together with a memorandum of law in support of his motion, filed by *pro se* Plaintiff Charles Johnson. (Doc. 2). [1] By this motion, Johnson requests that this Court enter an order directing that he be transferred to a state prison in Missouri and that he be placed in protective custody until such time as he can be transferred to a state facility on the basis that prison officials at USP Lewisburg have verbally threatened him and have encouraged inmates affiliated with the white supremacist movement to assault him. (Doc. 1). Specifically, he argues that a substantial threat of irreparable harm exists because inmates of the white supremacist movement "have a contract hit out on [his] life ... due to [him] being labeled a ... (snitch)." (Doc. 1). Additionally, Johnson alleges that corrections officers have filed false misconduct reports against him. (Doc. 2).

[1]   The Court construes this *pro se* filing as both a motion for a preliminary injunction and a complaint. As such, the Court will not screen the complaint pursuant to its statutory obligation pursuant to 28 U.S.C. § 1915A and 28 USC § 1915(e)(2)until such time as Plaintiff has paid the filing fee or alternatively, submitted the proper forms to proceed *in forma pauperis.*

### II. *DISCUSSION*

Preliminary injunctive relief is extraordinary in nature and should issue in only limited circumstances. *See Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1426–27 (3d Cir.1994).* Moreover, issuance of such relief is at the discretion of the trial judge. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Chamberlain, 145 F.Supp.2d 621,*

*625 (M.D.Pa.2001).* In determining whether to grant a motion seeking preliminary injunctive relief, courts in the Third Circuit consider the following four factors: "(1) likelihood of success on the merits; (2) irreparable harm resulting from a denial of the relief; (3) the harm to the non-moving party if relief is granted; and (4) the public interest." *United States v. Bell, 238 F.Supp.2d 696, 699 (M.D.Pa.2003); see also Bieros v. Nicola, 857 F.Supp. 445, 446 (E.D.Pa.1994)* ("The standards for a temporary restraining order are the same as those for a preliminary injunction."). It is the moving party who bears the burden of satisfying these factors. *Bell, 238 F.Supp.2d at 699.* "Only if the movant produces evidence sufficient to convince the trial judge that all four factors favor preliminary relief should the injunction issue." *Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 192 (3d Cir.1990).*

"[A]n essential prerequisite to the grant of a preliminary injunction is a showing by the movant of irreparable injury *pendente lite* if the relief is not granted." [2] *United States v. Pennsylvania, 533 F.2d 107, 110 (3d Cir.1976).* A preliminary injunction "may not be used simply to eliminate a possibility of a remote future injury." *Holiday Inns of Am., Inc. v. B & B Corp., 409 F.2d 614, 618 (3d Cir.1969).* "[T]he irreparable harm must be actual and imminent, not merely speculative ." *Angstadt ex rel. Angstadt v. Midd–West Sch., 182 F.Supp.2d 435, 437 (M.D.Pa.2002).* "[M]ore than a risk of irreparable harm must be demonstrated. The requisite for injunctive relief has been characterized as a 'clear showing of immediate irreparable injury,' or a 'presently existing actual threat....' " *Continental Grp., Inc. v. Amoco Chems. Corp., 614 F.2d 351, 359 (3d Cir.1980)* (citations omitted). "A preliminary injunction cannot be issued based on past harm. The purpose of a preliminary injunction is to prevent *future* irreparable harm." *Fisher v. Goord, 981 F.Supp. 140, 168 (W.D.N.Y.1997)* (emphasis in original).

[2]      *Pendente lite* is a Latin term meaning "while the action is pending" or "[d]uring the proceeding or litigation." *Black's Law Dictionary* 1154 (7th ed.1999).

**\*3** Moreover, "[t]he 'requisite feared injury or harm must be irreparable—not merely serious or substantial,' and it 'must be of a peculiar nature, so that compensation in money cannot atone for it .' " *ECRI v. McGraw–Hill, Inc., 809 F.2d 223, 226 (3d Cir.1987)* (quoting *Glasco v. Hills, 558 F.2d 179, 181 (3d Cir.1977)).* "In order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the *only* way of

protecting the plaintiff from harm." *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 801 (3d Cir.1989) (emphasis added). "The key word in this consideration is *irreparable* .... The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) (emphasis in original).

Reviewing the complaint, the supporting exhibits, and the motion papers, it is clear that no immediate irreparable injury is alleged. These materials fail to articulate a presently existing actual threat of irreparable injury, outlining nothing more than a speculative *possibility* of future harm, based upon generalized allegations of threats and harassment by correctional officers. Such generalized allegations are insufficient to establish a "clear showing of immediate irreparable injury." *See Continental Grp.,* 614 F.2d at 359; *Hendricks v. Hazzard,* No. 2:11–cv–399, 2013 WL 2635729, at *5 (S.D.Ohio June 12, 2013) (finding that allegations of ongoing general harassment and threats, and allegations of specific threats of physical harm that were never acted upon, were insufficient to demonstrate imminent irreparable harm).

Moreover, notwithstanding Johnson's allegations that he was the victim of continual threats and assaults by corrections officers and inmates of the white supremacist movement, Johnson has not articulated any injuries he may have suffered as a result of the alleged misconduct, thus failing to make a "clear showing of immediate irreparable injury" required to establish irreparable harm. *See Continental Grp.,* 614 F.2d at 359.

### III. *RECOMMENDATION*

Based on the foregoing, it is recommended that the Plaintiff's Motion for an Emergency Preliminary and Permanent Injunction. (Doc. 1) be **DENIED.**

Filed March 25, 2015.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1638612

---

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.